# INDEX OF EXHIBITS TO DECLARATION OF KELLY V. O'DONNELL

| | |
|---|---|
| **Exhibit 1** | Plaintiffs' Second Amended Complaint filed in this action. (Doc. No. 56.) |
| **Exhibit 2** LODGED UNDER SEAL | Experian's technical manual titled "Automated Response Format Specifications." |
| **Exhibit 3** LODGED UNDER SEAL | Experian's technical manual titled "File One Appendix." |
| **Exhibit 4** | Email dated February 9, 2010 from Scott Wight of Experian to Stacey Shifman of Fannie Mae regarding "Technical Manual Access." |
| **Exhibit 5** | Email dated February 9, 2010 from Scott Wight of Experian to Stacey Shifman of Fannie Mae regarding "Technical Manual Access." |
| **Exhibit 6** | Instructions to download Experian's technical documents that were provided via zip file in the February 9, 2010 Experian emails to Stacey Shifman of Fannie Mae |
| **Exhibit 7** LODGED UNDER SEAL | Experian's Systems Requirements Document (SRD), CDI ReWrite 2010, Consumer Experience, Project Request #32871. |
| **Exhibit 8** | Excerpts from the December 8, 2014 deposition of plaintiff Kenneth Coke |
| **Exhibit 9** LODGED UNDER SEAL | Consumer disclosure prepared by Experian for plaintiff Kenneth Coke, dated March 15, 2012 |
| **Exhibit 10** LODGED UNDER SEAL | Letter written by plaintiff Kenneth Coke to Experian, dated June 4, 2013 |
| **Exhibit 11** LODGED UNDER SEAL | Consumer disclosure prepared by Experian for plaintiff Kenneth Coke, dated June 4, 2013 |
| **Exhibit 12** | Excerpts from the February 20, 2015 deposition of plaintiff John T. Shaw |
| **Exhibit 13** LODGED UNDER SEAL | CBC Innovis Infile Credit Report, also known as a merged report or "tri-merge" |

| | |
|---|---|
| **Exhibit 14**<br>LODGED UNDER<br>SEAL | Consumer disclosure prepared by Experian for plaintiff John T. Shaw, dated August 18, 2012 |
| **Exhibit 15**<br>LODGED UNDER<br>SEAL | Copies (one per plaintiff) of Experian's ARF format credit report data for the plaintiffs |
| **Exhibit 16** | Excerpts from the January 16, 2015 deposition of plaintiff Ray Rydman |
| **Exhibit 17**<br>LODGED UNDER<br>SEAL | Fannie Mae "Desktop Underwriter Findings" dated June 27, 2013 for plaintiff Rydman |
| **Exhibit 18**<br>LODGED UNDER<br>SEAL | Consumer disclosure prepared by Experian for plaintiff Rydman, dated June 3, 2013 |
| **Exhibit 19** | Excerpts from the January 25, 2015 deposition of Ken Larsen (testifying as the designated representative on behalf of Banner Bank) |
| **Exhibit 20**<br>LODGED UNDER<br>SEAL | Freddie Mac "Loan Prospector Full Feedback Certificate" for plaintiff Shaw and his wife |
| **Exhibit 21**<br>LODGED UNDER<br>SEAL | Freddie Mac "Loan Prospector Full Feedback Certificate" for plaintiff Shaw and his wife |
| **Exhibit 22** | Excerpts from the February 26, 2015 deposition of Bank of Texas Mortgage, by and through its designated representatives Bill North and Terry Kuski |
| **Exhibit 23**<br>LODGED UNDER<br>SEAL | Fannie Mae "Desktop Underwriting Findings" for plaintiff Rydman |
| **Exhibit 24** | Excerpts from the February 25, 2015 deposition of Valerie Atzinger (testifying as the designated representative on behalf of Commonwealth Bank and Trust) |
| **Exhibit 25**<br>LODGED UNDER<br>SEAL | CBC Innovis Decision Credit Report prepared for Commonwealth Bank & Trust regarding plaintiff Coke |
| **Exhibit 26** | Excerpts from the January 22, 2015 deposition of Joshua Nastal |

| Exhibit 27<br>LODGED UNDER SEAL | Fannie Mae "Desktop Underwriting Findings" for plaintiff Rydman |
|---|---|
| Exhibit 28<br>LODGED UNDER SEAL | Cisco merged credit report prepared for Academy Mortgage Corporation regarding plaintiff Rydman |
| Exhibit 29 | Excerpts from the deposition of Patricia Finneran, on March 5, 2013 (Vol. I) and on May 21, 2015 (Vol. II). |
| Exhibit 30 | "Session M – Reporting Alternatives to Foreclosure" |
| Exhibit 31 | "2014 Credit Reporting Resource Guide" |
| Exhibit 32 | Memorandum issued by the Consumer Financial Protection Bureau titled "Short Sale Credit Reporting and Evaluation" |
| Exhibit 33<br>LODGED UNDER SEAL | "2009 Credit Reporting Resource Guide." |
| Exhibit 34<br>LODGED UNDER SEAL | Excerpts from the April 1, 2015 deposition of John Abruzzi (testifying as the designated representative on behalf of Freddie Mac) |
| Exhibit 35 | Freddie Mac emails |
| Exhibit 36 | Excerpts from the deposition of Stuart Pratt (testifying as the designated representative on behalf of the Consumer Data Industry Association) |
| Exhibit 37 | Excerpts from the 2014 Credit Reporting Resource Guide |
| Exhibit 38 | Memorandum by the Consumer Data Industry Association titled "Mortgage Lending and Identifying Short Sales in Credit Reports" |
| Exhibit 39 | Memorandum issued by the Consumer Financial Protection Bureau titled "Short Sale Credit Reporting and Evaluation" |
| Exhibit 40<br>LODGED UNDER SEAL | Excerpts from the April 1, 2015 deposition of Frank Pasqualone (testifying as the designated representative on behalf of Freddie Mac) |
| Exhibit 41 | Excerpts from the March 17, 2015 deposition of Experian employee Kim Hughes |
| Exhibit 42<br>LODGED UNDER SEAL | Excerpts from the April 2, 2015 deposition of Fannie Mae employee Stacey Shifman |
| Exhibit 43 | Fannie Mae's Desktop Underwriter Credit Report Analysis as of December 30, 2009 |

| Exhibit 44 LODGED UNDER SEAL | Desktop Originator / Desktop Underwriter Version 4.5 Release Notes |
|---|---|
| Exhibit 45 | Fannie Mae's Desktop Underwriter Credit Report Analysis as of September 20, 2010 |
| Exhibit 46 | Email from Randall Price of Fannie Mae to Ken Eiden of Core Logic dated May 31, 2012 |
| Exhibit 47 | Fannie Mae email dated July 15, 2013 |
| Exhibit 48 | Excerpts from Fannie Mae's "Selling Guide" dated October 22, 2013 |
| Exhibit 49 | Excerpts from Fannie Mae's "Selling Guide" dated November 10, 2014 |
| Exhibit 50 LODGED UNDER SEAL | Excerpts from the December 12, 2014 deposition of Fannie Mae employee Cynthia Danko |
| Exhibit 51 | Excerpts from Fannie Mae's "Selling Guide," dated May 28, 2013 |
| Exhibit 52 | Excerpts from Fannie Mae's "Selling Guide, dated October 22, 2013 |
| Exhibit 53 | May 2013 email string involving Fannie Mae and FHFA officials |
| Exhibit 54 LODGED UNDER SEAL | Excerpts from the November 6, 2014 deposition of Fannie Mae employee Stephen Pawlowski |
| Exhibit 55 | February 2013 email string involving Fannie Mae and FHFA officials that was produced by Fannie Mae in this action pursuant to a subpoena for documents. |
| Exhibit 56 LODGED UNDER SEAL | June 5, 2013 email from Randall Price of Fannie Mae to Cyndi Danko of Fannie Mae that was produced by Fannie Mae in this action pursuant to a subpoena for documents. |
| Exhibit 57 | Email from Laura Arce of FHFA to Kristin McGovern of Fannie Mae that was produced by Fannie Mae in this action pursuant to a subpoena for documents. |
| Exhibit 58 | October 16, 2013 Complaint filed by Plaintiffs James McCalmont and Katherine McCalmont, filed in *McCalmont v. Federal National Mortgage Association, et al*, United States District Court in the District of Arizona, Case No. 2:13-cv-02107. |

| **Exhibit 59** | July 21, 2014 Order granting Defendants' Motion to Dismiss, filed in *McCalmont v. Federal National Mortgage Association, et al*, District of Arizona, Case No. 2:13-cv-02107. |
|---|---|
| **Exhibit 60** | "Docket Report" for the case *McCalmont v. Federal National Mortgage Association, et al*, District of Arizona, Case No. 2:13-cv-02107, as shown on the District of Arizona's Electronic Case Filing site (July 17, 2015). |
| **Exhibit 61** | November 5, 2013 Complaint by Plaintiffs Kristin Zabriskie and Richard Zabriskie, filed in *Zabriskie v. Federal National Mortgage Association, et al*, United States District Court in the District of Arizona, Case No. 2:13-cv-02260 SRB. |
| **Exhibit 62** | "Docket Report" for the case *Zabriskie v. Federal National Mortgage Association, et al*, District of Arizona, Case No. 2:13-cv-02260, as shown on the District of Arizona's Electronic Case Filing site (July 17, 2015). |
| **Exhibit 63** | Excerpts from the March 18, 2015 deposition of Experian employee Timothy Lobdell |
| **Exhibit 64** LODGED UNDER SEAL | Fannie Mae's "Credit Agencies System Integration Guide," (11th ed., June 2012) |

NAI-1500446696v1

# EXHIBIT 1

STANLEY LAW GROUP
MATTHEW J. ZEVIN, SBN: 170736
225 Broadway, Suite 1350
San Diego, CA 92101
Telephone:    (619) 235-5306
Facsimile:    (815) 377-8419
e-mail:       mzevin@aol.com

Attorneys for Plaintiffs
[Additional Counsel on Signature Page]

## IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN T. SHAW; KENNETH COKE; and RAYMOND RYDMAN, on behalf of themselves and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>EXPERIAN INFORMATION SOLUTIONS, INC., WELLS FARGO BANK, NA and CITIMORTGAGE, INC.,<br><br>Defendants. | Case No. 13CV1295 JLS BLM<br><br>**CLASS ACTION**<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>JUDGE:   Honorable Janis L. Sammartino<br>CTRM:    4A (Schwartz) |

1      Plaintiffs and proposed class representatives, John T. Shaw ("Shaw"),
2 Kenneth Coke ("Coke") and Raymond Rydman ("Rydman") (Shaw, Coke and
3 Rydman, collectively, "Plaintiffs"), by counsel, on behalf of themselves and others
4 similarly-situated, bring this action against Defendants, Experian Information
5 Solutions, Inc. ("Experian"), Wells Fargo Bank, NA ("Wells Fargo") and
6 CitiMortgage, Inc. ("CitiMortgage") (Wells Fargo and CitiMortgage, collectively,
7 the "Furnishers") to recover damages and to obtain injunctive relief from
8 Defendant's violations of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681, *et. seq.*
9 (the "FCRA").

## INTRODUCTION

11    1.    This action involves claims against the Consumer Reporting Agency
12 and the Furnishers for systematically breaching the FCRA by producing inaccurate,
13 incomplete, and misleading consumer reports for consumers who sold their real
14 estate by short sale.

15    2.    Under § 1681a(f) of the FCRA, Experian is classified as a "*consumer
16 reporting agency*," meaning that it engages in the business of assembling,
17 evaluating, and disbursing credit information on consumers for the purpose of
18 furnishing consumer reports, as defined in § 1681a(d) of the FCRA, to third parties.
19 The FCRA governs the conduct of consumer reporting agencies in an effort to
20 preserve the integrity of the consumer banking system and to protect the rights of
21 consumers to fairness and accuracy in the reporting of their credit information.

22    3.    The purpose of the FCRA is to require consumer reporting agencies to
23 "adopt reasonable procedures for meeting the needs of commerce for consumer
24 credit, personnel, insurance, and other information in a manner which is fair and
25 equitable to the consumer, with regard to the confidentiality, accuracy, relevancy,
26 and proper utilization of such information. . . ." 15 U.S.C. § 1681(b). The FCRA
27 further requires that when preparing consumer reports a consumer reporting agency
28 must follow "reasonable procedures to assure maximum possible accuracy of the

1

information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

4. As set forth in detail below, the procedures developed and systematically employed by Experian to report credit information about accounts in which consumers engaged in short sales are inaccurate, incomplete, and misleading, and violate the requirements of the FCRA. Among other things, the way in which the Furnishers code these accounts (coding which Experian wrongfully allows) leads subscribers (i.e., the users of consumer reports) to believe these consumers have lost their properties through the foreclosure process and/or that the consumer had a currently delinquent account. Exacerbating these inaccuracies, is Experian's failure and/or refusal to provide consumers with all the data in their credit files as specifically required by the FCRA and, in many cases, providing more data to its subscribers than it does to the consumer; all of which makes these errors difficult to discover.

5. This action is brought as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of the following four classes:

**Class No. 1**: All consumers domiciled or residing in the United States for whom Experian has furnished a consumer report within two years of the filing of the initial Complaint in this action and after which reported the results of a short sale by which the consumer's lender released its lien on the real estate and accepted less than the amount owed on the debt in such a way that a consumer report for that consumer would indicate or suggest that a consumer lost the real estate through foreclosure and/or that the consumer had a currently delinquent account.

**Class No. 2**: All consumers domiciled or residing in the United States from whom Experian received a request for reinvestigation related to the reporting of the consumers' short sales by which the consumer's lender released its lien on the real estate and accepted less than the amount owed on the debt and for whom Experian was inaccurately reporting those short sales.

2

13CV1295 JLS BLM

**Class No. 3**: All consumers domiciled or residing in the United States from whom Experian received a request for the consumers' files but for whom Experian did not disclose all information contained in those files.

**Class No. 4**: All consumers domiciled or residing in the United States who disputed the accuracy of their short sale related accounts with Furnishers through Experian or any other consumer reporting agency and for whom the Furnishers have inaccurately, incompletely or misleadingly reported to any consumer reporting agency the results of a short sale by which the Furnishers released their liens on the real estate and accepted less than the amount owed on the debt, including, but not limited to, by reporting the mortgage or mortgage related account in such a way that it would appear to the subscriber or user of a consumer report that the consumer lost the real estate through foreclosure, that the consumer had filed bankruptcy and/or that the consumer had a currently delinquent account.

## **PARTIES**

6.      Shaw is a natural person who, at the time of filing of the initial Complaint in this matter, resided in Alpine, California. Shaw is a "*consumer*" as defined by 15 U.S.C. § 1681a(c).

7.      Coke is a natural person who resides in Louisville, Kentucky. Coke is a "*consumer*" as defined by 15 U.S.C. § 1681a(c).

8.      Rydman is a natural person who resides in Peoria, Arizona.  Rydman is a "*consumer*" as defined by 15 U.S.C. § 1681a(c).

9.      Experian is a "*consumer reporting agency*" as defined by 15 U.S.C. § 1681a(f) of the FCRA, and regularly engaged in the business of assembling, evaluating, and dispersing information concerning consumers for the purpose of furnishing consumer reports, as defined in § 1681a(d) of the FCRA, to third parties.

10.      Experian regularly engages in the business of assembling, evaluating, and dispersing information concerning the credit histories of consumers for the purpose of furnishing consumer reports, as defined by § 1681a(d) of the FCRA, to third parties.  Experian provides such consumer credit reports to third party subscribers for monetary compensation.

3

11.　　Wells Fargo is a "furnisher" of credit information as that term is defined by the FCRA.

12.　　CitiMortgage is a "furnisher" of credit information as that term is defined by the FCRA.

## JURISDICTION AND VENUE

13.　　Jurisdiction of this Court arises under 28 U.S.C. § 1331 since this case involves federal questions under 15 U.S.C. §§ 1681, *et seq.*, and 1332 since this case involves diverse citizens and the amount in controversy exceeds the statutory amount.

14.　　Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

## FACTUAL ALLEGATIONS

### Metro 2 and Relevant Data Reporting Procedures

15.　　Experian regularly receives consumer credit information from various sources around the country including banks, credit unions, automobile dealers, student loan providers, public information vendors and others (these sources are known as "*furnishers*" within the credit reporting industry and under the FCRA).

16.　　Experian collects consumer credit information from tens of thousands of furnishers.

17.　　Experian processes consumer credit information electronically and, through a complex set of logic programs.

18.　　Experian's database matches the credit information it receives with a particular consumer's credit file.

19.　　The credit file is then updated electronically by the furnishers to reflect new information regarding the reported accounts (referred to as "*tradelines*" within the industry).

20.　　The consumer reporting agencies, including Experian, and the various furnishers, including the Furnishers, have a duty to maintain up-to-date information.

4

21. As such, the Furnishers are required to periodically update the records they report to the consumer reporting agencies.

22. In order for these periodic updates to have their intended result, the consumer reporting agencies must maintain their information in such a way as to allow the information to change with each new report.

23. The process by which Experian and the other consumer reporting agencies receive, sort, and store information is largely electronic.

24. The Furnishers report consumer credit information to Experian and the other consumer reporting agencies through the use of coded tapes that are transmitted to the agencies on a monthly basis.

25. The transmission of information using coded tapes is accomplished through standardized formatting known as "*Metro 2*."

26. Metro 2 was developed in 1997 by the Consumer Data Industry Association (the "*CDIA*") to replace the Metro format which was developed in the late 1970's.

27. Since then, Metro 2 has become the industry standard for reporting consumer credit information.

28. Experian applies robust tests to sample data sets received from the Furnishers and works with the Furnishers to conform data reporting to the Metro 2 data standard.

29. After approving the Furnishers, Experian continues ongoing monitoring of the data reporting stream received by the Furnishers.

30. Experian produces reports for data the Furnishers provide which outline any data reporting problems, including errors in loading data and data which is not loaded.

31. Experian cross-references the Furnishers' data in certain fields to look for logical inconsistencies.  This process is used as a data quality check.

5

32.     Experian reviews and analyzes historical data reporting trends about the Furnishers, at the database level or data furnisher level which reviews are used as baseline metrics upon which to evaluate the Furnishers' incoming data.

33.     Experian performs manual reviews of data it receives from the Furnishers when anomalous data reporting trends are identified.

34.     Experian reviews incoming data from the Furnishers for consistency with the Metro 2 data standard.

35.     Standardizing how data is reported is a key strategy for improving data quality.

36.     The Metro 2 software allows furnishers to report information in various "fields."

37.     A "*field*" is a space allocated for a particular type of information.

38.     Each of those fields is given a name and each field has a certain value associated with it.

39.     In addition to providing the basic reporting format, Metro 2 provides standard codes for reporting certain types of information.

40.     Metro 2 is published by the CDIA for use by Experian and the other consumer reporting agencies and furnishers, including Wells Fargo and Citimortgage.

41.     Defendants are members of the CDIA.

42.     The "Credit Reporting Resource Guide" (the "*Guide*") published by the CDIA is a comprehensive overview of the Metro 2 format.

43.     According to the CDIA, the Guide "provides the codes that are compliant with all requirements of the Fair Credit Billing Act (FCBA), the Fair Credit Reporting Act (FCRA), the Equal Credit Opportunity Act (ECOA) and all applicable state laws and enables the reporting of accurate, complete and timely credit information."

44.    In addition to the Metro 2 formatting itself, the Guide also contains certain recommended credit reporting procedures for certain types of consumer credit reporting.

45.    The Guide contains procedures for the recommended method of reporting short sales.

46.    A short sale is the sale of real estate in which the proceeds from the sale fall short of the balance owed on the loan, which is secured by the property sold.  In a short sale, the lender agrees to discount the loan balance typically due to an economic or financial hardship on the part of the consumer.

47.    There are two options for reporting based on the result of the short sale.

48.    If the real estate is sold for less than the full balance owed and the deficiency balance is forgiven, a furnisher and the consumer reporting agencies are required to report the following "Base Segment" fields to the consumer reporting agencies as specified: (a) Account Status Code = 13 (Paid or closed account/zero balance); (b) Payment Rating = applicable code that identifies whether the account is current or past due within the activity period being reported; (c) Special Comment = AU (Account paid in full for less than the full balance); and (d) Current Balance and Amount Past Due = zero.

49.    If the real estate is sold for less than the full balance owed and the deficiency balance is not forgiven (i.e., the consumer is obligated to pay the deficiency balance), the furnishers and the consumer reporting agencies are required to report the following Base Segment fields as specified: (a) Portfolio Type & Account Type = remain the same as previously reported; (b) Date Opened = the date the account was originally opened; (c) Original Loan Amount = the original amount of the loan; (d) Terms Duration = terms of the loan, which can be changed if the terms of the loan are extended; (e) Scheduled Monthly Payment Amount = new scheduled payment due; (f) Account Status Code = the applicable code that

7

specifies how the consumer is paying the deficiency balance, such as current or delinquent; (g) Special Comment = CM (Collateral released by creditor/balance owing); (h) Definition of CM = To be used for Mortgages, Home Equity or other secured accounts when the collateral is released, but the consumer still has an outstanding balance to repay.  Includes short sales when the consumer is obligated to pay the deficiency balance; (i) Current Balance = deficiency balance owed, which may decline as payments are made; (j) Amount Past Due = outstanding past due amount, if the account is delinquent.

50.    If the consumer eventually pays the deficiency balance in full, furnishers and the consumer reporting agencies are required to: (a) report the applicable "paid" Account Status Code, as well as the Payment Rating; (b) discontinue reporting Special Comment CM; and (c) report the Current Balance and Amount Past Due as zero.

51.    These Base Segment fields in turn have their own reporting rules and coding requirements.

52.    Experian and the Furnishers maintain that these procedures for reporting the result of a short sale are reasonable.

53.    The Furnishers did not report and Experian did not maintain these short sale results and the accounts related thereto as required by the Guide, Metro 2 formatting and their own dedicated policies and procedures for the proper reporting of the results of a short sale.

54.    As such the Furnishers' reporting and Experian's maintaining of these accounts was inaccurate and unreasonable.

**Plaintiffs**

55.    Plaintiffs have never lost any real estate through the foreclosure process.

56.    Plaintiffs have never filed bankruptcy.

8

57. Plaintiffs owned real estate on which the Furnishers provided loans and held mortgages.

58. Plaintiffs sold said real estate in private sales through a short sale process which was approved by the Furnishers and for which the Furnishers released their liens on the real estate and accepted less than the amount owed on the debt thereby forgiving Plaintiffs for any unpaid balance on their respective loans.

59. Plaintiff Shaw obtained a mortgage in October 2004 through Defendant Wells Fargo to finance the real estate located at 212 Tenwood Court in Durham, North Carolina, Zip Code 27712. Wells Fargo identified the account number for this mortgage as XXXXXXXXX1080. Shaw obtained another mortgage through Defendant CitiMortgage for said real estate in March 2008. CitiMortgage identified the account number for this mortgage as XXXXXX8137. On March 26, 2010, Shaw sold said real estate through a short sale process that was approved by both Wells Fargo and CitiMortgage, and for which Wells Fargo and CitiMortgage released their respective liens on the real estate and accepted less than the amounts owed on the debts, thereby forgiving Shaw for any unpaid balance on his loans.

60. Plaintiff Coke obtained a mortgage on September 21, 2005 through Defendant Wells Fargo to finance the real estate located at 20 Ryland Park Drive #314 in San Jose, California, Zip Code 95110. Wells Fargo identified the account number for this mortgage as XXXXXXXXX6335. On April 15, 2011, Coke sold said real estate through a short sale process that was approved by Wells Fargo and for which Wells Fargo released its lien on the real estate and accepted less than the amount owned on the debt, thereby forgiving Coke for any unpaid balance on his loan.

61. Plaintiff Rydman obtained two mortgages on November 29, 2006 through Defendant Wells Fargo to finance the real estate located at 1504 Sand Dune Way, San Marcos, California 92078. Wells Fargo identified the account numbers

9

for this mortgage as XXXXXXXXXXXX0001 and XXXXXXXXX1533. On June 27, 2011, Rydman sold said real estate through a short sale process that was approved by Wells Fargo and for which Wells Fargo released its liens on the real estate and accepted less than the amounts owned on the debts, thereby forgiving Rydman for any unpaid balance on his loans.

62. Experian maintains at least one credit file for each of the Plaintiffs.

63. At all times relevant, included in at least one credit file which Experian maintains for each of the Plaintiffs, was the reporting of a mortgage or mortgage related account which resulted in a short sale and which was reported to Experian by the Furnishers.

64. The Furnishers furnished information relating to a mortgage or mortgage related account about Plaintiffs which resulted in a short sale to Experian and to the other national consumer reporting agencies, Trans Union and Equifax.

65. Experian does not maintain any credit file for Plaintiffs which contains a public record of any foreclosure proceeding related to any real estate ever owned by Plaintiffs.

66. Experian does not maintain any credit file for Plaintiffs which contains a public record of any bankruptcy proceeding related to Plaintiffs or to any real estate ever owned by Plaintiffs.

67. Upon information and belief, the Furnishers knowingly and willfully incorrectly coded the results of Plaintiffs' short sales when they reported the account or accounts in question to the consumer reporting agencies.

68. Upon information and belief, Experian permitted the Furnishers to incorrectly code the results of Plaintiffs' short sale.

69. Experian does not maintain any policies or procedures which would prevent the Furnishers from inaccurately, incompletely or misleadingly reporting the results of a short sale.

70.     Experian created consumer reports about Plaintiffs in which it reported this inaccurate and misleading information.

71.     Said consumer reports contained inaccuracies related to these accounts provided by the Furnishers; which inaccuracies caused denials of credit, emotional distress, and other related damages.

72.     Plaintiffs disputed and requested the reinvestigation of, among other items, the accuracy of the consumer reporting agencies' reporting of their accounts which were being reported by the Furnishers (collectively, Plaintiffs' "*Requests for Reinvestigation*").

73.     The consumer reporting agencies received Plaintiffs' Requests for Reinvestigation.

74.     After receiving Plaintiffs' Requests for Reinvestigation, the consumer reporting agencies, initiated reinvestigations with the Furnishers.

75.     After receiving Plaintiff's Requests for Reinvestigation, Experian failed to conduct a reasonable reinvestigation regarding Plaintiffs' disputes of the accuracy of the inaccurate reporting by Experian and the accuracy of the inaccurate reporting by the Furnishers of Plaintiffs' short sales.

76.     Experian did not remove or modify its reporting of the inaccurate information before issuing consumer reports containing this inaccurate information.

77.     In responding to Plaintiffs' Requests for Reinvestigation, Experian provided Plaintiffs with consumer reports.

78.     The consumer reports provided by Experian in response to Plaintiffs' Requests for Reinvestigation included a reporting of the inaccurate information.

79.     In processing Plaintiffs' Requests for Reinvestigation, Experian communicated Plaintiffs' disputes to the Furnishers.

80.     In processing Plaintiffs' Requests for Reinvestigation, Experian failed or refused to examine and review its own records of the coding of Plaintiffs' accounts which resulted in short sales by which the Furnishers released their liens

11

on the real estate and accepted less than the amount owed on the debt to ensure that the coding reported by the Furnishers complied with its own policies and procedures regarding the reporting of the results of the short sales.

81.    Plaintiffs requested that Experian provide them with their credit files in accordance with § 1681g of the FCRA.

82.    The files disclosed by Experian in response to Plaintiffs' request for their credit files did not include all information contained within Experian's complete files.

## CLASS ACTION ALLEGATIONS

83.    Plaintiffs bring this case pursuant to Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure on their own behalves and on behalf of the proposed Classes, defined as:

> **Class No. 1**: All consumers domiciled or residing in the United States for whom Experian has furnished a consumer report within two years of the filing of the initial  Complaint in this action and after which reported the results of a short sale by which the consumer's lender released its lien on the real estate and accepted less than the amount owed on the debt in such a way that a consumer report for that consumer would indicate or suggest that a consumer lost the real estate through foreclosure and/or that the consumer had a currently delinquent account.

> **Class No. 2**: All consumers domiciled or residing in the United States from whom Experian received a request for reinvestigation related to the reporting of the consumers' short sales by which the consumer's lender released its lien on the real estate and accepted less than the amount owed on the debt and for whom Experian was inaccurately reporting those short sales.

> **Class No. 3**: All consumers domiciled or residing in the United States from whom Experian received a request for the consumers' files but for whom the Experian did not disclose all information contained in those files.

> **Class No. 4**:  All consumers domiciled or residing in the United States who disputed the accuracy of their short sale related accounts with Furnishers through Experian or any other  consumer reporting agency

and for whom the Furnishers have inaccurately, incompletely or misleadingly reported to any consumer reporting agency the results of a short sale by which the Furnishers released their liens on the real estate and accepted less than the amount owed on the debt, including, but not limited to, by reporting the mortgage or mortgage related account in such a way that it would appear to the subscriber or user of a consumer report that the consumer lost the real estate through foreclosure, that the consumer had filed bankruptcy and/or that the consumer had a currently delinquent account.

84.   Each of the classes is comprised of thousands of consumers.

85.   Although the exact number and identities of class members is presently unknown, the number and identities of class members can be readily determined through the consumer reporting agencies' records.

86.   The disposition of the numerous claims of these class members in a single class action will provide substantial benefits to all parties and to the Court.

87.   Experian and the Furnishers have acted or refused to act on grounds that apply generally to the classes, so that final injunctive relief is appropriate for the classes as a whole.

88.   There is a well-defined community of interest in the questions of law and fact involved affecting the class members.   The questions of law and fact common to the classes predominate over questions affecting only individual class members, and include without limitation the following:

a.   Whether Experian violated the FCRA by furnishing consumer reports within two years of the filing of the initial Complaint in this action and after which inaccurately, incompletely or misleadingly reported the results of a short sale, including, but not limited to, by reporting the mortgage or mortgage related account in such a way that it would appear to a subscriber of the consumer report that the consumer lost the real estate through foreclosure, that the consumer filed bankruptcy and/or that the consumer had a currently delinquent account.

b.      Whether Experian violated § 1681e(b) of the FCRA by furnishing consumer reports within two years of the filing of the initial Complaint in this action and after which inaccurately, incompletely or misleadingly reported the results of a short sale, including, but not limited to, by reporting the mortgage or mortgage related account in such a way that it would appear to a subscriber of the consumer report that the consumer lost the real estate through foreclosure, that the consumer filed bankruptcy and/or that the consumer had a currently delinquent account.

c.      Whether Experian violated Section 1681g by failing to disclose to any consumer the entire contents of any and all files maintained by Experian for those consumers after receiving a § 1681g request from the consumers for those files.

d.      Whether Experian violated § 1681i of the FCRA by failing to correct its inaccurate reporting of these consumer short sales in response to disputes from consumers regarding the accuracy of this reporting.

e.      Whether Experian violated § 1681i of the FCRA by failing to provide all the relevant information received by a consumer requesting a reinvestigation to the furnisher of the information disputed by the consumer.

f.      Whether the Furnishers violated the FCRA by knowingly and willfully reporting the results of a consumer short sale inaccurately, incompletely or misleadingly to the consumer reporting agencies.

89.    Plaintiffs' claims are typical of the claims of the classes.

90.    Plaintiffs and class members have similarly suffered harm arising from the Experian's and the Furnishers' violations of the FCRA.

91.    Plaintiffs' and class members' claims flow, in each instance, from a common nucleus of operative facts – Experian's and the Furnishers' violations of the FCRA.

14

92. Plaintiffs are members of each of the classes and have standing to serve as class representatives for each.

93. Plaintiffs are adequate representatives of the classes because their interests do not conflict with and are not antagonistic to the interests of the class members they seek to represent.

94. Plaintiffs will fairly and adequately represent and protect the interests of the classes.

95. Plaintiffs have retained counsel who are competent and experienced in the prosecution of class litigation and who are experienced in claims under the FCRA.

96. Plaintiffs and class members have all suffered and will continue to suffer substantial harm and damages due to the Agencies' and the Furnishers' conduct, including loss of credit, emotional distress and other related damages.

97. A class action is superior to other methods for the fair and efficient adjudication of the subject controversy.

98. Absent a class action, most class members likely will find the cost of litigating their individual claims to be prohibitive, and will have no effective remedy at all.

99. Because of the relatively small size of the individual class members' claims, few class members likely could afford to seek legal redress on their own.

100. Absent a class action, class members will continue to sustain damages, and Experian's and the Furnishers' violations will proceed without remedy.

101. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants and promotes consistency and efficiency of adjudication.

15

102. Additionally, Experian and the Furnishers have acted, and failed to act, on grounds generally applicable to Plaintiffs and the classes, requiring court imposition of uniform relief to insure compatible standards of conduct toward Plaintiffs and the classes.

## CAUSES OF ACTION

## COUNT I

### Violation of 15 U.S.C. § 1681e on behalf of Plaintiffs and Class No. 1

103. Experian prepared, compiled, issued, assembled and communicated consumer reports about Plaintiffs and the classes containing inaccurate, erroneous, unfair, inequitable, incomplete and misleading credit information related to Plaintiffs' and the classes' short sales, including, but not limited to, Experian's reporting of Plaintiffs' and the classes' short sales.

104. Experian's inaccurate reporting of Plaintiffs' and the classes' short sales were caused by Experian's failure to follow reasonable procedures to assure maximum possible accuracy of the information concerning Plaintiffs' and the classes' short sales.

105. Plaintiffs and the classes have been and continue to be damaged as a result of the Experian's violations of § 1681e(b) of the FCRA.

106. The credit worthiness of a consumer who performed a short sale by which the consumer's lender released its lien on the real estate and accepted less than the amount owed on the debt is superior to that of a consumer who lost the real estate through foreclosure and/or that of the consumer who had a currently delinquent account.

107. Experian's violations of § 1681e(b) of the FCRA are the proximate cause of Plaintiffs' and the classes' damages.

108. Experian's conduct, actions and inaction were willful, rendering it liable for statutory and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

109. WHEREFORE, Plaintiffs, on behalf of themselves and for all others similarly situated, demand judgment against Experian for actual, statutory and punitive damages in an amount to be determined at trial, injunctive relief, reasonable attorneys' fees and costs, and all other just and proper relief.

## COUNT II

### Violation of 15 U.S.C. § 1681i on Behalf of Plaintiffs and Class No. 2

110. Experian prepared, compiled, issued, assembled and communicated consumer reports about Plaintiffs and the classes containing inaccurate, erroneous, unfair, inequitable, incomplete and misleading credit information related to Plaintiffs' and the classes' short sales.

111. Plaintiffs and the members of Class No. 2 disputed the completeness and accuracy of the Experian's reporting of Plaintiffs' and Class No. 2's short sales by notifying Experian directly of their disputes.

112. Experian failed to conduct a reasonable reinvestigation of Plaintiffs' and Class No. 2's disputes to determine whether the disputed information was inaccurate in violation of § 1681i(a)(1)(A).

113. Experian failed to provide all the relevant information provided by Plaintiffs and the members of Class 2 to the Furnishers of the disputed information.

114. Plaintiffs and the members of Class No. 2 have been and continue to be damaged as a result of Experian's violations of § 1681i of the FCRA.

115. Experian's violations of § 1681i of the FCRA are the proximate cause of Plaintiffs' and Class No. 2's damages.

116. Experian's conduct, actions and inaction were willful, rendering it liable for statutory and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. 1681n.

117. WHEREFORE, Plaintiffs, on behalf of themselves and for all others similarly situated, demand judgment against Experian for actual, statutory and punitive damages in an amount to be determined at trial, injunctive relief,

17

1    reasonable attorneys' fees and costs, and all other just and proper relief.

2                                   **COUNT III**

3        **Violation of 15 U.S.C. § 1681g on behalf of Plaintiffs and Class No. 3**

4        118.   Experian received requests from Plaintiffs and from the members of

5    Class No. 3 for their consumer credit files.

6        119.   The FCRA requires that every consumer reporting agency, upon the

7    request of the consumer, clearly and accurately disclose to the consumer "[a]ll

8    information in the consumer's file at the time of the request.

9        120.   In response to those requests, Experian failed to disclose all

10   information contained in those files in violation of § 1681g of the FCRA.

11       121.   Experian knows that when consumers request their credit files,

12   Experian does not disclose all the information contained in those files to the

13   consumers making the requests.

14       122.   Plaintiffs and the members of Class No. 3 have been and continue to

15   be damaged as a result of Experian's violations of § 1681g of the FCRA.

16       123.   Experian's violations of § 1681g of the FCRA are the proximate cause

17   of Plaintiff's and Class No. 3's damages.

18       124.   Experian's conduct, actions and inaction were willful, rendering it

19   liable for statutory and punitive damages in an amount to be determined by the

20   Court pursuant to 15 U.S.C. § 1681n.

21       125.   WHEREFORE, Plaintiffs, on behalf of themselves and for all others

22   similarly situated, demands judgment against Experian for actual, statutory and

23   punitive damages in an amount to be determined at trial and injunctive relief,

24   together with reasonable attorneys' fees and costs, and all other just and proper

25   relief.

26                                   **COUNT IV**

27       **Violation of 15 U.S.C. § 1681s-2 on behalf of Plaintiffs and Class No. 4**

28       126.   This is a claim for violations of the federal Fair Credit Reporting Act.

                                        18

127.   The Furnishers furnish credit information to national consumer reporting agencies, Experian, Trans Union and Equifax, as those terms are defined by the FCRA.

128.   The Furnishers are subject to the requirements of the FCRA, including those duties set out in 15 U.S.C. § 1681s-2(b).

129.   At all relevant times, the Furnishers provided inaccurate, misleading, incomplete, derogatory and false credit information to the consumer reporting agencies about the short sale results pertaining to Plaintiffs and the members of Class No. 4.

130.   The inaccurate information reported by the Furnishers about Plaintiffs was reported in consumer reports prepared about Plaintiffs' credit history.

131.   The mortgage loans in question, including specific information about those loans, such as the account numbers, dates of short sales, etc., can be identified by the Furnishers by reference to Plaintiffs' names.

132.   The inaccurate information reported by the Furnishers is inaccurate not simply because those accounts were not reported in accordance with the Metro 2 but also because the reporting shows Plaintiffs lost their real estate through bankruptcy or foreclosure instead of through short sale which is untrue.

133.   This inaccurate, misleading, incomplete, derogatory and false information was reported by the consumer reporting agencies to Plaintiffs' and Class No. 4's potential lenders and others in a position of evaluating their creditworthiness, credit standing, credit capacity, character and general reputation.

134.   One way in which the Furnishers created the inaccuracies at issue is by reporting the code of "9" in the payment history field to the consumer reporting agencies; which code the Furnishers know is interpreted to mean that a consumer has filed bankruptcy or gone through foreclosure.

135.   The nation's major sources of mortgage financing – Fannie Mae, Freddie Mac and the Federal Housing Administration – all recognize the differences

19

between short sales and foreclosures in their underwriting policies regarding new mortgages.

136.   Generally speaking, these mortgage underwriters will not approve a new mortgage application by borrowers with a foreclosure on their credit file for up to seven years, but will consider lending to consumers who were involved in short sales in as little as two years.

137.   The Furnishers have reported Plaintiffs' short sales as if they were foreclosures. This inaccurate reporting has, among other things, prevented Plaintiffs from obtaining new mortgages.

138.   Plaintiffs and the members of Class No. 4 have notified Experian and the other consumer reporting agencies who in turn have notified the Furnishers, of their disputes of the false information being reported by the Furnishers related to these short sales.

139.   Upon information and belief, a form of the disputes and Requests for Reinvestigation made by Plaintiffs and Class No. 4 were forwarded to the Furnishers by Experian and/or the other consumer reporting agencies.

140.   Information was available to the Furnishers that should have, upon a reasonable reinvestigation, informed the Furnishers that their reporting of these short sales was inaccurate.

141.   At the time the Furnishers reported the accounts in question to the consumer reporting agencies, they knew Plaintiffs had not filed bankruptcy, that the real estate in question was not lost through foreclosure and that these consumers did not have currently delinquent accounts.

142.   The Furnishers could have examined but failed to examine the Guide, Metro 2 formatting or their own policies and procedures for the proper reporting of the results of Plaintiffs' short sales by which the Furnishers released their liens on the real estate and accepted less than the amount owed on the debts to determine that their reporting of these short sales was inaccurate.

143. The Furnishers reported the short sales as if Plaintiffs lost their real estate through foreclosure knowing that the real estate was transferred through short sales which the Furnishers approved.

144. Despite their knowledge that the information being reported on Plaintiffs' and Class No. 4's credit files was inaccurate, the Furnishers verified to Experian that the false and derogatory information was accurate, knowing that by doing so the creditworthiness of these consumers would be damaged.

145. The Furnishers knowing and willfully failed to report the results of these short sales to the consumer reporting agencies as required by the Guide, Metro 2 formatting, and by their own policies and procedures for the proper reporting of such information and the FCRA.

146. The furnishers have taken actions which violate the FCRA, specifically 15 U.S.C. § 1681s-2(b). These actions include, but are not limited to, the following: (a) failing to fully, properly or reasonably investigate the disputes received from these consumers of the reporting of the false and derogatory information; (b) failing to review all relevant information regarding the disputes received from these consumers and/or by disregarding that information after review; (c) after receiving notice of Plaintiffs' disputees, continuing to submit false and derogatory information to the consumer reporting agencies regarding the results of these short sales; (d) failing to modify, delete or permanently block the reporting of credit information regarding Plaintiffs and the members of Class No. 4 which the Furnishers knew to be false, incomplete, misleading and/or not verifiable; (e) failing to accurately respond to the disputes made by these consumers through the consumer reporting agencies after receipt of those disputes; (f) failing to report the results of these short sales in accordance with the Guide, Metro 2 formatting, their own policies and procedures for the proper reporting of such information and the FCRA; and (g) failing to report the mortgage accounts in question as short sales instead of bankruptcies or foreclosures.

21

147. The Furnishers knew that information provided to the consumer reporting agencies regarding these short sale results was false, incomplete, misleading and/or could not verified, in that the Furnishers knew they were reporting these loans as if Plaintiffs had either filed bankruptcy or gone through foreclosure instead of reporting the loans as resulting in short sales.

148. As a proximate result of this conduct, Plaintiffs and the members of Class No. 4 have suffered actual damages, including but not limited to loss of credit, emotional distress and other related damages.

149. The Furnishers' acts and/or omissions made in violation of the FCRA were willful, entitling Plaintiffs and Class No. 4 to recover the remedies provided in 15 U.S.C. § 1681n.

150. WHEREFORE, Plaintiffs, on behalf of themselves and for all others similarly situated, demand judgment against Wells Fargo and CitiMortgage for actual, statutory and punitive damages in an amount to be determined at trial, injunctive relief, reasonable attorneys' fees and costs, and all other just and proper relief.

## **DEMAND FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, respectfully requests that this Court award relief as follows:

A.    certifying this matter as a class action with Plaintiffs as class representatives and their counsel as class counsel;

B.    entry of a judgment in favor of Plaintiffs, including an award of all available actual, common-law and statutory damages, punitive damages, pre- and post-judgment interest,

C.    injunctive relief;

D.    attorneys' fees and costs; and

E.    all other just and proper relief.

# DEMAND FOR JURY TRIAL

Plaintiffs respectfully demand a jury trial on all of their claims.

DATED: May 20, 2014        STANLEY LAW GROUP


_/s/ Matthew J. Zevin_
MATTHEW J. ZEVIN

225 Broadway, Suite 1350
San Diego, CA  92101
Telephone:  (619) 235-5306
Facsimile:   (815) 377-8419
e-mail:      mzevin@aol.com

DMJ LAW PC
DEYAR JAMIL, Illinois SBN: 6257093
(admitted _pro hac vice_)
4050 N. Lincoln Avenue
Chicago, IL  60618
Telephone:  (773) 450-6111
e-mail:      deyar.jamil.law@gmail.com

CENTO LAW, LLC
G. JOHN CENTO, Indiana SBN: 21571-49
(admitted _pro hac vice_)
The Emelie Building
334 North Senate Avenue
Indianapolis, IN  46204
Telephone:  (317) 908-0678
e-mail:      cento@centolaw.com

PAVLACK LAW LLC
ERIC S. PAVLACK, Indiana SBN: 21773-49
(admitted _pro hac vice_)
6507 Ferguson Street, Suite 201
Indianapolis, IN  46220
Telephone:  (317) 251-1100
Facsimile:   (317) 252-0352
e-mail:      Eric@PavlackLawFirm.com

Attorneys for Plaintiffs

23

## PROOF OF SERVICE

*John T. Shaw v. Experian Information Solutions, Inc., et al.*
CASE NO: 13CV1295JLS(BLM)

I, the undersigned, declare under penalty of perjury that I am over the age of eighteen years and not a party to this action. I am employed in the County of San Diego, State of California. My business address is: 225 Broadway, Suite 1350, San Diego, CA 92101.

That on May 20, 2014, I served the following document(s) entitled: **SECOND AMENDED CLASS ACTION COMPLAINT** on ALL INTERESTED PARTIES in this action:

### SEE ATTACHED SERVICE LIST

☐ **BY MAIL:** By placing a true copy thereof in a sealed envelope addressed as above, and placing it for collection and mailing following ordinary business practices. I am readily familiar with the firm's practice of collection and processing correspondence, pleadings, and other matters for mailing with the United States Postal Service. The correspondence, pleadings and other matters are deposited with the United States Postal Service with postage thereon fully prepaid in San Diego, California, on the same day in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if the postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☐ **BY OVERNIGHT COURIER**: I caused the above-referenced document(s) to be contained in an overnight envelope and to be deposited in a **Federal Express/Overnite Express** box located at 225 Broadway, San Diego, California, for delivery to the above address(es).

☒ **BY CM/ECF Electronic Service:** I caused such document to be served via the Court's (NEF) electronic filing system on all registered parties.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 20, 2014, at San Diego, California.

_/s/ Matthew J. Zevin_____
MATTHEW J. ZEVIN

13CV1295 JLS BLM

# EXHIBIT 2

# LODGED UNDER SEAL

# EXHIBIT 3

# LODGED UNDER SEAL

# EXHIBIT 4

## Lobdell, Tim

| | |
|---|---|
| **From:** | Wight, Scott |
| **Sent:** | Tuesday, February 09, 2010 11:20 AM |
| **To:** | stacey_shifman@fanniemae.com |
| **Cc:** | Lobdell, Tim |
| **Subject:** | Tehnical Manual Access |
| **Attachments:** | TM.zip |

Password to be sent.

---------------

Scott Wight
Senior Client Technical Services Representative
Client Services Delivery

 Experian

Office 630-620-6508
Cell 518-810-5370

MCSE CCNA



1

EXP_001133

# EXHIBIT 5

**Lobdell, Tim**

| | |
|---|---|
| **From:** | Wight, Scott |
| **Sent:** | Tuesday, February 09, 2010 11:24 AM |
| **To:** | 'stacey_shifman@fanniemae.com' |
| **Cc:** | Lobdell, Tim |
| **Subject:** | RE: Tehnical Manual Access |

Password=Scott123

---

**From:** Wight, Scott
**Sent:** Tuesday, February 09, 2010 10:20 AM
**To:** stacey_shifman@fanniemae.com
**Cc:** Lobdell, Tim
**Subject:** Tehnical Manual Access

Password to be sent.

----------------

Scott Wight
Senior Client Technical Services Representative
Client Services Delivery

 Experian™

Office 630-620-6508
Cell 518-810-5370

MCSE CCNA

EXP_001134

# EXHIBIT 6

We no long send out hard copy technical manuals. Please follow the instruction below to download a copy.

**How to download the our Technical Documents:**

Follow these instructions to download our Technical PDF's.
1.   Using your Web browser, go to https://stm.experian.com.
1.   On the "Welcome to Experian SecureTransport" login screen, enter the following and click "Log In":

        Name:  
        Password: ███████

3.   Select "from_xpn"
3.   Select "!Lastest Technical Manual"
4.   From here you can select the Technical Manual PDF.zip file.

Note: The password for the ██████ user id is changed every 90 days. If your logon attempt fails, please do not continue trying to logon, as this could lock access for all users. Please contact your assigned TSSR for help.

Note that only one person can logon at a time, so download the data files you need and then log off as soon as possible. You can log on as often as needed.

# EXHIBIT 7

# LODGED UNDER SEAL

# EXHIBIT 8

```
 1              UNITED STATES DISTRICT COURT

 2             SOUTHERN DISTRICT OF CALIFORNIA

 3             CASE NO. 13-CV-1295 JLS (BLM)

 4

 5     JOHN T. SHAW; KENNETH COKE; AND RAYMOND RYDMAN, ON

 6   BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED

 7                       PLAINTIFFS

 8

 9                          V.

10

11   EXPERIAN INFORMATION SOLUTIONS, INC.; WELLS FARGO BANK,

12             NA; AND CITIMORTGAGE, INC.

13                      DEFENDANTS

14

15

16             DEPOSITION OF KENNETH COKE

17               DECEMBER 8, 2014

18              LOUISVILLE, KENTUCKY

19

20

21

22   REPORTER: JULIE V. LUNN

23

24

25   PAGES 1 - 151
```

                                              Page 1

1      A    I was in the office of our bank and she was

2   explaining and showed me my actual credit report and I

3   went home to Google.  I was nowhere -- I couldn't

4   figure out why nobody would change a 9.  Why 9, and

5   they were telling me a bankruptcy or foreclosure, so I

6   Googled some information and his name popped up and I

7   called him.

8      Q    Okay.  Did you -- during that Googling, did

9   you also happen to Google and learn that a 9 does not

10  mean foreclosure?

11     A    No.

12     Q    Okay.  During -- at any point, did you think

13  of asking your bank why they were reading a 9 as a

14  foreclosure when an 8 is a foreclosure?

15          MR. CENTO:   Objection.   Assumes facts not in

16     evidence.   Calls for speculation.

17     A    Our bank told us it was through Fanny Mae and

18  that's how they read it.

19     Q    Okay.  Did you ask your bank why Fanny Mae

20  was reading a 9 as a foreclosure?

21     A    Not that I remember.

22     Q    Okay.  How -- what -- at what point did you

23  decide that you were going to sell the San Jose

24  property?

25     A    I -- well, when I exhausted all of my

Veritext Legal Solutions
866 299-5127

```
 1        Q     And then at some point -- (Phone ringing.)
 2             MR. WIERS:  Hold on one second.  Sorry about
 3        that, my wife is also an attorney.  If she's
 4        calling me in the middle of a deposition,
 5        that's...
 6             MR. HYMAN:  Want to take a moment?  That's a
 7        call you got to take.
 8             MR. WIERS:  Yeah, let me step out.  Let me
 9        take a break real quick.
10                  (OFF THE RECORD)
11   BY MR. WIERS:
12        Q     Okay.  So this March 2012 Exhibit 8 file, was
13   this something you had requested at the time that you
14   got that initial mortgage?
15        A     We did.
16        Q     Okay.  And if you could flip through it and
17   let me know if there's anything in here that you see as
18   being inaccurate.
19        A     Where it says -- first thing out of the gate
20   would be May of 2011 where it closed, my short sale
21   closed actually in April of 2011, so that's inaccurate.
22   The terms of two years, that's inaccurate, because
23   you've provided other information from Wells Fargo that
24   states it was 30 years.  The thing that's also
25   inaccurate, this is a disclosure that I got from
```

Page 60

1    Experian.

2        Q    Okay.  If Experian requires that the actual

3    consumer himself -- him or herself -- be the one to

4    make changes to their credit report, do you think you

5    might have sent it in or do you think your wife...

6        A    I can't remember at this stage.

7        Q    Okay.  So you don't remember if anyone did

8    that or not, right?

9             MR. CENTO:  Objection.  Asked and answered.

10       A    I can't tell you that somebody did that, but

11   my feeling is that someone did.

12       Q    Okay.  And Exhibit -- is that 9?

13            COURT REPORTER:  Yes.

14               (EXHIBIT 9 MARKED FOR IDENTIFICATION)

15       Q    Exhibit 9, Shaw 560 -- I think this was

16   produced by the plaintiff -- is a promissory note from

17   March 2012 in the amount of $225,240 between

18   Commonwealth Bank and Kenneth P. Coke.  Is this the

19   mortgage that you entered into for the -- initially

20   entered into for the property in Kentucky?

21       A    You are correct.

22       Q    All right.  And you had initially an interest

23   rate of 3.75 percent?

24       A    Mm-hmm (affirmative).

25       Q    You understood that was a pretty good rate?

                                          Page 65

1          A       Yeah.

2          Q       And was this a -- I'm trying to see if

3     there's an arm in here.   Do you recall whether there's

4     an arm?

5          A       There's a maturity date of 2017 at the top.

6          Q       So does that refresh your recollection that

7     this was a five-year loan?

8          A       Correct.

9          Q       And it looks like it's not actually an arm.

10    You can correct me, but I'm looking at the payment

11    section, it says, "My final payment," which is the very

12    second paragraph right here (indicating), "final

13    payment will be due on April 1, 2017 and it will be for

14    all principle and all accrued interest."

15         A       Not yet paid.

16         Q       So there's -- in other words, there's not an

17    adjustable rate here, but it's basically a five-year

18    mortgage and...

19         A       It was through their private lending section.

20         Q       So if you hadn't paid in five years, they

21    could take the -- foreclose on the home, right?

22         A       Correct.

23                 (EXHIBIT 10 MARKED FOR IDENTIFICATION)

24         Q       Now, let's look at this.  Exhibit 10, sir, is

25    a document that I think you produced, Shaw 341 and

                                                    Page 66

```
 1              MR. CENTO:  Is this a good time for a break?
 2              MR. WIERS:  Sure.  Do you need a break?
 3                   (OFF THE RECORD).
 4                   (EXHIBIT 11 MARKED FOR IDENTIFICATION)
 5      BY MR. WIERS:
 6         Q    All right.  The latest exhibit has been
 7      marked which is Exhibit 11, it's Shaw 361 and this is a
 8      copy of your June 4, 2013 Experian disclosure.  And was
 9      this a document you requested from Experian at or
10      around the time that you were involved in these
11      discussions with Pam Tamme?
12         A    Correct.  My wife -- I said earlier on June
13      4th, when all of these notes -- that day she ran our
14      credit to start the loan refinance process and that's
15      when we discovered the 9.
16         Q    Okay.  And then when you got this document,
17      did you -- I take it you reviewed it?
18         A    We did, yes.
19         Q    Yeah.  And did you look at page 4 and see the
20      Wells Fargo home mortgage account not being reported as
21      a foreclosure?
22         A    That's what we didn't understand that, you
23      know, our bankers told us that the 9 represented a
24      bankruptcy or foreclosure, and we go here and we see
25      that we closed in -- the short sale was in April and
```

Page 75

1    there's nothing to tell us on this disclosure that my

2    credit report is screwed up.

3        Q    Let me just ask you this, sir.  Assuming that

4    a 9 does not mean foreclosure and that it was being

5    misread, would you agree with me that Experian is

6    accurately reporting this short sale here?

7            MR. CENTO:  Objection.  Calls for

8        speculation. Lack of foundation.  Assumes facts

9        not in evidence. Calls for a legal conclusion.

10       A    I'm going to rely on him.

11       Q    He's not instructing you not to answer, he's

12   just putting in an objection for the record.

13       A    State your question again.

14       Q    Would you agree, sir, that assuming that a 9

15   does not actually mean a foreclosure and that it was

16   being misinterpreted, would you agree that other than

17   the 9, everything here is being reported exactly

18   correctly?

19           MR. CENTO:  Lack of foundation.  Calls for

20       speculation.  Assumes facts not in evidence.

21       Vague and ambiguous.  Calls for a legal

22       conclusion.

23       Q    Go ahead.

24       A    To my knowledge, a 9 means a bankruptcy or

25   foreclosure.  I'm sticking with my story, what my

1    bankers told us to this day.  So I don't know that.

2    I've never seen and I'm not going to agree to you

3    telling me that it's something other than that.

4        Q    I'm not asking you to agree.

5        A    You're not a banker and I trusted my bankers.

6    They told me a 9.  It's not reflected.  Even if

7    whatever was reflected in my credit report is not

8    reflected in here, there's nothing in here.  That

9    states it.  That's wrong, that's wrong.  So in my

10   opinion, and the way I perceive it is, the 9 is not

11   reflected in here.

12       Q    Okay.  So the 9 -- you believe it was

13   inaccurate for Experian to report a -- and it's call a

14   MOPC, Manner of Payment Code 9, because you believe

15   that means foreclosure?

16       A    Once again, I'm going off what my banker

17   said. Experian is the only one different than

18   TransUnion or Equifax, and it's Wells Fargo and

19   Experian, and I called and e-mailed and wrote letters

20   and nobody's ever fixed it, they all reported the same

21   thing, and according to my banker, I was denied a loan

22   and screwed out of an interest of -- you know, I had to

23   go to private banking and I lost out on the

24   opportunity.

25       Q    Let me ask you this, did you ever ask your

Page 77

```
 1        A    No.  I was in her office and they said they
 2   can't give us a traditional loan.  I didn't think to
 3   ask any other questions about a tri-merge or whatever
 4   the hell that is --
 5        Q    Okay.
 6        A    -- we -- I tried everything I could get a
 7   loan through a natural traditional way and you can see
 8   that all this -- we started figuring out what was wrong
 9   with my credit report and it's never been resolved.
10        Q    Well, when you say "it's never been
11   resolved", you ultimately got the refinance, right?
12        A    Through a private sector where they didn't
13   take into account the 9 or the foreclosure.
14        Q    In other words, they use different
15   underwriting?
16        A    Through the private sector.
17        Q    Okay.  And have you -- you got -- what's your
18   interest rate there?
19        A    I believe, to my knowledge, it's 4.56 or 57
20   and I could have had a three.
21        Q    You could have had a three on a -- was it a
22   30-year?
23        A    We were looking at 15-year loans.
24        Q    A 15-year fixed or some kind of arm?
25        A    No arm.  I think it was fixed.
```

Page 80

```
 1          A    I'm sorry, what is -- state it again, please.
 2          Q    If you knew or learned that 9s are now
 3   correctly being read by Fannie Mae's desktop
 4   underwriter, would that cause you to reconsider your
 5   decision not to go to refinance again?
 6               MR. CENTO:  Asked and answered.  Assumes
 7          facts not in evidence.  Calls for speculation.
 8          Lack of foundation (indicating).  Answer if you
 9          can.
10          A    I can't answer that at this point.
11          Q    Okay.  And is that because of your counsel's
12   five objections while he demonstratively points at the
13   table?
14          A    I don't know if --
15               MR. CENTO:  This is -- this was counting.
16               (EXHIBIT 12 MARKED FOR IDENTIFICATION)
17          Q    Okay.  Let's -- let's look at the next
18   exhibit here.  Exhibit 12, sir, Bates stamped, this is
19   Experian's production Document 1 through 5 --
20          A    Mm-hmm (affirmative).
21          Q    -- is a June 4, 2013 dispute letter that you
22   sent Experian.  Let me just ask a couple of -- of --
23               MR. WIERS:  Here, do you guys need another
24          one?
25          Q    -- a couple of basic questions about it.
```

Page 83

1   When people started talking to you about the code 9 or

2   the 9, did you ask, you know, what that is or what

3   that's supposed to be?

4        A    Yes.

5        Q    And what were you told that that number's

6   supposed to represent?

7             MR. CENTO:   Asked and answered.

8        A    As I've said before, that both Pam Tamme and

9   Susan Roberts have stated to us that the 9 meant a

10  foreclosure or bankruptcy.

11       Q    No, I -- okay.   And that's not what I -- I

12  meant more generally, what do these numbers that you're

13  referring to supposed to indicate, like current status

14  of the accounts or the number of the -- well, let me

15  ask you this.   Did anyone tell you that those codes

16  were meant to indicate the final status of the account?

17       A    Not to my knowledge, I can remember that.

18       Q    Okay.   Did you ask like what the other

19  possible codes could be?

20       A    Meaning where at on the...

21       Q    Yeah, what other code -- what other number --

22  what the under -- like if we reported a 7, what would

23  that be?   Or what would a 6 mean?

24       A    No, I didn't ask those questions.

25       Q    Okay.   In this dispute letter to Experian,

Page 84

1   you say that "Both TransUnion and Equifax reports show

2   that my previous Wells Fargo mortgage account was

3   closed and they rated a 1, Experian was the only credit

4   reporting company that rated my Wells Fargo account as

5   a 9."  Did you believe that this was some sort of a

6   rating -- ranking scale of some kind?

7        A    Well, I don't know if I would put it that

8   way. I think they put a 9 to what our bankers told us

9   that it meant, and a foreclosure or bankruptcy.

10        Q    Okay.  Did you understand what a 1 meant?

11        A    At what part of the -- are you referring to,

12   a 1?

13        Q    Well, you're saying "Equifax and TransUnion

14   reported it as a 1".  Well, let me -- were you -- were

15   you hoping by way of this letter that Experian would

16   report it as a 1?

17        A    In the way of this letter, we were hoping

18   that they would fix it.  That it was -- Experian was

19   the only -- out of the three, that was different --

20        Q    Okay.  And you say --

21        A    -- and it wasn't reflected in Exhibit Number

22   11 that it was a 9.

23        Q    And you say, "Legally, for a short sale, this

24   should have been reported as a 1 after two years for

25   short sale."  Is that what your banker told you?

1        A      To the best of my knowledge, yes.

2        Q      At the time -- we looked earlier at the

3    status of your Wells Fargo account and before the

4    settlement, it was 90 days late, right?

5        A      Correct.

6        Q      If a 1 means 30 days late, do you agree that

7    would actually be inaccurate -- and inaccurate way to

8    code that?

9              MR. CENTO:  Lack of foundation.  Calls for

10         speculation.

11       A      I'm not sure I understand what you're saying.

12       Q      Well, you're asking Experian to code it as a

13   1 and I'm telling you a 1 actually means 30 days late

14   and the 1 -- and that number is supposed to represent

15   the final disposition.

16             MR. CENTO:  Objection.

17       Q      You would agree that a 1 would actually be

18   inaccurate?

19             MR. CENTO:  It calls for speculation.

20         Assumes facts not in evidence.  Lack of

21         foundation.

22       A      What I'll say is at the time of this writing,

23   this is how we understood it and that's how I

24   understand it today, that we thought it should have

25   been rated as a 1.  Whatever code you're trying to get

Page 86

```
1          Q      Have you considered that?

2                 MR. CENTO:  Assumes facts not in evidence.

3          Calls for speculation.  Lack of foundation.

4          A      Not really, because the two seem to have got

5    the rest of the -- my credit report right, and credit

6    file right, it's -- seems to be between Experian and

7    Wells Fargo.

8          Q    Okay.  What about Fannie Mae, do you think

9    they play any role at all?

10         A    I don't know.  I don't know how to answer

11   that.  I'm a safety professional, I'm not a banker.

12         Q    Have you ever seen -- have you ever seen a

13   document where Experian actually reported that your

14   Wells Fargo home mortgage account was in foreclosure or

15   a foreclosure?

16                MR. CENTO:  Asked and answered.

17         A    I don't -- I rely on these guys to show me

18   that, but if we produced, but I -- I can't answer that.

19         Q    Have you ever seen a document where Experian

20   has used the word foreclosure to describe your Wells

21   Fargo home mortgage account?

22         A    The word foreclosure?

23         Q    Yeah.

24         A    No.

25         Q    If you look at the -- and this is, I'll
```

Page 88

```
 1        A    Yes.
 2        Q    And did anyone on the phone explain to you --
 3   did those conversations provide you any clarity?
 4        A    No.  When we could even get through, calling
 5   Experian is a 20-minute process to get through to a
 6   speaking person, and numerous times we got
 7   disconnected, but they always seemed to say it was
 8   reported accurately.
 9        Q    Okay.  Did anyone ever tell you that it's
10   actually an 8 --
11        A    No.
12        Q    -- that's a foreclosure and not a 9?
13        A    No.
14        Q    Did you ask that question, if 9 was a
15   foreclosure?
16        A    How would I know to ask that question?
17        Q    Did you ask the question if 9 meant
18   foreclosure?
19        A    Not to my recollection did I specifically ask
20   if 9 was a foreclosure.  I was assuming it was a
21   foreclosure based off what our banker --
22        Q    Okay.
23        A    -- told us.
24             (EXHIBIT 14 MARKED FOR IDENTIFICATION)
25        Q    Exhibit 13 --
```

                                          Page 92

```
 1              COURT REPORTER:  14.
 2       Q    -- 14 -- God, I'm really bad at that -- is a
 3  copy of a document you produced, Shaw 540, which is a
 4  complaint with the CFPB.  Did you file a complaint with
 5  the CFPB as well?
 6       A    I did.
 7       Q    And how was that resolved?
 8       A    It was never resolved.
 9       Q    So the CFPB did not find any inaccuracy?
10            MR. CENTO:  Objection.  Lack of foundation.
11       A    Well, they were -- I don't know about that,
12  but they were wanting me to provide proof or to show
13  where there was a number 9 on there.
14       Q    Okay.  Did you send the --
15       A    And I believe we did.
16       Q    Okay.  And how was that resolved, did they
17  ever agree with you that that was inaccurate?
18       A    I -- from what I recollect, that they said
19  that Wells Fargo said everything was fine and it didn't
20  go anywhere.
21       Q    Okay.  The CFPB is a Federal governmental
22  agency?
23       A    Correct.
24       Q    And did the fact that the CFPB didn't seem to
25  take issue with the reporting cause you to reconsider
```

Veritext Legal Solutions
866 299-5127

1    the last few hours, my credit disclosure, on one of

2    these exhibits, does not accurately reflect, even

3    though I dispute a number 9, I never had a bankruptcy

4    or foreclosure, but it is not -- this credit report

5    (indicating) is not the same as what I was provided by

6    my banker.

7            MR. CENTO:  For the record, the witness held

8        up Exhibit 10.

9        Q    Okay.  And is it your -- so you believe -- so

10   you want Experian to include technical coding in the

11   copies of disclosures it gives to lay people like

12   yourself?

13       A    It should accurately reflect what is on the

14   credit report.  This would not indicate I have a

15   bankruptcy or foreclosure (indicating) the way my

16   banker read mine.

17       Q    And so you think -- so you wanted the copy

18   that came to you have a 9 on it or you wanted it to say

19   bankruptcy and foreclosure?

20       A    Well, to back up.  I don't want to have a 9.

21   I never had a bankruptcy or foreclosure, but if that's

22   on my credit file, it should be on every credit

23   disclosure that I or anybody else that has had that

24   indicated, that it would clearly represent to them that

25   could clearly read it.  In March of 2012, I had no idea

Page 116

Veritext Legal Solutions
866 299-5127

1    that a 9 was on my credit report.

2        Q    So you would want it presented to you in a

3    way you could read it and not in some technical code

4    jargon, right?

5        A    I just want it accurately reported.  I don't

6    understand why it's not the same thing as what the bank

7    had.  I don't understand why two Experian and Wells

8    Fargo get it wrong when the other two get it right. The

9    integrity of the information is off.  That's what I

10   want.  I want them to fix it so that I could read it.

11   When I go on to get a free credit report, that I can

12   see.  I would have been fighting this a lot earlier.

13   And I was fortunate enough to get a loan through the

14   private industry, I can't imagine all the people that

15   didn't.

16       Q    What -- so what -- I just want to know

17   precisely what you think that file disclosure should

18   have said.  What should it have said that would...

19       A    I don't know what it should have said.  It

20   should have just --

21            MR. CENTO:  Asked and answered.

22       A    -- it should just reflect the actual credit

23   report.

24       Q    So you want the actual technical coding or

25   you want...

                                          Page 117

```
1                    CERTIFICATE OF REPORTER
2               COMMONWEALTH OF KENTUCKY AT LARGE
3
4          I do hereby certify that the witness in the
5      foregoing transcript was taken on the date, and at the
6      time and place set out on the Title page here of by me
7      after first being duly sworn to testify the truth, the
8      whole truth, and nothing but the truth; and that the
9      said matter was recorded stenographically and
10     mechanically by me and then reduced to type written
11     form under my direction, and constitutes a true record
12     of the transcript as taken, all to the best of my skill
13     and ability. I certify that I am not a relative or
14     employee of either counsel, and that I am in no way
15     interested financially, directly or indirectly, in this
16     action.
17
18     JULIE V. LUNN, COURT REPORTER/ NOTARY
19     MY COMMISSION EXPIRES ON: 07/18/2017
20     SUBMITTED ON: 12/16/2014
21
22
23
24
25
                                                 Page 151
```

# EXHIBIT 9

# LODGED UNDER SEAL

# EXHIBIT 10

# LODGED UNDER SEAL

# EXHIBIT 11

# LODGED UNDER SEAL

# EXHIBIT 12

Page 1

1              UNITED STATES DISTRICT COURT
2             SOUTHERN DISTRICT OF CALIFORNIA
3
4    _____
                                   )
5    JOHN T. SHAW, KENNETH COKE,   )
     and RAYMOND RYDMAN, on        )
6    behalf of themselves and      )
     all others similarly          )
7    situated,                     )
                                   )
8              Plaintiffs,         )
                                   )
9         vs.                      )  Case No.:
                                   )  13-CV-1295 JLS (BLM)
10   EXPERIAN INFORMATION          )
     SOLUTIONS, INC.; WELLS        )
11   FARGO BANK, NA; and           )
     CITIMORTGAGE, INC.,           )
                                   )
12             Defendants.         )
13   _____)
14
15
16            DEPOSITION OF JOHN T. SHAW
17             San Francisco, California
18            Friday, February 20, 2015
19
20
21
22

     Reported by:  SUZANNE F. BOSCHETTI
23   CSR No. 5111
24
25

Page 26

1   was a foreclosure or an other significant -- it was --

2   it was a charge-off.  Like a charge-off credit card

3   account would be considered a 9 rating.

4        Q    And what if any specific documents do you

5   recall locating that gave you the belief that a 9

6   indicated a foreclosure?

7        A    I do not recall any specific documents other

8   than the DU findings.  Not that there weren't other

9   documents, it was research on the Internet and possibly

10  verbal conversations that I had that led me down that

11  path.

12       Q    Can you recall ever seeing an Experian document

13  stating that a code 9 actually meant foreclosure?

14            MR. ZEVIN:  Objection.  Vague.

15            THE WITNESS:  I do not recall.

16  BY MR. O'DONNELL:

17       Q    If you'd look at the third page of Exhibit 4,

18  and you look at the item -- there's a Wells Fargo

19  account, and it's been circled in handwriting with some

20  notes.  And I want to focus on the notation REV 09

21  that's then encircled.  Do you see that?

22       A    Yes.

23       Q    Is that REV 09 what you believe you were

24  referring to on the first page of Exhibit 4 when you

25  stated it should not be reported as an R9?

1      Q    I'm trying to understand -- when you wrote

2    Exhibit 4, I'm trying to understand what you were asking

3    Wells Fargo to change, and I'm trying to understand

4    whether you believe you were asking them to change an

5    account type code or a manner of payment code?

6           MR. ZEVIN:  Objection.

7    BY MR. O'DONNELL:

8      Q    Or if you didn't know?

9           MR. ZEVIN:  Objection.  Vague.

10          THE WITNESS:  At the time when I wrote the

11   letter, I was asking them to change both the account

12   type and the manner of payment.

13   BY MR. O'DONNELL:

14     Q    And what were you asking them to change those

15   codes to?

16     A    I was asking them to change the REV, which

17   stands, to the best of my knowledge, for revolving, to

18   MTG, which to the best of my knowledge means mortgage.

19   And I was asking them to change the 09, quote/unquote,

20   my understanding foreclosure code to the correct, my

21   understanding, 05 short sale code.

22     Q    What did you believe -- well, let me ask it a

23   different way.  On Exhibit 4 when you say -- when you

24   wrote "I am told it should have been reported as a MTG

25   05," which you then crossed out and wrote "R5," what was

1    your understanding about what the 5 meant?

2        A    It was my understanding at the time based upon

3    research that the 5 code was what was being used to

4    distinguish an account as a short sale.

5        Q    And did you ever, to the best of your

6    knowledge, see any documents from any of the credit

7    reporting agencies to indicate that that was accurate?

8    In other words, that a 5 in fact meant a short sale?

9            MR. ZEVIN:  Objection.  Vague and compound.

10           THE WITNESS:  I do not recall.

11   BY MR. O'DONNELL:

12       Q    And to the best of your recollection, where did

13   you form the belief or how did you form the belief that

14   the code should be a 5 instead of a 9?

15           MR. ZEVIN:  Objection.  Asked and answered.

16           THE WITNESS:  Research, online research and

17   conversations with other -- well, I won't say -- no, I

18   won't say for sure I know.  I know I'd spoke with the

19   credit service provider, but if I did at that exact

20   moment in time, I don't recall.

21   BY MR. O'DONNELL:

22       Q    And just to be clear, when you say credit

23   service provider, you don't mean Experian, right, you

24   mean someone who is like a reseller?

25       A    The reseller.

Page 36

```
 1          THE WITNESS:  No, it was -- it was for what's
 2    called a pre-qualification.  And just so you understand
 3    how it works for mortgage industry regulations, until
 4    you actually input a property address, it's not
 5    officially an application.  It is -- and the
 6    significance of that is there's no disclosure
 7    requirements.  If I put in a property address, then I
 8    have three -- I have three business days I have to send
 9    out TILs and GFEs.
10          This is just a pre-qualification.  That's why
11    you see the property address pre-qualification on there.
12    And that's where it is.  So it's not officially an
13    application until I put in the property address.
14    BY MR. O'DONNELL:
15       Q    And so when you personally submitted your own
16    information or some of your own information to Desktop
17    Underwriter, on at least some occasions, which we'll
18    talk about, you received a "refer with caution,"
19    correct?
20       A    Correct.
21       Q    But that was not in connection with any actual
22    application for credit, correct?
23       A    That is correct.
24          MR. ZEVIN:  And belatedly object.  Vague.
25    BY MR. O'DONNELL:
```

Page 37

1    Q    So let's turn our attention to Exhibit 5, and I

2   made some notes that I think can orient ourselves.  So

3   at the bottom right they have these Bates numbers that

4   start with the word "Shaw" and then have a series of

5   numbers.  Do you see those?

6    A    I do.

7    Q    Direct your attention to Shaw 972.

8         MR. ZEVIN:  You said 972?

9         MR. O'DONNELL:  Correct, yes.

10  BY MR. O'DONNELL:

11   Q    Let me know when you're there.

12   A    I'm there.

13   Q    Do you recognize the DU Underwriting Findings

14  document that begins at Shaw 972 within Exhibit 5?

15        MR. ZEVIN:  Can you tell us where it ends?  Do

16  you know?

17        MR. O'DONNELL:   The DU Underwriting Findings

18  appears to end at Shaw 976.  And then -- we'll ask him

19  some questions that try to identify what these other

20  documents are.

21  BY MR. O'DONNELL:

22   Q    So my first question is just whether you

23  recognize the DU Underwriting Findings document.

24   A    This looks familiar, yes.

25   Q    Okay.  And if you look at the first page, which

Page 39

1   BY MR. O'DONNELL:

2       Q    Let me direct your attention to a document that

3   has your name on it.  Direct your attention within

4   Exhibit 5 to Shaw 943.

5       A    I'm there.

6       Q    And do you recognize this document that begins

7   at SHAW 943 as a DU Underwriting Findings document that

8   pertains to you that you yourself submitted around

9   August 6th, 2012?

10          MR. ZEVIN:  Objection.  Vague.  Lacks

11  foundation.  And the document speaks for itself.

12          THE WITNESS:  Yes, it looks familiar.

13  BY MR. O'DONNELL:

14      Q    And so to the best of your knowledge, was --

15  was this document how you came -- this DU Underwriting

16  Findings document how you came to believe that someone

17  was recording your prior short sale as a foreclosure?

18          MR. ZEVIN:  Objection.  Vague.  Misstates prior

19  testimony.

20          THE WITNESS:  And I'll clarify that.  Based

21  upon what is written here, this -- this is the document

22  that led me to believe that my short sale was being

23  incorrectly reported as a foreclosure or as a deed in

24  foreclosure.

25  BY MR. O'DONNELL:

Page 40

1      Q    And specifically are you referring to the
2   paragraph or finding No. 4 that appears on Shaw 943?
3      A    Yes.
4      Q    And to the best of your knowledge, who or what
5   system created this document that we're looking at that
6   indicates foreclosure next to your Wells Fargo Home
7   Equity account?
8          MR. ZEVIN:  Objection.  Lacks foundation.
9   Calls for speculation.
10         THE WITNESS:  Are you -- you're asking me who
11  created this document, Shaw 000943?
12  BY MR. O'DONNELL:
13     Q    Right.  Who is responsible for documents that
14  are titled "DU Underwriting Findings"?
15         MR. ZEVIN:  Objection.  Vague.  Calls for
16  speculation.  Lacks foundation.
17         THE WITNESS:  To the best of my knowledge, DU
18  is a Fannie Mae system, so it would be Fannie Mae who
19  generated that document.
20  BY MR. O'DONNELL:
21     Q    You don't believe that Experian generated this
22  document, right?
23     A    I do not.
24     Q    Have you ever reviewed any documents titled
25  "Fannie Mae Selling Guide"?  Are you familiar with that

Page 41

1    document?

2              MR. ZEVIN:  Objection.  Vague.

3              THE WITNESS:  I have a general familiarity with

4    the Fannie Mae Selling Guide.

5    BY MR. O'DONNELL:

6         Q    When you received this DU Underwriting Findings

7    that's SHAW 943 that had a "refer with caution"

8    recommendation, did you research the Fannie Mae Selling

9    Guide regarding what information Fannie Mae would deem

10   to be a foreclosure?

11             MR. ZEVIN:  Objection.  Vague.

12             THE WITNESS:  I don't recall specifically doing

13   that.

14   BY MR. O'DONNELL:

15        Q    Do you have any knowledge one way or the other

16   as to whether Fannie Mae Selling Guide as of August 6th,

17   2012, would have interpreted an account as a foreclosure

18   if a prior manner of payment code indicated that

19   foreclosure proceedings had been started against the

20   property?

21             MR. ZEVIN:  I'm sorry, could you read that

22   back?

23             (Record read as follows:

24             "QUESTION:  Do you have any knowledge

25        one way or the other as to whether Fannie

Page 42

1          Mae Selling Guide as of August 6th, 2012,

2          would have interpreted an account as a

3          foreclosure if a prior manner of payment

4          code indicated that foreclosure proceedings

5          had been started against the property?")

6               MR. ZEVIN:  Objection.  Vague and calls for

7     speculation.

8               THE WITNESS:  I have no knowledge of that.

9     BY MR. O'DONNELL:

10         Q     So is it fair to say that you did not have a

11    specific understanding as to how Fannie Mae reached the

12    conclusion that we see here on Shaw 943 that this Wells

13    Fargo home equity account was a foreclosure or a deed in

14    lieu of foreclosure?

15               MR. ZEVIN:  Objection.  Vague.

16               THE WITNESS:  At that time I had -- I had -- I

17    did not know how they were coming to that conclusion.

18    BY MR. O'DONNELL:

19         Q     And later subsequent to this time, subsequent

20    to August 6th, 2012, do you believe that you discovered

21    the answer to how Fannie Mae reached this conclusion we

22    see here?

23               MR. ZEVIN:  And again, I just want to caution

24    the witness not to divulge any information you've

25    learned from any of your attorneys.  Otherwise you can

Page  43

1    tell him.

2          THE WITNESS:   I do.

3    BY MR. O'DONNELL:

4        Q    And what's that understanding?

5        A    My understanding is the way that Fannie Mae

6    came to that conclusion was that Experian was coding my

7    credit report with a 9 while TransUnion and Equifax was

8    coding it with something other than a 9.   And therefore

9    it was Experian and Experian alone who created the

10   misread by the automated underwriting system.

11       Q    But you said earlier that the property at

12   issue, the Tennwood property foreclosure proceedings had

13   been instituted against it, right?

14       A    Yes.

15       Q    And did you ever -- did you ever find out an

16   answer as to whether Fannie Mae would have interpreted

17   that fact, the institution of foreclosure proceedings,

18   as constituting a foreclosure picked up by Desktop

19   Underwriter?   If you don't know, it's okay.   I just want

20   to know if you ever found out the answer to that

21   question.

22       A    I never did find out the answer to that

23   question, but I'll also state that I've never through

24   thorough research been able to find an Experian code

25   which indicated a foreclosure was started but not

Page 44

1    finished.  I'm not familiar that any credit agency has
2    one unless it actually turns into a foreclosure.
3         Q    So without asking you about the codes then, you
4    don't know one way or the other whether Fannie Mae would
5    have instituted -- whether -- let me ask that a
6    different way, okay?
7              You don't know one way or the other whether
8    Fannie Mae would have interpreted the reporting of
9    foreclosure proceedings being instituted as leading to a
10   "refer with caution" recommendation, do you?
11             MR. ZEVIN:  Objection.  Vague.  Calls for
12   speculation.
13             THE WITNESS:  I do not know.
14             MR. ZEVIN:  Could we take a break when you --
15             MR. O'DONNELL:  Sure, absolutely.
16             MR. ZEVIN:  Now a good time?
17             MR. O'DONNELL:  Now is fine.  Take five
18   minutes.
19             (Recess.)
20   BY MR. O'DONNELL:
21        Q    Mr. Shaw, you ready to continue?
22        A    I am.
23        Q    Direct your attention back to Exhibit 5 and
24   specifically the page that's Bates numbered Shaw 943.
25        A    Okay.

Page 46

1   what credit report information was input into Desktop

2   Underwriter in order to arrive at these DU Underwriting

3   Findings?

4           MR. ZEVIN:  Objection.  Vague and lacks

5   foundation.

6           THE WITNESS:  To the best of my knowledge, the

7   only thing that this represents is the actual credit

8   report ID that was -- that was imported to produce these

9   findings.  It doesn't specify if the findings came from

10  all three credit bureaus or just one or another.

11  BY MR. O'DONNELL:

12      Q    I understand.  I just -- this is -- Exhibit 5

13  is a stack of documents that was produced to us, and I

14  believe some of the documents are CBCInnovis credit

15  reports.  And I'm just trying to identify what

16  information might help us find the one, if any, that was

17  associated with these DU Underwriting Findings we're

18  looking at here.

19      A    Oh, then yes, definitely that credit report ID

20  will trace the actual credit report that was used.

21      Q    Okay.  And before we look at that credit

22  report, which I believe is in Exhibit 5, let's back up.

23  And since you submitted this yourself, give me a very

24  brief overview of the process.  How does it work when

25  you -- describe the process for arriving at these DU

Page 47

1    Underwriting Findings.   I just mean very generally, you

2    know --

3        A    The submission process?

4        Q    Yes.

5            MR. ZEVIN:  I'll object.  Vague and compound.

6            THE WITNESS:  The submission process would

7    involve going through our loan application software,

8    entering in the borrower information, pulling up a

9    credit report, which is done via the software, and then

10   running all of that through DU, which is also all --

11   links in the software.

12   BY MR. O'DONNELL:

13       Q    And so DU is software that you or the company

14   work for licenses from Fannie Mae; is that right, or is

15   that your understanding?

16           MR. ZEVIN:  Objection.  Calls for a legal

17   conclusion.

18           THE WITNESS:  I'm not sure on how the licensing

19   part works for -- how that all works, but --

20   BY MR. O'DONNELL:

21       Q    I mean where do you get the software, if you

22   know?

23       A    I'm not sure if that's part of the software

24   package for the loan application software or it's --

25   my -- my best -- my best guess would be that the --

Page 48

1          MR. ZEVIN:  We don't want you to guess.

2          THE WITNESS:  Okay.

3    BY MR. O'DONNELL:

4       Q    Do you have a belief or do you not know?

5       A    I would believe that we pay a subscription to

6    Encompass, which is our loan origination software, and

7    then that's kind of all packaged in there is what I

8    believe, but I'm not certain.

9       Q    And during the process that you just described

10   when you described pulling a credit report or uploading

11   that to Desktop Underwriter, you mean a credit report

12   that comes from a reseller, like here we see CBCInnovis,

13   correct?

14      A    Reseller, correct.

15      Q    Now I've made some notes here that may help us

16   find the right document.  But if we're looking at Shaw

17   946, we see the credit report ID.  It's a long number,

18   but it begins with 712 and ends with 8266.  Do you see

19   that?

20      A    Yes.

21      Q    And then there's a credit report date of

22   8/6/2012.  Now let me direct your attention to Shaw 859.

23      A    Okay.

24      Q    And feel free to confirm for yourself, but this

25   appears -- if you look near the very top of the page,

Page 56

1           MR. ZEVIN:  Objection.  Lacks foundation.

2    Compound.

3    BY MR. O'DONNELL:

4       Q    Well, let me ask -- let me ask it a different

5    way, actually.  So go ahead and strike that question.

6           Flip back to -- flip back to Exhibit 4, Mr.

7    Shaw.  And you see your handwritten note there that

8    says:

9           "Wells changed the R9 to R5 after this

10          dispute and I was able to get a DU

11          approval."

12      A    Yes.

13      Q    Are the codes we've just been discussing, and

14   specifically the REV 05 on Shaw 836, is -- are those the

15   codes you were referring to in this handwritten note on

16   Exhibit 4?

17          MR. ZEVIN:  Objection.  Lacks foundation.

18   Calls for expert opinion.

19          THE WITNESS:  I believe so.

20   BY MR. O'DONNELL:

21      Q    And do you consider yourself knowledgeable

22   about CBCInnovis's own proprietary procedures for

23   generating credit reports like the one we're looking at

24   on SHAW 836?

25          MR. ZEVIN:  Objection.  Vague.

Page 57

1          THE WITNESS:   No, I do not consider myself any

2     type of expert on CBCInnovis's processes.

3     BY MR. O'DONNELL:

4          Q    Is it possible that CBCInnovis did something

5     different with your information that caused the REV 05

6     to appear -- strike that question.  It was a bad

7     question.

8               In Exhibit 4 you wrote that Wells changed the

9     R9 to an R5, right?

10         A    Yes.

11         Q    But you said that you never got a letter from

12    Wells Fargo stating that they changed any coding, right,

13    to the best of your recollection?

14         A    Yes, to the best of my recollection, I did not

15    receive.

16         Q    And to the best of your recollection, you never

17    had a verbal conversation where someone from Wells Fargo

18    stated that they changed any coding, like a 9 to a 5,

19    correct?

20         A    I wouldn't go that far.  I wouldn't -- I don't

21    remember one way or another.  I had so many phone calls

22    and letters during that period of time that I -- I

23    couldn't say one way or another on that.

24         Q    But as you sit here today, you can't recall

25    ever having -- you can't identify a conversation that

Page 59

1      Q      Around the time that you moved to Oregon, you
2   obtained a construction loan from Banner Bank; is that
3   correct?
4      A      Correct.
5      Q      And you generally paid off that loan, correct?
6   They gave you the loan, the house was constructed, and
7   you paid off the loan, right?
8      A      Correct.
9      Q      In some of the written discovery responses that
10  we have, there's a reference to a Pentagon Federal
11  Credit Union loan denial around July 5, 2013.  Does that
12  sound familiar to you?
13         MR. ZEVIN:  Objection.  Vague.
14         THE WITNESS:  I'm familiar with Pentagon
15  Federal Credit Union.
16  BY MR. O'DONNELL:
17     Q      Have you, to the best of your recollection,
18  made any mortgage loan applications through Pentagon
19  Federal Credit Union?
20     A      I have.
21     Q      And did you receive a mortgage loan from
22  Pentagon Federal Credit Union?
23     A      I have.
24     Q      So what do you mean -- I'm referring to your
25  interrogatory responses where you referenced Pentagon

Page 62

1       Q     Do you recognize Exhibit 6?

2       A     It looks familiar, yes.

3       Q     And do you believe this is what you were

4    referring to when you testified about a credit denial by

5    Pentagon Federal Credit Union?

6       A     I do.

7       Q     And do you see where it -- on the second page

8    of Exhibit 6, does it identify any reasons for -- any

9    principal reasons for the credit denial?

10       A     It does.

11       Q     And what does it identify?

12       A     Three reasons:

13             "One, Delinquent Past Or Present Credit

14    Obligations With Others;

15             "Two, Collection Action Or Judgment;

16             "Three, Foreclosure Or Repossession."

17       Q     Taking the first one, Delinquent Past Or

18    Present Credit Obligations With Others, when you

19    received Exhibit 6, did you believe that reason to be

20    inaccurate?

21       A     No.

22       Q     The second reason, Collection Action Or

23    Judgment, when you received Exhibit 6, did you believe

24    that principal reason for the credit denial to be

25    inaccurate?

1    to what loan you were referring to?

2        A    I believe it was the Banner Bank loan, but I'm

3    not certain.

4        Q    And Banner Bank uses Loan Prospector, right,

5    which is Freddie Mac's automated underwriting system?

6            MR. ZEVIN:   Objection.   Vague.   Calls for

7    speculation.

8            THE WITNESS:   I'm aware that they use that.   I

9    don't know if that is their sole automated system that

10   they use.

11   BY MR. O'DONNELL:

12       Q    But you were under the impression that Banner

13   Bank used that -- used Freddie Mac's Loan Prospector

14   system for your loan application, right?

15       A    That is my understanding, yes.

16       Q    The second paragraph says "According to Freddie

17   Mac," and then it goes on to -- to describe some reasons

18   about what you believe Loan Prospector was doing.   What

19   was the basis for this information you wrote in

20   Exhibit 12 about according to Freddie Mac?

21       A    Please repeat the question?

22       Q    The paragraph that begins "According to Freddie

23   Mac," and says that "the automated underwriting system

24   they use is not reading the...tradeline as a short

25   sale," what was the basis for the information you wrote

1      Q    And it looks like it's dated December 26th,

2   2012?

3      A    Yes.

4      Q    If I can find the page.  Direct your attention

5   to the page 13 of 22.  It's got Bates No. Shaw 630.

6           MR. ZEVIN:  Sorry, you said 630?

7           MR. O'DONNELL:  630.

8   BY MR. O'DONNELL:

9      Q    And let me know when you're there.

10     A    I'm there.

11     Q    I want to focus on the first tradeline here,

12  which is CitiMortgage Inc. and it's the one at the top

13  of page 630.  This is the account No. 200518XXXX.

14     A    I see it.

15     Q    Looking at this tradeline here on this Experian

16  document, is there any information that you believe is

17  inaccurate?

18          MR. ZEVIN:  Objection to the extent it calls

19  for a legal opinion or legal conclusion or expert

20  opinion.  And compound and vague.

21          THE WITNESS:  Please repeat the question?

22  BY MR. O'DONNELL:

23     Q    Looking at this CitiMortgage tradeline at the

24  one that's account 200518XXXX that's at the top of the

25  page, Shaw 630 in Exhibit 13, is there any information

1  in this Experian document that you believe to be

2  inaccurate?

3          MR. ZEVIN:   Objection.  Vague.  Calls for a

4  legal conclusion.  Calls for expert opinion.  Compound.

5          THE WITNESS:   It's kind of a loaded question

6  because it's not what's inaccurate, it's what is not

7  showing on the report that makes it inaccurate.

8  BY MR. O'DONNELL:

9     Q    Well, let's stick with the question that I

10  asked first.  Is there anything on this page, Shaw 630

11  for the CitiMortgage tradeline, that you believe to be

12  inaccurate?

13          MR. ZEVIN:   Same objections and asked and

14  answered.

15          THE WITNESS:   Without saying that anything else

16  is not inaccurate, I do see something that appears to

17  be -- to be inaccurate on the -- on the 24-month payment

18  history.

19  BY MR. O'DONNELL:

20     Q    Okay.  What's that?

21     A    Well, just from using reasoning, if I was -- if

22  I stopped making my mortgage payment in May, and I was

23  30 days late in June and 60 in July and 90 in August and

24  120 in September, I would reasonably assume I would then

25  be 150 in October, 180 in November, 210 in December, 240

Page 102

1    in January, 270 in February and 300 in March.  But

2    that's not reporting as what I would assume would be the

3    actual case.

4         Q    So you believe that it should show you as being

5    more delinquent on this account in the 24-month payment

6    history here?

7              MR. ZEVIN:  Same objections.

8              THE WITNESS:  You just asked me if I thought it

9    was accurate, and if I'm looking at it like that -- you

10   know, I believe I was more than 120 days past due in

11   March of 2010.

12   BY MR. O'DONNELL:

13        Q    Okay.  Is there any other information in page

14   Shaw 630 within Exhibit 13 that you believe to be

15   inaccurate?

16             MR. ZEVIN:  Objection.  Calls for a legal

17   conclusion.  Expert opinion.  Vague.  Compound.  Lacks

18   foundation.

19             THE WITNESS:  There is nothing that I can see

20   on this report that I see is -- that I would say is

21   completely inaccurate other than what I pointed out as

22   far as what it's actually showing.

23   BY MR. O'DONNELL:

24        Q    So other than the information we just discussed

25   about the length of delinquencies in the 24-month

Page 154

1      MR. ZEVIN:  Can you repeat that question?

2  BY MR. PROVANCE:

3      Q    Yeah.  So if the date of status is the month of

4  April 2010, that could include April 1, 2010, right?

5      A    Correct.

6      Q    And April 1, 2010, is only five days later than

7  March 26th -- or six, I suppose.  I guess your math is

8  better than mine, but six I suppose?

9      A    Correct.

10      Q    In the legal world we never count the day of

11  the event, we always count the first day as the next.

12  But anyway, do you see there's also a heading here of

13  creditor's statement?

14      A    I do.

15      Q    Okay.  Do you see where it says the "creditor's

16  statement is account legally paid in full for less than

17  full balance"?

18      A    Yes.

19      Q    And again, that's an accurate description of

20  your short sale, isn't it?

21          MR. ZEVIN:  Objection.  Calls for a legal

22  conclusion.  Calls for expert opinion.  Lacks foundation

23  and vague.

24          THE WITNESS:  From my layperson's

25  understanding, I would agree that that does describe a

1    short sale, at least in part.

2              MR. PROVANCE:  I'd like to mark another

3    exhibit.

4              Should we go off the record to see if we can

5    fix the blinds?

6              (Discussion off the record.)

7              MR. PROVANCE:  Let's go ahead and mark what is

8    Shaw 18.  This is a document produced to us, Bates

9    number SHAW-CMI 130.

10             (Deposition Exhibit 18 marked by the court

11             reporter.)

12   BY MR. PROVANCE:

13        Q    So among the disputes that you made in

14   August 2012, do you recognize this as the dispute letter

15   that you sent to CitiMortgage about two of your

16   accounts?

17        A    Yes.

18        Q    All right.  And one is the 2005 account, or

19   shall I say the account number that begins with 200518?

20        A    Yes.

21        Q    And the other one is an account number that

22   begins with 200485?

23        A    Correct.

24        Q    Okay.  And is this the same account that you

25   noted on the CBCInnovis report earlier?

Page 268

1         I, the undersigned, a Certified Shorthand

2    Reporter of the State of California, do hereby certify:

3         That the foregoing proceedings were taken

4    before me at the time and place herein set forth; that

5    any witnesses in the foregoing proceedings, prior to

6    testifying, were duly sworn; that a record of the

7    proceedings was made by me using machine shorthand which

8    was thereafter transcribed under my direction; that the

9    foregoing transcript is a true record of the testimony

10   given.

11        Further, that if the foregoing pertains to the

12   original transcript of a deposition in a Federal Case,

13   before completion of the proceedings, review of the

14   transcript [ X ] was [ ] was not requested.

15        I further, certify I am neither financially

16   interested in the action nor a relative or employee of

17   any attorney or party to this action.

18        IN WITNESS WHEREOF, I have this date subscribed

19   my name.

20   Dated: March 6, 2015

21

22

                    SUZANNE F. BOSCHETTI

23                  CSR No. 5111

24

25

# EXHIBIT 13

# LODGED UNDER SEAL

# EXHIBIT 14

# LODGED UNDER SEAL

# EXHIBIT 15

# LODGED UNDER SEAL

# EXHIBIT 16

```
 1                 UNITED STATES DISTRICT COURT
 2            FOR THE SOUTHERN DISTRICT OF CALIFORNIA
 3
 4
    JOHN T. SHAW, KENNETH COKE;    )
 5  and RAYMOND RYDMAN, on behalf )
    of themselves and all others  )
 6  similarly situated,           )
                                  )
 7        Plaintiffs,             )
                                  )
 8  vs.                           )  CASE NO. 13-CV-1295
                                  )
 9  EXPERIAN INFORMATION          )
    SOLUTIONS, INC.; WELLS FARGO  )
10  BANK, NA; and CITIMORTGAGE,   )
    INC.,                         )
11                                )
          Defendant.             )
12
13
14
15     **********************************************
16                   ORAL DEPOSITION OF
17                     RAY RYDMAN
18                    IRVING, TEXAS
19                  JANUARY 16, 2015
20     **********************************************
21
22
23
24
25     PAGES: 1-168
```

Page 1

1    decrease over the five years to zero making my 2011 the

2    last year and the smallest year of having that income.

3    In doing that I realized that my mortgage was too much

4    for the decline in pay and proceeded to contact

5    Wells Fargo about what I could do in advance, and the

6    recommendation was short sale.

7         Q.    Prior to the short sale occurring had you gone

8    into default on one or more of the mortgages on the

9    property in San Diego?

10        A.    On advice from Wells Fargo I stopped making

11   payments.

12        Q.    Do you recall approximately when you stopped

13   making payments?

14        A.    January 2011.

15        Q.    In 2013 you sought the new mortgage with

16   Academy Mortgage; is that right?

17        A.    That's correct.

18        Q.    What was the purpose of that mortgage?

19              In other words, what were you looking to

20   finance with that mortgage?

21        A.    I was looking to purchase a home in Phoenix,

22   Arizona.

23        Q.    And did you ultimately purchase the home?

24        A.    No.

25        Q.    Did you ultimately purchase a home in Phoenix?

                                              Page 14

1        A.      No.

2        Q.      So let's back up, and I just want to get the

3   chronology of where you were living in 2011.

4                You were living in San Diego, right?

5        A.      Correct.

6        Q.      And the short sale occurred around June of

7   2011, right?

8        A.      Correct.

9        Q.      When did you move away from San Diego?

10       A.      In July of 2012.

11       Q.      So you stayed in San Diego for approximately

12   another year after the short sale had occurred?

13       A.      Yes.

14       Q.      Were you living in an apartment?

15       A.      An apartment.

16       Q.      And why did you move away from San Diego in

17   2012?

18       A.      The cost of living.

19       Q.      Any other reasons?

20       A.      Not that I can recall at this point in time.

21       Q.      So in 2012 you moved to the Phoenix area,

22   right?

23       A.      Yes.

24       Q.      And at what point did you move to Texas?

25       A.      Last year, 2014, in February.

1      Q.    What were the reasons that you moved to Texas?

2      A.    There were several reasons.  One reason was my

3   wife didn't like Arizona.  The second reason was we knew

4   people here.

5      Q.    Any other reasons?

6      A.    No, not that I can recall at this time.

7      Q.    And do you own your home in Texas or do you

8   rent?

9      A.    I own.

10      Q.    When did you buy a home in Texas?

11      A.    February and March of 2012.

12      Q.    Did you obtain a loan to finance that purchase

13   of the house in Texas?

14      A.    Yes, I did.

15      Q.    And who was the lender that you used to obtain

16   that loan?

17      A.    The Bank of Texas.

18      Q.    Do you recall the name of the person that you

19   worked with at the Bank of Texas?

20      A.    Terry, and I can't pronounce her last name.  It

21   starts with a K, Kruski (phonetic) or Kroski (phonetic).

22   I don't recall the full name at this point.

23      Q.    Do you recall where Terry's office was in

24   Texas?

25      A.    Flower Mound.

                                            Page 16

```
1    do a short sale of your property in San Diego?
2         A.    Yes, it was.
3         Q.    Let's mark as Exhibit 2 a single page document.
4    The Bates number on this one is WFB-RYDMAN 620.
5                   (Exhibit 2 marked)
6         Q.    (By Mr. O'Donnell)  So take a moment to look at
7    Exhibit 2.  The first question I want to ask you is
8    whether you recognize Exhibit 2.
9         A.    Yes, it does look familiar.
10        Q.    So Exhibit 2 is a letter that Wells Fargo sent
11   you about a Wells Fargo account that was involved in the
12   short sale, correct?
13        A.    Yes.
14                   MR. PAVLACK:  Objection; the document
15   speaks for itself.
16                   You can -- you can answer.
17        A.    It appears that way.
18        Q.    (By Mr. O'Donnell)  Is that how you understood
19   the letter when you received it?
20        A.    Can you restate the question?
21        Q.    When you received Exhibit 2 in July of 2011 did
22   you understand it to refer to a Wells Fargo account that
23   was involved in the short sale of your San Diego
24   property?
25        A.    Yes, I did.
```

Page 23

1       Q.    Look at the first sentence, please, that says:

2   This letter confirms that with your remittance of

3   $44,979.99 on 6/12/2011 Wells Fargo considers the

4   above-referenced account to be settled in full for less

5   than the full balance.

6       Do you see that?

7       A.    Yes, I do.

8       Q.    When you received this letter in 2011 did you

9   believe that it was inaccurate in any way?

10      A.    I don't recall.

11      Q.    Did you ever call or write Wells Fargo to

12  indicate to them that this letter, Exhibit 2, was

13  inaccurate in any way?

14      A.    Not to my knowledge.

15      Q.    Did you ever contact Wells Fargo to indicate to

16  them that you had difficulty understanding this letter

17  that's marked as Exhibit 2?

18      A.    Not to my knowledge.

19      Q.    And you understood in 2011, right, that the

20  Wells Fargo account referenced in this letter was settled

21  in full for less than the full balance that was owed,

22  correct?

23      A.    I'm not familiar with the terminology.

24      Q.    Well, earlier you said that the -- of the three

25  accounts on the San Diego property one of them received

1    substantially less than was owed, correct?

2         A.    I think I stated they received less than what

3    was owed, correct.

4         Q.    Right.

5              Okay.  And did you understand that in 2011 as a

6    result of the short sale even though Wells Fargo had not

7    received the full amount owed that they would no longer

8    seek to collect that amount from you?

9         A.    That was my understanding, I believe.

10        Q.    Did you understand the short sale to represent

11   a settlement of that account?

12                 MR. PAVLACK:  Objection.  "Settlement" is

13   a term of art and calls for a legal conclusion.

14                 You can testify as to your understanding.

15        A.    I don't understand the terminology.

16        Q.    (By Mr. O'Donnell)  When you received this

17   letter, Exhibit 2, though, you never contacted

18   Wells Fargo to tell them that you had any difficulty

19   understanding the letter, correct?

20        A.    Not to my knowledge.

21        Q.    And you never asked anyone else to help you

22   understand it?

23        A.    Not that I can recall.

24        Q.    Let's mark as Exhibit 3 a one-page document

25   with the Bates No. WFB-RYDMAN 472.

                                            Page 25

1      Q.    (By Mr. O'Donnell)   Let's mark as Exhibit 5 a

2    document that was produced by Experian.   This one's got a

3    Bates number of EXP_Ryd-0048.

4                 (Exhibit 5 marked)

5      Q.    (By Mr. O'Donnell)   So Exhibit 5 is an Experian

6    disclosure dated June 3, 2013.

7                 Does it look familiar to you?

8      A.    Yes.

9      Q.    Does Exhibit 5 help you identify what

10   information you identified prior to learning about any

11   issues with Desktop Underwriter that you believe was

12   inaccurate in your Experian disclosure?

13     A.    Yes.   There are dates that seem to have been

14   off.

15     Q.    Okay.   So which page of Exhibit 5 are you

16   referring to or are you looking at right now?

17     A.    Page 4 of 34.

18     Q.    Okay.   And I see two Wells Fargo accounts on

19   Page 4 of Exhibit 5.

20                 Which of those accounts are you referring to?

21     A.    Actually in regards to the dates and the

22   closure, both of them.

23     Q.    Okay.   And what about the dates did you believe

24   to be inaccurate?

25     A.    Underneath the payment history it shows the

                                                    Page 34

1   Wells Fargo accounts?

2       A.    I don't recall the specifics other than the

3   dates.

4       Q.    So at some point after identifying the

5   information on the dates that you believe was inaccurate

6   did you form the belief that other information reported

7   by Experian was inaccurate with respect to your

8   Wells Fargo account?

9              MR. PAVLACK:  Object to form.  Object;

10  vague.

11      A.    I didn't have the knowledge to understand if

12  there was something wrong or not.

13      Q.    (By Mr. O'Donnell)  Let's mark as Exhibit 6 a

14  document with the Bates No. Shaw 1139, and this document

15  is titled DU Underwriting Findings.

16              (Exhibit 6 marked)

17      Q.    (By Mr. O'Donnell)  Does Exhibit 6 look familiar

18  to you?

19      A.    Yes.  The front page looks extremely.

20      Q.    And do you recall receiving Exhibit 6 from

21  Academy Mortgage?

22      A.    Yes, I do.

23      Q.    And at some point did Academy Mortgage tell you

24  that they would be unable to grant you the loan that you

25  had applied for?

                                        Page 37

1    A.    Josh Nastal of Academy Mortgage.

2    Q.    Have you ever seen an Experian document that

3    you believed indicated any account of yours was a

4    foreclosure?

5    A.    An Experian document?

6    Q.    Uh-huh.

7    A.    No, I don't recall seeing one.

8    Q.    Other than the Desktop Underwriting findings

9    generated by Fannie Mae and provided to you by Academy

10    have you ever seen a document that indicated to you that

11    Experian was reporting any account of yours as a

12    foreclosure?

13         MR. PAVLACK:  Objection; vague.

14         Are you asking whether a document actually

15    uses the term "foreclosure" or had information that

16    indicates foreclosure?

17    Q.    (By Mr. O'Donnell)  You can answer.

18         MR. PAVLACK:  Well, I think we have had

19    that clarification today.

20         So if you think you have an understanding

21    you can answer, Ray.

22    A.    Restate the question.

23    Q.    (By Mr. O'Donnell)  Other than the Desktop

24    Underwriting findings document have you ever seen a

25    document that you believed indicated Experian was

Page 44

1    reporting any account of yours as a foreclosure?

2         A.    I don't recall.

3         Q.    As you sit here today you can't think of any

4    document other than the Desktop Underwriting findings

5    document that indicated to you foreclosure in any way,

6    correct?

7              MR. PAVLACK:   Same objections.

8         A.    I don't recall seeing that Experian document.

9         Q.    (By Mr. O'Donnell)  You indicated that Josh

10   Nastal told you about this issue and that was the basis

11   for your statement here that Experian reported this as a

12   foreclosure.

13             Do you recall anyone else telling you that

14   other than Josh?

15        A.    I don't remember.  I don't recall.

16        Q.    You can't think of anyone else right now?

17        A.    No, I don't recall.

18        Q.    Do you remember what the outcome was of the

19   letter, Exhibit 7, that you sent to Wells Fargo on

20   June 7th, 2013?

21        A.     It's difficult to pinpoint this specific letter

22   as there was multiple letters, so I don't recall exactly

23   what the outcome was of this particular letter.

24        Q.    Let's mark as Exhibit 8 a letter with the Bates

25   No. WFB-RYDMAN-622.

1        Q.     Anything else?

2        A.     Nothing I can think of at this particular point

3    in time.

4        Q.     Are you aware of any underwriting system that

5    as we sit here today in 2015 interprets a 9 to mean

6    foreclosure?

7                    MR. PAVLACK:   Objection; lack of

8    foundation.

9        A.     I'm not knowledgeable enough to do that.  I

10   don't know.  I'm not a loan officer or banker so I trust

11   other people to know that.

12       Q.     (By Mr. O'Donnell)  But you don't know, right,

13   one way or the other?

14       A.     I'm not knowledgeable enough to know.

15       Q.     Do you recall an interrogatory by Experian

16   asking you to describe humiliation or embarrassment or

17   mental or emotional distress --

18       A.     Yes --

19       Q.     -- associated with your claim?

20       A.     Yes, I do.

21       Q.     Describe for me in your own words what

22   humiliation or embarrassment or mental or emotional

23   distress you believe Experian's reporting has caused you.

24                   MR. PAVLACK:   Objection; asked and

25   answered.  Objection; calls for a legal conclusion.

                                                Page 91

1    some Fannie Mae selling guidelines?

2        A.    I believe Josh Nastal forwarded some Fannie Mae

3    guidelines based on foreclosure and Code 9.

4        Q.    And what was your recollection about what those

5    Fannie Mae documents said about the Code 9?

6        A.    Basically the Code 9 was a foreclosure or

7    worse.

8        Q.    Do you have any information as to what Fannie

9    Mae's selling guidelines say today on that point?

10       A.    I have no knowledge of that.

11       Q.    Do any of the four classes that you have

12   described for me today include someone who has a 9 but

13   who applied for a loan today?

14             MR. PAVLACK:  All the same objections.

15       A.    I don't have the knowledge to answer that.

16       Q.    (By Mr. O'Donnell)  In approximately February or

17   March of 2014 you purchased a home in Texas, right?

18       A.    That's correct.

19       Q.    And I think you said you used the Bank of

20   Texas?

21       A.    That's correct.

22       Q.    Do you have any reason to believe that a 9 on

23   your -- in your credit file adversely impacted you in any

24   way regarding the house that you successfully purchased

25   in 2014 in Texas?

                                         Page 114

```
1    received this what this document did help, not help, or
2    do for me that particular point in time.
3         Q.    (By Mr. O'Donnell)  Go real quick to Exhibit 6,
4    please.
5         A.    (Witness complying).
6         Q.    Exhibit 6 is the document that's entitled DU
7    Underwriting Findings.
8         A.    Correct.
9         Q.    Do you have any understanding as to who
10   actually prepares this document?
11        A.    I'm not knowledgeable in who does what with
12   these documents.
13        Q.    Has anybody ever told you that Experian
14   prepared Exhibit 6?
15        A.    Repeat the question.
16        Q.    Has anyone ever indicated to you that Experian
17   prepared Exhibit 6?
18        A.    Not to my knowledge.
19        Q.    We talked a lot about today your belief as to
20   the meaning of the Code 9, right?
21        A.    We have.
22        Q.    Have you ever considered the possibility that
23   Fannie Mae incorrectly interpreted the Code 9?
24        A.    I don't have the knowledge to know who makes
25   the codes and who writes the descriptions on that.  I
```

Page 160

1    just trust that my mortgage lender is telling me the

2    truth about who's doing what.

3        Q.    Have you ever considered the possibility that

4    Fannie Mae incorrectly interpreted the Code 9?

5        A.    Not to my knowledge.

6                    MR. O'DONNELL:  That is all I have.

7                         EXAMINATION

8    BY MR. HYMAN:

9        Q.    Two real quick questions.

10               You testified you haven't talked to the other

11   two named plaintiffs in this case --

12                   MR. PAVLACK:  That mischaracterizes

13   testimony.

14                   Before the case?

15                   MR. HYMAN:  Before the case.

16                   MR. PAVLACK:  I'm sorry.

17                   MR. HYMAN:  I didn't get to finish the

18   question.

19                   MR. PAVLACK:  I'm just eager to be done.

20   Go ahead.

21       Q.    (By Mr. Hyman)  So you testified you haven't

22   talked to either one of the named plaintiffs since the

23   case was filed; is that correct?

24       A.    That's not what I testified.

25       Q.    Have you talked to either one of the named

                                              Page 161

1

2

3

4

5

6        I, RAY RYDMAN, have read the foregoing deposition

7    and hereby affix my signature that same is true and

8    correct, except as noted.

9

10                    --------------------------------

11                    RAY RYDMAN

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 167

1          I, Tim Fails, Certified Shorthand Reporter in and
2     for the State of Texas, hereby certify to the following:
3          That the witness, RAY RYDMAN, was duly sworn and
4     that the transcript of the deposition is a true record of
5     the testimony given by the witness;
           That the deposition transcript was duly submitted
6     January 27, 2014 to the witness or to the attorney for
      the witness for examination, signature, and return to
7     MERIT COURT REPORTERS - A VERITEXT COMPANY by March 10,
      2015;
8          I further certify that I am neither counsel for,
      related to, nor employed by any of the parties or
9     attorneys in the action in which this proceeding was
      taken, and further that I am not financially or otherwise
10    interested in the outcome of this action.
           Further certification requirements will be certified
11    to after they have occurred.
12
13
14
15         Certified to by me on this 27th day of January,
16    2015.
17
18
19                         --------------------------
20                         Tim Fails, CSR
21                         Texas CSR No. 2931
22
23
24
25

                                                    Page 168

# EXHIBIT 17

# LODGED UNDER SEAL

# EXHIBIT 18

# LODGED UNDER SEAL

# EXHIBIT 19

1              UNITED STATES DISTRICT COURT

2             SOUTHERN DISTRICT OF CALIFORNIA

3

4      JOHN T. SHAW, KENNETH COKE, and )

5      RAYMOND RYDMAN, on behalf of    )

6      themselves and all others       )

7      similarly situated,             )

8              Plaintiffs,             ) Case No.

9        vs.                           ) 13-CV-1295 JLS (BLM)

10     EXPERIAN INFORMATION SOLUTIONS, )

11     INC.; Wells FARGO BANK, NA; and )

12     CITIMORTGAGE, INC.,             )

13             Defendants.             )

14     _____)

15

16            Deposition of KEN LARSEN

17     was taken in behalf of the Defendants pursuant

18     to the Federal Rules of Civil Procedure before William

19     J. Bridges, Certified Shorthand Reporter for

20     Washington, Oregon and Idaho, on Thursday, the 29th

21     day of January, 2015, at the law offices of McAdams,

22     Ponti & Wernette, 103 East Poplar Street, Walla Walla,

23     Washington, commencing at the hour of 9:00 a.m.

24

25     PAGES 1 - 158

                                            Page 1

```
 1          A.     Yeah.
 2          Q.     Any reason that you can think of why you
 3    wouldn't be able to give us your best testimony
 4    today?
 5          A.     No.
 6          Q.     Okay.  And you're doing a good job of
 7    this so far.  One of the most important things in a
 8    deposition, is because the court reporter is taking
 9    down all the words that we say, he can't take down
10    things like uh-huh, huh-uh, shakes of the head,
11    nods, and so forth.
12                 So, it's real important that you give
13    verbal responses, such as yes, no, or other words
14    that he can transcribe.
15                 Do you understand that?
16          A.     Yes.
17          Q.     Okay.  Do you understand that you are
18    here to testify today as a representative of Banner
19    Bank?
20          A.     Yes.
21          Q.     And do you understand that you're
22    represented by counsel here today, correct?
23          A.     Correct.
24          Q.     There are other lawyers who are on the
25    phone to represent parties to the litigation.  Some
```

1          MS. DuBAY:   Yes.   This is Eleanor

2     Dubay, D-U-B-A-Y, of Tomasi Salyer Baroway, as

3     attorney.

4               (Deposition Exhibit 1 was

5               marked for identification).

6          MR. O'DONNELL:  And, Ms. DuBay, can

7     we have a stipulation that the witness is here to

8     testify on the matters as set forth in Exhibit 1

9     today?

10         MS. DuBAY:   Yes.

11         MR. O'DONNELL:  As a representative

12    of Banner Bank, I should say.

13         MS. DuBAY:   Yes.

14         MR. O'DONNELL:  Thank you.

15    Q.    Mr. Larsen, what is your current title at

16    Banner Bank?

17    A.    The Senior Vice-President, Mortgage

18    Banking Director.

19    Q.    Okay.  And how long have you held that

20    title?

21    A.    I have been with Banner Bank 10 years.  I

22    have had the title for six.

23    Q.    Since approximately 2008, 2009, you have

24    been Senior Vice-President of Mortgage Banking?

25    A.    Correct.

1        Q.      And can you generally describe what your
2    duties are in your current position?
3        A.      I oversee anything that has to do with a
4    loan, from the initial application to the last
5    payment.  So, loan services, secondary marketing,
6    loan underwriting, processing, closing, sales,
7    quality control.
8        Q.      Can you generally describe Banner's
9    mortgage lending business?  What I mean is, who does
10   Banner lend to, what type of loan, just a very
11   general overview?
12       A.      We lend within our market area, which is
13   Washington, Oregon and Idaho.  We employ
14   commissioned salespeople throughout those three
15   states who generate leads from various sources,
16   referrals.  Realtors, builders, financial planners,
17   attorneys and branch referrals.
18               We package and sell loans direct to both
19   Fannie Mae and Freddie Mac.  We also sell loans on a
20   limited basis to what I would call aggregators.
21   Places similar to Wells.  We don't sell to Wells.
22   But BB&T, Franklin American.
23               We tend to lend -- we don't -- never lend
24   to sub-prime clients.  So, they tend to be more
25   generic, conventional-type products.

                                        Page 11

```
 1            Q.    So, in terms of where the loans go that
 2      Banner Bank originates, some may go to Fannie Mae,
 3      some may go to Freddie Mac, some may go to
 4      aggregators?
 5            A.    Correct.
 6            Q.    And what did you mean when you referenced
 7      portfolio loans?  What's a portfolio loan?
 8            A.    Loans that are originated on the
 9      bank's -- using the bank's money, and warehoused
10      within the bank.
11            Q.    So, the bank originates the loan and then
12      holds it itself?
13            A.    Correct.
14            Q.    Okay.  And finally, you listed custom
15      construction loans, correct?
16            A.    Uh-huh.  Correct.
17            Q.    To whom does Banner Bank sell custom
18      construction loans, if anyone?
19            A.    We sell custom construction loans to
20      Freddie Mac.
21            Q.    And is that true for all of the custom
22      construction loans that Banner Bank does?
23            A.    During the time period that Shaw applied
24      for a loan, correct.
25            Q.    If you had to provide an estimate of the
```

Page 13

```
1      foreclosure, correct?
2           A.    It could.
3                     MR. LANE:    Object to the form,
4      leading.
5           Q.    (BY MR. O'DONNELL:)   Does serious
6      delinquency -- Well, let me ask you a different
7      question.
8                     If someone stopped paying on their
9      mortgage and fell 30 or 60 or 90 days' delinquent,
10     could that constitute a serious delinquency?
11          A.    Well, I'm not an expert in the inner-
12     workings of Loan Prospector.   I would assume that
13     would.
14          Q.    And could it constitute a serious
15     delinquency regardless of whether that property
16     ultimately was sold in, say, a short sale?
17          A.    Can you rephrase that question?
18          Q.    If someone fell behind on their loan,
19     even before the property was taken by a foreclosure
20     or sold in a short sale, the fact of falling behind
21     on the payment, that alone could constitute a
22     serious delinquency, correct?
23          A.    Correct.   My expectation, utilizing LP, I
24     would expect them to do that.
25          Q.    Turn to, if you will, the fifth page of
```

Page 35

1    Exhibit 6, which has the number on the bottom BANNER

2    347.   And let me direct your attention to, near the

3    bottom of the page, there's a code YX, and then a

4    short paragraph of explanation.

5              Do you see that?

6         A.    I do.

7         Q.    Okay.  Would you read what that says,

8    please?

9         A.    "The Borrower has had a short sale/deed-

10   in-lieu of foreclosure within the last seven years.

11   The mortgage file must also contain evidence of the

12   completion of the short sale/deed-in-lieu of

13   foreclosure."

14        Q.    And that explanation that you just read

15   from the Loan Prospector findings, what did you

16   understand that to mean?

17        A.    Well, the borrower promised to pay back a

18   bank, at a certain amount by a certain date, and

19   didn't.

20        Q.    The paragraph you just read indicates

21   that Loan Prospector was picking up the fact that

22   the borrower had a short sale, correct?

23        A.    Correct.

24        Q.    Okay.  And based on your review of the

25   documentation or on Banner's review of the

Page  36

1    documentation regarding Mr. Shaw, that was accurate,

2    right?  He had a short sale?

3         A.    Based on the information contained in the

4    credit report and the borrower's client's

5    explanation of the credit report, correct.

6                        (Pause in the proceedings).

7         Q.    I want to make sure I'm not asking you

8    about duplicative loan processer findings.

9                   MR. O'DONNELL:  Let's mark as Exhibit

10   7 a document, for you on the phone, the beginning

11   Bates number here is BANNER 0005.  This is another

12   Loan Prospector Feedback Certificate.

13                        (Deposition Exhibit 7 was

14                         marked for identification).

15        Q.    (BY MR. O'DONNELL:)  Sir, do you

16   recognize Exhibit 7 as another Loan Prospector

17   Feedback Certificate that Banner Bank pulled in

18   connection with Mr. Shaw's loan application?

19        A.    Yes.

20        Q.    And looking at Exhibit -- or at page 2 of

21   Exhibit 7, it looks like this particular document

22   was accessed or generated on March 18th, 2013.

23        A.    Correct.

24        Q.    And like the ones we have looked at

25   before, this Loan Prospector certificate advised a

                                           Page 37

1    class of Caution, correct?

2         A.    Correct.

3         Q.    And like the other Loan Prospector

4    Feedback Certificate we have seen for Mr. Shaw, it

5    identified several, or what you interpreted, what

6    Banner interpreted, to be several reasons for that,

7    correct?

8         A.    Correct.

9         Q.    And I think you identified the most

10   significant one, or a significant one, as serious

11   delinquency, correct?

12        A.    Correct.

13        Q.    Go to the page that has the Bates number

14   009, if you will.   And let me direct your attention

15   to the paragraph that has the code YX.   Do you see

16   that?

17        A.    I do.

18        Q.    Would you read that paragraph, please?

19        A.    "The Borrower has had a short sale/deed-

20   in-lieu of foreclosure within the last seven years.

21   The mortgage file must also contain evidence of the

22   completion of the short sale/deed-in-lieu of

23   foreclosure."

24        Q.    And would you understand this paragraph

25   to mean that Loan Prospector was advising the bank

Page  38

Veritext Legal Solutions
866 299-5127

1     that Mr. Shaw had had a short sale?

2          A.    Correct.

3          Q.    And as part of the underwriting process,

4     Banner Bank needed to evidence that that was true,

5     correct?

6          A.    Correct.

7          Q.    And document when it occurred, correct?

8          A.    Correct.

9          Q.    And Banner Bank did that, right?

10         A.    Yes.

11         Q.    And Banner Bank ultimately originated the

12    loan that Mr. Shaw applied for, correct?

13         A.    Correct.

14              MR. O'DONNELL:  Let's take a short

15    break.

16              MS. DuBAY:   Sure.

17              MR. O'DONNELL:  For the people on the

18    phone, we're going to take a short break.

19                              (Short recess).

20              MR. O'DONNELL:  Let's go back on the

21    record.

22         Q.    We are back on the record, Mr. Larsen.

23    Are you still feeling okay, ready to proceed?

24         A.    Yes.

25         Q.    I can tell you that from my perspective,

Page 39

1          Q.     Okay.   And is one purpose of this memo

2     that we've marked as Exhibit 10 to document the

3     process that the bank had gone through to evaluate

4     the file and to receive some higher-up approval

5     within the bank to proceed with the manual

6     underwriting?   Is that how you would characterize

7     this document?

8          A.     Correct.

9          Q.     I want to direct your attention to the

10    first paragraph titled "Overview."   There's a

11    sentence that says "The automated system for LP was

12    picking up his short sale as a foreclosure."

13              Do you see that?

14         A.     I do.

15         Q.     Earlier today we looked at the Loan

16    Prospector Feedback reports, and we can look through

17    them again if it would be helpful, but do you recall

18    those Loan Prospector Feedback reports as

19    identifying a foreclosure?

20         A.     No.

21         Q.     So, this information here that says "LP

22    was picking up his short sale as a foreclosure," do

23    you believe that that is inaccurate?

24         A.     Yes.

25         Q.     So, Loan Prospector was not picking up

```
 1        his short sale as a foreclosure, based on the
 2        document that we looked at, correct?
 3                        MR. LANE:   Object to the form.
 4                        MR. O'DONNELL:  I will ask the
 5        question a different way.
 6             Q.   Based on your review today of the Loan
 7        Prospector Feedback Certificate, was Loan Prospector
 8        identifying a foreclosure?
 9             A.   Loan Prospector identified a short sale/
10        deed-in-lieu of foreclosure within the last seven
11        years.
12                        MR. O'DONNELL:  I don't have any more
13        questions.  Who wants to go next, if anybody?
14                        MR. PROVANCE:  Yeah.  I will go.
15                        MR. O'DONNELL:  Who is that?
16                        MR. PROVANCE:  Do you mind if we take
17        a five-minute break, maybe even shorter than that?
18                        MR. O'DONNELL:  No.  Absolutely.  We
19        can take a break.  Just make sure to identify
20        yourself.  Is that Matt?
21                        MR. PROVANCE:  Yes.  This is Matt
22        Provance.
23                        MR. O'DONNELL:  Sure.  We will just
24        wait here.
25                                        (Short recess).
```

Page 46

```
 1      STATE OF WASHINGTON      )

                                 ) ss.

 2      County of Walla Walla    )

 3

 4              I, William J. Bridges, do hereby certify

 5      that at the time and place heretofore mentioned in the

 6      caption of the above-entitled matter, I was a

 7      Certified Shorthand Reporter for the State of

 8      Washington, and pursuant to RCW 5.28.010, am

 9      authorized to administer oaths and affirmations in and

10      for the State of Washington; that at said time and

11      place I reported in stenotype all testimony adduced

12      and proceedings had in the foregoing matter; that

13      thereafter my notes were reduced to typewriting and

14      that the foregoing transcript consisting of 155

15      typewritten pages is a true and correct transcript of

16      all such testimony adduced and proceedings had and of

17      the whole thereof.

18              Witness my hand at Walla Walla, Washington,

19      on this 11th day of February, 2015.

20

21

22      _____

        William J. Bridges

23      CSR NO. 2421

24      Certified Shorthand Reporter

25      My commission expires:  11-1-15
```

Page 158

# EXHIBIT 20

# LODGED UNDER SEAL

# EXHIBIT 21

# LODGED UNDER SEAL

# EXHIBIT 22

1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3

4    JOHN T. SHAW, ET AL,          )

5                   Plaintiffs,    ) CIVIL ACTION

6    VS.                           ) NO.: 13CV1295

7    EXPERIAN INFORMATION          )

8    SOLUTIONS, INC., ET AL,       )

9                   Defendants.    )

10

11       DEPOSITION OF BANK OF TEXAS MORTGAGE BY AND

12   THROUGH ITS DESIGNATED REPRESENTATIVES, BILL NORTH AND

13   TERRY KUSKI, produced as a witness at the instance of

14   the Defendant Experian Information Solutions, Inc., and

15   duly sworn, was taken in the above-styled and numbered

16   cause on February 26, 2015, from 1:10 a.m. to 2:26 p.m.,

17   before Julie G. Davault, CSR in and for the State of

18   Texas, reported at the offices of Bank of Texas Mortgage,

19   2901 North Dallas Parkway, Suite 100, Plano, Texas

20

21

22

23

24

25   PAGES 1 - 60

                                                Page 1

```
 1    BY MR. WIERS:
 2         Q.   And, Mr. North, could you please tell me what
 3    your position is with Bank of Texas?
 4         A.   Yeah, I'm a vice president and branch manager
 5    with Bank of Texas Mortgage.
 6         Q.   And how long have you had that position?
 7         A.   Approximately three-and-a-half years.
 8         Q.   And what was your position before that?
 9         A.   I was vice president and branch manager at Bank
10    of America.
11         Q.   How long have you worked in the mortgage
12    industry?
13         A.   About 12 years or so.
14         Q.   Is the branch that you currently manage the
15    branch that Ray Rydman, where he applied for the
16    mortgage that is at question here today?
17         A.   Yes.
18         Q.   And where is that branch located?
19         A.   In Plano, Texas.
20         Q.   The subpoena that's been marked as Exhibit 1
21    includes a requests for documents.  And those -- we
22    received documents from your lawyer yesterday.  And I
23    just want to do some sort of official authenticating --
24    authentication of those.  Are you familiar with the
25    documents that were provided to us?
```

```
 1          A.  Yes.

 2          Q.  And are those documents that were produced to

 3     us from the business records of Bank of Texas?

 4          A.  Yes.

 5          Q.  And did you provide them to Counsel as they

 6     were kept in the ordinary course of business?

 7          A.  Yes.

 8          Q.  And do they reflect sort of the contemporaneous

 9     -- were those -- were those records created

10     contemporaneously with the -- with the dates on them?

11          A.  Yes.

12          Q.  Are you familiar with Mr. Rydman, personally?

13          A.  No.

14          Q.  Are you familiar with his loan application?

15          A.  I've been brought to speed in the last day or

16     so, yes.

17          Q.  Are you familiar, in your experience in the

18     mortgage industry, are you familiar with the rules

19     Fannie Mae applies governing short sells?

20          A.  Yes, I'm familiar with those rules.

21          Q.  What do -- what's your general understanding of

22     that -- of Fannie Mae's rules in regard to short sells

23     and -- and the ability to secure a mortgage after a

24     short sell?

25          A.  I believe a short sell is seven years, although
```

Page 7

1    I'm not -- I would have to double-check.  It's something

2    I could look up pretty quickly.

3        Q.  So there's some -- Okay.  Where would you go

4    look the answer up?

5        A.  I've got some guidelines.  They're MRI books on

6    my desk that I could reference or I -- or I could go

7    online.

8        Q.  Would you check the Fannie Mae selling guide?

9        A.  Yes.

10       Q.  And in that guide, Fannie Mae lays out their --

11   the rules that they've set with regard to lots of

12   things, including short sells, right?

13       A.  Yes, sir, that's correct.

14       Q.  And those are rules that Fannie Mae, with

15   regard to things like how long after a particular

16   derogatory event one has to wait before it no longer is

17   considered derogatory, Fannie Mae sets those rules,

18   right?

19       A.  Correct.

20       Q.  During your tenure with either Bank of America

21   or Bank of Texas, did you ever become aware of a

22   situation or hear through the grapevine of a situation

23   where potential borrowers were applying for mortgages

24   and were receiving "refer with caution" recommendations

25   from Fannie Mae's Desktop Underwriter claiming that they

Page 8

1    had a foreclosure when, in fact, they had a short sell?

2         A.  Am I familiar, personally, with those

3    instances?

4         Q.  Have you heard about it generally?

5         A.  I'm sure it could happen if there is a --

6    misinformation on the credit report.

7         Q.  Well, my question is, have you heard of a sort

8    of -- in the industry talk, have you heard of any sort

9    of like systemic problem, setting aside individual

10   situations where maybe there's a -- a mistake somewhere,

11   have you heard of this being an issue?

12        A.  I don't think it's a prevalent issue, no.

13        Q.  Are you familiar with Fannie Mae's Desktop

14   Underwriter?

15        A.  Yes.

16        Q.  What is Desktop Underwriter?

17        A.  It's an automated decisioning engine that

18   Fannie Mae provides so you plug in, you know, borrower

19   data, income, assets, credit and the collateral and then

20   it provides a decision as to whether or not it's a loan

21   Fannie Mae will accept.

22        Q.  And what -- when -- when you say that Fannie

23   Mae will accept, what does that mean?  What does Fannie

24   Mae do with loans?

25        A.  Well, they -- well, they ultimately, I guess,

Veritext Legal Solutions
866 299-5127

1    securitize the loans.  And, you know, we turn around --

2    we sell the loan, the securitized loan to Fannie Mae.

3         Q.  Okay.  So if Fannie Mae has approved a loan,

4    they will purchase it?

5         A.  Correct.

6         Q.  If -- if Fannie Mae -- Do you know the

7    potential outcomes for Desktop Underwriter, what the --

8    what the possible outcomes are?

9         A.  Yes.

10        Q.  What are those?

11        A.  "Approved/eligible" and then "ineligible" or

12   "approved/ineligible."

13        Q.  Is it called "ineligible" or is it called

14   "refer with caution"?  Do you know?

15        A.  I'm not -- I'm not positive.

16        Q.  Okay.  If someone receives a "refer with --"

17   Are you familiar with the term "refer with caution"?

18   Have you heard that?

19        A.  Yes.

20        Q.  Okay.  You're aware that if someone receives a

21   "refer with caution" and the mortgage broker, who is

22   sitting there eyeballing the person and that person's

23   credit report, if that person is able to see that the --

24   that Desktop Underwriter is mistaken or believes that

25   they should be approved, that the loan can be manually

1    underwritten and Fannie Mae will still purchase it,

2    right?

3         A.   That's correct for some banks.   My bank doesn't

4    do manual underwrites.

5         Q.   Does the Bank of Texas have a corporate policy

6    that it will not manually underwrite?

7         A.   On Fannie Freddie loans, that is correct.

8         Q.   Is that across the board?

9         A.   Yes.   But, you know, we can do a manual on FHA

10   and VA, but that's not applicable here.

11        Q.   And FHA, VA manual underwrites are required by

12   law, right?

13        A.   I don't believe they're required by law, but

14   it's just our bank policy that we will allow for a

15   manual underwrite on those -- those products in certain

16   circumstances.

17        Q.   If Bank of Texas did do a manual underwrite on

18   a Fannie loan and it was purchase by Fannie, there's no

19   additional financial risk to the bank than there would

20   be if it had received an approved at the outset, right?

21        A.   I'm not -- I can't answer that.   I don't know,

22   I should say.   I believe, actually, there would be, but

23   I -- I can't say for certain.

24        Q.   Are you familiar with the term "significant

25   derogatory event" --

                                              Page 11

```
 1          A.   Yes.
 2          Q.   -- as that term is used by Fannie Mae in its
 3     selling guide?
 4          A.   Yes.
 5          Q.   And are you familiar with the fact that a short
 6     sell is a significant derogatory event?
 7          A.   Yes.
 8          Q.   When there are -- and the presence of
 9     significant derogatory events, like short sells, what
10     are some other examples of significant derogatory
11     events?
12          A.   Bankruptcy, foreclosure, those are -- that's
13     it.
14          Q.   Deed in lieu of foreclosure?
15          A.   Yes.   Charge-off.
16          Q.   It's important -- Lenders want to know about
17     them, right?
18          A.   Absolutely.
19          Q.   And even when a loan is sent to automated
20     underwriting, the lenders will still review the file and
21     -- and will review the documentation related to a
22     significant derogatory event, right?
23          A.   That's correct.
24          Q.   And the lender is still charged with making the
25     final decision about the acceptability of a borrower's
```

Page 12

1    credit history when significant derogatory events exist,

2    right?

3            A.   Correct.

4                 MR. LANE:  Object to the form, foundation,

5    asked and answered.

6                 Chris Lane for Plaintiff.

7                 MR. WIERS:  And, Chris, if you could just

8    -- we ran into this a little bit yesterday, but, you

9    know, we're in Federal Court, so I think if you'll just

10   say, "Objection, form," that'll save us all a lot of

11   heartache.

12                MR. WIERS:  Let me -- I guess it makes

13   sense, and as I said I really don't have a ton of

14   questions, but I do want to ask some questions about

15   Mr. Rydman and his application.  And I think it makes

16   the most sense to ask those questions to Ms. Kuski.  And

17   so I think we should pass to the Plaintiff at this point

18   and I'll ask Ms. Kuski these questions and then if need

19   be I can clean up with Mr. North at the back end if

20   there are some things that she didn't know that maybe he

21   knows.  Okay?

22                THE REPORTER:  Thank you.

23                MR. LANE:  This is Chris Lane for the

24   Plaintiff.  I would rather -- I mean, since the entire

25   deposition is designated as the deposition of the Bank

```
 1   of Texas, I'd like to wait until we've got all the
 2   questions out and then that way I could streamline
 3   things and know who I need to ask what questions to, so
 4   you go ahead and finish up, Adam.  We'll go from there.
 5              MR. WIERS:  So I guess I didn't understand
 6   what you're saying, Chris.  You're agreeing with what I
 7   proposed, right?
 8              MR. LANE:  That I ask Mr. North questions
 9   now?
10              MR. WIERS:  No, I would -- I would suggest
11   you save your questions till the end, but --
12              MR. LANE:  Oh, I'm sorry.  I misunderstood
13   you.  Absolutely.  If that's what you suggested, I
14   misunderstood.
15              MR. WIERS:  Yeah, I'm suggesting that I now
16   ask Ms. Kuski questions and then -- and then I'll pass
17   the -- the witness, quote, unquote, which is Bank of
18   Texas.
19              MR. LANE:  Okay.  Fair enough.
20              MR. WIERS:  All right.
21                     TERRY KUSKI,
22   having previously been first duly sworn, testified:
23                     EXAMINATION
24   BY MR. WIERS:
25        Q.  Ms. Kuski, what is your current position?
```

Page 14

```
 1        A.   I am a mortgage loan officer with Bank of
 2   Texas.
 3             MR. CLAYMAN:   You need to get closer.
 4        Q.   (BY MR. WIERS)   And how long have you been a
 5   mortgage loan officer with Bank of Texas?
 6        A.   Three-and-a-half years.
 7        Q.   Is that when the branch opened?   That seems
 8   conveniently the same amount of time that Mr. North has
 9   been a -- there?
10        A.   Yes.   I came over with Mr. North.
11        Q.   Okay.   So you -- were you at the Bank of
12   America before?
13        A.   Yes, sir.
14        Q.   And how long have you been a mortgage loan
15   officer, generally?
16        A.   12 years, about.
17        Q.   Let me ask you, ma'am, are you familiar with --
18   familiar with a situation in the lending industry where
19   potential borrowers who had short sells were
20   encountering Fannie Mae Desktop Underwriter findings
21   that labeled their short sells as foreclosures?
22        A.   I don't know of many that labeled them
23   differently.   I'm sure that could happen, but I hadn't
24   seen any that were different.
25        Q.   Okay.   So it wasn't something you heard chatter
```

Page 15

```
 1   pull his credit and took that information, pulled his
 2   credit and then spoke to him about it.
 3       Q.  Okay.  When you pulled his credit, did you see
 4   anything that you thought would be a potential hindrance
 5   in securing a mortgage?
 6       A.  Yes, like I mentioned before, the
 7   delinquencies, I had asked him to write me a letter of
 8   explanation so I could forward it.
 9       Q.  Okay.  And you believed with the letter of
10   explanation he would be able to be approved, which is,
11   in fact, what happened, right?
12       A.  Yes.
13       Q.  When Mr. Rydman first contacted you, to the
14   extent you remember, had he already selected a property
15   that he was going to purchase or was his search for a
16   property in its infancy and he was just looking to see
17   how much he would qualify for?
18       A.  Yes, he was looking for property and had not
19   found one yet and was looking to get approved.
20       Q.  Okay.  Do you -- Did the bank approve him for a
21   certain amount?
22       A.  Yes.
23       Q.  Do you know what that amount was?
24       A.  Yes, it was for 300 -- 332,000.
25       Q.  And did he then find a property that he
```

Page 18

1    purchased?

2         A.   Yes.

3         Q.   And you were able to complete a mortgage for

4    him?

5         A.   Yes.

6         Q.   And received an approval from Fannie Mae?

7         A.   Yes.

8         Q.   And the mortgage was sold to Fannie Mae?

9         A.   Yes.

10        Q.   So far as you know?

11        A.   Yes.

12        Q.   I want you to look at a document that you guys

13   produced that has the Bates stamp BOTX-Rydman-44.   Do

14   you have --

15             MR. WIERS:   John, do you guys have that,

16   the document that I identified for you?

17             MR. CLAYMAN:   Yes, we do.   So this is --

18   We're there.

19             MR. WIERS:   Okay.   Good.

20        Q.   (BY MR. WIERS)   This -- Can you just tell me --

21   So this is a document that's called "Conventional

22   Underwriting Requirement Sheet."   And it's dated

23   February 21, 2014.   And I just -- And you're listed

24   there, Ms. Kuski, as the originator.   Can you tell me

25   what this document is and what happened on February 21,

                                              Page 19

1   2014?

2       A.  This document would come from underwriting to

3   my processor to say the conditions, what Mr. Rydman had

4   to provide for us in order for the loan to get full

5   approval.

6       Q.  So the underwriters approved Mr. Rydman for --

7   for this mortgage, right?

8       A.  Correct.

9       Q.  And if we look at the top this was a

10  conventional mortgage -- that was a conventional

11  30-year, right?

12      A.  Yes.

13      Q.  At a rate of 4.375 percent, right?

14      A.  Yes.

15      Q.  Would you agree with me in the grand scheme of

16  your career as a mortgage loan officer is a pretty good

17  interest rate?

18      A.  Yes.

19          MR. LANE:  Object to the form, foundation.

20          Plaintiff's Counsel.

21      Q.  (BY MR. WIERS)  Can -- So this document as I --

22  Correct me if I'm wrong, but this represents the fact

23  that the folks at Bank of Texas were approving this

24  mortgage for -- the underwriters were approving it?

25          MR. NORTH:  Loan approval.

                                            Page 20

1    quickly look at it, right?

2        A.   Yes.

3        Q.   And here, if you look at Mr. Rydman's credit

4    report, on page 9 it says he has no -- there's no public

5    records found, right?  If you -- I'm looking at the big

6    heading at the bottom.  It says, "Public Records"?

7        A.   Right.

8        Q.   You there?

9        A.   Correct.  Yes.

10        Q.   And then underneath, "No public record found"?

11        A.   Correct.

12        Q.   So you'd agree that on this credit report there

13    is no foreclosure reporting for Mr. Rydman, right?

14        A.   Right.

15        Q.   And just so we're clear about what this credit

16    report is, is this a credit report that was generated by

17    one of the three national credit reporting bureaus,

18    Experian Equifax or TransUnion?

19        A.   Yes, all three.

20        Q.   Okay.  It's -- so -- so it includes information

21    from all three, but was it generated by all three?

22        A.   It -- No, it was generated by Equifax Mortgage.

23        Q.   Okay.  Equifax Mortgage Solutions, which is a

24    different company from Equifax the credit reporting

25    agency, right?

                                            Page 24

1    put there?  What are those -- what are those accounts?

2         A.  Well, the information that is put on the

3    adverse summary is the information when somebody is

4    delinquent on any kind of trade line.  It's posted on

5    that first section, so you're aware it's there --

6         Q.  Okay.  Good.  So you do know what it it is?

7         A.  Right.

8         Q.  Because it sounds to me like you do know what

9    it is.

10        A.  Oh, okay.  I'm sorry.  I misunderstood.

11        Q.  Okay.  That's -- I -- Undoubtedly my question

12   was not nearly as clear as I'd hoped.

13             But that section includes a summary of the

14   delinquent or other adverse accounts, right?

15        A.  Yes.

16        Q.  And one of the accounts that -- And Mr. Rydman

17   had three such accounts, right?

18        A.  Yes, he did.

19        Q.  And they all seem -- Well, one is a KeyBank

20   home equity loan, right?

21        A.  Yes.

22        Q.  And one is a Wells Fargo home equity loan --

23        A.  Yes.

24        Q.  -- right?

25        A.  Yes, that's correct.

                                        Page 27

1        Q.   And then the third one there is Wells Fargo
2    Home Mortgage, right?
3        A.   Yes.
4        Q.   And the KeyBank account and the Wells Fargo
5    Home Mortgage account are delinquent because they were
6    past -- the accounts were past due, right?
7        A.   Yes, they were.
8        Q.   And the Wells Fargo home equity line says that
9    the account was legally paid in full for less than the
10   full balance.   Is there a term that is generally used in
11   the mortgage industry for mortgage accounts that are
12   legally paid in full for less than the full balance?
13       A.   Short sell.
14       Q.   Okay.   So that's a short sell?
15       A.   Yes.
16       Q.   Okay.   When I'm looking at this and then and
17   just -- just so the record's clear, if you look at
18   page 4 at the bottom, so the -- Okay.   So let me just
19   restart.
20            The page we were looking at is sort of a
21   summary page.   And then behind it is the full credit
22   report.   And it starts with page 1 of 9.   Do you see
23   that?
24       A.   Yes.
25       Q.   And on that first page it lists Mr. Rydman's

                                              Page 28

1    credit scores; is that right?

2         A.   Yes, it does.

3         Q.   Who did he have the highest score with?

4         A.   His highest score was with Experian.

5         Q.   Okay.  And if you then flip the page to page 4

6    of 9 on -- at the bottom, you see the page numbers 4 of

7    9?

8         A.   Yes.

9         Q.   The second account from the bottom is -- is

10   that the same Wells Fargo short sell we were just

11   looking at?

12        A.   Yes.  Yes, it is.

13        Q.   Okay.  Having a prior short sell is not a

14   complete bar to receiving a mortgage, is it, ma'am?

15        A.   No, it's not.

16        Q.   Fannie Mae has certain rules regarding prior

17   short sells, right?

18        A.   Yes, they do.

19        Q.   Are you familiar with what those -- what the

20   waiting period is, for example?

21        A.   Yes, if I go, according to the Fannie Mae

22   guidelines, it gives me that information, how many years

23   for bankruptcy, foreclosure and short sell.

24        Q.   And do you know it off the top of your head

25   what it is for short sells?

```
 1                    MR. CLAYMAN:  Yes.

 2                    MR. HYMAN:  Yes.

 3                    MR. WIERS:  Scott, you there?

 4                    MR. HYMAN:  Yes, I am.

 5                    MR. WIERS:  Chris?

 6                    MR. LANE:  Yes, I'm here.

 7        Q.   (BY MR. WIERS)  Okay.  Exhibit 4 is another

 8   tri-merge credit report, right?

 9        A.   Yes.

10        Q.   And this one is dated February 20, 2014; is

11   that right?

12        A.   Yes.

13        Q.   And this one also does not have -- include any

14   foreclosures, right?

15        A.   Yes.  Correct.

16        Q.   And it also does include the same short sell

17   account, right?

18        A.   Yes, it does.

19        Q.   Okay.  I now want to look at Exhibit 5, which

20   is the document entitled "DU Underwriter Findings."  Do

21   you have that in front of you, ma'am?

22        A.   Yes, I do.

23        Q.   Are you familiar with Desktop Underwriting

24   findings?

25        A.   Yes, I am.
```

Page 32

1      Q.   Can you tell, generally, what they are?

2      A.   It's a summary of the customer -- the

3   information that was put into our system about the

4   customer and then also the findings, whether or not this

5   loan would give us an "approve/eligible" or not to

6   proceed further if --

7      Q.   Okay.

8      A.   -- basically.

9      Q.   And here, I see the top -- and this -- so this

10   is -- Desktop Underwriter is a Fannie Mae system, right?

11      A.   Yes.

12      Q.   And -- and you are providing information to

13   Fannie Mae and they are spitting it back to you and

14   telling you whether they will purchase this loan or

15   whether you need to manually underwrite it or do

16   something else, right?

17      A.   Yes.

18      Q.   And here they say the recommendation is

19   "approve/eligible," right?

20      A.   Yes, sir.

21      Q.   So as of this date, Mr. Rydman received an

22   "approve/eligible" from DU Underwriter, even with his

23   short sell, right?

24      A.   Yes.

25      Q.   So if you look at the submission date, there's

Page 33

1        Q.   Why did it get submitted so many times?

2        A.   It just -- When different numbers might be

3    changed, possibly because the purchase price that we

4    originally were going to approve him with could have

5    changed, you know, his bank accounts could have changed.

6    There's different things that might have changed, so the

7    process would just run it through the system to make

8    sure that nothing comes up that wasn't there that we

9    originally had put on the application.

10       Q.   Okay.   And he was receiving an

11   approve/eligible, I take it, every time?

12       A.   Yes.

13       Q.   You certainly were never under the

14   misimpression that Mr. Rydman had a prior foreclosure,

15   right?

16       A.   No.

17       Q.   The document I want to look at next is

18   BOTX-Rydman-340.

19       A.   Okay.   I'm getting it out.

20       Q.   And just tell me when you have that and when

21   the court reporter has marked it as the next exhibit.

22       A.   Okay.

23            (Exhibit 6 marked.)

24            THE REPORTER:   No. 6.

25       Q.   (BY MR. WIERS)   Okay.   Ma'am, is this the

                                              Page 37

1    letter you referred to earlier that Mr. Rydman provided

2    explaining -- excuse me, explaining his short sell?

3         A.   Correct.

4         Q.   And this would be a standard procedure for an

5    applicant who has a short sell, right?

6         A.   Yes, it would be.

7         Q.   Do you recall Mr. Rydman saying anything to you

8    to the effect of that his short sell had previously been

9    misinterpreted by Fannie Mae to be a foreclosure causing

10   him to be not approved?

11        A.   I don't recall that.

12        Q.   And he certainly, I take it then, never told

13   you that such an event caused him substantial emotional

14   distress?

15        A.   We never discussed that.

16        Q.   Can you please take a look at Rydman-341?

17             THE REPORTER:  Do we want to mark that?

18             MR. WIERS:  Yes, thank you.  We do.

19             (Exhibit 7 marked.)

20             THE REPORTER:  No. 7.

21        Q.   (BY MR. WIERS)  Okay.  Can you tell me what

22   Exhibit 7 is, ma'am?

23        A.   Let me just look real quick.  Oh, because he

24   was moving from California -- from Michigan to

25   California, his job, we just want verification that his

                                              Page 38

1        A.   No.

2        Q.   Are you familiar with a company by the name of

3   Freddie Mac?

4        A.   Yes.

5        Q.   And are you familiar with their automated

6   underwriting system called "Loan Prospector"?

7        A.   Yes.

8        Q.   Do you at Bank of Texas ever use Loan

9   Prospector?

10        A.   Yes.

11        Q.   In what scenarios would you use it?

12        A.   Basically, it's -- each -- Fannie Mae and

13   Freddie Mac have different guidelines as far as if they

14   had a dispute on their credit or, you know, some other

15   information.   One is less strict on some information

16   than the other would be.

17        Q.   And so they have certain different rules in

18   their under -- their automated systems are set up

19   differently, right?

20        A.   Yes, they are.

21        Q.   And would you agree with me that it's good

22   practice that if you receive a "refer with caution" or

23   denial from one, to perhaps try to submit it to the

24   other to see if you can get an approval?

25        A.   Absolutely.

                                             Page 40

1                    MR. LANE:   Object to the form, foundation.

2                    Plaintiff.

3        Q.   (BY MR. WIERS)   Is that something that you

4   would do in your practice?

5        A.   Yes.

6                    MR. WIERS:  I don't have any further

7   questions.

8                    Thank you.

9                    MR. LANE:  Scott, do you have any

10  questions?

11                   MR. HYMAN:  Am I up or is Citi up?

12                   MR. MORRILL:  I got nothing for Citi, so

13  it's you.

14                           EXAMINATION

15  BY MR. HYMAN:

16       Q.   Okay.  Yeah, this is -- this is Scott Hyman for

17  -- for Wells Fargo.

18                   Ms. -- I'm sorry.  I -- Is it Kuski?

19       A.   Kuski.

20       Q.   Kuski?

21       A.   Yes.

22       Q.   I'm sorry.

23                   Have you -- do you work on the -- does the

24  Bank of Texas retain servicing rights for any of the

25  conventional loans that it originates?

                                                  Page 41

```
 1    case, but --

 2              MR. CLAYMAN:  And -- and for what it's

 3    worth, this is John Clayman, it's not your subpoena.  So

 4    -- so I think we've responded as -- in good faith to a

 5    subpoena we received last week from -- from Adam Wiers.

 6              MR. WIERS:  I've got one follow-up

 7    question, just to -- to wrap a bow on this thing, to

 8    follow up on what Mr. Lane asked Ms. Kuski.

 9                   FURTHER EXAMINATION

10    BY MR. WIERS:

11         Q.  Just as a general sort of overview, the

12    situation with Mr. Rydman, he came in, applied for a

13    conventional mortgage, he was approved and he got that

14    mortgage without any hiccups, right?

15              MR. LANE:  Object to the form of the

16    question.

17              THE WITNESS:  Do I answer?

18              MR. CLAYMAN:  If you understand the

19    question, despite there being an objection, you can

20    answer.  If you don't understand -- But it doesn't mean

21    you can't answer it.

22              THE WITNESS:  Oh.  Yes.

23              MR. WIERS:  Okay.  Thank you.

24              MR. CLAYMAN:  Anything further from anyone?

25              MR. HYMAN:  No.
```

Page 51

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE SOUTHERN DISTRICT OF TEXAS

 3

 4   JOHN T. SHAW, ET AL,          )

 5                  Plaintiffs,    )

 6   VS.                           ) CIVIL ACTION

 7   EXPERIAN INFORMATION          ) NO.: 13CV1295

 8   SOLUTIONS, INC., ET AL        )

 9                  Defendants.    )

10

11              REPORTER'S CERTIFICATION

12        DEPOSITION OF BANK OF TEXAS MORTGAGE

13         BY AND THROUGH ITS REPRESENTATIVES

14             BILL NORTH AND TERRY KUSKI

15                FEBRUARY 26, 2015

16       I, Julie G. Davault, Certified Shorthand Reporter

17   in and for the State of Texas, hereby certify to the

18   following:

19       That the witnesses for the BANK OF TEXAS MORTGAGE,

20   was duly sworn by the officer and that the transcript of

21   the oral deposition is a true record of the testimony

22   given by the witnesses;

23       That the amount of time used by each party at the

24   deposition is as follows:

25   Christopher T. Lane, Esq......00 HOUR(S):13 MINUTE(S)
```

Page 58

```
 1   Adam Wiers, Esq......00 HOUR(S):50 MINUTE(S)
     Michael N. Morrill.....00 HOUR(S):00 MINUTE(S)
 2   Scott J. Hyman, Esq......00 HOUR(S):03 MINUTE(S)
 3        That pursuant to information given to the
 4   deposition officer at the time said testimony was taken,
 5   the following includes counsel for all parties of
 6   record:
 7   FOR THE PLAINTIFFS:
 8        Christopher T. Lane, Esq. (Via Telephone)
          CENTO LAW, LLC
 9        The Emelie Building
          334 North Senate Avenue
10        Indianapolis, Indiana 46204
          (317) 331-1344
11        chrislane@centolaw.com
12   FOR THE DEFENDANT EXPERIAN INFORMATION SOLUTIONS, INC.:
13        Adam Wiers, Esq. (Via Telephone)
          JONES DAY
14        77 West Wacker
          Chicago, Illinois 60601-1692
15        (312) 782-3939
          awwiers@jonesday.com
16
     FOR THE DEFENDANT CITIMORTGAGE:
17
          Michael N. Morrill (Via Telephone)
18        MAYER BROWN, LLP
          71 S. Wacker Drive
19        Chicago, Illinois 60606
          (312) 701-8239
20        mmorrill@mayerbrown.com
21   FOR THE DEFENDANT WELL FARGO:
22        Scott J. Hyman, Esq. (Via Telephone)
          SEVERSON & WERSON
23        19100 Von Karman Avenue
          Suite 700
24        Irvine, California 92612
          (949) 442-7110
25        sjh@severson.com
```

Page 59

```
 1   FOR THE WITNESSES:

 2        John D. Clayman, Esq.

 3        FREDERIC DORWART LAWYERS

 4        Old City Hall

 5        124 East Fourth Street

 6        Tulsa, Oklahoma 74103

 7        (918) 583-9965

 8        jclayman@fdlaw.com

 9        I further certify that I am neither counsel for,

10   related to, nor employed by any of the parties or

11   attorneys in the action in which this proceeding was

12   taken, and further that I am not financially or

13   otherwise interested in the outcome of the action.

14        Certified to by me this 4th day of March, 2015.

15

16

17                    Julie G. Davault

18

19        Julie G. Davault, CSR, No. 2092

20        Expiration Date:  12/31/16

21

22

23

24

25
```

Page 60

# EXHIBIT 23

# LODGED UNDER SEAL

# EXHIBIT 24

```
 1            IN THE UNITED STATES DISTRICT COURT

 2             SOUTHERN DISTRICT OF CALIFORNIA

 3

 4   JOHN T. SHAW, KENNETH COKE; and RAYMOND

 5   RYDMAN, on behalf of themselves and all others

 6   similarly situated,

 7                                         PLAINTIFFS,

 8

 9   V.

10                    CASE NO. 13CV1295JLSBLM

11

12   EXPERIAN INFORMATION SOLUTIONS, INC., WELLS

13   FARGO BANK, NA and CITIMORTGATGE, INC.,

14                                       DEFENDANTS.

15   _____

16

17            DEPOSITION FOR THE DEFENDANTS,

18        EXPERIAN INFORMATION SOLUTIONS, INC.:

19

20     The Deposition of Valerie Atzinger, taken in the

21   above-styled matter at Stites & Harbison, PLLC, 400

22   West Market, 1800 Mercer Tower, Louisville, Kentucky,

23   on the 25th day of February, 2015, beginning

24   at 9:06 a.m.

25
```

                                                   Page  1

```
 1    BY MR. WIERS:
 2       Q.    Exhibit 1, ma'am, is a subpoena that was
 3    served on Commonwealth Bank.   Have you seen
 4    this before?
 5       A.    Yes.
 6       Q.    And are you -- have you been designated
 7    as the witness to speak on behalf of
 8    Commonwealth Bank with regard to the topics
 9    identified there?
10       A.    Yes.
11       Q.    Can you please -- and -- and did you
12    assist -- I -- I know Commonwealth made a couple
13    of document productions.   Did you assist in -- in
14    that process, or was that something that took
15    place behind the scenes?
16       A.    I don't know which documents you're
17    referring to.   Yesterday I provided documents.
18    Outside of that, I don't know who provided the
19    initial set of documents.
20       Q.    Okay.   But to your understanding, the
21    documents that are requested in that subpoena
22    have been searched for and provided?
23       A.    Yes.
24       Q.    What's your -- the name of your current
25    employer?
```

Page 7

1     A.    Commonwealth Bank & Trust Company.

2     Q.    And what is your title?

3     A.    I'm Mortgage Operations Manager.   Also,

4     Vice President.

5     Q.    How big an outfit is Commonwealth Bank?

6           MR. CROWE:   800 -- 800 million.

7     A.    800 million.

8     BY MR. WIERS:

9     Q.    800 million --

10          MR. CROWE:   In assets.

11    A.    Assets.

12    BY MR. WIERS:

13    Q.    In assets?   And -- and does it have

14    storefront sort of locations?

15    A.    Yes.

16    Q.    And how many -- is it -- is it primarily in

17    the Kentucky area, or --

18    A.    Yes.

19    Q.    Okay.   How many -- so is it a pretty major

20    player in the Kentucky mortgage industry?

21    A.    We're probably top five in Louisville.

22    Q.    Okay.   And as your job, Mortgage

23    Operations Manager, is that a corporate job, or are

24    you on the ground sort of closing mortgages and

25    things like -- or dealing with actual mortgages?

                                              Page  8

1    A.   I deal with actual mortgages.

2    Q.   Okay.  And where is the loc -- where is

3    the location where your sort of office is?

4    A.   I'm at 4912 U.S. Highway 42 in Louisville.

5    Q.   Okay.  Have you ever had your deposition

6    taken before?

7    A.   Many, many years ago.

8    Q.   Okay.  What was that -- what was that

9    related to?

10   A.   Oh, my gosh.  That's a long -- that's

11   been, like, 20 something years ago.  It was related

12   to mortgages, actually.  I worked for National City.

13   It was related to mortgages we made to a company

14   in Atlanta, Georgia.

15   Q.   So how long have you worked in the

16   mortgage industry?

17   A.   Thirty-five years.

18   Q.   Do you consider yourself fairly

19   knowledgeable about that industry?

20   A.   Yes.

21   Q.   Did you work for National City here in

22   Louisville?

23   A.   Yes.

24   Q.   And how long have you been with

25   Commonwealth?

Veritext Legal Solutions
866 299-5127

1    A.   Yes.

2    Q.   If you don't understand a question I ask, I

3    would ask that you please ask me to rephrase it.

4    If you answer, I'll assume you understood the

5    question; does that seem fair?

6    A.   Fair.

7    Q.   If you need to take a break at any point,

8    just let me know, and we'll do that.  The only

9    caveat to that would be if there's a question

10   pending I'd ask you to answer it first, and then we

11   can take a break; fair enough?

12   A.   Fair enough.

13   Q.   Okay.  So can you tell me sort of

14   generally what your duties are at Commonwealth?

15   A.   I oversee the processing, closing,

16   underwriting, and post-closing of secondary

17   mortgage loans that we sell on the secondary

18   market.

19   Q.   What's -- underwriting, closing, and

20   post-closing?

21   A.   And processing.

22   Q.   What's post-closing?

23   A.   After the file's closed, we review the

24   closing package that comes back from the closing

25   attorney to make sure all the closing documents

Page 11

```
1    are accurate, and we make sure that they're

2    shipped to the investors.

3        Q.   Who are the investors?

4        A.   Fannie, Freddie, Kentucky Housing,

5    Chase.  We have a handful of investors.

6        Q.   Are those the same as underwriters?

7        A.   No.  Investors and underwriters are

8    different.  Underwriters underwrite the file, make a

9    decision on the loan.  Investors actually buy the

10   asset of the mortgage.

11       Q.   Is Fannie both an underwriter and an

12   investor?

13       A.   Fannie is not a physical underwriter.

14   Fannie has an underwriting engine.  We physically

15   still have to underwrite the files.

16       Q.   So Commonwealth itself underwrites it,

17   and then Fannie buys it?

18       A.   Correct.

19       Q.   Is the same true for Freddie -- for

20   Freddie?

21       A.   Yes.

22       Q.   And Kentucky Housing?

23       A.   Yes.

24       Q.   Chase, when you deal with Chase?

25       A.   If it's -- if it's a jumbo loan, Chase
```

Page 12

1      A.   If it comes in without an approval, they

2    can still underwrite it to see if they could get to an

3    approval status.

4      Q.   Okay.  So, if it comes back with, for

5    example, refer with caution, you could still

6    manually underwrite it; right?

7      A.   No.

8      Q.   Okay.  So is that a Common --

9    Commonwealth has a policy where they don't allow

10   a manual underwrite of a refer with caution?

11     A.   On a conventional loan, that's correct.

12     Q.   Okay.  But that is possible to do, it's just

13   that Commonwealth has a policy to not do it?

14     A.   It's up to each lender whether they

15   choose to do it or not, but you can manually

16   underwrite -- Fannie Mae and Freddie Mac have

17   certain guidelines that you could manually

18   underwrite, yes.

19     Q.   And if you manually -- but Commonwealth

20   has just made a decision that they won't --

21     A.   Right.

22     Q.   -- manually underwrite?

23     A.   Conventional loans.  That's correct.

24     Q.   So tell me -- explain to me what these

25   underwriting people, these six people are doing

Page 20

1    then if they're just -- are they doing anything other

2    than just rubber stamping the decision of the

3    automated underwriter?

4       A.   No.   They have to actually go through the

5    documents that have been provided by the

6    borrower and make sure the documents are

7    accurate.

8        They calculate income, they look at the bank

9    statements, they have to see if there's any large

10   deposits that need to be addressed, they have to

11   make sure the names on the bank statements and

12   all the documents agree, the addresses agree.

13   They review the purchase contracts to ensure

14   there's no -- that it meets all the guidelines.   It

15   takes them, like, an hour and a half on each loan

16   to review.

17      Q.   Okay.  So, even if -- and so what they're

18   doing there is to just make sure that the automated

19   system has -- well, in that -- in that situation, they

20   would look to see if perhaps the automated system

21   provided an approval when it shouldn't have?

22        MR. LANE:  Object to form; foundation.

23      A.   They're not looking for that; no.  They're

24   looking to confirm that the information that was

25   input into the AUS system is accurate.

                                        Page 21

1    Q.   And what does GSE stand for?

2    A.   Government Sponsored Entities.

3    Q.   And/or is "investor" a -- a good term to

4  use, as well?

5    A.   Sure.

6    Q.   Okay.  So you're -- so the -- the -- the

7  guidelines that each investor has for whether they

8  will approve a particular application are set by

9  that investor; right?

10   A.   They don't approve, it goes through their

11  under -- they -- they have guidelines, but they

12  don't officially approve loans.  Our investors, loan

13  jumbo, do not officially approve loans.

14   They rely on our underwriters to approve

15  loans.  They have underwriting engines with the

16  recommendations that we have to follow, but they

17  do not approve loans.

18   Q.   Okay.  But the guidelines -- they create

19  their own guidelines that lead to the

20  recommendations; right?

21   A.   Yes.

22   Q.   And each investor might have slightly

23  different guidelines?

24   A.   They could; yes.

25   Q.   Do you ever submit conventional

1    mortgages to Freddie instead of Fannie?

2       A.   We always start with Fannie.  We have

3    probably five known reasons that there are

4    difference in underwriting guidelines, and if that

5    loan happens to meet a Freddie Mac guideline that

6    doesn't meet a Fannie, then we'll send it to

7    Freddie, but it does not happen very often.

8       Q.   Okay.  But it is -- so there are times when

9    you'll receive a refer with caution from Fannie

10   when you'll submit it to Freddie and you'll get a

11   recommend approval?

12      A.   We'll get an approve eligible, yes, that

13   will happen, mainly on FHA loans, rarely on

14   conventional.

15      Q.   So let's say you got a recommendation of

16   approve from the investor, the underwriting group

17   that approves it.  I assume then the deal would go

18   through closing.

19      A.   If our underwriter approves it, yes --

20      Q.   Right.

21      A.    -- and all the conditions are obtained,

22   then the deal would go to closing.

23      Q.   Okay.  And then what happens?  Is the

24   loan sold to the investor, or does -- what does the

25   investor do?

1    the day, the goal is to have Fannie Mae purchase

2    it; right?

3        A.   Correct.

4        Q.   Have you ever run into situations where

5    you thought a loan could be manually underwritten

6    but you were unable to do it simply because of

7    Commonwealth's policy?

8        A.   No, but I don't look at every loan every

9    day.  No, I have not.

10       Q.   If that situation arose, is there room to

11   go to a superior and say, "Hey, look, there's just

12   something going on with the automated system

13   here.  I think we can manually underwrite this"?  Is

14   there room to request to do that and then to do it?

15           MR. LANE:  Object to the form; calls for

16   speculation.

17       A.   No.

18   BY MR. WIERS:

19       Q.   Okay.  So Commonwealth has -- they just

20   have a policy they won't manually -- they won't

21   manually underwrite conventional mortgages that

22   receive a refer with caution?

23       A.   Correct.

24       Q.   End of story.  Okay.

25           Now, we talked about this -- was it called loan

Page 39

1   A.   We have an interface through Mortgage

2   Builder to Fannie Mae that mirrors up, goes to

3   Fannie Mae, and we get the findings back.

4   Q.   And at some point, you pull the person,

5   the applicant's credit report; right?

6   A.   Yes.  Yes.

7   Q.   When does that happen?

8   A.   Normally, the loan originators will pull

9   the credit report before they run the loan through

10  the AUS system.

11  Q.   So they'll eyeball it just to make sure,

12  you know, hey, it looks like we're -- you look like

13  you're in pretty good shape here?

14  A.   Yes.

15  Q.   Do they pull a particular -- well, you're

16  familiar with the big three credit reporting

17  agencies?

18  A.   Yes.

19  Q.   Experian, Equifax, and TransUnion; right?

20  A.   Yes.

21  Q.   And then there are also these re-sellers

22  which are also known as credit reporting agencies,

23  like Credco and others.  Are you familiar with

24  those?

25  A.   I'm familiar with Credco.

Page 41

1      Q.   Okay.   When you're pulling a credit

2   report, are you pulling a report from one of the big

3   three, or are you pulling -- and by "you" I mean

4   Commonwealth -- are you pulling from a re-seller?

5      A.   We pull from CBC.

6      Q.   CBC Innovis?

7      A.   M-hm.

8           THE REPORTER:   CBC and. . .

9           MR. WIERS:   Innovis.

10          THE REPORTER:   Innovis.

11          MR. WIERS:   I-n-n-o-v-i-s, I think.

12          THE WITNESS:   That's it.

13   BY MR. WIERS:

14      Q.   And that's what's called a tri-merge

15   report?

16      A.   Correct.

17      Q.   And the tri-merge is what's sent to Fannie

18   Mae; right?

19      A.   Well, we reference the number on the

20   tri-merge, and that's what Fannie Mae sees.

21      Q.   Okay.   So Fannie is receiving data from

22   CBC Innovis?

23      A.   I would assume.   That's an assumption;

24   yes.

25      Q.   It's not per -- it's not, to your knowledge,

Page 42

```
 1    getting data directly from the big three?
 2        A.   No, not to my knowledge.
 3        Q.   Do you know how tri-merge is, do you
 4    have a general understanding of how they're
 5    created?
 6        A.   Can you further define the question?
 7        Q.   Well, I mean, what is a tri-merge?
 8        A.   A report that pulls from the three
 9    repositories.
10        Q.   And why would that be more
11    advantageous than just pulling from a single
12    repository?
13        A.   Because you get different information
14    from different repositories and different credit
15    scores, and Fannie Mae requires and every
16    investor requires that you have a tri-merge.
17        Q.   Fannie Mae requires a tri-merge; doesn't
18    it?
19        A.   Yes.
20        Q.   And what -- do you know how the re-seller
21    or tri-merge builder deals with inconsistencies
22    between the different big three bureaus?
23        A.   No.
24        Q.   Do you know if the tri-merge company,
25    the re-seller takes the data and translates it into
```

Page 43

1       A.   I can't answer that.

2       Q.   So you don't know one way or the other?

3       A.   No, I do not know one way or the other.

4       Q.   Okay.

5            MR. WIERS:  Let's mark this as Exhibit 2,

6   please.

7   [WHEREUPON, document referred to is marked

8   Exhibit 2 for identification.]

9            MR. HYMAN:  And can you describe it for

10   the record?

11           MR. WIERS:  Yeah.  And I don't have any

12   additional copies, because this is just what we got

13   last -- yesterday.

14           MR. HYMAN:  Okay.

15   BY MR. WIERS:

16      Q.   Exhibit 2, ma'am, is a -- is a copy of

17   some documents that your lawyer provided

18   yesterday, and -- an extra copy from me.

19           MR. SPEAKER:  All these [phonetic]--

20           MR. WIERS:  Okay.

21           MR. HYMAN:  Can I take this one?

22   BY MR. WIERS:

23      Q.   This is a set of documents Bates stamped

24   confidential, and I'm talking about the -- the stamp

25   on the bottom right, Confidential-CB&T-Coke 55

Page 48

Veritext Legal Solutions
866 299-5127

1    through 70, and previously -- well, are these the

2    documents -- Exhibit 2, are these the documents

3    that you provided to counsel?

4        A.    Yes.

5        Q.    And -- and were these documents -- did

6    you provide them to counsel -- did you find them in

7    Commonwealth's records?

8        A.    Yes.

9        Q.    And are these fair and accurate copies

10   of -- of the records maintained by Commonwealth

11   in the ordinary course of business?

12       A.    Yes.

13       Q.    Prior to --

14            MR. WIERS:   I'm just going to have a

15   series of exhibits here.   And I'm sorry.   This is

16   going to be a little bit jumbled here.

17   [WHEREUPON, documents referred to are

18   marked Exhibit 3, Exhibit 4, Exhibit 5, Exhibit

19   6, Exhibit 7, Exhibit 8, Exhibit 9, and Exhibit

20   10 for identification.]

21   BY MR. WIERS:

22       Q.    Okay, ma'am.   And I -- I'm sorry to have

23   made this confusing.   I should have just kept these

24   all as one big document, but Exhibits 3 through 10,

25   which you've been handed, are a series of

Veritext Legal Solutions
866 299-5127

1    documents that we previously received from your

2    counsel, and I just -- my secretary had broken

3    them up by individual document.   That's why

4    there's so many of them as opposed to one stack.

5       But same questions for these:   Are these

6    documents that were provided to us as they were

7    maintained in the ordinary course of business by

8    Commonwealth?

9            MR. HYMAN:   Adam, is that -- is the

10   entirety of that 1 through 54?

11           MR. WIERS:   Yeah, it is.   And that's a

12   fair point.   For the -- for the record, the 3 through

13   10 is simply CB&T-Coke 1 through 54 just split into

14   various individual documents.

15      A.   1 through what?   54?

16   BY MR. WIERS:

17      Q.   Yeah.

18      A.   Okay.   Yes.   The answer to your question

19   is "yes."

20           MR. HYMAN:   In other words, just -- so

21   the entirety of the production between Exhibits --

22   as set forth in Exhibits 2 through 10 is CB&T 1

23   through CB&T 70?

24           MR. WIERS:   My answer to that is "yes."

25           MR. HYMAN:   Well, yeah.

Page 50

1          MR. WIERS:  Yes.  They're all -- all those

2     pages have now been marked as exhibits.

3          MR. HYMAN:  Okay.

4     BY MR. WIERS:

5     Q.   Okay.  Now --

6     A.   It goes through Exhibit 10?

7     Q.   Yeah.

8     A.   Okay.

9     Q.   Goes through Exhibit 10, and -- and we've

10    now encompassed every page produced, and I just

11    wanted to authenticate those documents.

12    A.   Okay.

13    Q.   So it was just sort of some boring lawyer

14    talk that we can now move past.

15       Now, Mr. Coke and his wife -- have you

16    reviewed Mr. Coke and his wife's sort of file and

17    history with Commonwealth Bank?

18    A.   To some degree, yes.

19    Q.   Okay.  Are you aware that Mr. Coke

20    originally received a mortgage for a property that

21    he purchased in Louisville with Commonwealth

22    through your private bankers back in 2012, I think?

23    A.   Yes.

24    Q.   Okay.  And then, in -- and are you aware

25    that at the time he received that mortgage from

                                          Page 51

1   Commonwealth he had a short sale on his file that

2   had happened within the past two years?

3      A.    Yes.

4      Q.    And he was still able to receive a

5   mortgage from Commonwealth Bank?

6      A.    Yes.

7      Q.    And he then came in to Commonwealth

8   initially in March 2013 hoping to perhaps

9   refinance; is that right?

10      A.    Yes.

11      Q.    And the -- and his information was

12   submitted to Desktop Underwriter; correct?

13      A.    Yes.

14      Q.    And the results of that are found at

15   CB&T-Coke 55 through 60, which is part of Exhibit

16   2?

17         MR. HYMAN:   2.

18      A.    Yes.

19   BY MR. WIERS:

20      Q.    Okay.

21         MR. HYMAN:   And for clarification, I

22   think you said 2012, March 2012.

23         MR. WIERS:   Right.

24         MR. HYMAN:   Is it March 2013 or 2012?

25         MR. WIERS:   Oh, when he came in?  He

Page 52

1    came in, that was March 2013.   If I said 2012, I

2    made a mistake.

3    BY MR. WIERS:

4        Q.    He came in in March 2013, and that's the

5    document we're looking in front of us, Coke 55;

6    right?

7        A.    Yes.   On this transaction; yes.

8        Q.    He received a refer with caution; is that

9    right?

10       A.    Yes.

11       Q.    And is it your understanding that he was

12   informed by -- do you know if he was dealing with

13   Ms. Tamme at this time?

14       A.    Yes.

15       Q.    And did she explain to him that he had a

16   short sale that was within two years?

17       A.    I can't answer that.

18       Q.    Okay.  If you. . .

19       A.    It's probably in your notepad here.

20            MR. LANE:  All of a sudden [phonetic] --

21            THE WITNESS:  I think he's looking at

22   the notepad, not Pam.

23            MR. LANE:  Still referring to the March

24   loan, correct, for the March loan?

25            MR. WIERS:  I'm referring to the March

1    loan.

2    BY MR. WIERS:

3        Q.    If you look at Exhibit 3, ma'am, do you

4    recognize Exhibit 3?

5        A.    Yes.

6        Q.    Is this a copy of Mr. Coke -- Mr. and Mrs.

7    Coke's tri-merge report from March 2013?

8        A.    Yes.

9        Q.    If you look at Page 8 of that report, which

10   is conveniently also Bates stamped 8, do you see

11   that there's a Wells Fargo mortgage account there

12   that's grayed out?

13       A.    Yes.

14       Q.    What does the grayed out mean?

15       A.    Some type of delinquency on the account.

16       Q.    And a short sale is a delinquency; is that

17   right?

18       A.    Yes.

19       Q.    And --

20       A.    Well, let me repeat, he has -- there's

21   delinquencies on the 30, 60, and 90.

22       Q.    Yeah.   So he was 30 days late, 60 days

23   late, and 90 days late on that mortgage; right?

24       A.    Correct.

25       Q.    And if you see there where it says

Page 54

1     A.     Not back in 2013, because they have

2   changed.

3     Q.     Okay.  And today they're four years?

4     A.    I -- honestly, I don't know them off the

5   top of my head.

6     Q.     Okay.  So you don't know what they are

7   today, either?

8     A.     I would if I was at my desk, but, no, I

9   can't tell you off the top of my head.

10     Q.     So do you -- do you consult the selling

11   guide frequently in the course of your work, or, at

12   least, do you consult it occasionally?

13     A.     Items like this, derogatory events, we

14   have matrixes built at Commonwealth, and we go

15   right to our matrixes.

16     Q.     Okay.  So there's a cheat sheet sort of?

17     A.     Sort of, so we don't have to go into the

18   guide all the time; yes.

19     Q.     Okay.  If you look at that Wells Fargo

20   account, based on your experience in the mortgage

21   industry, would you agree that that is -- that that

22   was a mortgage that's being reported as a short

23   sale?

24     A.     Yes.

25     Q.     If you could, ma'am, if you could flip

Page 56

1    through and just quickly review Mr. and Mrs.

2    Coke's application, and tell me whether you are

3    able to identify any foreclosure or bankruptcy on

4    this credit report.

5        A.   [examines document] There's no public

6    records found.

7        Q.   Okay.  A foreclosure and a bankruptcy

8    would both be located in the public record section?

9        A.   Yes.

10       Q.   Whereas, a short sale is not a public

11   record; right?

12       A.   That's correct.

13       Q.   So that's one way to very easily tell

14   whether something is a short sale or a foreclosure;

15   right?

16           MR. LANE:  Object to the form;

17   foundation.

18       A.   Yes.

19   BY MR. WIERS:

20       Q.   And another way to very easily tell would

21   be, for example, in the remarks code where it says

22   with regard to his mortgage that it was legally paid

23   in full for less than full balance.  Do you see that?

24           MR. LANE:   Same objection.

25       A.   Yes.

                                        Page 57

```
1    BY MR. WIERS:
2       Q.   That -- those are the remarks codes used
3    for short sale; right?
4       A.   Yes.
5       Q.   And as someone who's been in the
6    mortgage industry for many years, you're familiar
7    with that; right?
8       A.   Yes.
9       Q.   And you would expect those you work with
10   are similarly familiar with that; right?
11      A.   I can't answer that question.
12      Q.   You would expect that people at Fannie
13   Mae are familiar with that; right?
14      A.   I can't answer that question.
15      Q.   Okay.  Let's -- are you familiar with the
16   term "significant derogatory event"?
17      A.   Yes.
18      Q.   Is a short sale a significant derogatory
19   event?
20      A.   Yes.
21           MR. LANE:  Object to form; foundation.
22   BY MR. WIERS:
23      Q.   And while you testified earlier you don't
24   know them by heart, you are aware of the fact that
25   Fannie Mae has special rules for the handling of
```

Page 58

1    submitted to them; right?

2        A.    Yes.

3        Q.    Okay.  Now, if you look at Page 486, I'm

4    looking at the page number at the bottom right, it

5    talks about the waiting period requirements, and

6    then we sort of talked about that a little bit earlier

7    after someone has a significant derogatory event

8    there are certain waiting periods that Fannie Mae

9    imposes; right?

10       A.    Correct.

11       Q.    And are you familiar with the fact

12   that Fannie Mae refers to short sales as

13   pre-foreclosure sales?

14       A.    Yes.

15       Q.    They're the same thing?

16       A.    Yes.

17       Q.    So, if you look down at the bottom of

18   Page 486, it says -- we're here in the -- in the

19   all -- in the waiting period requirement section,

20   and there's "Deed-in-Lieu of Foreclosure or

21   Pre-foreclosure Sale."  Are you with me?

22       A.    Yes.

23       Q.    Okay.  And the waiting period requirement

24   is two years if there's an 80% maximum loan to

25   value ratio; right?

                                        Page 61

```
 1      Q.   Correct?

 2      A.   Correct.

 3      Q.   And the second one is, "The loan receives

 4   a recommendation from DU that is acceptable for

 5   delivery to Fannie Mae or, if manually

 6   underwritten, meets the minimum credit score

 7   requirements based on the parameters of the loan

 8   and the established eligibility requirements";

 9   right?

10      A.   Yes.

11      Q.   So Fannie Mae here is contemplating that

12   banks -- that some banks will manually underwrite

13   things that receive a refer with caution; right?

14      A.   Yes.

15           MR. LANE:   Object to form; calls for

16   speculation.

17   BY MR. WIERS:

18      Q.   If you flip to Page 496, there's a section

19   entitled "Pre-foreclosure Sales or Short Sales."

20   Are you with me?

21      A.   Yes.

22      Q.   It says, "DU is not able to identify

23   pre-foreclosure or short sales in the credit report

24   data.  Lenders must manually apply the

25   pre-foreclosure sale requirements to DU loan case
```

Page 66

1    files, regardless of the underwriting

2    recommendation received from DU."

3       Did I read that right?

4       A.    Yes.

5       Q.    Are you familiar with the requirement by

6    Fannie Mae that regardless of the recommendation

7    received from DU that the underwriters have to

8    manually review it?

9       A.    Yes.

10      Q.    If there's a pre-foreclosure sale in the

11   file?

12      A.    Yes.   So they get --

13            MR. LANE:   I'm going to object to the

14   form; mischaracterizes the -- the document.

15      A.    If they get an approve eligible, they still

16   have to make sure it meets the time frame,

17   because Fannie Mae does not know that it was a

18   short sale.

19   BY MR. WIERS:

20      Q.    Okay.   And even if -- and similarly --

21   well, okay.   Right.

22      And then it says, "DU will issue a message on

23   loan case files where the borrower's credit report

24   indicates an account may have been released to a

25   pre-foreclosure sale."

1    Do you see that?

2    A.    Yes.

3    Q.    So have you seen that before, DU will

4    often recognize, it can recognize when there's

5    been a pre-foreclosure sale; right?

6    A.    Yes.

7    Q.    And in fact, if we look back at -- well,

8    let's look at Exhibit 10, and look at Paragraph 6.

9          MR. LANE:   What pages constitute

10   Exhibit 10?

11         MR. WIERS:   Oh, sorry.   49 through 54.

12   Here.   Do you want. . .

13         MR. LANE:   I can get it, but if you've got

14   it --

15         MR. WIERS:   It's the only exhibit that I

16   don't have in my stack in front of me.

17         MR. LANE:   -- I'll take it [phonetic].

18   BY MR. WIERS:

19   Q.    Exhibit 10, Paragraph 6 -- and Exhibit 10,

20   for the record, this is the DU recommendation --

21   the Desktop Underwriter findings associated with

22   Mr. Coke's June 2013 application; right?

23   A.    Yes.

24   Q.    And here in Paragraph 6, it says, "The

25   credit report has identified an account that may

Page 68

1        A.    No.

2    BY MR. WIERS:

3        Q.    Okay.   What is Paragraph 6 saying to

4    you?

5        A.    That it appears through some way

6    somehow Fannie Mae through their connection

7    through the credit bureau has identified that there

8    may be a pre-foreclosure sale.

9        Q.    Okay.   And they're asking -- they're

10   saying in order to -- and they're identifying that

11   account -- for this application as being the Wells

12   Fargo account we looked at earlier that you agreed

13   with me was, in fact, a pre-foreclosure sale; right?

14       A.    It was a short sale; yes.

15       Q.    And it says, "The pre-foreclosure sale

16   must have been completed two or more years from

17   the credit report date."

18       And here we saw earlier the date of that short

19   sale was May 2011.   In this June 2013 application,

20   that would be more than two years; right?

21       A.    Yes.

22       Q.    You want to take a break?

23       A.    No, I'm fine.

24            THE REPORTER:   I could use a break,

25   bathroom break.

Page 70

1    A.    Correct.

2    Q.    And if you look at Paragraph 6, again,

3  Fannie Mae has correctly noted that the credit

4  report has identified an account that may have

5  been subject to a pre-foreclosure sale; do you see

6  that?

7    A.    Yes.

8    Q.    And -- and that was no secret to the folks

9  at Commonwealth Bank.  They understood that

10  that -- that that refer with caution in -- in March

11  2013 was because of that short sale; right?

12        MR. LANE:  Object to the form;

13  foundation.

14    A.    I can't answer that question, because it

15  could have been for other reasons as well,

16  because he was also delinquent on the mortgage.

17  BY MR. WIERS:

18    Q.    Okay.  And if you look at Page 61, there's

19  some notes.  Denise Heiner, was she one of the

20  ladies you referred to as a -- one of the

21  underwriters?

22    A.    She -- no, she's not an underwriter, but

23  she does the review of the denials that come from

24  our loan originators.

25    Q.    Okay.  She -- she identified that there

Page 72

1    them stand for something different.

2    Q.   Right.

3    A.   So, based on what that rating was, it

4    would have picked it up as a foreclosure.

5    Q.   And it's --

6    A.   Yeah, it was a 9.

7    Q.   It's your understanding based on your 30

8    plus years of experience in the mortgage industry

9    that a 9 is a foreclosure?

10   A.   I would have to go back and pull it.

11   Q.   But why are you saying that today that

12   it's a foreclosure?

13   A.   Based because they picked it up on a

14   foreclosure, so it had to be picked up on

15   something within the credit bureau.

16   Q.   So you're just assuming Fannie Mae

17   correctly picked this up and that they read a 9 as a

18   foreclosure?

19   A.   I would -- that is an assumption on my

20   part.

21   Q.   Okay.  Who told you that the reason was

22   a 9.  Is that what you -- did you learn that from

23   Pam?

24   A.   No.

25        THE REPORTER:  Did --

                                        Page 77

```
 1              MR. LANE:  Object to the form;
 2    foundation.
 3    BY MR. WIERS:
 4        Q.   If you looked and a 9 did not mean
 5    foreclosure, would -- well, have you looked?
 6        A.   No.
 7        Q.   Pr -- prior to this deposition, did you
 8    look?
 9        A.   No.
10        Q.   Did you talk to Ms. Tamme about the fact
11    that it was reporting as a 9?
12        A.   No.
13        Q.   And you're assuming a 9 means
14    foreclosure simply because that's how they spit
15    this back?
16        A.   Yes.  They would have to pick up this
17    from somewhere in the credit bureau.  So, outside
18    of the 9, I don't know where it would have been
19    picked up.
20        Q.   Okay.  Because we looked at it earlier,
21    and on its face it was obviously and plainly a short
22    sale; right?
23        A.   It's written that it's a short sale, but
24    obviously and plainly, Fannie Mae picked it up
25    somewhere that it's a foreclosure.
```

Page 79

1              MR. WIERS:  Could we mark this as

2     Exhibit 12?

3     [WHEREUPON, document referred to is marked

4     Exhibit 12 for identification.]

5     BY MR. WIERS:

6         Q.    Have you seen Exhibit 12 before?

7         A.    No.

8         Q.    This is a document that is a Fannie Mae

9     document, and it's called -- they call it their

10    Integration Guide.  Are you familiar with the

11    Fannie Mae Integration Guide?

12        A.    No.

13        Q.    If you turn to Page 19, you see where

14    they've got manner of payment codes?

15        A.    Yes.

16        Q.    And if you look down, you see that an 8 is

17    repossession or foreclosure?

18        A.    Yes.

19        Q.    So you'd agree an 8 is a foreclosure --

20              MR. LANE:  Object to the --

21    BY MR. WIERS:

22        Q.    -- at least, according to Fannie Mae?

23              MR. LANE:  Object to the form and

24    foundation.

25        A.    According to this; yes.

                                            Page 80

1    BY MR. WIERS:

2       Q.    Okay.    And a 9 is, according to this

3    document, a collection or charge-off?

4             MR. LANE:    Same --

5       A.    According to this.

6             MR. LANE:    Same objection.

7    BY MR. WIERS:

8       Q.    Okay.    Based on that, does that --

9    assuming that this document is correct, do you

10   have an understanding as to why there was a refer

11   with caution on the June 2013 application?

12            MR. LANE:    Object to the form --

13      A.    No.

14            MR. LANE:    -- foundation.

15      A.    I mean, I guess I don't --

16            MR. LANE:    -- asked and answered.

17      A.    The refer with caution is either for the

18   delinquency or the short sale or the foreclosure.

19   BY MR. WIERS:

20      Q.    Okay.

21      A.    So those are the three items that --

22      Q.    As --

23      A.    -- it could be.

24      Q.    As we saw, there's no foreclosure on the

25   file; right?

                                            Page 81

1      A.   Based on the credit report and the -- the

2   information on the credit report it states it's a

3   short sale.

4      Q.   Okay.  So there's no foreclosure, so the

5   two -- right?  Reporting, there's no foreclosure

6   reporting; right?

7      A.   I can't answer that.  I don't know how

8   Fannie Mae picked up the foreclosure.

9      Q.   Okay.  But you'd agree as someone who's

10   reviewed many credit reports -- and let's look at

11   the -- let's look at the June of 2013 credit report.

12          MR. THOMPSON:  Before we go further,

13   I'm going to object to this document only because

14   of the date, June 2014.

15          MR. WIERS:  That's fine.

16      A.   What are we looking at?  I'm sorry.

17   BY MR. WIERS:

18      Q.   I want to look at the June 2013 credit

19   report, which I guess -- I think it's Exhibit 6.

20          MR. LANE:  Where -- where are the

21   numbers at?

22          MR. WIERS:  Twenty -- this here.

23          MR. LANE:  Got one?

24          MR. WIERS:  This is 24, Coke 24.

25   BY MR. WIERS:

Page 82

```
 1          MR. LANE:  Object to the form;
 2     foundation.
 3      A.    I would have to confirm what the 9 was
 4     before I could do that.
 5     BY MR. WIERS:
 6      Q.    Well, you agree that there -- in the public
 7     record section, do you see a foreclosure
 8     reporting?
 9      A.    No.
10      Q.    Okay.  So, on its face, there's no
11     foreclosure reporting; right?
12      A.    Unless --
13          MR. LANE:  Object to form and
14     foundation.
15      A.    -- 9 means foreclosure.
16     BY MR. WIERS:
17      Q.    Right.  And as we looked at earlier,
18     assuming that Fannie Mae's internal documents
19     are accurate, an 8 means foreclosure; right?
20          MR. LANE:  Object to the form;
21     foundation; calls for speculation.
22      A.    Yeah.  Based on the document, yes, 8 on
23     that document.
24     BY MR. WIERS:
25      Q.    Okay.  And if we look here at the Wells
```

Page 84

1  Fargo account, which is not in the public record

2  section, and it's, again, on Page 8, you'd agree

3  that it's reporting as legally paid in full for less

4  than the full balance?

5      A.   That's what it says; yes.

6      Q.   And which is a short sale; right?

7      A.   Yes.

8      Q.   Ma'am, if you had been handling this file

9  and you received a refer with caution for an

10  applicant who had a short sale that was two years

11  old -- right, it was more than two years old at that

12  point, right, the short sale was?

13      A.   I know we discussed this, but the two

14  years you're pinpointing on is this May 2011,

15  which is the report date, so the actual short sale

16  date is the day he sold the property, but, yes,

17  based on the date, report date, we're within the

18  two years.

19      Q.   Okay.  And so -- and he -- he received a

20  refer with caution regardless of that; right?

21      A.   Yes.

22      Q.   Have you ever heard -- well, do you

23  know -- do you know for a fact that had you

24  submitted this to Freddie Mac that it would have

25  similarly read this short sale as a foreclosure?

Page 85

1    A.    It -- it would only be an assumption.

2    Q.    Okay.  Have you heard elsewhere in other

3  instances other than this of instances where

4  Fannie Mae was reading short sales as

5  foreclosures?

6    A.    No.

7    Q.    Are you aware of the fact that Fannie Mae

8  changed their system shortly after this to start

9  correctly reading 9s and treating them as settled

10  accounts instead of as foreclosures?

11    A.    No.

12        MR. LANE:  Object to the form;

13  foundation --

14  BY MR. WIERS:

15    Q.    Are you --

16        MR. LANE:  -- calls for speculation.

17  BY MR. WIERS:

18    Q.    Are you aware that had you -- this been

19  submitted -- are you aware that Freddie Mac was

20  not reading 9s as foreclosures?

21    A.    No.

22        MR. LANE:  Ob -- object to the form;

23  foundation.

24  BY MR. WIERS:

25    Q.    Assuming that's true --

Veritext Legal Solutions
866 299-5127

1    foundation; calls for speculation; asked and

2    answered.

3        A.   I can't answer that question.

4    BY MR. WIERS:

5        Q.   Okay.  Even though you've been in the

6    mortgage industry 30 years, you don't see anything

7    in this credit report that's contradictory to those

8    findings?

9            MR. LANE:   Same objections.

10       A.   That's contradictory?  So you're asking

11   me -- I don't see a foreclosure in this?

12   BY MR. WIERS:

13       Q.   Right.

14       A.   I -- I can't answer that.  If -- if you ask

15   me to look at that, I would say, well, it looks like

16   it's reporting as a short sale, but there's a rating

17   of 9.

18       Q.   Right.

19       A.   If I was specifically looking at that.  But

20   some way or another Fannie Mae is picking up that

21   there's a foreclosure.

22       Q.   For some reason that's not on the face of

23   the credit report itself?

24           MR. LANE:  Object to the form;

25   foundation; asked and answered; calls for

                                           Page 94

```
 1            MR. LANE:  Object to the form;
 2   foundation.
 3      A.    No, she wouldn't have called Fannie Mae.
 4   BY MR. WIERS:
 5      Q.    In the notes that were produced which is
 6   Exhibit 9, Ms. Tamme noted -- well, would she
 7   have called CBC, perhaps?
 8      A.    Perhaps.  I -- but I can't answer for her.
 9      Q.    Because she notes in these. . .
10            MR. THOMPSON:  Is Exhibit 9 --
11            MR. WIERS:  Yeah.
12            MR. THOMPSON:  -- Bate stamped 48?
13            MR. WIERS:  Exhibit 9 is -- is Page 48.
14   BY MR. WIERS:
15      Q.    So Ms. Tamme it appears made the
16   determination that there was a 9 on the file that
17   was causing this to report as a fore -- for Fannie
18   Mae to read it improperly as a foreclosure.
19      Do you know what steps Ms. Tamme took, if
20   any, to try to find a work around solution to Fannie
21   Mae's improper reading of the 9?
22            MR. LANE:  Object to the form;
23   foundation; calls for speculation; mischaracterizes
24   the testimony; and mischaracterizes the evidence.
25      A.    No, I do not.
```

Page 98

1    was Experian, one or the other, to figure out why

2    that was going -- why -- why that was happening.

3        Q.   And if you learned that it was because

4    Fannie Mae was improperly reading 9s as

5    foreclosures, what do you think you would have

6    done?

7             MR. LANE:  Object to the form --

8    BY MR. WIERS:

9        Q.   Submit it to Freddie Mac, perhaps?

10            MR. LANE:  Object to the form;

11   foundation: calls for speculation; mischaracterizes

12   the evidence.

13       A.   I wouldn't have that knowledge as a

14   borrower to understand to do that.

15   BY MR. WIERS:

16       Q.   Okay.  Mr. Coke ultimately did receive a

17   loan from Commonwealth Bank; right?

18       A.   Yes.

19       Q.   And was that a loan that was simply not

20   sold to Fannie Mae?

21       A.   That's correct.

22       Q.   And he received a rate of 4.56%?

23       A.   Is that it?

24            MR. THOMPSON:  You need Exhibit 2.

25   BY MR. WIERS:

Page 100

1    Q.    And it says your credit score.   Which of

2    the three bureaus had the highest score for Mr.

3    Coke in June 2013?

4    A.    This is the June of 2013?

5    Q.    Yeah.

6    A.    Experian.

7    Q.    And if you flip the page to key factors

8    that adversely affected your score, you'd agree

9    that one key factor -- if someone had a

10   foreclosure, that would be a key factor; right?

11   A.    It would be; yes.

12   Q.    On his -- on the Experian listing there, do

13   you see it listed anywhere that foreclosure is

14   impacting his Experian score and report in any

15   way?

16   A.    No.   It just says "serious delinquency."

17   Q.    Which a short sale is; correct?

18   A.    And so is his payments.

19   Q.    Right.

20         MR. HYMAN:   So the answer to that

21   question was "yes"?

22   A.    Well, I mean, you -- well, you can have a

23   short sale and not be delinquent on your loan.   I

24   honestly don't know in this format how that would

25   report, if you just have a short sale where that

Page 103

1    would go into these factors.

2    BY MR. WIERS:

3        Q.    So, some -- okay.   So you -- a short sale,

4    in and of itself, is that a serious delinquency?

5        A.    I don't know how it would report in these

6    factors.   I -- I don't know.

7        Q.    That wasn't my question.   My que -- is it

8    a serious delinquency, a short sale?

9            MR. LANE:   Object to the form;

10   foundation.

11       A.    No.

12   BY MR. WIERS:

13       Q.    Okay.   So the serious delinquency here

14   are the late payments?

15       A.    Yes.

16       Q.    You're familiar with banks who will do

17   short sales when someone's not -- when they

18   haven't missed any payments?

19       A.    I can't speak to that.

20       Q.    But have you seen that before?

21       A.    No.

22       Q.    Okay.  Usually banks require you to, at

23   least, have missed a few payments before they'll

24   entertain a short sale; right?

25       A.    I've only heard of that, but I can't confirm

Page 104

1    show me on there where the -- where those late

2    pays would -- would -- would be reflected on this

3    underwriting findings, if at all?

4        A.    They don't reflect them on the findings.

5        Q.    Okay.

6        A.    They only reflect derogatory events.

7        Q.    Okay.  I -- I believe you testified earlier

8    that you felt like that was a derogatory event.

9        A.    The short sale, foreclosure, bankruptcy,

10   deed in lieu are derogatory events.

11       Q.    Okay.

12       A.    But when you look at the tradeline, it

13   shows delinquencies on there.

14       Q.    Okay.  But do you know whether or not

15   Desktop Underwriter took those into

16   consideration?

17       A.    I can't speak to that.

18       Q.    But you do know that they took the

19   foreclosure into consideration?

20       A.    Yes.

21       Q.    In terms of Commonwealth Bank's file on

22   these two applications, would the materials that

23   you-guys produced, would that be the totality of

24   everything that was generated, or would some

25   things may have been purged or no longer

Page 141

```
 1                       CERTIFICATE

 2                           OF

 3                        REPORTER

 4          The undersigned Certified Shorthand Reporter

 5     Deposition Officer does hereby certify:

 6

 7          That the forgoing Deposition was taken before me

 8     at the time and place therein set forth, at which time

 9     the Witness was duly sworn by me:

10          That the testimony of the Witness and all

11     objections made at the time of the Deposition were

12     recorded stenographically by me and was thereafter

13     transcribed, said transcript being a true and correct

14     copy of the proceedings thereof.

15          In witness whereof, I have subscribed my name

16     this date: _____

17

18

19

20

21               _____

22                    BARBIE A. HENNESSEY

23                                   .

24     .

25     .
```

                                            Page 163

# EXHIBIT 25

# LODGED UNDER SEAL

# EXHIBIT 26

```
 1                    UNITED STATES DISTRICT COURT
                 FOR THE SOUTHERN DISTRICT OF CALIFORNIA
 2

 3

 4      JOHN T. SHAW, et al.,      ) No. 13-cv-1295 JLS (BLM)
 5                                 )
                     Plaintiff,    )
 6                                 )
        vs.                        )
 7                                 )
        EXPERIAN INFORMATION       )
 8      SOLUTIONS, INC., et al.,   )
                                   )
 9                    Defendant.   )
        _____)
10

11

12

13

14                    DEPOSITION OF JOSHUA NASTAL
                           Phoenix, Arizona
15                         January 22, 2015
                              9:03 a.m.
16

17

18

19

20

21

22

23      Prepared by:
        JEFFREY W. BARTELT, CR, RPR
24      Certificate No. 50363
25

                                              Page 1
```

1      know, if not -- I mean, like I said, we did manual

2      underwrite FHA loans at the time, but it would be

3      better -- it would have been easier for him, better

4      payment if we could get the automated approval,

5      which would be the approved/eligible.

6          Q.  Right, but when you wrote Exhibit 3, it was

7      your belief that even if you couldn't get the

8      automated approval you could still at least try to

9      do a manual underwrite; correct?

10         A.  Could try.  Correct.

11         Q.  And, to the best of your recollection, did

12     Academy ever try to manually underwrite Mr. Rydman's

13     loan?

14         A.  To the best of my knowledge, no.  Again,

15     because he didn't really want to go the FHA route.

16     We were trying to keep it conventional.  To the best

17     of my knowledge, from what I understand, we were

18     trying to only get a conventional loan for him.

19         Q.  Let's mark as Exhibit 4 a copy of a document

20     titled DU Underwriting Findings.

21             MR. O'DONNELL:  For the folks on the phone,

22     this one has got a Bates number of Shaw 1139.

23                 (Deposition Exhibit No. 4 was marked for

24                 identification.)

25             Q.  BY MR. O'DONNELL:  Exhibit 4, Mr. Nastal, is

Page 27

1   a copy of the Desktop Underwriting findings that

2   were produced in this case related to Mr. Rydman.

3   Do you recognize these?

4       A.  Yes, sir.

5       Q.  About a third of the way down, the first

6   page of Exhibit 4 refers to a total loan amount of

7   $204,000.  Do you see that?

8       A.  Yes, sir.

9       Q.  To the best of your knowledge, would a loan

10  amount of $204,000 have been eligible for an FHA

11  mortgage?

12      A.  It could have.

13      Q.  Yes, it could have?

14      A.  Yes.

15      Q.  Turning your attention to the paragraph

16  numbered three on the first page of Exhibit 4 that

17  begins with this loan case file is ineligible.  Do

18  you see that?

19      A.  I'm sorry.  Repeat that.

20      Q.  Paragraph three on the first page down here

21  that says -- begins with number three.

22      A.  Yes, sir.

23      Q.  The second sentence.  Would you please read

24  out loud the second sentence that begins with the

25  word "However."

Page  28

1       A.   Absolutely.   "However, any loan case file

2   that receives a refer with caution recommendation

3   may be manually underwritten in accordance with the

4   Fannie Mae Selling Guide.   Refer to the Selling

5   Guide for additional information."

6       Q.   To the best of your knowledge, was that a

7   true statement?   Is that an accurate statement?

8       A.   Well, I mean, to the best of my knowledge --

9       MR. LANE:   I'm going to object to the form,

10  foundation.

11      MR. O'DONNELL:   You can answer.

12      THE WITNESS:   I mean, to the best of my

13  knowledge, it's a true statement per the DU

14  findings, but as I stated earlier, you know, we

15  didn't have an outlet for an investor for that

16  product, so we don't manually underwrite loans for a

17  conventional product.

18      Q.   BY MR. O'DONNELL:   So let's take that in two

19  parts.   The paragraph that we just read that's in

20  paragraph three on Exhibit 4, to the best of your

21  knowledge, is that an accurate statement about the

22  way the Fannie Mae Selling Guide operates?

23      A.   Again, I don't know the entire manual.   I

24  mean, it's hundreds and hundreds of pages, but, I

25  mean -- I mean it says in the findings, so -- I

1    mean, I'm not going to -- I don't think it's

2    untrue.

3         Q.   So you have no reason to believe that what

4    you read is incorrect; right?

5         A.   No.   I don't have any reason to believe it's

6    incorrect, No.

7         Q.   And so when you mentioned that Academy

8    couldn't do that, it's not because it was prohibited

9    by Fannie Mae; correct?

10        A.   I would say that's probably an accurate

11   statement.   Again, I don't know the entire Fannie

12   Mae, you know, selling guide, but like I stated

13   earlier, Academy, to my understanding when we

14   received a refer with caution on a conventional

15   loan, there was no investor for to us deliver that

16   product to.

17        Q.   And the lack of an investor, is that what

18   you would identify as the primary reason that you

19   couldn't -- that Academy could not proceed with a

20   loan like this one?

21        A.   Repeat that one for me.

22        Q.   Well, let me phrase it a different way.   Had

23   Academy had sufficient investors for a loan like

24   this, do you believe it would have been possible

25   under Fannie Mae's guidelines to manually underwrite

Page  30

1  a loan such as Mr. Rydman's?

2       A.   I ultimately believe that's not true because

3  I don't think that any investors were purchasing

4  refer with caution at that time.

5       MR. HUBER:  I can make a clarification for

6  you, if that will help.

7       MR. O'DONNELL:  Sure.

8       MR. HUBER:  So at the time Academy didn't

9  sell very many loans direct to Fannie Mae, so when

10 we would sell them to an investor, investors would

11 put overlays on top of Fannie Mae, which was very

12 common, so if investors had an overlay and said,

13 look, we won't take a manual, then, in effect,

14 Academy wouldn't have a delivery option for the loan

15 while Fannie Mae would -- you are correct.  This is

16 absolutely accurate.  You could -- Fannie Mae did

17 permit it, I mean, a manual underwrite.  The problem

18 at the time was our investors who put overlays on

19 top would not accept it, and since they were our

20 primary delivery options, Academy couldn't do --

21 well, based on what Josh is saying, that would be

22 the reason Academy wouldn't do it.  So if that kind

23 of helps --

24       MR. O'DONNELL:  That does and I appreciate

25 it.  Just so I understand, Exhibit 4 is accurate,

Page 31

```
 1        Q.  And is this top e-mail dated June 6, 2013,
 2   at 8:05 p.m., is that something that you wrote?
 3        A.  I'm assuming it is, yes, sir.
 4        Q.  And when you wrote it, was everything
 5   accurate, to the best of your knowledge?
 6        A.  To the best of my knowledge, yes.
 7        MR. O'DONNELL:  Why don't we take a short
 8   break and I can consult with some of my notes and we
 9   will get started again.  Maybe five minutes.
10        THE WITNESS:  Okay.
11           (WHEREUPON, a short break was taken from
12              9:46 a.m. to 9:54 a.m.).
13        Q.  BY MR. O'DONNELL:  Mr. Nastal, before we
14   continue, let me ask you, is there any reason you
15   can think of why you wouldn't be able to give us
16   your best testimony today?
17        A.  My best testimony?
18        Q.  Right.  Are you feeling okay?
19        A.  Oh, yeah.  Absolutely.
20        Q.  Great.
21        MR. O'DONNELL:  And also before we continue,
22   I just want to make clear on the record that,
23   Mr. Huber, earlier the information you provided,
24   would you -- I just want to make clear that that
25   information was testimony by Academy by someone with
```

Page 36

1    knowledge to provide it.

2              MR. HUBER:  That's correct.  And the

3    testimony I gave was not specific to this loan.  I'm

4    just telling you, in general, that's how it works,

5    that -- to clarify, that most investors have

6    overlays, and that's why it's both accurate what,

7    you know, the Fannie Mae Seller Servicer Guide says

8    completely and why Academy had -- may have not been

9    able to have delivery options because investors have

10   overlays, but I wasn't being specific to this

11   loan.

12             MR. O'DONNELL:  Perfect.  I completely

13   understand.  I just want to make sure that the

14   record is clear that his testimony is by Academy

15   today in addition to that provided by Mr. Nastal.

16             MR. HUBER:  It is.

17             MR. O'DONNELL:  Thank you.

18             MR. LANE:  Hey, Kelly, I don't think it's a

19   huge big deal, but I would prefer that during the

20   breaks you don't leave us out.

21             MR. O'DONNELL:  Okay.  No problem.  I wasn't

22   even in the room, but that's fine by me.

23        Q.  BY MR. O'DONNELL:  Turning back to

24   Mr. Rydman's loan, Mr. Nastal, can you describe what

25   information is input into the Desktop Underwriter

```
 1    Academy goes into Desktop Underwriter?
 2         A.  Repeat that one more time.
 3         Q.  Is it your understanding that the company
 4    Cisco or Academy used the company Cisco to input
 5    credit information into Desktop Underwriter?
 6         A.  Correct.  We use Cisco to input the file
 7    number from that credit report into Desktop
 8    Underwriter, yes, sir.
 9         Q.  And, to the best of your knowledge, are
10    there other companies in addition to Cisco that do
11    the same thing, offer the same product?
12         A.  I'm sure there are.  I mean, I don't know
13    the exact names of other companies, but I know
14    different mortgage companies use different credit.
15    If you are calling them a reseller, I know that not
16    every mortgage company uses Cisco.
17         Q.  But is Cisco the only one used by Academy,
18    at least during the time of Mr. Rydman's loan?
19         A.  During the time of Mr. Rydman's loan and
20    currently, that's the only -- our branch uses Cisco
21    exclusively.
22              MR. O'DONNELL:  Let's mark as Exhibit 6 a
23    Cisco report dated June 27, 2013.  And for the folks
24    on the phone, this Bates number is SHAW1127.
25
```

Page 39

1          (Deposition Exhibit No. 6 was marked for
2          identification.)
3          MR. LANE:   And, Kelly, what was the
4     description of the document?
5          MR. O'DONNELL:   It's a Cisco report dated
6     6/27/2013.
7          MR. LANE:   Okay.
8     Q.  BY MR. O'DONNELL:   Do you recognize Exhibit
9     6, Mr. Nastal?
10    A.   I'm sure it's one of the -- I think we had
11    several credit reports on Mr. Rydman, so I'm sure
12    this is one of them.
13    Q.   Are you -- as part of your job, are you
14    familiar and experienced with reading credit reports
15    such as Exhibit 6?
16    A.   I'm familiar with reading this credit
17    report, yeah.
18    Q.   Okay.  We may come back to it, but that's
19    all I have on Exhibit 6 right now.
20          Let's mark as Exhibit 7 a document with the
21    beginning Bates No. FM-SHAW90.
22          (Deposition Exhibit No. 7 was marked for
23          identification.)
24    Q.  BY MR. O'DONNELL:  Does Exhibit 7 look at
25    all familiar to you, Mr. Nastal?

```
 1          A.  It's -- I haven't seen this exact report
 2     before, but I know what it -- I mean, I know what it
 3     is.  It's basically some of the coding behind the
 4     credit report that Cisco gets.
 5          Q.  And have you ever heard of the term
 6     Tri-Merge?
 7          A.  Yes, sir.
 8          Q.  Does this look like a Tri-Merge report to
 9     you?
10          A.  I mean, I would say yes because it has the
11     three bureaus reporting.
12            MR. LANE:  Hey, Kelly, real quick, can you
13     give me the Bates number.
14            MR. O'DONNELL:  Exhibit 6 is SHAW1127.
15            MR. LANE:  Okay.  Great.
16          Q.  BY MR. O'DONNELL:  And let's go back to
17     Exhibit 6, Mr. Nastal.
18          A.  Sure.
19          Q.  I want to direct your attention to the --
20          A.  Wells Fargo equity line?
21          Q.  Correct, which I believe is on the bottom
22     of --
23          A.  Page 5.
24          Q.  -- Page 6.  I think it's the sixth page of
25     the document.
```

Page 41

1          A.   Page 5.

2          Q.   It's got a number at the very bottom that

3     says 1132, SHAW1132.

4          A.   This over here?

5          Q.   Yes.   Okay.

6          A.   That's page 5.

7          Q.   Thank you.   And do you see near the bottom

8     of the page there is a reference to a tradeline that

9     looks like it's Wells Home Equity.   Do you see

10    that?

11         A.   Yes, sir.

12         Q.   And this one is where the account begins,

13    650650?

14         A.   Yes, sir.

15         Q.   And is it your understanding that this was

16    the tradeline that Desktop Underwriter was reading

17    as a potential foreclosure?

18         A.   Yes, sir.   That is my understanding of why

19    the loan was running refer with caution, yes, sir.

20         Q.   And as you look at this Exhibit 6, are you

21    able to identify what about this Wells home equity

22    tradeline was causing Desktop Underwriter to read it

23    as a potential foreclosure?

24         A.   This credit report, no, but I can't tell --

25    I wouldn't have been able to tell from this.   Going

1   back to exhibit -- the DU findings, it tells you on
2   there that it's reading that as a foreclosure.  I
3   can go to that exhibit.  I think it was --
4        Q.  The DU findings were 4.
5        A.  4.  If you look at Exhibit 4, first page,
6   number two.
7        Q.  Yes.
8        A.  It says there that Desktop Underwriter has
9   identified that tradeline that you're referring to
10   on the credit report as a foreclosure.
11        Q.  And did you do any investigation to
12   determine why Desktop Underwriter was identifying a
13   potential foreclosure for Mr. Rydman?
14        A.  I did.
15        Q.  And what did you do?
16        A.  I found out the -- I talked to my
17   representative at Cisco and found out the different
18   codings that are read.
19        Q.  Who did you talk to at Cisco?
20        A.  Chuck.  I can't think of his last name, but
21   we can get that information to you.  He's very
22   familiar with this, the codings, and how credit and
23   how DU reads the credit.
24        Q.  In addition to Chuck at Cisco, did you talk
25   with anyone else in order to try to investigate why

                                          Page 43

1    STATE OF ARIZONA                    )
                                          ) ss
2    COUNTY OF MARICOPA                   )

3

4

5     BE IT KNOWN that the foregoing deposition
6    was taken by me, JEFFREY W. BARTELT, CR No. 50363, a
7    Certified Reporter for the State of Arizona; that
8    prior to being examined, the witness named was duly
9    sworn to testify to the whole truth; that the
10   questions propounded and the answers of the witness
11   thereto were taken down by me and thereafter reduced
12   to computerized transcription under my direction and
13   supervision; that the foregoing is a true and
14   correct transcript of all proceedings had upon the
15   taking of said deposition, all done to the best of
16   my skill and ability.
17           I further certify that I am in no way
18   related to any party to said action nor in any way
19   interested in the outcome thereof.
20           DATED at Phoenix, Arizona, this 5th day of
21   February, 2015.

22                   _____
23                           JEFFREY W. BARTELT
                             CR No. 50363

24

25

                                           Page 89

# EXHIBIT 27

# LODGED UNDER SEAL

# EXHIBIT 28

# LODGED UNDER SEAL

# EXHIBIT 29

```
 1                IN THE UNITED STATES DISTRICT COURT
 2                  SOUTHERN DISTRICT OF CALIFORNIA
 3
 4
    JOHN T. SHAW; KENNETH COKE;    )
 5  and RAYMOND RYDMAN, on behalf  )
    of themselves and all others   )
 6  similarly situated,            )  Case No. 13CV1295
                                   )  JLS BLM
 7                  Plaintiff,     )
                                   )
 8           vs.                   )
                                   )
 9  EXPERIAN INFORMATION           )
    SOLUTIONS, INC., WELLS FARGO   )
10  BANK, NA and CITIMORTGAGE,     )
    INC.,                          )
11                  Defendants.    )
    _____
12
13
14
15            DEPOSITION OF PATRICIA FINNERAN
16                    Irvine, California
17                 Thursday, March 5, 2015
18
19
20
21  Reported by:
22  Shari Stellhorn
23  CSR No. 2807
24  Job No. 2007338
25  PAGES 1 - 284
```

                                                    Page 1

```
 1                        EXAMINATION
 2    BY MR. CENTO:
 3        Q    Good morning, Ms. Finneran.  Am I saying
 4    your name right, Finneran?
 5        A    Yes.                              10:05:58
 6        Q    Okay.  Ms. Finneran, what do you do for
 7    Experian?
 8        A    I'm a marketing director for our product
 9    infrastructure.
10        Q    So what does that actually mean?  Like what  10:06:10
11    are your job duties, your responsibilities?
12             THE REPORTER:  You have to wait until he
13    finishes.
14             THE WITNESS:  I'm sorry.
15             My job responsibilities are I have business  10:06:17
16    role responsibility for our consumer credit
17    database.
18    BY MR. CENTO:
19        Q    And the consumer credit database, that's
20    FileOne?                                   10:06:31
21        A    Yes.
22        Q    What does it mean to have business role
23    responsibility?
24        A    Well, you have a system that's -- has
25    multiple applications in it for processing.  You  10:06:42
```

Page 7

Veritext Legal Solutions
866 299-5127

```
 1              THE REPORTER:  Yes, but I could barely hear
 2    you.
 3    BY MR. CENTO:
 4         Q    There are consumer reports, in other words,
 5    that aren't credit -- quote "credit reports"?        10:12:31
 6         A    I don't know what you mean.
 7         Q    What does the word "credit report" mean to
 8    you?  What is it?
 9         A    Well, a credit report is going to be a
10    consumer report of sorts that would be delivered to  10:12:49
11    an end user of the data.
12         Q    Okay.  And what is a consumer disclosure?
13         A    So the consumer disclosure is a report that
14    is generated through our National Consumer
15    Assistance office that would formulate the consumer  10:13:05
16    disclosure to the consumer.
17         Q    Are you familiar with the various tables
18    that make up the database, the FileOne database?
19         A    Yes.
20              MR. WIERS:  Objection.  Form.             10:13:24
21    BY MR. CENTO:
22         Q    Okay.  And familiar with the fields within
23    those tables?  Do you have an understanding of how
24    the tables relate to each other?
25         A    Yes.                                      10:13:32
```

                                            Page 13

1      Q      Okay.   But as far as what the scoring

2  models do with the 9 in the payment history grid,

3  you are not sure?

4      A      Well -- and I want to be clear, right --

5  the 9 in the payment history grid is not just a        10:28:00

6  settled.   There is multiple conditions that came out

7  to a 9.   So the 9 tells them in the grid right out

8  that it's simply a derog.   They'll look at the

9  status of the account to determine what that derog

10  is, bankruptcy, is it a settled, is it a charge-off,    10:28:14

11  you know, so they're looking at all of this

12  information as a package and then whatever algorithm

13  a scorer uses, it's part of that package.

14      Q      Doesn't the AU code already tell them,

15  whoever they are, the decisioning systems, risk        10:28:32

16  models, scoring models, doesn't it already tell them

17  that this is a settled account; isn't that what AU

18  means?

19      A      As a special comment code, it could.

20      Q      So why do you have to tell them again with   10:28:45

21  the 9?

22          MR. WIERS:   Objection.   Form.

23          THE WITNESS:   I'm not sure I'm following

24  you in terms of the 9, but I'll just say in terms of

25  our display of a credit report, there is an account    10:28:59

Page 25

1    someone to read that trade line as if it had been

2    paid in full.

3         A    What I said was you can't just remove the

4    9, you have to change the way that you display the

5    entire trade, so you are changing what you're          10:39:42

6    putting out for the account condition, the status,

7    you are changing how we calculate the current grid

8    position and what we do with the special comment AU,

9    so it's not just removing the 9.  You are

10   recalculating -- we're having to actually show the    10:39:59

11   data differently on the credit report which would

12   view differently to users of the file.

13        Q    All right.  So let me try it this way:  In

14   the trade lines we're talking about for this case,

15   the trade lines for these particular Plaintiffs,      10:40:15

16   when they output to a credit report, they show

17   settled for less than full value --

18        A    Uh-huh.

19        Q    -- as a condition, they show a paid status,

20   they show a zero balance and they show a 9 in the     10:40:29

21   payment history profile table, the payment grid;

22   right?

23        A    No.

24        Q    No.  Where do they show the 9?

25        A    No.  So on the display the account          10:40:40

                                                           Page 34

1    condition is going to say settled for less than the

2    full balance, that's going to be the status of the

3    account so that people can read the status to know

4    that it was settled.   You'll have a zero balance,

5    you'll have the date the settle occurred, you'll         10:40:53

6    have your payment history profile that starts first

7    position of the 9 because that's our display that

8    matches to the current status that we've output on

9    the trade, prior status, prior grid history and a

10   text field for the special comment code that says       10:41:11

11   settled for less than the full balance.

12        Q    Right.   And if you just erased that 9 and

13   it was not on the payment grid, wouldn't the account

14   read exactly the same way?

15        A    What would I put in the payment history        10:41:24

16   grid?

17        Q    Why would you have to put anything in the

18   payment history grid?

19        A    Because -- again, you have a very defined

20   specification of how the credit report is delivered,     10:41:37

21   right, you have systems for our users that are

22   looking at our specs, they're using those specs to

23   interpret and read the data coming in in the ARF

24   report, the Automated Response Format that we send

25   them.   It's unexpected to have a blank in the first     10:42:04

                                                     Page 35

Veritext Legal Solutions
866 299-5127

```
1    same.

2         Q    And one of the differences is that

3    TransUnion and Equifax do not map a 9 to the grid

4    code from an AU --

5         A    Okay.                                  10:48:20

6         Q    -- right?

7              You know do that, don't you?

8         A    I don't know that for sure, but, I mean, if

9    they don't, that's their system design.  They may

10   not of grid codes for other conditions that may come  10:48:30

11   up in the trade.  I don't know what their business

12   rules are.

13             What I do know that is that we all have the

14   settled, we all display that as part of our trade

15   line, we all have grid -- you know, payment history  10:48:43

16   grid data.  We may not all have the same values, we

17   may display our grids completely different, which is

18   one of the things that I do know, that some of the

19   values in the grids are different in the way that we

20   position data, but the meaning is the same.          10:49:01

21             Each bureau has a technical manual that

22   goes out for users of the data, technical manuals

23   that would be delivered for anybody who is reading

24   or interpreting their raw data to understand how the

25   data's formatted, what the data means and use it is   10:49:19
```

Page 41

1          Q     If a furnisher reports code G, do you still

2     map a 9 on a collection account?

3          A     For output on the credit report that goes

4     to a data user, yes.

5          Q     Why if you've already got a code in the          11:08:38

6     payment history profile that represents collection?

7          A     Because, again, you've got data reporting,

8     which is a common format for the industry, you have

9     product display.  The credit report and the data

10    that we display on that credit report for our users     11:08:56

11    is a common documented format and even though

12    Metro 2 may have a specific grid code to represent

13    something for data reporting, changing those payment

14    history profile entries on an output report to

15    something that a user of our credit report is not      11:09:17

16    expecting to see is going to create a problem in

17    their system.

18               So we have a common output that we map

19    multiple things to a 9.  Again, in our technical

20    specs information that will identify what that is.      11:09:30

21         Q     That seems to be your explanation; right,

22    for why you are using the 9, because the users of

23    credit reports you say are -- expect to see it.

24         A     Well, their systems are designed to

25    interpret the data based on the specifications that     11:09:46

                                                    Page 50

1    a user version.  It's mostly used only by our

2    consumer assistance, so the common version of our

3    credit report that is used by users is Version 7.

4        Q    And then the common version of your credit

5    report, Version 7, the one that is used by users,    11:12:12

6    which would include Fannie Mae; right?

7        A    Yes.

8        Q    In the common version a grid code 9 can be

9    mapped for a collection condition; right?

10       A    Yes.                                          11:12:30

11       Q    Charge-off?

12       A    Yes.

13       Q    Settled?

14       A    Yes.

15       Q    Chapter 7, 11 or 12 bankruptcy?              11:12:35

16       A    Right.

17       Q    And some others; right?

18       A    And maybe one or two more.  I don't --

19   yeah.

20       Q    In the Metro 2 guide it says -- I'm reading  11:12:44

21   from it -- when it explains and defines what the

22   payment history profile grid is and the codes that

23   can be used in it, it says, Codes 1 through 6 and

24   then some letter codes, and then it says, "No other

25   values are acceptable in this field."               11:13:13

Page 53

1              Again, the display of the trade line as

2     built by Experian is going to house 25 months of

3     payment history grid first by mapping to the status.

4         Q    You say the 9 --

5              THE REPORTER:  Wait a minute.

6     BY MR. CENTO:

7         Q    You say the 9 represents the current

8     status, but the current status is already

9     represented in the codes I just told you.

10             MR. WIERS:  Pat, don't let him cut you off.  11:16:32

11    Finish your answer and, you know --

12    BY MR. CENTO:

13        Q    Go ahead.

14             MR. WIERS:  He's being --

15             THE WITNESS:  I forgot what I was going to  11:16:37

16    say now.

17    BY MR. CENTO:

18        Q    Isn't the current status already there?

19    Don't we already know from 13, AU zero balance and

20    associated dates the current status of that account  11:16:45

21    that it has been settled for less than full value?

22    Don't we already know that without seeing the 9?

23        A    I don't know how to answer you to be any

24    clearer than what I've said, right, so then --

25        Q    Let's try it this way:  Assume the trade   11:17:01

Page 56

1    line looks exactly the way it does on the credit

2    report without the 9.  Could you look at that trade

3    line and tell me what the current status of that

4    account is?

5        A    If I were physically sitting here reading    11:17:12

6    the credit report, I probably could.

7        Q    All right.  Let's do that.

8        A    But -- but -- let me finish because that's

9    not what people do with a credit report.

10            Very -- less than 3% of your credit reports   11:17:24

11   that are delivered into the user community are read

12   by a person.  They are delivered in a

13   computer-generized (sic) format where those systems

14   have taken the specs from each bureau on how to

15   interpret and read the data that's coming in, so    11:17:45

16   those systems are designed to look at all of this

17   information as a package, bit by bit, code by code,

18   whatever, to understand the makeup of that.

19            Grid code 9 represents the settled.  It's

20   just the way the format is designed.  It's the way   11:18:02

21   the users are expecting it.  It's way that we have

22   it defined.  It's the way that it's been output

23   since 1996.  I don't know how to answer that.

24       Q    I'm going to show you a document.  This is

25   one of the documents produced in this case.  This is  11:18:19

                                                Page 57

```
 1              THE WITNESS:  You know, I'm hesitant to

 2    answer because I don't have their rules and I don't

 3    have their business rules.

 4    BY MR. CENTO:

 5        Q    I'm not asking about the rules.          11:34:32

 6        A    They show the paid in settled here.  They

 7    show -- and then they're showing closed.  I don't

 8    understand.

 9        Q    I'm not asking about their rules; you

10    already told me you don't know what their rules are.  11:34:42

11            I'm asking you as a general matter of

12    principal here; right, if the code in that field is

13    a 9 in the field that represents May 2011 in the

14    payment history, if that is a 9 and a 9 means

15    settled, shouldn't -- if there going to say the same  11:35:02

16    thing which you agree they should; right -- do you

17    agree that -- let's start there.

18            Does a credit report -- should a credit

19    report contain the same information that's in a

20    consumer disclosure?                             11:35:13

21            MR. WIERS:  Objection.  Foundation, legal

22    conclusion, form.

23            THE WITNESS:  So a consumer disclosure has

24    all the same underlying data that is delivered to a

25    user of the report, that is correct.             11:35:23
```

Page 71

```
1     specifically what that one says.

2     BY MR. CENTO:

3         Q    Okay.  G is the section of the act that

4     allows a consumer to obtain a copy of their

5     disclosure.                                    11:38:07

6         A    Okay, yes.

7         Q    What is the consumer entitled to get in

8     their disclosure?

9         A    The consumer needs to see all the

10    information that we've delivered to any data user,   11:38:20

11    along with other information that we have in our

12    database that pertains to them.  So they see more

13    information on their consumer discloser that we --

14              THE REPORTER:  Wait.  Slow down.

15              THE WITNESS:  I'm sorry.

16              THE REPORTER:  More information --

17              THE WITNESS:  Consumer disclosure from

18    Experian's National Consumer Assistance Center,

19    actually contains more information than what we

20    provide out to a user.                         11:38:40

21              So the rules there are you need to display

22    all of the content you have on the consumer to

23    represent the information that we have in our

24    database, which we are.

25    BY MR. CENTO:                                  11:38:56
```

Page 74

```
 1    dispute about that, all right.

 2           When they look at their disclosure like the

 3    one we're looking at now, there is no 9 and it

 4    doesn't say settled.

 5       A    Not in the payment history; in the status    11:50:24

 6    it says --

 7       Q    In the payment history, right.

 8           THE REPORTER:  Wait.

 9           MR. WIERS:  Let Pat finish.  I don't think

10    she was done.                                        11:50:32

11           THE WITNESS:  The grid, the payment history

12    entry, does say settled; the trade line says settled

13    the consumer can see the settled, it's there.

14    BY MR. CENTO:

15       Q    Right, right, right, but they can't see the  11:50:43

16    thing that was causing -- that they were being told

17    was causing their problem; right?

18       A    Okay.

19       Q    Do you agree?

20       A    They don't see a 9.                          11:50:51

21       Q    Right.  And it's the 9 in that place in

22    that need was causing their problem, whether you

23    think it should have or not.

24       A    Okay.

25           MR. WIERS:  Objection to form.                11:51:02
```

Page 84

1              VIDEO OPERATOR:  This is the beginning of

2    Disk 2.  We are back on the record.  The time is

3    12:54 p.m.

4    BY MR. CENTO:

5         Q    How does an end user of credit reports know    12:55:03

6    what your codes mean?

7              MR. WIERS:  Objection.  Form.

8              THE WITNESS:  The end user of the credit

9    report -- there is a technical manual with all the

10   specs so that they can set up their system to be    12:55:19

11   able to read the input and interpret the data.

12   BY MR. CENTO:

13        Q    What's the name of that technical manual?

14        A    Technical manual.

15        Q    Is that what it's called?                12:55:36

16        A    Yeah.

17        Q    Is it one of the documents you produced in

18   this case?

19        A    I don't know.

20             MR. WIERS:  I believe it, John.           12:55:44

21   BY MR. CENTO:

22        Q    Did a copy of that technical manual at any

23   time ever go from Experian to Fannie Mae?

24             MR. WIERS:  Objection.  Foundation.

25             THE WITNESS:  I believe so.  They would    12:55:59

Page 102

```
1    to object to form because every single one is

2    compound.

3    BY MR. CENTO:

4        Q    Go ahead.

5        A    So I'm going to go back to the beginning    01:32:08

6    and try to explain this all over again.

7            The output of a credit report by any CRA is

8    a product that they're developing and it goes out

9    the door.  That output is in the format that a CRA

10   puts it in, right.  You have data reporting, you    01:32:33

11   have data output.  There is a line that gets drawn

12   there.  We did not just arbitrarily pick a code and

13   toss it out on a credit report as you say.  That

14   code 9, along with other grid codes -- 9 is not the

15   only one that's not in Metro 2 specific reporting,   01:32:51

16   that's bureau specific which nothing wrong with

17   that -- there is a bunch them, right, so the thing

18   is, you put that out on the credit report, like I

19   said, somewhere around June 15th, 1996, there are

20   coding specifications that identify exactly what     01:33:09

21   every single code on that credit report means.

22   There is -- all that documentation is provided out

23   to the user, all of their systems are developed to

24   read the input data that we provide to them based on

25   those coding specifications so that they know what   01:33:28
```

Page 134

1    the data is because you -- they're not physically

2    looking at it, it's coded data that's going into

3    their system, right, it comes out in segments and

4    bits and bytes and all of these things.

5           So they have to take our specs, they put it    01:33:43

6    in their system, their system then reads that credit

7    report.  Grid code 9, grid code 8, grid code 7,

8    whatever that code is, there is a defined definition

9    of what each one of those code represents.

10       Q    Not for a 9.                                  01:34:00

11       A    Yes, there is.

12       Q    Except that definition includes a whole

13   host of different things.

14       A    Yes, it does.

15       Q    Why?  Why can't you just have a separate      01:34:05

16   code for each one?

17       A    Because we just don't.

18       Q    Why?

19       A    I don't know why; we just don't.  This is

20   the way the system was developed in 1996.            01:34:14

21       Q    Doesn't that at least create the potential

22   for confusion when you have one code that has

23   several different meanings?

24           MR. WIERS:  Objection.  Form.

25           THE WITNESS:  I don't think so.               01:34:25

                                                    Page 135

```
1    reseller who can use a DU underwriting system.  I
2    don't know.
3        Q    Either way, Fannie Mae is not getting --
4    taking your data directly from you and applying your
5    individual specifications.                        02:38:58
6        A    Okay.
7        Q    Your individual specification are being
8    applied at the reseller's level?
9        A    Okay.
10       Q    Okay, meaning yes, that's correct?        02:39:05
11       A    That's fine, okay.
12       Q    All right.  So I don't understand the
13   significance of you telling me that there are
14   individual specifications that would tell Fannie Mae
15   anything because they're not reading your individual  02:39:16
16   specifications or using them.
17       A    So now they're reading a reseller report
18   who has taken three bureau reports with three sets
19   of specifications, they've built their logic within
20   their own systems, using the raw data from all       02:39:32
21   bureaus and the specifications from all bureaus, and
22   they built their merge logic to build one credit
23   report then that they're sending into the DU
24   underwriting system.
25            The fact of the matter is you roll that up,  02:39:47
```

Page 182

1    they're getting three individual reports or two

2    individual reports of raw data, and in order to read

3    those in their system, they first have to start with

4    the specifications from each bureau, so they're

5    getting that data in so that they can interpret the        02:40:03

6    data from each bureau and then they've their own

7    logic then on how to merge that together to send it

8    to the DU underwriting system.

9        Q    And they should in their mind be reading --

10   know to read your data differently, because if              02:40:15

11   Equifax and TransUnion are sending the 9 in the

12   payment history field to represent a foreclosure,

13   they got to know that that's -- if it's coming from

14   you, it doesn't mean that.

15       A    Well, it's no different than if I'm sending         02:40:31

16   them a 3 that means an 90-day delinquent on our file

17   and Equifax is sending them a 4, they need to know

18   that the 4 means something different than the 3

19   depending on the bureau report they're looking at.

20       Q    They do; right?                                    02:40:46

21       A    They do, which is why we have

22   specifications and details about what each thing

23   means and how to read it, and each bureau is going

24   to provide that.

25       Q    And Fannie Mae uses your specifications?          02:40:56

                                                    Page 183

```
 1        A     Well, yeah.  They brought it to my

 2   attention and I told them that I would look into it

 3   and get it over to the right group to get it, but it

 4   was in the technical manual and it looked like it

 5   was just missing or was an error on that piece of      02:48:23

 6   collateral, yes.

 7        Q     Well, isn't that kind of a big deal?  I

 8   mean people rely on that glossary to understand how

 9   to read their credit reports; right?

10             MR. WIERS:  Form, foundation.               02:48:35

11             THE WITNESS:  So 97% of the credit reports

12   that are delivered are delivered in an ARF 7 format,

13   which is the technical manual that we talked about.

14   Their systems read that in based on the technical

15   manual and all those tables and everything are         02:48:57

16   defined there.  You do have a subset, very small

17   percentage, that are looking at human readable

18   reports and may be looking at the glossary to

19   understand what the codes mean, so, yes, small

20   percentage.                                            02:49:14

21   BY MR. CENTO:

22        Q     Did you ever figure out why it took -- I

23   mean, from what you're telling me, you've been using

24   this 9 to mean settled going back to the '90s.  Why

25   did it take until 2013 to update the glossary?        02:49:27
```

Page 187

```
1              The 9 that Experian populates in the grid

2     code is mapped from the current status; is that

3     right?

4         A    That is correct.

5         Q    It is simply an additional way that        05:17:21

6     Experian displays the current status being reported

7     to it?

8         A    That is correct.

9         Q    Here the history grid goes through May

10    2011; right?                                         05:17:35

11        A    Yes.

12        Q    And do you see up where it says date of

13    status?

14        A    Yes.

15        Q    What does that say?                         05:17:41

16        A    May of 2011.

17        Q    And if you look across where it says

18    status, what does it say there?

19        A    Paid in settlement.

20        Q    Okay.  So here on this disclosure there is  05:17:53

21    no secret that Experian is reporting the current

22    status as settlement; right?

23        A    That is correct.

24        Q    You mentioned in passing that there were

25    15,000 users of Experian's credit reports; do you    05:18:06
```

Page 279

1    remember that?

2          A     Yes.

3          Q     And Fannie Mae is -- there are 14,999

4    approximately in addition to Fannie Mae?

5          A     That is correct.                          05:18:18

6          Q     They are but one?

7          A     Right.

8          Q     Of the 14,999, have you ever heard of a

9    single instance of any of those other companies

10   having an issue with interpreting Experian's         05:18:28

11   reporting of short sales?

12         A     No.

13         Q     I want you to quickly take a look at a

14   document that has the Bates number EXP_E928.  It's

15   an e-mail you're copied on, but it includes a        05:18:46

16   portion of Fannie Mae's selling guide, and if you

17   read here it says, "The DU applies the following

18   guidelines to prior foreclosures:  Mortgage accounts

19   including first liens, second liens, home

20   improvements loans, HELOCS and mobile home loans,    05:19:02

21   will be identified as a foreclosure if there is a

22   current status or manner of payment code of 8

23   (foreclosure) or 9, (collection or charge-off).

24              Ma'am, in your opinion is it appropriate to

25   ever identify and make a determination on the        05:19:18

Page 280

1      I, the undersigned, a Certified Shorthand
Reporter of the State of California, do

2    hereby certify:
      That the foregoing proceedings were taken

3    before me at the time and place herein set
forth; that any witnesses in the foregoing

4    proceedings, prior to testifying, were
administered an oath; that a record of the

5    proceedings was made by me using machine
shorthand which was thereafter transcribed

6    under my direction; that the foregoing
transcript is a true record of the

7    testimony given.
      Further, that if the foregoing pertains to

8    the original transcript of a deposition in
a Federal Case, before completion of the

9    proceedings, review of the transcript [ ]
was [ ] was not requested.  I further

10   certify I am neither financially
interested in the action nor a relative or

11   employee of any attorney or any party to
this action.

12      IN WITNESS WHEREOF, I have this date
Subscribed my name.

13   Dated: March 12, 2015

14

15

16

17

18

19

20

21

22   SHARI STELLHORN

23   CSR No. 2807

24

25

Page 284

Page 1

1                  UNITED STATES DISTRICT COURT
2                 SOUTHERN DISTRICT OF CALIFORNIA
3
4      ------------------------------
       JOHN T. SHAW, et al.,          )
5                                     )
                    Plaintiff,        )
6                                     )
             vs.                      ) Case No. 13cv1295-JLS
7                                     )           (BLM)
       EXPERIAN INFORMATION           )
8      SOLUTIONS, INC., et al.,       )
                                      )
9                   Defendants.       )
                                      )
10     ------------------------------
11
12
13
14
              VIDEOTAPED DEPOSITION OF PATRICIA FINNERAN
15
                       San Diego, California
16
                      Thursday, May 21, 2015
17
18
19
20
21               VERITEXT LEGAL SOLUTIONS
                    MID-ATLANTIC REGION
22           1801 Market Street - Suite 1800
                   Philadelphia, PA  19103
23
24
25

```
1    Automated Response Format output.
2         Q.   Okay.  And what is ARF?
3         A.   I'm sorry.  I didn't hear you.
4         Q.   What is ARF?  What is the Automated
5    Response Format?
6         A.   Automated Response Format is a
7    system-to-system readable output.  So the inquiry
8    would come in from the -- from our client asking
9    for a credit report.  We would output it in this
10   format at their request.  It would be -- goes
11   directly into their system that would then
12   reinterpret the data according to their software
13   code and create their own readable format.
14        Q.   Is this the version of a report or the
15   formatting of the report that you would give to,
16   say, Credco?
17        A.   I believe it's ARF 7.
18        Q.   And what is the difference between ARF
19   and a teletype report?
20        A.   The ARF report, being Automated
21   Response Format, is -- is built in segments and
22   bits and bytes kind of a thing, right?  So it goes
23   from -- typically it's going to go from our system
24   to the lender's system, and their system would
25   interpret it.  It's not meant for -- to sit down
```

Page 9

1   and just human read it.  The teletype report is
2   formatted into that -- we call it the human
3   readable format.  So it's formatted out into words
4   with headings and, you know, specific fields.
5           Q.    How does your system know it's going to
6   send a teletype report or an ARF report?
7           A.    Based on the request from the users.
8           Q.    Are teletype reports often sent or are
9   they mostly ARF reports at this point?
10          A.    Approximately 96, 97 percent of the
11  credit reports we deliver are in an ARF format.
12          Q.    Is it a category of users or
13  subscribers that still use teletype reports of
14  some kind?
15          A.    They're either small users or they
16  could be one-off reports.  So, you know, the user
17  may have, you know, their entire system set up to
18  receive the ARF data.  So, you know, there's a
19  normal transmission process to get the ARF data to
20  send them into their decision system.  They may
21  have a need in another department or a specific
22  need to pull a one-off report and so they'll pull
23  that one-off report in the TTY format so that
24  they're looking at it and it's not something
25  that's being fed through that decisioning systems.

Page 58

1          The actual physical guide only gets
2     printed once a year.  So this document was created
3     and sat on the CDIA website to help direct people
4     and address some of their questions.
5          Q.   Okay.  And in terms of publishing, was
6     it sent to furnishers?
7          A.    It was published on the -- it was on
8     the CDIA website.  It's not -- it's not actually
9     an Experian document.  This is a CDIA Metro 2
10    document.  So it was published on their website.
11    I don't know -- I don't believe there was a
12    mailing done on it.
13              MR. CENTO:  Okay.  All right.  All
14    right.  Ms. Finneran, that's actually all I have.
15    Thank you very much for seeing me again.  I
16    appreciate it.
17              THE WITNESS:  Sure.
18              MR. WIERS:  John, I do have just a
19    slight bit of redirect.
20              MR. CENTO:  Okay.
21
22                   EXAMINATION
23    BY MR. WIERS:
24         Q.   Ms. Finneran, we've been talking today
25    a little bit about the grid codes.  And I just

Page 59

1    want to ask a few questions.

2              The front position in the grid in

3    Experian's data represents the current status; is

4    that right?

5         A.   That is correct, correct.

6         Q.   As you discussed with Mr. Cento, there

7    is a date in the credit data that maps to that

8    current status, right?

9         A.   That is correct.

10        Q.   So, for example, when Experian reports

11   a 9 for a short sale, there is a date associated

12   with that 9 or settled condition, right?

13        A.   Yes.

14        Q.   We looked at an e-mail from the CFPB,

15   which I think was marked as Exhibit 3, and they

16   were -- or Exhibit 10, rather, Document 3.  CFPB

17   had noted that there were potentially some issues

18   with folks who read credit reports with

19   identifying the date of a short sale.

20              Would that be a problem for anyone --

21   for any lender or other user who is reviewing

22   Experian's data?

23        A.   No, it would not be.

24        Q.   So that issue was not an issue that

25   Experian confronted, right?

Page 60

1          A.    Correct.

2          Q.    If, however, Experian had simply used

3   the reported payment rating as the current status

4   in the grid, would that have potentially in -- in

5   your view, would that have potentially created

6   confusion with regard to the date of status?

7          A.    Yes, it would.

8          Q.    Are you aware that other bureaus were

9   not using a grid code that would map directly to

10  the settled condition and directly to the date of

11  the settlement?

12         A.    Yes.

13         Q.    If they had, however, the problem

14  identifying dates likely would not have existed,

15  right?

16         A.    Correct.

17         Q.    Here, however, resellers were getting

18  potentially three different grid codes instead of

19  just one grid code that represented the settled

20  condition, right?

21         A.    Right.

22         Q.    And what CFPB was suggesting in this

23  e-mail was that perhaps the resellers should

24  simply create a dedicated MOP code for the short

25  sale condition to cure the problem of -- the

Page 61

1   problem of identifying the date of short sales.
2   That was actually a solution Experian already had
3   in place, right?
4        A.    Yes.
5        Q.    By using a grid code that mapped to
6   settled conditions, Experian had already done
7   precisely what the CFPB was recommending resellers
8   potentially do, right?
9        A.    Correct, yes.
10        Q.    If Experian had simply maintained the
11   reported payment rating as the leading number in
12   the grid, would that accurately represent the
13   current status?
14        A.    No.
15        Q.    In the example of the Wells Fargo
16   account that Mr. Cento gave you, if Wells Fargo
17   reported, for example, a 4 for the payment rating
18   on an account that resulted on a short sale, if
19   Experian reported a 4 as the leading number in the
20   grid, that would be inaccurate, wouldn't it?
21        A.    Yes.
22        Q.    Because the current status of that
23   account is not 120 days late or 90 days late or
24   whatever 4 maps to, right?
25        A.    That is correct.

Page 62

1    Q.   The current status is settled, right?

2    A.   Yes.

3    Q.   And that's how Experian would report

4  it, right?

5    A.   Yes.

6    Q.   Because that is the way to maximize

7  accuracy, right?

8    A.   Yes.

9    Q.   If a data furnisher contacted you and

10  asked you to use the 4 instead of the 9, what

11  would be your response?

12    A.   Well, we would have to advise them that

13  they would need to report the data differently.

14  So we would tell them that if the account is paid

15  in full and settled, you know, that the 4 is

16  implying that it's not paid in full and settled

17  and that it's going to be 120 days delinquent, so

18  we would tell them that that would be inaccurate

19  on the report if, in fact, the consumer was a

20  settled-in-full account.

21    Q.   So it's Experian's position that they

22  won't report inaccurate data even if a data

23  furnisher asks them to do that, right?

24    A.   That is correct, yes.

25    Q.   If a consumer starts a foreclosure but

1   then at the last minute it short sales the

2   property, what would be the payment rating?

3         A.    On the Experian file, we would go --

4   payment rating would be the 8 before the

5   foreclosure proceeding starting, and once the

6   short sale settled and the settled is reported,

7   the Experian file would update the payment grid to

8   show the 9 to map the settled.

9         Q.    So in that example where the account

10  resulted in a short sale and not a foreclosure,

11  Experian would report a current status of 9 for

12  settled, right?

13        A.    Correct.

14        Q.    But if Experian simply regurgitated the

15  payment history, it would actually display as an

16  8, which means foreclosure, right?

17        A.    Correct.

18        Q.    And that would be inaccurate, wouldn't

19  it?

20        A.    Very much so.

21        Q.    Is that another reason Experian would

22  not use the payment rating for the leading number

23  in the grid?

24        A.    Right, it's not accurate.

25        Q.    The CFPB -- Mr. Cento showed you an

Page 64

1   e-mail that we looked at it.   It was Exhibit 10.
2   And there was a memo that CFPB issued which I'd
3   like to mark as Exhibit -- John, did you mark an
4   Exhibit 15 or --
5               MR. CENTO:   I have exhibits -- you
6   should see them there, but they are --
7               MR. WIERS:   Right.   You have a Document
8   8, but it doesn't say that you ever marked it as
9   an exhibit, so I don't know if that should have
10  been.
11              MR. CENTO:   Yes.   Exhibit 15 is marked.
12  Your next -- if you want to mark an exhibit, it
13  would be 16.
14              MR. WIERS:   Okay.   So Exhibit 16 is a
15  Bates range of EXP_E 0004435.
16              (Exhibit 16 marked)
17  BY MR. WIERS:
18      Q.   Do you recognize this document?
19      A.   Yes.
20      Q.   And this was a memo that was put out by
21  the CFPB, right?
22      A.   Yes.
23      Q.   And they state in here that our
24  investigation discovered that the underlying
25  problem was not due to inaccurate reporting by

Page 65

1   furnishers or the credit reporting companies.  Did

2   I read that right?

3        A.    You did, yes.

4        Q.    And after this memo was issued, did you

5   engage in further conversations with the CFPB?

6        A.    We did.  We had a couple of additional

7   conversations relative to identification of a

8   date, how do you tell when it occurred.

9        Q.    And by the end of these conversations,

10  do you believe CFPB was fully apprised and fully

11  understood the manner in which Experian reports

12  short sales?

13       A.    Yes.

14       Q.    At any point in time did CFPB inform

15  you that they changed their view that Experian's

16  reporting was accurate?

17       A.    They never changed that view, no.

18       Q.    Did the CFPB at any time advise

19  Experian that it should do anything differently?

20       A.    No.

21       Q.    Did the CFPB ever tell you that it

22  thought that Experian was doing anything wrong?

23       A.    No, it did not.

24            MR. WIERS:  I don't have anything else.

25  ///

Page 85

1    BY MR. CENTO:

2         Q.   But not necessarily the date that the

3    short sale occurred, right?

4         A.   Correct.

5              MR. CENTO:   I have no more questions.

6

7              FURTHER EXAMINATION

8    BY MR. O'DONNELL:

9         Q.   Ma'am, just a couple follow-ups.  You

10   had several follow-up calls with the CFPB and you

11   explained to them in detail how -- Experian's

12   procedures with regard to the dates associated

13   with the short sale, right?

14        A.   That is correct.

15        Q.   And they fully understood what you were

16   telling them and you explained in detail how

17   Experian's processes work, right?

18        A.   Correct.

19        Q.   And they never had any problems with

20   it, did they?

21        A.   No, they did not.

22        Q.   The -- Mr. Cento pointed you to some

23   language in an e-mail where it say that a memo had

24   been rescinded.  The -- after November 2013, the

25   date of that e-mail, the primary issue that was

1   discussed was simply the dating issue and not the

2   accuracy of the underlying data, right?

3        A.   That is correct.

4        Q.   Did the CFPB ever in any way, shape or

5   form, after it issued its initial memo, come back

6   and question the accuracy of the data reported by

7   the bureaus?

8        A.   No, they did not.

9             MR. WIERS:  That's all I have.

10            MR. CENTO:  Thank you.

11            THE REPORTER:  Do you want to put a

12  stip on?  Or we don't do that --

13            MR. CENTO:  I'm sorry?

14            THE REPORTER:  Do you want me to handle

15  the transcript by code?

16            Let's go off the record.

17            MR. O'DONNELL:  Yeah, we can go off the

18  record.  That's fine.

19            THE VIDEOGRAPHER:  This concludes --

20            MR. CENTO:  What was the question?

21            MR. O'DONNELL:  She wants to know how

22  we want to handle the transcript.  And I don't

23  think we have a stipulation in this case to do

24  anything different than the code would provide.

25  So unless you feel strongly otherwise, I would

Page 87

1    suggest that the court reporter simply do it

2    according to the code.

3              MR. CENTO:  Agreed.  Agreed.

4              MR. WIERS:  Okay.  We're off the

5    record.

6              MR. CENTO:  Shelly, I'll take a text

7    file of the transcript.

8              MR. WIERS:  Let's go off the record,

9    John.

10             THE VIDEOGRAPHER:  The concludes

11   today's video deposition of Patricia Finneran.

12   Total number of media used is one.  Going off the

13   record, the time is 12:11 p.m.

14             (Discussion off the record)

15

16

17

18

19

20

21

22

23

24

25

Page 88

1    STATE OF CALIFORNIA      ) ss:

2    COUNTY OF SAN DIEGO      )

3

4        I, SHELLY M. BERRY, CSR No. 9896, do hereby certify:

5        That the foregoing deposition testimony was taken

6    before me at the time and place therein set forth, at

7    which time the witness was placed under oath by me;

8        That the testimony of the witness and all objections

9    made at the time of the examination were recorded

10   stenographically by me, were thereafter transcribed under

11   my direction and supervision and that the foregoing is a

12   true record of same.

13       I further certify that I am neither counsel for nor

14   related to any party to said action, nor am I in any

15   way interested in the outcome thereof.

16           IN WITNESS WHEREOF, I have subscribed my name

17   this 2nd day of June, 2015.

18

19

20

21   _____

22   Shelly M. Berry, CSR No. 9896

23

24

25

**EXHIBIT 30**

**Session M – Reporting Alternatives to Foreclosure**

**Notes:**

- Distribute the session handout and explain that we're going to complete two scenarios: one for deed in lieu of foreclosure and a second for short sales.

- Read together the first paragraph of our first scenario. Note that the July column is filled out so we know how the account was reported prior to the deed in lieu. However, the K3 Segment is blank at this point. Since we did not cover this segment yesterday, refer participants to page 4-38 in the CRRG® complete the K3 fields. (If any attendees did not attend the Stages of Foreclosure session, make sure they understand the field requirements for this segment.)

- Refer to FAQ 53 on page 6-45 of the CRRG® and review the guidelines for deed in lieu. Read together the 2nd paragraph of the scenario and complete the blank fields for the October reporting period, which is when the deed in lieu was completed. Stress that Special Comment BO should no longer be reported.

- Complete the November reporting period to show how the deed in lieu should be reported as payments are being made.

- <u>Facilitators:</u> There is no value available for reporting the Payment History Profile for months after the initial Deed in Lieu status is reported. PHP should be <u>blank filled</u> at that point.

- Read together the last paragraph of the scenario and complete the January reporting period, which shows how to report the account if the consumer eventually pays the deficiency balance in full. (Facilitator: Is it clear to data furnishers that Account Status remains 89 with zero balance?)

- Point out the last paragraph of the Deed in Lieu reporting guidelines and stress that a Charge off status should not be reported after Status 89. (even if the creditor internally charges off the outstanding balance)

© **Consumer Data Industry Association, 2014. All rights reserved.**


Exhibit
12

EXP_E0004805

## Session M – Alternatives to Foreclosure: Deed in Lieu – FAQ 53 (Page 6-45)

John has a mortgage with ABC Bank. This mortgage loan is backed by Freddie Mac and the Freddie Mac loan number is 2454843876. Complete the K3 Segment for the July reporting period.

Realizing that he can no longer make the payments, John turned in the deed to the property in lieu of foreclosure in October. John is liable for the $30,000 deficiency balance remaining on the account and made a payment of $200 on November 10, 2014.

John was able to pay off the loan on January 9, 2015 – he must have gotten an inheritance!

| Field # | Base Segment | July 15, 2014 | October 15, 2014 (Deed in lieu) | Nov. 15, 2014 (Now paying) | January 15, 2015 (Paid in full) |
|---|---|---|---|---|---|
| 1 | RDW | 0466 | 0466 | 0466 | 0466 |
| 2 | Processing Indicator | 1 | 1 | 1 | 1 |
| 3 | Time Stamp | 0715201408 2001 | 1015201410 2105 | 1115201409 1503 | 0115201509 1503 |
| 4 | Correction Indicator | 0 | 0 | 0 | 0 |
| 5 | Ident Number | ABC1460028598 | ABC1460028598 | ABC1460028598 | ABC1460028598 |
| 6 | Cycle Identifier | Blank | Blank | Blank | Blank |
| 7 | Consumer Account Number | 729801842 | 729801842 | 729801842 | 729801842 |
| 8 | Portfolio Type | M | M | M | M |
| 9 | Account Type | 26 | 26 | 26 | 26 |
| 10 | Date Opened | 04102005 | 04102005 | 04102005 | 04102005 |
| 11 | Credit Limit | Zero fill | Zero fill | Zero fill | Zero fill |
| 12 | Highest Credit or Original Loan Amount | 000150000 | 000150000 | 000150000 | 000150000 |
| 13 | Terms Duration | 30b (where b = blank) | 30b | 30b | 30b |
| 14 | Terms Frequency | M | M | M | M |
| 15 | Scheduled Monthly Payment Amount | 000000600 | 000000600 | 000000600 Ask: Would creditors create a new payment schedule? | 000000000 |
| 16 | Actual Payment Amount | 000000000 | 000000000 | 000000200 | 000029800 (@ last month's balance) |

(continued)

© Consumer Data Industry Association, 2014.  All rights reserved.

2

EXP_E0004806

## Session M – Deed in Lieu – FAQ 53 (continued)

| Field # | Base Segment | July 15, 2014 | October 15, 2014 | Nov. 15, 2014 | January 15, 2015 |
|---|---|---|---|---|---|
| 17A | Account Status | 84 | 89 | 89 | 89 |
| 17B | Payment Rating | Blank fill | 6 (Account continued to progress as delinquent – see PHP.) | 6 | 6 |
| 18 | Payment History Profile | 543222111110 000000000000 | 66543222111 110000000000 (Added Jul, Aug, Sep as 6's) | Blank fill (No PHP value available that designates deed in lieu) | Blank fill (No PHP value available that designates deed in lieu) |
| 19 | Special Comment | BO | Blank fill (not BO) | Blank fill (not BO) | Blank fill (not BO) |
| 20 | Compliance Condition Code | Blank fill | Blank fill | Blank fill | Blank fill |
| 21 | Current Balance | 000124800 | 000030000 | 000029800 | 000000000 |
| 22 | Amount Past Due | 000003600 | 000030000 | 000029800 | 000000000 |
| 23 | Original Charge-off Amount | Zero fill | Zero fill | Zero fill | Zero fill |
| 24 | Date of Account Information | 07152014 | 10152014 | 11152014 | 01152015 |
| 25 | FCRA Compliance/ Date of First Delinquency | 08152013 | 08152013 | 08152013 | 08152013 |
| 26 | Date Closed | Zero fill | Zero fill | Zero fill | 01092015 |
| 27 | Date of Last Payment | 03022014[1] | 03022014 | 11102014 | 01092015 |
| 28 | Interest Type Indicator | V | V | V | V |
| 28A | Reserved | Blank fill | Blank fill | Blank fill | Blank fill |

Note: Fields 29 through 46 contain consumer-level information.

| Field # | K3 Segment | July 15, 2014 | October 15, 2014 | Nov. 15, 2014 | January 15, 2015 |
|---|---|---|---|---|---|
| 1 | Segment Identifier | K3 | K3 | K3 | K3 |
| 2 | Agency Identifier | 02 | 02 | 02 | 02 |
| 3 | Account Number | 2454843876 | 2454843876 | 2454843876 | 2454843876 |
| 4 | Mortgage Identification Number (MIN) | Blank fill | Blank fill | Blank fill | Blank fill |

Facilitator Note: Return to page 1 for additional discussion items.

[1] Date of Last Payment is March because payment had to be made in March for status to remain the same (2).

© Consumer Data Industry Association, 2014. All rights reserved.

EXP_E0004807

**Session M – Short Sales – Notes:**

- Read together the first paragraph of our first scenario. Note that the July column is filled out so we know how the account was reported prior to the short sale. However, the K4 Segment is blank at this point. Refer participants to page 4-39 in the CRRG® and complete the K4 Segment based on the scenario. (If any attendees did not attend the Stages of Foreclosure session, make sure they understand the field requirements for this segment.)

- Refer to the second set of guidelines in FAQ 53 on page 6-45 of the CRRG and review the intro paragraph.

- Read the rest of the scenario. Complete the fields described in the FAQ FIRST; then complete all other fields. Be sure participants understand that the K4 Segment should be removed since it is no longer applicable.

- Questions?

- Facilitator: If anyone asks about short sales where the consumer is obligated to pay the deficiency balance, explain that for credit reporting purposes, a short sale is considered a final report when the account is paid in full, but settled.

For situations where the real estate has been sold but the consumer has to pay the deficiency balance, refer to FAQ 54 on page 6-46 for reporting guidelines. Review FAQ together. Note that the coding for this situation has not changed; it's just not called a short sale.

If it would be helpful to attendees, refer to page 5-27 and review the definition of Special Comment CM.

© Consumer Data Industry Association, 2014. All rights reserved.

EXP_E0004808

## Session M – Alternatives to Foreclosure: Short Sale – FAQ 53 (Page 6-45)

Fred has a mortgage account with ABC Bank. He agreed to a $15,000 balloon payment, which will come due in January 2037. Complete the K4 Segment for the July reporting period.

ABC Bank started foreclosure proceedings on Fred's account in July 2014. However, a short sale was negotiated. Upon the sale of the house on October 10, the bank accepted payment in full for less than the full balance; i.e., the deficiency balance of $24,800 was forgiven.

| Field # | Base Segment | July 15, 2014 | October 15, 2014 |
|---|---|---|---|
| 1 | RDW | 0456 | 0456 |
| 2 | Processing Indicator | 1 | 1 |
| 3 | Time Stamp | 07152014082001 | 1015201410210S |
| 4 | Correction Indicator | 0 | 0 |
| 5 | Ident Number | ABC1460028598 | ABC1460028598 |
| 6 | Cycle Identifier | Blank | Blank |
| 7 | Consumer Account Number | 729801987 | 729801987 |
| 8 | Portfolio Type | M | M |
| 9 | Account Type | 26 | 26 |
| 10 | Date Opened | 01052007 | 01052007 |
| 11 | Credit Limit | Zero fill | Zero fill |
| 12 | Highest Credit or Original Loan Amount | 000150000 | 000150000 |
| 13 | Terms Duration | 30b (where b = blank) | 30b |
| 14 | Terms Frequency | M | M |
| 15 | **Scheduled Monthly Payment Amount** | 000000600 | **000000000** |
| 16 | **Actual Payment Amount** | 000000000 | **000010000**[1] |
| 17A | **Account Status** | 84 | **65** |
| 17B | **Payment Rating** | Blank | **6** (Account continued to progress as delinquent – see PHP.) |
| 18 | Payment History Profile | 543222111110 000000000000 | 66654322111 110000000000 (Added Jul, Aug, Sep as 6's) |
| 19 | **Special Comment** | BO | **AU** |

(continued)

[1] Last month's current balance minus the settlement amount: property sold for $100,000 leaving $24,800 deficiency balance, which was forgiven.
Facilitator Note: Most creditors (in our workshops) thought the Actual Payment Amount should contain the amount received based on the sale of the property, even though payment was not actually made by the consumer.
© Consumer Data Industry Association, 2014. All rights reserved.

EXP_E0004809

5

EXP_E0004810

6

## Session M – Short Sale (Deficiency Balance Forgiven) – FAQ 53 (continued)

| Field # | Base Segment | July 15, 2014 | October 15, 2014 |
|---|---|---|---|
| 20 | Compliance Condition Code | Blank fill | Blank fill |
| 21 | Current Balance | 000124800 | 000000000 |
| 22 | Amount Past Due | 000003000 | 000000000 |
| 23 | Original Charge-off Amount | Zero fill | Zero fill |
| 24 | Date of Account Information | 07152014 | 10102014 |
| 25 | FCRA Compliance/ Date of First Delinquency | 08152013 | 08152013 |
| 26 | Date Closed | Zero fill | 10102014 |
| 27 | Date of Last Payment | 03022014[1] | 10102014[2] |
| 28 | Interest Type Indicator | V | V |
| 28A | Reserved | Blank fill | Blank fill |

Note: Fields 29 through 46 contain consumer-level information.

| Field # | K4 Segment | July 15, 2014 | October 15, 2014 |
|---|---|---|---|
| 1 | Segment Identifier | K4 | N/A |
| 2 | Specialized Payment Indicator | 01 | |
| 3 | Deferred Payment Start Date | 00000000 | |
| 4 | Balloon Payment Due Date | 01012037 | |
| 5 | Balloon Payment Amount | 000015000 | |
| 6 | Reserved | Blank fill | |

Facilitator Note: Return to page 4 for additional discussion items.

[1] Date of Last Payment is March because payment had to be made in March for status to remain the same (2).
[2] Facilitator Note: Workshop participants thought DLP should be date of sale when $ were received, even though not actually paid by the consumer.

© Consumer Data Industry Association, 2014.  All rights reserved.