# EXHIBIT 32





Short Sale Credit Reporting and Evaluation

*Next Steps*

**Summary:**  Since early this year, we had been looking into concerns that GSE underwriting systems are treating homes sold as "short sales" as foreclosures, and thus unnecessarily screening affected consumers out of automated underwriting.

The issue had been surfaced publicly in recent press reports, and by Senator Bill Nelson. On May 7th Senator Nelson requested that the CFPB and FTC investigate what he considers to be a violation of FCRA accuracy obligations.

Our investigation discovered that the underlying problem was not due to inaccurate reporting by furnishers or the credit reporting companies, but rather an issue of conflicting information being presented on the consumer's credit tradeline within the tri-merge credit reports. We believe that it is the "way" that the information is presented and not an issue with core inaccuracies in the information being presented. We worked very closely with FHFA, GSEs and industry stakeholders to lead the effort to determine the root cause of the issue. As previously announced, Fannie Mae took the lead and will be implementing an update to *Desktop Underwriter* later this year. This update will allow lenders to provide updated information and therefore allow DU to more accurately evaluate a consumer's credit history that has previously undergone a short sale. This is a major step in the right direction and is a key sign to the industry that the issue of short sales appearing in consumer's credit history is not a short term scenario.

**Problem Statement**

Although the update that Fannie Mae will be implementing within DU in November 2013 is a key advancement in the accurate evaluation of short sales within a consumer's credit history, it is not the final answer. Systems like Fannie Mae's *Desktop Underwriter* and other downstream technology platforms utilize a xml file format (either FNMA or MISMO based data standards) to report and evaluate a credit file. Within the credit file, there are two main categories of information, the tradeline data and the remarks code. I segregate these two categories because within the xml file, the tradeline data is actionable whereas the remarks codes are not actionable. This is a remaining key roadblock in allowing systems to automatically and with 100% certainty determine if a credit tradeline was disposed as a short sale and exactly when the short sale occurred. The current Metro 2 codes that are currently used to identify a short sale has occurred are reported by the data furnisher and then provided by the credit repositories within the remarks codes. These remarks codes can be evaluated to identify a short sale tradeline but do not contain information about when the short sale occurred. Other tradeline data fields have to be evaluated to attempt to determine when the short sale occurred however this process is not always accurate for numerous reasons.

EXP_E0004435



## Proposed Solution

We believe that additional efforts are required so that consumer's credit history will be evaluated accurately and effectively. We would like to continue our reviews and collaboration with industry stakeholders and experts to determine the best way to represent short sales within a tri-merge credit report without introducing extensive burden upon the industry to accomplish this. An initial idea would be to introduce a specific code for a short sale and date that can be represented within the actionable tradeline data. For example, this could be accomplished by adding a short sale specific Manner of Payment code. We want to call upon industry to help us determine the best course of action to address this key obstacle. We want to ensure that consumers are not inadvertently denied access to new credit following a short sale due to the inability to properly evaluate their credit history.

EXP_E0004436

# EXHIBIT 33

# LODGED UNDER SEAL

# EXHIBIT 34

# LODGED UNDER SEAL

# EXHIBIT 35

| From: | John B Abruzzi |
| Toi | Alan G Hitchcock; April Stuhl; Evelina Draper; Lorna K Parker; Mai-Lan Nguyen; Rob Diehl; Vincent W Robinson |
| Subject: | E-STORE: Re: DU Clarif. |
| Date: | 04/18/2013 11:18 AM |
| Attachments: | du-clarib-phase2-textbook-preface-table-contents.pdf |

Just wanted to throw out a few things

First, Vince was able to show me where the doc was that I was missing:



this is the thing that apparently got Fannie in the spot its in.  In it, Fannie says it describe the MOP codes it uses to determine Foreclosure, then says it doesn't have the codes it needs to identify pre foreclosures (which are pretty much the same) then says that when they return codes that indicate pre-foreclosures, customers must do blah blah blah (so DU must have them) and then say they don't use the codes (that they say they don't have) because they are not 100% accurate.

It gave Vince, April and I a laugh.

Hard to know what to make of it, other than that Fannie's trying to spin something.

If I had to guess, Fannie either has all the codes and supporting credit file data it needs to identify pre foreclosures as we do but has chosen not to use them systematically in DU in the way we have OR for whatever reason, perhaps their use of merged reports over raw infiles, are unable to get the granularity of data they need to have the confidence we do in making that determination.

To us its now pretty simple.  We get and now use the credit data from the repositories to identify with accuracy (nothing is 100%, so that's just BS) whether or not a trade is a mortgage, and whether or not is appears to show a foreclosure vs pre foreclosure (Deed in lie or short sale).  We use that data to drive different credit policy treatments of those occurrences in LP.  It appears for whatever reason that Fannie does not, or cannot now do this.

J

John Abruzzi
Customer Business Services
(571) 382-3712
(703) 626-5940 cell

▼ John B Abruzzi---04/17/2013 12:40:51 PM---Thanks Evelina, that's just the kind of input and clarification I was looking for.

| From: | John B Abruzzi/MSP/HQ/FHLMC |
| To: | Evelina Draper/HQ/FHLMC@FHLMC |
| Cc: | Rob Diehl/MSP/HQ/FHLMC@FHLMC, Alan G Hitchcock/HQ/FHLMC@FHLMC, April Stuhl/RISKMGMT/HQ/FHLMC@FHLMC, Lorna K Parker/HQ/FHLMC@FHLMC, Mai-Lan Nguyen/HQ/FHLMC@FHLMC, Vincent W Robinson/SELLERVHQ/FHLMC@FHLMC |
| Date: | 04/17/2013 12:40 PM |
| Subject: | Re: DU Clarif. |

Thanks Evelina, that's just the kind of input and clarification I was looking for.

▼ Evelina Draper---04/17/2013 12:38 PM EDT---John, you are generally correct.  To summarize the history of the Black Box Credit Policy, we first c

| From: | | Evelina Draper |
| To: | | John Abruzzi |
| Cc: | | Rob Diehl; Alan Hitchcock; April Stuhl; Lorna Parker; Mai-Lan Nguyen; Vincent Robinson |
| Date: | | 04/17/2013 12:38 PM EDT |
| Subject: | | Re: DU Clarif. |

John, you are generally correct.  To summarize the history of the Black Box Credit Policy, we first changed the policy to extend the time frame during which the override to caution was applied on loans with a foreclosure, DIL or a  short sale, from 3 years to 7.  Then we revised the policy for alternatives to foreclosure (DIL and short sales) from 7 years to 4.  The policy was revised back in 2010, though we were not able to implement in LP until just recently.

I will cover this for Credit Policy, so please add me to the future communications and meetings on this issue, as needed.  Thanks!


We make home possible ®

Evelina Draper
Associate Director
Mortgage Credit Policy
(571)382-3399



▼ John B Abruzzi---04/17/2013 10:20:14 AM---Thanks Rob, well managed.  So, the reality in LP, consistent with my earlier description, is that LP

| From: | John B Abruzzi/MSP/HQ/FHLMC |
| To: | Rob Diehl/MSP/HQ/FHLMC@FHLMC, Alan G Hitchcock/HQ/FHLMC@FHLMC, April Stuhl/RISKMGMT/HQ/FHLMC@FHLMC, "Evelina Draper" <evelina_draper@freddiemac.com>, Lorna K Parker/HQ/FHLMC@FHLMC, Mai-Lan Nguyen/HQ/FHLMC@FHLMC, Vincent W Robinson/SELLER/HQ/FHLMC@FHLMC, Vincent W Robinson/SELLER/HQ/FHLMC@FHLMC |
| Date: | 04/17/2013 10:20 AM |
| Subject: | Re: DU Clarif. |

Thanks Rob, well managed.

So, the reality in LP, consistent with my earlier description, is that LP now differentiates between Foreclosures and both Deeds in Lieu of Foreclosure and

Short Sales that appear in borrower credit reports.  We group Deeds in Lieu and Short Sales together into something we internally call "Alternatives to Foreclosure", so we while we do differentiate Foreclosures from Deeds in Lieu and Short Sales, we don't differentiate Deeds in Lieu from Short Sales (in case that comes up).

Until relatively recently, we did not differentiate Foreclosures from Deeds in Lieu and Short Sales. When that was the case, we applied the same LP Credit treatment (override to caution) and LP model point assignment to loans with a Foreclosure that we did to loans with a Deed in Lieu or Short Sale.  LP would apply a Credit Policy "override" to caution if there was a recent Foreclosure/Deed in Lieu/Short sale, with recent being defined, I think, as within the last 3 or 4 year (Evelina and Lorna can confirm that.  Similarly, the LP model applied a point hit if there were any Foreclosures/Deeds in Lieu/Short sales within the last 12 months.

Credit then changed policy so that Foreclosures would cause an override with a longer lookback period (Foreclosures within the last 7 years) but excluded Deeds in Lieu and Short Sales from that 7 year lookback, instead making the look back for those "Alternatives to Foreclosure" to only 4 years (again, Lorna and Evelina, please confirm).  Modeling on the other hand, preferred to continue to drive their point assignments/hits off of a combined Foreclosure/Deed in Lieu/Short sale field as they felt that best reflected risk in the model.

This was a complex change to implement, not so much in the LP space, but in the                     REDACTED                     , and took a very long time to get into production.

So that's what LP does today.

I read through the emails (oddly enough, from Brian Webster, who once worked for me on, again, oddly enough, the LP scoring engine) from FHFA that Rob forwarded, but I can't see any really meaningful detail.

It sounds like they may be interested in exactly what we look at, and how we determine if a credit report does or does not indicate a Deed in Lieu and/or Short Sale vs a Foreclosure.

You can see some of that detail in my LP requirements. While this may not be the final, final version, its close to it.

These requirements were of course created in partnership with Credit.  If CFPB, through FHFA is poking at that level, I really don't like it.

Just wanted to get everyone on the same page

Thanks

John


John Abruzzi
Customer Business Services
(571) 382-3712
(703) 626-9940 cell


Lets wait for the meeting.  I just asked Laura to hold her questions.

Rob Diehl
Product Development Director
Single-Family Sourcing and Securitization
Freddie Mac
571-382-3180 (work)
571-243-2221 (cell)

REDACTED

REDACTED

REDACTED

REDACTED

[attachment "Alt Foreclosure detailed LF business requirements final 2_8_11 update 8_25.doc" deleted by John B Abruzzi/MSP/HQ/FHLMC]

**FannieMae**

## Desktop Underwriter Clarification
*The DU identification of a previous foreclosure or preforeclosure sale*

March 12, 2013

Recent requests for clarification on how Desktop Underwriter® (DU®) identifies a foreclosure and a preforeclosure sale have been received. This document is being provided to clarify the DU identification of these significant derogatory events.

### Foreclosure Identification

When reviewing the credit report data received, DU reviews the manner of payment (MOP) codes and Remarks Codes associated with each tradeline, and the Public Record information to determine if a foreclosure has occurred.

Mortgage accounts, including first liens, second liens, home improvement loans, HELOCs, and mobile home loans, will be identified as subject to a foreclosure if there is a current status code or MOP code of "8" (foreclosure) or "9" (collection or charge-off); or if there is a foreclosure-related Remarks Code present in the credit report data and associated to the tradeline. If a foreclosure was reported within the seven-year period prior to the report date associated with the tradeline, the loan casefile will receive a Refer with Caution recommendation and will be ineligible for delivery to Fannie Mae as a DU loan.

> **NOTE:** *On loan casefiles where DU determined a mortgage or HELOC account was subject to a prior foreclosure, if the account was actually reported in error, or the foreclosure was the result of extenuating circumstances, lenders have the option to manually underwrite those loans (assuming the appropriate waiting period has been met) in accordance with the Fannie Mae Selling Guide.*

### Preforeclosure Sale Identification

A preforeclosure sale or short sale is the sale of a property in lieu of a foreclosure resulting in a payoff of less than the total amount owed, which was pre-approved. At this time, there are no codes provided in the credit report data received by DU that specifically identify a preforeclosure sale.

With DU Version 8.2 in December 2010, DU began issuing a message based on the presence of Remarks Codes E0047 (Settlement accepted on this account), T0140 (Settled for less than full balance), or R0107 (Account legally paid in full for less than the full balance) on a mortgage or HELOC account. However, because those codes can be used on any account for any reason, DU is not able to use those codes to identify a preforeclosure sale with 100% accuracy, so it is not able to fully automate the preforeclosure sale waiting period or eligibility requirements.

When DU issues the preforeclosure sale message the lender must confirm that the preforeclosure sale had been completed two or more years from the credit report date, and must confirm that the loan casefile complies with all other requirements specific to preforeclosure sales as specified in the Fannie Mae *Selling Guide*.

> **NOTE:** *On loan casefiles that receive a Refer with Caution recommendation because DU determined a mortgage or HELOC account was subject to a foreclosure (based on a current status or MOP code of "8 or "9", as stated in the Foreclosure Identification section above), if the account was actually subject to a preforeclosure sale, lenders have the option to manually underwrite those loans (assuming the appropriate waiting period has been met) in accordance with the Fannie Mae Selling Guide.*

## Lender Responsibility

For all mortgage loans, the lender is responsible for reviewing the credit report, as well as all credit information, to determine that the credit report meets Fannie Mae's requirements and that the data evaluated by DU was accurate.

If a foreclosure or preforeclosure sale was not clearly identified in the credit report, the lender must obtain copies of appropriate documentation for the event and ensure that the appropriate waiting periods and eligibility guidelines have been met. The documentation must establish the completion date of a previous foreclosure or preforeclosure sale.

Additional information is available in Appendix A of this document, as well as the Fannie Mae Selling Guide.

## For More Information

For more information about these topics, lenders may contact their Fannie Mae customer account team; and mortgage brokers should contact their DO sponsoring wholesale lender.

## Appendix A: Fannie Mae Selling Guide Sections

The following section of the Selling Guide further describes how DU determines a foreclosure, provides information on the message issued on a preforeclosure sale, and is the official policy statement of Fannie Mae.

### B3-5.3-09, DU Credit Report Analysis

DU applies the following guidelines to prior foreclosures:

- Mortgage accounts, including first liens, second liens, home improvement loans, HELOCs, and mobile home loans, will be identified as a foreclosure if there is a current status or manner of payment/MOP code of "8" (foreclosure) or "9" (collection or charge-off); or if there is a foreclosure-related Remarks Code present in the credit report data and associated to the tradeline.

- If a foreclosure was reported within the seven-year period prior to the credit report date, the loan casefile will receive a Refer with Caution or Refer with Caution/IV and will be ineligible for delivery to Fannie Mae.

- If the filed date and the satisfied date of the foreclosure are both unknown, but it appears that the foreclosure occurred within the seven-year period prior to the credit report date, the lender must confirm that the foreclosure did not occur within the most recent seven-year period.

- Foreclosure laws vary by state and the time it takes to complete the process may vary by state. DU assumes that the date the foreclosure was reported in the tradeline is the date of the foreclosure sale or liquidation. The lender must confirm that all foreclosures are satisfied.

### Preforeclosure Sales or Short Sales

DU is not able to identify preforeclosure or short sales in the credit report data. Lenders must manually apply the preforeclosure sale requirements to DU loan casefiles, regardless of the underwriting recommendation received from DU.

DU will issue a message on loan casefiles where the borrower's credit report indicates an account may have been released to a preforeclosure sale. The recommendation on the loan casefile will not be changed when this information appears on the credit report, though as stated above, the lender must ensure the loan complies with all other requirements specific to preforeclosure sales as specified in B3-5.3-07, Significant Derogatory Credit Events — Waiting Periods and Re-establishing Credit (05/15/2012).

Note: B3-5.3-07, Significant Derogatory Credit Events — Waiting Periods and Re-establishing Credit (05/15/2012), also contains additional requirements pertaining to underwriting borrowers with a preforeclosure sale, short sale, or extenuating circumstances. DU is not able to identify preforeclosure or short sales in the credit report data, or whether the borrower's derogatory credit history was the result of extenuating circumstances. Loan casefiles that receive a Refer with Caution or Refer with Caution/IV recommendation due to a bankruptcy or foreclosure action that was caused by extenuating circumstances may be manually underwritten if the lender has the appropriate documentation that these events occurred, the applicable minimum time period has elapsed, and the loan meets all requirements of this Selling Guide that pertain to manually underwritten loans.

# EXHIBIT 36

```
 1              UNITED STATES DISTRICT COURT

 2             SOUTHERN DISTRICT OF CALIFORNIA

 3

 4   JOHN T. SHAW; KENNETH COKE;    )

 5   and RAYMOND RYDMAN, on behalf )

 6   of themselves and all others  )

 7   similarly situated,           )

 8        Plaintiffs,              )

 9        v.                       ) Case No.

10   EXPERIAN INFORMATION          ) 13-CV-1295 JLS (BLM)

11   SOLUTIONS, INC.; WELLS FARGO  ) Volume I

12   BANK, NA; and CITIMORTGAGE,   )

13   INC.,                         )

14        Defendants.              )

15   -----------------------------)

16

17         DEPOSITION OF STUART KENDALL PRATT

18                  WASHINGTON, D.C.

19               MONDAY, MARCH 9, 2015

20

21   Reported by:

22   NANCY J. MARTIN, CSR No. 9504, RMR

23   Job No. 2004860

24

25   PAGES 1 - 306
```

Page 1

1          Q.   Is it fair to say that you've had dozens if

2     not hundreds of interactions with the CFPB and the FTC

3     over the years?

4          A.   Yes.

5          Q.   As it's currently set up, the CFPB is the

6     agency that regulates the bureaus, the repositories?

7          A.   Yes.   It has the supervisory and examination

8     powers.   The Federal Trade Commission still has

9     enforcement opportunity under the Fair Credit

10     Reporting as do the state attorneys general.

11          Q.   You were also a member of the task force for

12     the World Bank's 2011 report on general principles of

13     credit reporting; is that right?

14          A.   Yes, I was.

15          Q.   Do you know how you were selected for that

16     role?

17          A.   We were selected because CDIA speaks for

18     credit reporting here in the United States.   The task

19     force needed a U.S. representative.   And I was really

20     the right person with the right knowledge to

21     participate, and we've historically had quite a bit of

22     interaction with the World Bank and with the

23     international finance corporation, which is sometimes

24     called the for-profit arm of the World Bank.

25          Q.   In addition to your testimony in front of

1    Congress and meeting with the various regulatory

2    agencies, you're also a regular speaker on the

3    subjects of consumer data law, policy and business

4    practices and things like that?

5         A.   I am, yes.

6         Q.   And you've also served on the U.S. Chamber of

7    Commerce's committee of 100; is that right?

8         A.   I'm still a member of that.

9         Q.   And what is that?

10        A.   That is -- the way they brand it the top 100

11   CEOs of trade associations whose members have a

12   significant impact on the U.S. economy.

13        Q.   And how long have you served on that?

14        A.   So I've probably been a member since 2008,

15   2007.

16        Q.   And you also have served or currently serve

17   on the advisory council for the National Foundation

18   for Credit Counseling?

19        A.   I'm still a member of that.

20        Q.   And what's that?

21        A.   It really is just what the title would

22   suggest.   It's an advisory council.   Credit counselors

23   work with consumers to help them establish budgets to

24   work their way out of financial difficulty, and, you

25   know, credit reporting is one small piece of sort of

Veritext Legal Solutions
866 299-5127

1  that bigger puzzle of how consumers learn and really

2  improve their financial literacy skills and ultimately

3  become more successful.

4      Q.  I want to go over a little bit of terminology

5  with you just to make sure we're using the same

6  language.  What is a credit furnisher?

7      A.  We may be using the same term.  I tend to

8  think about data furnisher --

9      Q.  Okay.  Yes.

10      A.  -- but a furnisher of information is someone

11  who is furnishing information to one of our members

12  who is operating as a consumer reporting agency.

13      Q.  Okay.  Well, so that would be like -- would

14  an example be, for example, CitiMortgage if they're

15  reporting to one of the agencies, a trade line, like a

16  mortgage?  Is that data furnishing?

17      A.  Yes.  That's data furnishing.

18      Q.  And we talked about Experian, Equifax, and

19  TransUnion.  Do you refer to those companies as --

20  well, what's the word that you would use to describe

21  those companies?

22      A.  Nationwide credit bureaus.  That's not a term

23  that you find in law, but it's a term that we find

24  works well when we're working with legislators and

25  media.

1    Q.  Okay.  And then is that to distinguish it --

2    them from non nationwide credit bureaus?

3    A.  Yeah.  There are other types of consumer

4    reporting agencies, and, No. 1, most consumers don't

5    know what a consumer reporting agency is.

6    Q.  Right.

7    A.  That's a term that we find in the Fair Credit

8    Reporting Act.  So, again, sometimes what we're trying

9    to do is we connect with consumers or regulators to

10   find a phrase that they get.  One they understand.

11   Q.  Okay.

12   A.  So, yes, there are other types of consumer

13   reporting agencies, background screening companies,

14   tenant screening companies, and their business models

15   are very different.  The kind of data they use is very

16   different, but they do happen -- they all are

17   regulated under the Fair Credit Reporting Act.

18   Q.  So have you ever heard the term "Tri Merge

19   report"?

20   A.  I have.

21   Q.  And that's a report that sort of takes credit

22   reports from all three of the bureaus and creates a

23   Tri Merge report; right?

24   A.  That's what -- in essence, that's what it is,

25   yes.

Page 18

1    Q.   And what do you call the companies who create

2    the Tri Merge report?

3    A.   They're sometimes called "mortgage reporting

4    companies."   Sometimes we talk about them more so like

5    a technology platform.   However, they're a platform of

6    software and hardware, and they're going to pull a

7    variety different data that's relevant to a mortgage

8    lending decision.   One part of that would be the

9    credit reports of me as a consumer with each of the

10   nationwide credit bureaus.   But it could include

11   electronic flood zone certification information or an

12   electronic appraisal, et cetera.

13   Q.   Are you familiar with the term "reseller"?

14   A.   I am.

15   Q.   Would those companies be, in your view,

16   considered resellers?

17   A.   They are, yes.

18   Q.   But they're also technically, under the FCRA,

19   known as credit reporting agencies?

20   A.   Well, they're consumer reporting agencies.

21   Q.   Consumer reporting agencies.   Thank you

22   for --

23   A.   Just making sure I'm on the right page.

24   Q.   Right.

25   A.   They are consumer reporting agencies.

1    They're also resellers.  And you'll find that in the

2    definition of the Fair Credit Reporting Act, that

3    sometimes a company fits within two different

4    definitions.  Maybe more depending on how many

5    holdings they have and how many different types of

6    consumer reporting agencies they operate.

7         Q.   Are you familiar with a company called Fannie

8    Mae?

9         A.   I am.

10        Q.   And they are -- are they a member of CDIA?

11        A.   They are not.

12        Q.   And they're not a credit reporting agency or

13   consumer reporting agency?

14        A.   To my knowledge, they are not.

15        Q.   What does Fannie Mae do, to your knowledge?

16        A.   So Fannie Mae operates -- it's really a

17   pipeline into a secondary market, and when Fannie was

18   originally created, it was a way to take primary

19   market loans, to buy them from the primary market.  So

20   the primary market would be a bank or a credit union.

21   It was all about money supply.  It was ensuring that

22   money supply continued to flow into that primary

23   market at a reasonable cost so mortgage loans were

24   reasonably priced and so more consumers could

25   successfully own a home.

1    What they do, then, is they value those loans

2    that are made in the primary market.   They establish

3    underwriting guidelines for loans that will qualify

4    for them to buy and then move into the secondary

5    market, and they may hold those loans and have a

6    servicer service them or they may sell those loans and

7    package them as mortgage backed securities.

8        Q.   So, in essence, is what Fannie Mae does -- or

9    is one part of what they do is they buy loans; right?

10       A.   They do.   But important for our members is

11   that they have a desktop underwriting platform, and

12   this is how data from our members flows into that

13   secondary market.   So a primary market lender, a

14   credit union approves a mortgage.   They approve it

15   based on what they believe are the Fannie Mae

16   guidelines.   Fannie Mae buys that mortgage.

17       When Fannie Mae does that, they're going to

18   pull data back up through that was initially used to

19   make the loan.   They're going to pull that back up

20   into the Desktop Underwriting System they have at the

21   secondary market level where they will approve the

22   purchase of that loan, where the loan meets the

23   underwriting criteria that they've laid out for the

24   primary market.

25       Q.   And the underwriting criteria that they've

Veritext Legal Solutions
866 299-5127

1    laid out are guidelines that Fannie Mae creates;
2    right?
3        A.   They are, yes.   They own those guidelines.
4    They're established based on the risk profile that
5    they think can absorb.
6        Q.   And consumer reporting agencies or other
7    members of CDIA can't tell Fannie Mae what to do with
8    their data, for example?   Fannie Mae has its own
9    guidelines and they decide --
10       A.   In other words, when they make a risk
11   decision, that's absolutely right.   Our members will
12   design products to potentially help them or to help
13   the primary market comply with the requirements of
14   Fannie Mae, but it's Fannie Mae who is at the top of
15   The Hill, if you will, and it's what they say that
16   matters in the marketplace.
17       Q.   So they receive the data, and then what they
18   do with it is Fannie Mae's prerogative?
19       A.   It definitely is.
20       Q.   Is Fannie Mae also regulated by CFPB?
21       A.   No.   They're regulated by a different agency.
22   FHFA, the Federal Housing Finance Authority.
23       Q.   So CDIA does not have any jurisdiction over
24   Fannie Mae?
25       A.   Oh, gosh, no.

Page 22

1       Q.   And CFPB does not have jurisdiction over them
2   either?
3       A.   That's correct.
4       Q.   And we're going to come back to that in a
5   second, because, as I think you know, the reason we're
6   here today is to talk about some ways in which Fannie
7   Mae was reading credit data and the industry's
8   response to that.  But before we get to that, I want
9   to talk a little bit about -- circle back to the data
10  furnishing that we talked about earlier, and I want to
11  talk about how that happens.
12      A.   Okay.
13      Q.   Data is reported to the bureaus by the
14  furnishers using something called Metro 2; is that
15  right?
16      A.   That's the data format standard that we've
17  put in place, yes.
18      Q.   And Metro 2 is the standard for the input
19  into the bureaus; right?
20      A.   That's exactly right.
21      Q.   Metro 2 is not the format by which the
22  bureaus ultimately output the information?
23      A.   That's also exactly right.
24      Q.   Each bureau -- as we discussed, the bureaus
25  are competitors with one another, and each bureau will

Page  23

1    have different proprietary outputs and displays;

2    right?

3         A.  Yes.  Yes, that's a good description.

4         Q.  And they compete with one another, the

5    bureaus, in various ways, one of which is accuracy of

6    data; right?

7         A.  They do, and you're right.  They compete in a

8    lot of different ways.

9         Q.  Another way they compete is on the display of

10   their data?

11        A.  Yes, that could be a form of competition.

12        Q.  The Metro 2 reporting standards are laid out

13   in something called the Credit Reporting Resource

14   Guide; is that right?

15        A.  Yes, that's right.

16        Q.  I want to take a look at -- is that a

17   guide -- is that published by CDIA?

18        A.  Yes, it is.

19        Q.  How was it created, to your knowledge?

20        A.  So we've had the guide for many decades at

21   this point, and CDIA hosts, as many trade associations

22   do, a task force that focuses specifically on the

23   maintenance of the Metro 2.  The task force is

24   comprised of subject matter experts from nationwide

25   contract bureaus who have this expertise in data

Page  24

1    quality.  And we, over the course of any given year,

2    do a lot of outreach and training relative to how the

3    Metro 2 should be used.

4         And that's one mission, if you will, that the

5    task force has is to make sure that data furnishers

6    fully understand what is in the guide.  And we review

7    the Credit Reporting Resource Guide every year, and we

8    issue a version of it every year, which is sometimes

9    very modestly amended and sometimes more materially

10   amended, just depending on what has happened in the

11   context of law or practice.

12        Q.  And the Credit Reporting Resource Guide,

13   that's not some confidential guide that would not be

14   available to, you know, folks not in the industry, for

15   example, Fannie Mae?

16        A.  So Fannie Mae would likely qualify to have

17   access to the Credit Reporting Resource Guide, yes.

18   It is limited in distribution.  So you have to be a

19   data furnisher or somehow connected with the -- what

20   we'll call the credit reporting ecosystem on the

21   furnishing side or the analysis side.  So somebody in

22   the public who came to our website and attempted to

23   download the metric to a credit recording Resource

24   Guide wouldn't have access to it.

25        MR. WIERS:  Let's mark this as 3, please.

Page 25

1          (Deposition Exhibit 3 was marked for

2          identification.)

3          MR. WIERS:  Exhibit 3, sir, is a document

4     that has the cover page of the Credit Reporting

5     Resource Guide and then one page from the guide, which

6     is on the back, which includes a section on the FAQs

7     related to reporting alternatives to foreclosure,

8     including short sales.

9          Q.   Do you see that?

10          A.   I do.

11          Q.   First, I want to just ask you what's your

12     understanding of what a short sale is?

13          A.   So a short sale is an instance where the bank

14     agrees to take the property back.  They're not fully

15     reimbursed, and they accept that they're likely to

16     have to sell it for something less than the full

17     balance owing on the loan.  And sometimes that ends up

18     with the consumer owing a balance which is now

19     unsecured, or sometimes it means the consumer has

20     simply -- the bank has written off the loss and the

21     consumer no longer owes anything to the bank.

22          Q.   So in layman's terms, you'll have an

23     individual who owns a house who might be under water

24     on the mortgage, who will enter --

25          A.   It's valued for less than the full amount of

1    the loan.

2         Q.   The value of the home has decreased since the

3    purchase.  So it's valued for less than the loan.  And

4    they will enter into a settlement agreement with the

5    bank to pay off that note for less than full value;

6    right?

7         A.   Yes, I think that's a good description.

8         Q.   And, historically, is it fair to say that we

9    didn't see a lot of short sales because the housing

10   market was, you know, sort of consistently -- by

11   "historically," for the last, you know, 15, 20 years,

12   it was consistently going up until we saw the crash a

13   few years ago?

14        A.   Yes.  Short sales were likely unusual rather

15   than regular order.  Most loans were on time and

16   otherwise paid.

17        Q.   And when the real estate market crashed, many

18   homeowners found themselves in a situation where they

19   were under water on their mortgage, and the short

20   sales became much more prevalent; right?

21        A.   I think that's fair, yes.

22        Q.   And Metro 2 has an explanation of how short

23   sales should be reported by the furnishers right here

24   in Exhibit 3; is that right?

25        A.   Yes.

1    Q.   And would you agree that if a furnisher or a

2   mortgage provider is reporting a short sale to one of

3   the bureaus using this guideline here, that they are

4   reporting it consistent with Metro 2 standards?

5    A.   Yes.   This is a current description of what

6   we believe should be done.

7    Q.   And in Metro 2, the short sale here is listed

8   on the bottom, and there's a series of bullets.   And

9   in Metro 2 the furnisher would report an account

10   status code of 13 or 65; is that right?

11    A.   That's what it says, yes.

12    Q.   Then they would report a payment rating that

13   indicates that whether the account was current or past

14   due at the time of the reporting?

15    A.   Uh-huh, yes.

16    Q.   And then the special comment code AU, which

17   means account paid in full for less than the full

18   balance; right?

19    A.   Yes, that's correct.

20    Q.   From Metro 2's perspective, when a mortgage

21   account is reported as paid in full for less than the

22   full balance, that is a status indicating that it is a

23   short sale; right?

24    A.   That is -- yes.   That's how a short sale

25   would be identified relative to a mortgage loan.

1    Q.   And the Metro 2 guidelines are -- one of the

2  reasons that they're important is that they provide a

3  way for data to be reported to the bureaus

4  consistently -- to all three bureaus consistently?

5    A.   Yes.   That's actually the high priority is

6  consistency of data being reported to the bureaus.

7    Q.   And then as we described, each then accepts

8  that data, and then may output it or display it or use

9  internal coding that's proprietary to that particular

10  bureau?

11    A.   Yes, that's right.

12    Q.   The Metro 2 guidelines indicate in a couple

13  of places that the date of the short sale should be

14  reported.   The last two bullets there are both sort

15  of -- as I'm reading it, relate to the same event, the

16  date of the short sale; right?

17    A.   Yes, that looks right.   Normally, what I

18  would do to make sure that was absolutely right is I

19  go back to the Metro 2 task force and, you know, make

20  sure that what I was saying was 100 percent right.

21  But, yes, that looks correct.

22    Q.   So one of the things that's reported to --

23  by the furnishers to the bureaus, assuming the

24  furnishers are appropriately using these standards, is

25  the date that the short sale occurred; right?

Page  29

1     A.   Yes, that's correct.

2     Q.   Are you personally familiar with the payment

3  ratings that are listed there, the different ratings

4  available in Metro 2?

5     A.   Not to the point where I can recite them back

6  to you.  I would have to probably turn to that page of

7  the Credit Reporting Resource Guide.

8     Q.   Do you know if Metro 2 includes every

9  possible final disposition, or do you know whether,

10  for example, foreclosure or "settled" or other things

11  aren't included in the Metro 2 ratings?

12     A.   So Metro 2 definitely, in a number of

13  different ways, allows a lender to accurately report

14  the final status of the account, and the payment

15  rating could be part of that.  The status could be

16  part of that.  The special comment could all be part

17  of that final disposition.

18     Q.   So they're all to be read together in order

19  to provide an accurate picture of the financial

20  disposition?

21     A.   That's how the Metro 2 is structured, yeah.

22     Q.   The CDIA -- we discussed earlier that the

23  bureaus, if I refer to the nationwide consumer

24  reporting agencies as "the bureaus," does that sound

25  fair enough to you?

Veritext Legal Solutions
866 299-5127

1          A.   That sounds fine.

2          Q.   So we discussed earlier how the bureaus

3     output data according to their own proprietary systems

4     and not Metro 2.  CDIA doesn't play any role in

5     determining those output systems; right?

6          A.   We do not.

7          Q.   Turning more specifically to the issue at

8     hand, do you recall in or around 2013 being involved

9     in an issue regarding credit reporting of mortgage

10    information related to short sales and the way that

11    information was being interpreted by Fannie Mae?

12         A.   I do.

13         Q.   And you recall that the CFPB was involved in

14    that as well; right?

15         A.   I do.

16         Q.   And the issue, ultimately, you came to learn,

17    involved Fannie Mae treating accounts that had been

18    coded and reported as short sales as foreclosures;

19    right?

20         A.   That's how it was described in some of the

21    media, and then ultimately described by some of the

22    CFPB staff.

23         Q.   Do you recall how the information first came

24    to your attention?

25         A.   I believe it was contact from CFPB.

1      Q.   And what did you do -- when it first came to
2  your attention, did you work to investigate the issue
3  and get to the bottom of it?
4      A.   Well, it was the beginning of a dialogue.
5  The CFPB, in essence, you know, wanted to have a
6  dialogue because diagnostically, they wanted to try to
7  better understand lots of different moving parts.  And
8  so it was the front end of how does Fannie analyze
9  data?  How does data come into Fannie Mae?  From where
10 does it come?  So it was a diagnostic process.  So
11 there were contacts over a period of time with Fannie
12 Mae and with others.
13     Q.   And did you have contact with the bureaus as
14 well?
15     A.   I definitely had plenty of contact with the
16 bureaus, yes.
17     Q.   And then you had contacts with the CFPB;
18 right?
19     A.   I did.
20     Q.   And did you have contact with Fannie Mae
21 directly?
22     A.   I did.
23     Q.   And you also responded to queries in front of
24 the Congress regarding this issue?
25     A.   I did.

Page  32

1        Q.   In particular, there were questions from

2   Senator Nelson of Florida.   Do you recall that?

3        A.   I do.

4        Q.   And did you ever talk to Senator Nelson or

5   his office directly?

6        A.   I spoke with three of his staff.

7        Q.   And when you answered Senator Nelson's

8   questions, do you recall that was in front of a --

9   that was in May of 2013?

10       A.   I'm trying to get my sequencing right here.

11   There was a hearing at which Senator Nelson asked --

12   actually, questions were asked on behalf of

13   Senator Nelson, if I recall correctly, and then

14   separately we had a meeting up on The Hill with

15   Senator Nelson's staff at their request.

16       Q.   And were questions also asked of the CFPB at

17   the same testimony on The Hill?

18       A.   Yes, that's correct.

19       Q.   And was the FTC there as well?

20       A.   You know, I'd have to go back and look at the

21   witness list to tell you whether that was right or

22   not.

23       Q.   And after that, do you know if that was the

24   first time that this issue had been raised to the

25   CFPB, or were they also aware of it?

1        A.   No, they were aware by the time of the
2   hearing.
3        Q.   And had you already been working with them on
4   discovering the root cause and a solution?
5        A.   Our dialogue had definitely begun by then.
6        Q.   And, ultimately, it was concluded that the
7   root cause was that Fannie Mae was interpreting short
8   sale data inaccurately and interpreting it as
9   foreclosure?
10        A.   That's how it was reported to us, yes.
11        Q.   And that's what the CFPB ultimately
12   concluded?
13        A.   And that was certainly one of our principal
14   sources in terms of diagnostically what they felt was
15   happening.
16        Q.   Right.  And that's what they ultimately
17   concluded; right?
18        A.   That is what they concluded.
19        Q.   But Fannie Mae, as we discussed, is not under
20   CFPB's jurisdiction; right?
21        A.   That's exactly right.
22        Q.   So the simple solution would be for Fannie
23   Mae -- for CFPB to simply tell Fannie Mae to start
24   interpreting the data correctly, but CFPB didn't have
25   the jurisdiction to do that?

                                        Page  34

1          A.   That's correct.

2          Q.   And CDIA worked to perhaps find another

3     solution short of Fannie Mae simply changing its

4     desktop underwriting so that it interpreted its data

5     correctly, including, perhaps, creating a new short

6     sale code; right?

7          A.   We explored options.

8          Q.   But CDIA recognized that it was important to

9     find the right solution and not just any sort of

10    patchwork fix; right?

11         A.   Yes, that's correct.

12         Q.   You didn't want to unnecessarily create

13    ripple effects that could adversely affect consumer

14    and furnishers and others?

15         A.   That was very important, yes.

16         Q.   Based on what you personally observed, did

17    you believe that Experian was working proactively to

18    investigate the issue?

19         A.   Yes.

20         Q.   And Experian was also having direct dialogue

21    with the CFPB?  Are you aware of that?

22         A.   I was aware of that.  I am, yes.

23         Q.   At any point did you question at all whether

24    Experian was committed to helping all involved find

25    the right solution?

Page 35

1    article from the Washington Post to some folks,

2    including, you know, Ms. Finneran and Ms. Senaway of

3    Experian.  Do you recognize, if you look at that list

4    of people who Eric Ellman is ending the E-mail to, do

5    you know who those people are?  Is that --

6         A.  At the time, they were members of the Metro 2

7    task force.

8         Q.  Okay.

9         A.  And Eric is our liaison, staff liaison to the

10   Metro 2 task force.

11        Q.  Okay.  And this article from the -- were you

12   familiar with the fact that the foreclosure short sale

13   issue we've been referring to was receiving some

14   attention in the press?

15        A.  I was, yes.

16        Q.  And the article states that short sales

17   were -- it says, "Short sales routinely show up in

18   credit reports coded as foreclosures."  You ultimately

19   learned -- or CFPB ultimately concluded that that's

20   actually a false statement.  That, in fact, it was

21   simply that Fannie Mae was reading short sales as

22   foreclosures but that they were reported accurately;

23   right?

24        A.  Yes.

25        Q.  And did you understand that some of the press

1   around this issue was not necessarily entirely

2   accurate?

3       A.   There's no doubt that there was inaccurate

4   press.

5       Q.   Which is not uncommon.   The press is not a

6   part of the industry and likely has no idea what's

7   actually going on.

8       A.   Yes.   But, also, if you look at the date,

9   this was very early on -- you know, some very early

10  media coverage.   So, again, if you think about

11  everything starting around in May and cascading

12  forward, that's one of the reasons why.   I mean, in

13  other words, here's a journalist who does a lot of

14  writing in the mortgage space writing a column.   He's

15  doing it based on what he's heard.   So he's reporting

16  journalistically.   But he's not diagnosing and doing

17  what we were doing to try to get to the root cause

18  analysis.

19       So I think that's why you see some of the,

20  you know, seminal media coverage looking the way that

21  it did or making statements the way it did.

22           (Deposition Exhibit 6 was marked for

23           identification.)

24       MR. WIERS:  Sorry, Dave.  I've kind of

25  forgotten that you're on the phone.  So I'll start

Veritext Legal Solutions
866 299-5127

1    the early dialogue centered around that question of

2    whether a code like that was somehow going to help

3    solve the problem.

4        Q.  And, ultimately, it was determined that that

5    was not needed; is that right?

6        A.  That is right, yes.

7        Q.  And that the only thing that was needed was

8    for Fannie Mae to simply start reading data

9    appropriately, which is what they ultimately started

10   doing; right?

11       A.  Yes.

12       Q.  And you're noting here that even if a new

13   code was put in place, one issue -- and there were

14   many issues with the new code that we'll look at

15   later.  One issue is that that wouldn't even be

16   implemented for another full year; is that right?

17       A.  Well, that's really just the starting point.

18   Then you'd have to wait for data furnishers to decide

19   to code their systems for the new code, and from there

20   you'd have to decide how many data furnishers decided

21   to code their systems to use the new code, and then

22   you'd have to wait a much longer period of time for

23   those codes to start being used and then to flow into

24   the database so the population gets large enough

25   that's it's a relevant population for some sort of

Page 43

1    analytics down the road.

2          And, by the way, that has nothing to do with

3    recording mortgage loans that had been reported

4    previously using the old coding convention.

5          Q.   So mortgage loans that had been reported

6    previously using the old convention, even if there was

7    a new code, would still be subject to Fannie Mae's

8    erroneous interpretation if they didn't fix their

9    system; right?

10         A.   Exactly.

11         Q.   And Fannie Mae would still need to change

12   their underwriting programming -- their desktop

13   underwriting programming to deal with the new code;

14   right?

15         A.   They would, yes.   And so they would have to

16   run a dual system, which seemed incredibly inefficient

17   as well.   One for a new code, still accounting for the

18   old code -- and by the way, majority of the target

19   population for this Fannie project were short sales

20   that had already occurred, and they were just simply

21   trying to get those consumers back into the market a

22   little bit sooner.   So they would have still had to

23   run a system that dealt with the old coding

24   convention.

25         Q.   And if you flip the page.   Already here in

1  May 2013 you're putting your finger on the far more

2  practical solution, which would be to ask Fannie to

3  simply adjust their Desktop Underwriting System to

4  start reading the data reported as -- to start reading

5  the data being reported accurately; right?

6        A.  Yes.  That's the essence of what that says,

7  yes.

8        Q.  Had you -- at this point early on, had you

9  spoken to CFPB about this idea of just asking Fannie

10  to reprogram Desktop Underwriter so that it would

11  properly read short sales?

12        A.  Well, the CFPB already was thinking about the

13  diagnostic track in different ways.  So in other

14  words, they already had asked themselves the question

15  is this a Fannie problem or does it emanate from

16  somewhere else, and what gives rise to the problem.

17  And, again, it was very early on.  But you know the

18  dialogue that we had with CFPB and the work that the

19  CFPB teams internally did as well ultimately gave rise

20  to a direct communication between a director Cordray

21  of the CFPB and director DeMarco of FHFA.  And that

22  was really the beginning of the joint dialogue between

23  CFPB and FHFA.

24        Q.  And it was through that joint dialogue where

25  the CFPB was able to ultimately convince FHFA to have

Page 45

1     changes, and as technical guidance changes, there's

2     some reprogramming along the way.

3               In this case, it appeared to me that Fannie

4     had designed a system that didn't match up with how

5     data was already being reported, and their approach to

6     reading the data that was coming in was wrong.

7          Q.   And you note here that score developers have

8     produced white papers on short sales versus

9     foreclosures, and apparently, they have no problem

10     recognizing the short sale population.

11          A.   Yes, that's right.

12          Q.   And that's consistent with what we talked

13     about earlier, that Fannie was the only one that

14     anyone has been able to identify who had any problem

15     at all identifying short sales?

16          A.   Yes, that's right.

17          Q.   You note in No. 2 that a short sale code

18     proposal is under review, but that this would require

19     over 10,000 lenders to have to reprogram their systems

20     to handle the code; right?

21          A.   Yes.

22          Q.   Whereas if Fannie simply reprogrammed its

23     system, that would only be one company as opposed to

24     10,000 that would have to reprogram their system;

25     right?

1        A.   That was the logic we were applying to this.

2        Q.   And similar -- and further that, even if

3    there was a new code, that one company would still

4    have to reprogram their system?

5        A.   And -- yes, that's correct.   And, also, as we

6    discussed before, they would still have to deal with

7    legacy data that had been reported in the old format

8    in addition to whatever data would then, going

9    forward, be reported using some new code, had one been

10   created.

11       Q.   And even further to that, even if a new code

12   had been created, the bureaus would still display that

13   data pursuant to their own proprietary display

14   systems; right?

15       A.   Yes, absolutely.

16       Q.   "CDIA," you write here, "urges great caution

17   in considering a new short sale code as a panacea."

18   What did you mean by calling it a panacea?

19       A.   Well, particularly, when something becomes a

20   little bit political, it's in the media, it's up on

21   Capitol Hill, everybody looks for that silver bullet,

22   that one idea that's going to solve the problem.   And,

23   seemingly, the immediate answer was the kind of answer

24   you saw in some of the early media coverage.   There's

25   no code for a short sale, and everybody goes, "Wow,

Page 62

1    that's incredible."

2          It's only later that, as we get into it and

3    we have this thoughtful discourse with the CFPB, with

4    the FTC, with Capitol Hill, with our members, that

5    it's very clear that the "Settled for less than full

6    amount" code, when applied to a mortgage as described

7    in our Credit Reporting Resource Guide, is a short

8    sale.  And again, it kind of goes back to the point

9    that if score developers can map the data and do

10   studies that look at short sales versus foreclosures,

11   in terms of credit score recovery coming out of the

12   great recession, then surely a company with the

13   technical expertise of Fannie Mae can do the same

14   thing.

15         Q.  And, indeed, here the great irony is that

16   there was a silver bullet, but it was, in fact, far

17   simpler than the silver bullet proposed by the media,

18   which was here, all that needed to happen was that

19   Fannie Mae needed to reprogram its system.

20         A.  So it would appear.

21         Q.  Points 3 and 4, I think we've already

22   discussed.  3, you're noting that, you know,

23   regardless of what happens, Fannie Mae is going to

24   have to reprogram its system; right?

25         A.  Yes.

1           MR. WIERS:  Okay.  Let's do it.  Sounds good.

2     Let's take a break.

3                 Off the record.

4                 (A recess was taken from 10:28 a.m.

5                 to 10:46 a.m.)

6                 (Deposition Exhibit 10 was marked for

7                 identification.)

8                 MR. WIERS:  Exhibit 10 is CDIA14.

9                 The CDIA ultimately published sort of a

10    summary of the facts as they learned it about the

11    short sale issue we've been discussing.

12         Q.  Right?

13         A.  Yes.

14         Q.  And are those listed there, is that what this

15    Exhibit 10 is?

16         A.  Yes.

17         Q.  And is this the final version?  Is there any

18    way you can tell that?

19         A.  You know, I can't tell, but it looks like a

20    final version.

21         Q.  And everything in it was -- did you review it

22    before it went out?

23         A.  I wrote it.

24         Q.  Okay.  So then, to your knowledge, everything

25    in it was accurate; right?

Page 68

1    A.   Absolutely.

2    Q.   Did all three bureaus review it before it

3  went out?

4    A.   They did.

5    Q.   And all three signed off on it?

6    A.   They did.

7    Q.   Nobody from any of the bureaus disagreed with

8  anything in here, to your knowledge?

9    A.   No.

10        MR. WIERS:  EXP_E375, Dave.

11        (Deposition Exhibit 11 was marked for

12        identification.)

13  BY MR. WIERS:

14    Q.   Exhibit 11 is an E-mail you wrote to a larger

15  group of folks, and you talk about a meeting that you

16  had coming up.  Well, do you recognize this E-mail?

17    A.   I do.

18    Q.   This is from May 29, 2013; right?

19    A.   Yes, it is.

20    Q.   And it's something that you sent?

21    A.   Yes.

22    Q.   If you look down at the bottom there's an

23  E-mail from Norm Magnuson.  Who's Norm Magnuson?

24    A.   He's our vice president for public affairs.

25    Q.   Okay.  He notes that the CRAs were looking at

Page 69

1    basic position, and also knew to call me for more

2    dialogue if more dialogue was necessary.

3        Q.   The CFPB, we've talked about them a number of

4    times today.  In your view, did they work diligently

5    to investigate the sort of Fannie Mae short sale issue

6    that we've been discussing?

7        A.   They worked hard.

8        Q.   And they ultimately wrote up a summary of

9    their conclusions; right?

10       A.   They did.

11       Q.   And was it your understanding those were

12   their final conclusions?

13       A.   I'd probably have to see what you have to

14   know whether that's the case.

15            (Deposition Exhibit 12 was marked for

16            identification.)

17            MR. WIERS:   CDIA 12 is Exhibit 12.

18       Q.   Do you recognize this as the CFPB's final

19   report on this issue?

20       A.   Well, this was a statement that they put

21   together, really in the diagnostic process, to be

22   clear.  So you can see at the bottom there was the

23   mortgage markets team that produced this.  So this was

24   Brian Webster's work.  And this was a way to lay out

25   with some precision what their investigations had

Page  74

1    concluded and what they thought the problem statement

2    was, and, candidly, not much changed in terms of their

3    views going forward, and I think you'd move all the

4    way through to the end, and, ultimately, Fannie Mae is

5    doing business differently than they were previously,

6    and the problems we saw in the market no longer

7    exists, and it had nothing to do with how our members

8    were outputting data, but it did have to do with how

9    Fannie Mae was reading information that was coming to

10   them.

11        Q.   And the CFPB in this memo says there in the

12   third paragraph in the summary that "Our investigation

13   discovered that the underlying problem was not due to

14   inaccurate reporting by furnishers or the credit

15   reporting companies."

16        A.   Yes.

17        Q.   Is that consistent with your understanding as

18   well?

19        A.   Yeah.  Now, that was a definitive statement.

20   So, in other words, this is where they were at that

21   time.  So when this was produced, they had already

22   gotten to this conclusion.  And then the question was,

23   "Well, what's next," and you see that in the problem

24   statement.  They discuss a little bit about what's

25   next.

 1            MR. WIERS:  Okay.  I think I just have one

 2    last document to discuss with you.

 3            (Deposition Exhibit 13 was marked for

 4            identification.)

 5            MR. WIERS:  Exhibit 13, sir, which is

 6    EXP_E714, is just an E-mail chain with CFPB and

 7    Experian, and I'm using it merely to put a stake in

 8    the ground with regard to timing.  This is from July

 9    2013, and the CFPB is sort of confirming that Fannie

10    is going to make changes to their Desktop Underwriter

11    system to address this issue.

12        Q.  Does that comport with your recollection on

13    it as well?

14        A.  Yeah.  By August everybody was publicly

15    happy.  July is where I think things were coalescing.

16    So this is indicative of that sort of coalescing of

17    views in July and that the way forward had been

18    determined.

19        Q.  Okay.  And what happened -- in August, did

20    Fannie make an announcement about the change?

21        A.  My recollection is Senator Nelson said

22    something in August because, ultimately, he was being

23    held accountable by constituents to say something

24    about this.

25        Q.  And, again, the change that was made, to your

                                          Page 76

1    knowledge, has remedied whatever problem there was?

2         A.   Yes, and I guess -- let me say it this way:

3    We don't still have this problem here at CDIA.

4    There's not a dialogue with CFPB.   There's not a

5    dialogue with The Hill.   There's not a dialogue with

6    the FTC.   And there's no media coverage of this issue.

7    So it appears to me -- those are probably good

8    indicators that the steps Fannie Mae took were the

9    steps that needed to be taken.

10        Q.   So the problem was solved by not implementing

11   a new short sale code; right?

12        A.   Clearly, a new short sale code was not the

13   solution and what Fannie Mae did was the solution.

14        Q.   And the solution was for Fannie Mae to simply

15   make some adjustments to Desktop Underwriter?

16        A.   That's correct.

17             MR. WIERS:   I don't have anything else for

18   now.

19             (A discussion was held off the record.)

20

21                        EXAMINATION

22   BY MR. PROVANCE:

23        Q.   Good morning, Mr. Pratt.

24        A.   Good morning.

25        Q.   My name is Matt Provance.   I represent

```
1               C E R T I F I C A T E
2         I do hereby certify that the aforesaid
3   testimony was taken before me, pursuant to
4   notice, at the time and place indicated; that
5   said deponent was by me duly sworn to tell
6   the truth, the whole truth, and nothing but
7   the truth; that the testimony of said
8   deponent was correctly recorded in machine
9   shorthand by me and thereafter transcribed
10  under my supervision with computer-aided
11  transcription; that the deposition is a true
12  and correct record of the testimony given by
13  the witness; and that I am neither of counsel
14  nor kin to any party in said action, nor
15  interested in the outcome thereof.
16
17  Dated:  March 20, 2015
18
19
20
21
22
23         Nancy J. Martin, RMR, CSR
24
25
```

Veritext Legal Solutions
866 299-5127

1              UNITED STATES DISTRICT COURT

2             SOUTHERN DISTRICT OF CALIFORNIA

3

4    JOHN T. SHAW; KENNETH COKE;    )

5    and RAYMOND RYDMAN, on behalf )

6    of themselves and all others  )

7    similarly situated,           )

8         Plaintiffs,              )

9         v.                       ) Case No.

10   EXPERIAN INFORMATION          ) 13-CV-1295 JLS (BLM)

11   SOLUTIONS, INC.; WELLS FARGO  ) Volume II

12   BANK, NA; and CITIMORTGAGE,   )

13   INC.,                         )

14        Defendants.              )

15   -----------------------------)

16

17       CONTINUED DEPOSITION OF STUART KENDALL PRATT

18                  WASHINGTON, D.C.

19              TUESDAY, MARCH 10, 2015

20

21   Reported by:

22   NANCY J. MARTIN, CSR No. 9504, RMR

23   Job No. 2007344

24

25   PAGES 307 - 392

                                        Page 307

```
 1   BY MR. CENTO:
 2       Q.  Do you know how credit scores work?
 3           MR. WIERS:  Objection.  Form.  Asked and
 4   answered.
 5           THE WITNESS:  Can you be more specific as to
 6   what you want me to speak to?
 7   BY MR. CENTO:
 8       Q.  Yeah.  What exactly would the effect have
 9   been on credit scores if you had created a Metro 2
10   short sale code?
11       A.  And the answer is we don't know.
12           MR. CENTO:  That's all I have.
13           MR. WIERS:  I've got a couple of just quick
14   clean-ups.
15
16                  FURTHER EXAMINATION
17   BY MR. WIERS:
18       Q.  Hi, Mr. Pratt.
19       A.  How are you?
20       Q.  I'm okay.  I just have a few questions
21   because I want to just correct a couple things because
22   I think Mr. Cento had a tendency to load his questions
23   with presumptions that were in many instances
24   inaccurate.  And so I want to ask you some questions
25   putting in the actual facts.
```

Page 381

1           When Experian receives an AU code from a

2    furnisher that is related to a mortgage account,

3    Experian will log that information.  It will report

4    that information.  It will, in addition, map it to the

5    current Manner of Payment code, and for a settled

6    account, Experian maps that to a 9.

7           So in Experian's credit report, the current

8    status will be reported in two ways.  First, and most

9    directly -- well, maybe even three ways.  But first,

10   and most directly, with the AU code.  But in addition,

11   the information that's contained in the AU code is

12   reflected in the Manner of Payment code.  It's a

13   convenience so that that information is seen in two

14   different ways.

15           With that knowledge, do you believe Experian

16   is overwriting any data it receives from the

17   furnishers?

18           MR. CENTO:  Objection.  Vague, ambiguous,

19   misstates the record, lack of foundation, assumes

20   facts not in evidence.

21           THE WITNESS:  So I'll have to say that what

22   Experian wants from us, or any of the nationwide

23   credit bureaus on the Metro 2 task force, is for us to

24   have the right codes that are useful for them in their

25   database.  So at the Metro 2 level, we know that

                                              Page 382

1    there's several different places, touch points, where

2    a lender will look at an account, and probably all

3    part of their risk decision, the status of the

4    account, other special comments, and it sounds like

5    you're describing how Experian would map a special

6    comment, and then whatever else they would do to -- in

7    a manner of payment to -- all of this with the goal

8    of -- with their goal, I would assume, of in the

9    marketplace creating a very competitive sort of

10   best-in-class result for customers.

11          And which, by the way, is true for the other

12   companies.  Each one of them is outputting differently

13   and mapping the way that they think is most useful to

14   the lending community.  I think at the end of the day

15   we kind of stop at your doorstep.  So we don't get

16   deeply into how that mapping is going to work.  Our

17   members don't ask us to get into how that mapping

18   works.  It's really just a question of compliance

19   within experience, saying, "Yes, we've mapped

20   properly.  We're displaying properly."

21          When you take this account as a whole, you

22   have everything you need to understand the status of

23   that account, which would include mapping the AU code.

24   BY MR. WIERS:

25        Q.  You've testified earlier that when making

Page 383

```
 1              C E R T I F I C A T E

 2

 3       I do hereby certify that the aforesaid

 4    testimony was taken before me, pursuant to

 5    notice, at the time and place indicated; that

 6    said deponent was by me duly sworn to tell

 7    the truth, the whole truth, and nothing but

 8    the truth; that the testimony of said

 9    deponent was correctly recorded in machine

10    shorthand by me and thereafter transcribed

11    under my supervision with computer-aided

12    transcription; that the deposition is a true

13    and correct record of the testimony given by

14    the witness; and that I am neither of counsel

15    nor kin to any party in said action, nor

16    interested in the outcome thereof.

17

18    Dated:  March 20, 2015

19

20

21

22

23       Nancy J. Martin, RMR, CSR

24

25
```

                                        Page 392

# EXHIBIT 37

# 2014 Credit Reporting Resource Guide ®



Δ π EXHIBIT 3
Deponent Pratt
Date 3/9/15 Rptr DM
WWW.DEPOBOOK.COM

# Frequently Asked Questions and Answers

**53. Question: How should alternatives to foreclosure (i.e., Deed in Lieu and Short Sale) be reported?**

Answer: Use the following guidelines:

**Deed in Lieu** – Account Status Code **89** should be reported, which specifies "Deed received in lieu of foreclosure on a defaulted mortgage; there may be a balance due". The appropriate Payment Rating should be reported in conjunction with this Account Status.

If the consumer is not responsible for the remaining balance on the account, report a Current Balance of zero. Report the Date Closed as the date the deed was received in lieu of foreclosure.

If the consumer is held responsible for the remaining balance on the account, report that amount in the Current Balance field. As payments are made by the consumer, report a declining balance. When the Current Balance reaches zero, report the Date Closed as the date the account was paid in full.

For credit reporting purposes, do **not** report Account Status Code 97 (Charge-off) after Account Status 89 has been reported.

**Short Sale** – A short sale occurs when the proceeds from the sale of real estate fall short of the balance owed on the loan. In a short sale, the lender agrees to discount the loan balance typically due to an economic or financial hardship on the part of the consumer.

Report the following Base Segment fields as specified:

- Scheduled Monthly Payment Amount = zero
- Actual Payment Amount = the amount actually received for this reporting period
- Account Status Code = 13 (Paid or closed account/zero balance) or 65 (Account paid in full, a foreclosure was started), as applicable
- Payment Rating = applicable code that identifies whether the account is current or past due within the activity period being reported
- Special Comment = AU (Account paid in full for less than the full balance)
- Current Balance and Amount Past Due = zero
- Date of Account Information = the date the account was paid in full for less than the full balance
- Date Closed = the date the account was paid in full for less than the full balance

# EXHIBIT 38



**CONSUMER DATA INDUSTRY ASSOCIATION**
*Empowering Economic Opportunity*

## Mortgage Lending and Identifying Short Sales in Credit Reports

**Are there different Metro 2[1] codes for mortgage lenders to use when reporting to credit bureaus mortgage loans that have been settled via short sales versus reporting a completed foreclosure?**

Yes.  Mortgage loans that are settled via a short sale are reported using a "settled for less than the full amount" code.  Mortgage loans associated with completed foreclosure proceedings are reported as foreclosures, which is a separate code from the one which states "settled for less than the full amount."  These codes have been active for years.

**Some are calling for the industry to adopt a new "Short Sale" code for Metro 2.  Is this necessary?**

No.  As discussed above, the industry already has a code that reflects a short sale.  This code is known as "settled for less than the full amount" and was developed in cooperation with financial institutions.

**Are companies having problems identifying short sales in credit reports?**

CDIA has investigated this question and it appears to be a problem unique to Fannie Mae. Sources indicate that Freddie Mac does not have a problem and in surveying our members, which include all of the largest data suppliers for the mortgage lending marketplace, they are not running into questions regarding Freddie Mac, VA or FHA technology platforms.

**What is the quickest way to fix Fannie Mae's problem?**

As others have done, Fannie Mae should reprogram its system now so that it can recognize the coding convention that is currently in place for reporting mortgage loans that have gone through short sales.  While CDIA's members cannot reprogram Fannie Mae's system the Association's members' technical teams stand ready to help Fannie Mae's teams to properly recognize the coding systems for each member database.

---

[1] The Metro 2 Format is the data reporting standard used by more than 10,000 lenders which report data to nationwide credit bureaus.  CDIA's Metro 2 Advisory Council oversees the ongoing management of the Metro 2 Format.

Δ π EXHIBIT ___

Deponent ____

Date ____  Rptr ____

WWW.DEPOBOOK.COM

**What would be the effect of developing a new code for short sales?**

First, since only Fannie Mae is experiencing a problem, creating a new code has the ripple effect of requiring all credit score developers and all other secondary market underwriting platforms to reprogram systems if a new Metro 2 code is adopted, even though they are already recognizing short sales today by utilizing the "settled for less than the full amount" code.

Second, the fact that third-party credit score developers and other secondary market technology platforms can identify short sales through the existing code confirms there is no need for another code. Fannie Mae should be able to fix their unique problem so that others don't have to reprogram.

Third, there are 10,000 sources reporting data to nationwide credit bureaus. Because codes have to be programmed into not just the databases of each of the nationwide credit bureaus, but also the data reporting systems for all lenders which report mortgage loans to credit bureaus, the rollout time frame can be between 12 and 24 months. A new code would not only be duplicative and confusing, but also would not address immediate concerns.

Fourth, new codes are not retroactive to all previously reported data. In conversations with the CFPB they estimate that there are two million mortgage loans that were resolved via a short sale. Fannie Mae would have to re-program their system to properly identify these loans regardless of the creation of a new code. Since this is true and since other platforms are able to identify short sales, there's no reason to create a new code.

**Would a new code adversely affect current credit scoring models and result in less safe and sound underwriting?**

Yes. Credit scores are properly accounting for differences in mortgage loans coded as "settled for less than the full amount" versus "foreclosure." Anytime a new code is created it takes approximately 18-24 months of reporting of the new code before a population of codes in the system is large enough to then be analyzed. Thus over this 18-24-month period loans with the new code are not recognized by current credit scores and this means risks are not fully accounted for. This result inserts unnecessary risk into a mortgage lending market place that is trying to regain the trust of private investors.

CDIA000015

# EXHIBIT 39



Consumer Financial
Protection Bureau

## Short Sale Credit Reporting and Evaluation
### *Next Steps*

**Summary:**   Since early this year, we had been looking into concerns that GSE underwriting systems are treating homes sold as "short sales" as foreclosures, and thus unnecessarily screening affected consumers out of automated underwriting.

The issue had been surfaced publicly in recent press reports, and by Senator Bill Nelson. On May 7th Senator Nelson requested that the CFPB and FTC investigate what he considers to be a violation of FCRA accuracy obligations.

Our investigation discovered that the underlying problem was not due to inaccurate reporting by furnishers or the credit reporting companies, but rather an issue of conflicting information being presented on the consumer's credit tradeline within the tri-merge credit reports. We believe that it is the "way" that the information is presented and not an issue with core inaccuracies in the information being presented. We worked very closely with FHFA, GSEs and industry stakeholders to lead the effort to determine the root cause of the issue.  As previously announced, Fannie Mae took the lead and will be implementing an update to *Desktop Underwriter* later this year.  This update will allow lenders to provide updated information and therefore allow DU to more accurately evaluate a consumer's credit history that has previously undergone a short sale. This is a major step in the right direction and is a key sign to the industry that the issue of short sales appearing in consumer's credit history is not a short term scenario.

## Problem Statement

Although the update that Fannie Mae will be implementing within DU in November 2013 is a key advancement in the accurate evaluation of short sales within a consumer's credit history, it is not the final answer.  Systems like Fannie Mae's *Desktop Underwriter* and other downstream technology platforms utilize a xml file format (either FNMA or MISMO based data standards) to report and evaluate a credit file.  Within the credit file, there are two main categories of information, the tradeline data and the remarks code.  I segregate these two categories because within the xml file, the tradeline data is actionable whereas the remarks codes are not actionable.  This is a remaining key roadblock in allowing systems to automatically and with 100% certainty determine if a credit tradeline was disposed as a short sale and exactly when the short sale occurred.  The current Metro 2 codes that are currently used to identify a short sale has occurred are reported by the data furnisher and then provided by the credit repositories within the remarks codes.  These remarks codes can be evaluated to identify a short sale tradeline but do not contain information about when the short sale occurred.  Other tradeline data fields have to be evaluated to attempt to determine when the short sale occurred however this process is not always accurate for numerous reasons.



Δ π EXHIBIT  12
Deponent Evart
Date 9/15  Rptr Dm
WWW.DEPOBOOK.COM



## Proposed Solution

We believe that additional efforts are required so that consumer's credit history will be evaluated accurately and effectively.  We would like to continue our reviews and collaboration with industry stakeholders and experts to determine the best way to represent short sales within a tri-merge credit report without introducing extensive burden upon the industry to accomplish this.  An initial idea would be to introduce a specific code for a short sale and date that can be represented within the actionable tradeline data.  For example, this could be accomplished by adding a short sale specific Manner of Payment code.  We want to call upon industry to help us determine the best course of action to address this key obstacle.  We want to  ensure that consumers are not inadvertently denied access to new credit following a short sale due to the inability to properly evaluate their credit history.

# EXHIBIT 40

# LODGED UNDER SEAL

# EXHIBIT 41

1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3

  JOHN T. SHAW; KENNETH     )

4  COKE; AND RAYMOND RYDMAN, )

5  ON BEHALF OF THEMSELVES   )

6  AND ALL OTHERS SIMILARLY  )

7  SITUATED,                 )

8         Plaintiffs,        )

9  vs.                       ) CASE NO. 13CV1295 JLS BLM

10  EXPERIAN INFORMATION      )

11  SOLUTIONS, INC., WELLS    )

12  FARGO BANK, NA AND        )

13  CITIMORTGAGE, INC.,       )

14         Defendants.        )

15

      DEPOSITION OF KIM HUGHES, produced as a

16  witness at the instance of the Plaintiffs and duly

17  sworn, was taken in the above-styled and numbered

18  cause on the 17th day of March, 2015, from 12:57 p.m.

19  to 3:42 p.m., before Cheryl Duncan, Certified

20  Shorthand Reporter in and for the State of Texas,

21  reported by computerized stenotype machine at the

22  offices of Jones Day, 2727 Harwood Street, Fifth

23

24

25  PAGES 1 - 103

                                        Page 1

```
 1        A.     That's correct.

 2        Q.     And Wells Fargo?

 3        A.     Yes.

 4        Q.     And what was the third one?

 5        A.     There's a Citi account.

 6        Q.     And what did -- so were reinvestigations

 7   opened on all three of these disputes?

 8        A.     Yes.

 9        Q.     And what did Experian do to investigate

10   each of the disputes?

11        A.     Regarding the Citi flex spending credit

12   card account, it looks like Experian reviewed

13   plaintiff's information and made an internal change

14   to the compliance condition code that was being

15   reported.  Regarding CitiMortgage and Wells Fargo

16   Bank, it appears that Experian contacted those

17   entities to request an investigation on their part,

18   using the ACDV form.

19        Q.     Okay.  What was the internal change that

20   was made on the Citi account?

21        A.     The previously reported compliance

22   condition code of account information disputed by

23   consumer was removed.

24        Q.     And you said an ACDV was sent on the Wells

25   Fargo account?
```

Veritext Legal Solutions
866 299-5127

1      A.      That's correct.

2      Q.      Was a response received from Wells Fargo?

3      A.      Yes, sir, it was.

4      Q.      When was the ACDV sent and when was the

5   response received?

6      A.      The ACDV for Wells was sent out on August

7   15th, 2012, and a response was received on August

8   17th, 2012.

9      Q.      What was the dispute?  What was being

10  disputed?

11     A.      The specific dispute was reported date

12  incorrect and account type incorrect, according to

13  the log.

14     Q.      And what -- okay.  And was it also -- was

15  the dispute also coded?

16     A.      Well, yes, a dispute code was used.

17     Q.      Okay.  And which dispute code was used?

18     A.      Consumer states inaccurate information,

19  provide complete ID and account information.

20     Q.      What is the purpose of that dispute code?

21  What does it cover in terms of what parts of the

22  trade line are being disputed?

23     A.      This particular dispute covers the account

24  in its entirety, all of the data elements, including

25  the consumer's identification information.

1    Q.    All right.  And what was the result of that

2    dispute?

3    A.    From the log, it appears that Experian

4    received confirmation that the account was to be

5    reporting as paid in settlement as of March 29, 2010,

6    and it looks like they also requested removal of a

7    previously reported compliance condition code that

8    read, account closed at consumer's request.

9    Q.    Okay.  Anything else?

10   A.    Not that I can see from here.

11   Q.    Okay.  Was the Wells Fargo account being

12   reported as a short sale?

13   A.    Wells Fargo was being reported as settled,

14   account legally paid in full for less than the full

15   balance.  And prior to that -- well, here I have no

16   prior history.  But that's how it was actually

17   reporting.

18   Q.    Okay.  What about the CitiMortgage account,

19   what did -- was a reinvestigation opened on that

20   account?

21   A.    Yes, it was.

22   Q.    Okay.  And what did you do to reinvestigate

23   that account?

24   A.    Experian sent an ACDV form to CitiMortgage,

25   conveying the consumer's dispute.

Page 13

1    Q.    Okay.  What dispute code was used?

2    A.    Consumer states inaccurate information,

3    provide complete ID account information with free

4    form text reported date incorrect.

5    Q.    Okay.  And when was the ACDV sent?

6    A.    It was sent on August 15th, 2012.

7    Q.    And responded to when?

8    A.    It was responded to on August 16th, 2012.

9    Q.    Okay.  And what was the response?

10    A.    In the response, the account was verified

11    as having been paid in settlement, and a compliance

12    condition code of XB, indicating that the account was

13    in dispute under the FCRA was verified, as well as

14    the prior history showing the account 180 days

15    delinquent.

16    Q.    What was the next communication Experian

17    received from -- oh, no, I'm sorry.  Strike that.

18              Was the CitiMortgage account being

19    reported as a short sale?

20    A.    It was being reported as settled, account

21    legally paid in full for less than the full balance.

22    Q.    Okay.  What was the next communication with

23    Mr. Shaw?

24    A.    According to the log, it looks like there

25    was a telephone call received from Mr. Shaw, just

Page 14

1    indicating that he was requesting a status check on

2    his file.

3        Q.    Okay.  And what happened with that call?

4    Anything?

5        A.    Well, I wouldn't know the contents of the

6    phone call.  It would have been handled between the

7    agent that fielded the phone call and that of

8    Mr. Shaw.

9        Q.    Okay.  Do you know anything more from these

10   records what that call was about or what was done

11   after the call?

12       A.    No.  I can tell you that we received a

13   piece of mail correspondence from Mr. Shaw on the

14   same day, according to the log.  He could have just

15   been calling to confirm it was received.  But there's

16   no indication that any additional action was taken,

17   just based on the phone call.

18       Q.    All right.  So I take it the next

19   communication is the letter.  Is that right?

20       A.    Yes, that's correct.

21       Q.    Okay.  Where does the log for that letter

22   start?  On what page?

23       A.    Let's see, I believe on page 418, at the

24   bottom.

25       Q.    Okay.  And was a reinvestigation started as

Page 15

1    a result of receiving this letter?

2         A.    Yes, sir.

3         Q.    And which, which accounts were

4    reinvestigated?

5         A.    There was a reinvestigation for Wells Fargo

6    Bank, for CitiMortgage.  That looks like it.

7         Q.    All right.  What was done to reinvestigate

8    the Wells Fargo Bank account?

9         A.    A consumer dispute verification form was

10   prepared and sent to Wells.

11        Q.    And when was it sent?

12        A.    Just a moment.

13        Q.    Was it December 31st?

14        A.    Yes, 12-31, 2012.

15        Q.    Was a dispute code used?

16        A.    Yes, sir.

17        Q.    And what was the dispute code that was

18   used?

19        A.    The dispute code was that a derogatory

20   status was being disputed.

21        Q.    Okay.  Which field does that call into

22   question?

23        A.    It would call into question any of the data

24   elements that reference the status, it could be

25   current or previous.

Veritext Legal Solutions
866 299-5127

1      Q.      Okay.   Does it call into question the

2   special comment code?

3      A.      If the special comment code is directly

4   driving the status of the account, yes, it would.

5      Q.      Okay.   Was the special comment code in the

6   case of the Wells Fargo account driving the status of

7   the account?

8      A.      Yes, sir, it was.

9      Q.      And does it call into question the account

10  status code itself?

11     A.      Yes.

12     Q.      What about the payment history?

13     A.      Yes.

14     Q.      Is anything else included in -- any of the

15  other fields included in this type of dispute?

16     A.      Well, as far as Experian is concerned, all

17  of the fields are called into question because

18  anytime a data furnisher responds to a request for

19  reinvestigation, Experian requires that they certify

20  accuracy of the entire item that's being responded

21  to.   It's my understanding that the dispute code just

22  helps narrow the focus of the actual nature of the

23  consumer's dispute in addition to the free form text,

24  where, in this case, Experian indicated that the

25  consumer believed the foreclosure was not correct.

Page 17

1    Q.    Okay.    And was the Wells Fargo account

2  reporting as a short sale?

3    A.    The Wells Fargo, at the time of the

4  dispute, was reporting as having been settled,

5  legally paid for less -- in full for less than the

6  full balance.

7    Q.    Okay.    And did you receive a response from

8  Wells Fargo to your ACDV?

9    A.    Yes, sir.

10   Q.    And on what date?

11   A.    January 4th, 2013.

12   Q.    And what was the response?

13   A.    In the response, they verified that the

14  account was accurately reporting as having been

15  paid-in settlement and that the date of the paid-in

16  settlement was March 29th, 2010.

17   Q.    Anything else?

18   A.    Not that I can see from here.

19   Q.    Okay.    And you initiated a reinvestigation

20  of the CitiMortgage account.    What did you do to

21  reinvestigate that account?

22   A.    Experian sent an ACDV to CitiMortgage.

23   Q.    Anything else?

24   A.    No.

25   Q.    And the ACDV, it was sent on December 31st,

Page 18

1    2012?

2         A.    Yes, sir, that's correct.

3         Q.    Okay.  And what was the dispute code used?

4         A.    It was the same status dispute, and

5    contained some additional free form text regarding a

6    description of documents that were received with the

7    dispute letter.

8         Q.    Okay.  Were -- in either case, the

9    CitiMortgage dispute or in the Wells Fargo dispute,

10   were images, any images sent along with the ACDV?

11        A.    No.

12        Q.    And could you translate that free form text

13   for me?  How do you read that?

14        A.    I read that as received settlement

15   statement number 2502-0265, stating the settlement

16   date was 3-26-10, consumer states foreclosure is not

17   correct.

18        Q.    Did CitiMortgage respond to this ACDV?

19        A.    Yes.

20        Q.    And when did they do that?

21        A.    They responded on January 2nd of 2013.

22        Q.    And what was their response?

23        A.    They verified to Experian that the status

24   of settled was correct.  They added the code XV,

25   indicating that the account was in dispute by the

Page 19

1    consumer under the FCRA.  And they confirmed that the

2    date of that settlement was April 7th, 2010.

3         Q.    And just so I'm clear, on -- when you say

4    that CitiMortgage responded by verifying that the

5    status was settled was correct, what information are

6    you looking at that tells you that?  Is it the

7    special comment AU under the response portion of

8    this?

9         A.    Yes, sir.  That, along with the status of

10   paid.  That special comment code is further defining

11   the manner in which the account was paid.

12        Q.    Gotcha.

13              So I see the special comment, dash,

14   AU, and then I see the payment grid and then

15   underneath that is where it says status paid, right?

16        A.    Yes, sir.

17        Q.    Okay.  And that is -- they were reporting

18   metro 2 code 13 for that?

19        A.    Yes.

20        Q.    All right.  And prior to that -- or after

21   that, when was the next communication from

22   Mr. Shaw -- or with Mr. Shaw?

23        A.    According to the log, around March 7 -- I'm

24   sorry, February 7, 2013, there's a remark that he was

25   transferred to a supervisor.  That would have had to

                                          Page 20

1    one of his disclosures that is Bates numbered --

2    starting with 81.  Do you have that one?  It is a

3    disclosure from December 19th, 2011.

4        A.    Yes, I do.

5        Q.    All right.  My question is, I have seen

6    many consumer reports for Mr. Shaw prepared around

7    this time, and the way they are reported is with a --

8    for the CitiMortgage account and for the Wells Fargo

9    account, they're reported by Experian with a code 9

10   in the payment history grid.  And I'm wondering if

11   you look at the CitiMortgage account on this

12   disclosure, which is on page 83, I don't see the code

13   9 or the word "settled" or a code meaning settled in

14   the payment history grid for the account on the

15   disclosure.  And my question is, do you know why that

16   is?

17       A.    Well, the purpose of the disclosure, of

18   course, is for the consumer to know what's being

19   reported about them.  And so you can clearly see,

20   looking at CitiMortgage on 83, we are telling the

21   consumer that the current status is paid in

22   settlement.  But with your specific question to the

23   9, I mean, we don't really show any actual grid

24   codes, 9s, Hs, 1s, 2s, because a consumer wouldn't

25   know what that meant.  And so here in the grid, we

                                        Page  78

1  are -- it's our decision to show certain things in

2  lay terms to the consumer.  And since in the status

3  we're already showing the paid in settlement, for the

4  grid character we would indicate that that account is

5  now closed, which you can see transpires to the

6  legend.

7       Q.    Uh-huh.  Now, the grid code 9, are you

8  familiar with it?  Do you know what it means, what

9  it's defined as?

10      A.    I know generally how it's defined, yes.

11      Q.    All right.  So one part of that definition

12  is that it means settled or collection or charge-off,

13  right?

14      A.    Yes, it's an indicator of a derogatory

15  code.

16      Q.    Okay.  But I have looked and I don't see

17  any definition of grid code 9 in any of the

18  Experian's documents that translate the grid code 9

19  to closed.  So my question is, why would the

20  disclosure show a closed code with CRS code instead

21  of at least one of the definitions of the grid code

22  9?

23      A.    Well, we are showing paid in settlement.

24  We're telling the consumer that CitiMortgage is in

25  status paid in settlement, account legally paid in

1  full for less than full balance.  So repeating that

2  with some kind of code in the payment history on a

3  consumer disclosure, A, would kind of be redundant,

4  we've already told you it's paid in settlement.  But

5  we're further clarifying for the consumer in certain

6  conditions that a certain set of accounts is closed.

7            A settlement is not the only thing

8  that's going to have a closed, it's going to be lots

9  of things with a final status, it's going to be

10  transfer, it's going to be refinanced.  So it's

11  further defining for the consumer how is your account

12  paid?  It's paid in settlement.  And your account is

13  closed, and then here's your previous history prior

14  to your settlement.

15     Q.    So the, the data that is used to create a

16  consumer disclosure like the one we're looking at, it

17  comes from file 1, right?

18     A.    That is correct.

19     Q.    All right.  And if we assume that in file 1

20  at the time this disclosure was made, the grid code

21  for April 2010 for the CitiMortgage trade line was a

22  code 9, how does it end up getting, I guess,

23  translated, for lack of a better word, into CLS,

24  which means according to the legend on the same page,

25  closed?  How does that happen?

Page 80

1        A.      So I can't really answer credit reporting

2    questions for you.   That would be someone else for

3    this purpose.   However, I can tell you that for

4    purposes of translation to a consumer disclosure, you

5    know, business decisions are made at Experian to

6    determine how we feel we can best make a lay consumer

7    understand what's being reported about them.   And so

8    within our system and within our coding, we set our

9    system up to say, if this condition appears, populate

10   this.   If this condition appears, populate that.   And

11   then we've provided a legend for that.   But also

12   making sure that we convey the accurate information

13   that's being reported, which here we are, that's

14   being reported as paid in settlement.

15       Q.      So the way that the disclosures are made,

16   is it safe to say that there is a rule that a grid

17   code 9 on a mortgage trade line will show those

18   closed?

19       A.      It's not that simple, because you have

20   other grid code 9s, like collections and charge-offs.

21   But if you have a grid code 9 that's mapped to a

22   settlement, for a settlement or transferred or

23   refinanced, we're going to report it out as closed so

24   long as we're able to show the status of the account

25   under the account status.   I mean, it's not just the

1   grid code that's driving the account, it's the

2   account status and the account condition.   Those

3   really drive the grid codes.   So, again, the goal is

4   to accurately portray what is being reported, which

5   is what's being done here.   And it was just a

6   decision not to put something confusing in the grid

7   when it's already indicated clearly in the status and

8   the creditor's statement.

9       Q.     Why do you think it would be confusing, if

10  you do -- actually, let me just ask you that.   So are

11  you saying it would be confusing for a consumer if

12  you just put, instead of CLS, in the April of 2010

13  field of the grid code for the CitiMortgage trade

14  line, a number 9 and then included in the legend the

15  definition of a 9?   Do you believe that would be

16  confusing to a consumer?

17      A.     To a lay consumer, trying to define grid

18  codes?   Yeah.   I mean, maybe -- maybe "confusing" is

19  the wrong word, maybe "redundant" or "more accurate."

20  I mean, you -- let me just kind of say for a second

21  that we take a lot of consumer feedback when we

22  develop and arrange our consumer disclosures, and

23  there have been many iterations over the years.   And

24  one of the questions that we commonly get phone calls

25  that really, if you're clear on your disclosure,

1   aren't necessary, are for accounts that are settled

2   or refinanced or paid.  A consumer will say, well, I

3   closed this.  And then you have to explain to them,

4   well, you don't really close an installment account,

5   you simply pay it in full.  But, yes, for all intents

6   and purposes, it's closed.  And so with this redesign

7   and the CLS being put in the grid for refinanced,

8   settled or transferred, it does also affirm to the

9   consumer that, yes, your account is technically

10  closed, here's your history, and the status of your

11  account is paid in settlement.  Which is accurate.

12      Q.    Okay.  But let me go back, let me ask that

13  question again.  I'm not sure you answered it

14  exactly.

15          My question was -- and let me take

16  some of what you said.  You said that it would be

17  more accurate or to do so would be redundant.  And by

18  that, we're talk about putting a 9 where it says CLS

19  and then defining the 9 in the legend.  Why do you

20  think it would be more accurate not to put the 9

21  there and just define it in the legend, as opposed to

22  putting CLS there, which a 9 doesn't translate to,

23  and then putting CLS in the legend?  Why is it more

24  accurate than what you're saying?

25      A.    Well, again -- and it's not really more

Page 83

1   accurate.  It's more about conveying the accurate

2   status.  We're telling the consumer what they need to

3   know about the account.  So the account is paid in

4   settlement, it's closed, and you were previously 180

5   days delinquent.  If we, just as we had in the

6   past -- you know, previously we didn't even have a

7   grid on the consumer file disclosure.  This was a

8   change that we thought would help the consumer better

9   understand what was being reported about them.  And

10  so, again, the information in the grid further

11  defines the history of the account, but we've already

12  said the account is settled, so repeating that in the

13  history grid is, is really not any more helpful to

14  the consumer, but we find that closed is, because

15  that's a question consumers have about accounts in a

16  final status.

17      Q.    Well, is there any reason why you couldn't

18  just do it the other way?  Why couldn't you just

19  put -- since you're getting a 9 from file 1 in the

20  payment history grid, why couldn't you put the 9

21  there, define it as settled and then put in the

22  status, closed?

23             MR. WIERS:  Objection, form,

24  foundation.

25      Q.    Would that make the reporting any

1    different?

2              MR. WIERS:   Preposterous.

3         A.    I mean, Mr. Shaw (sic), theoretically we

4    could do anything.

5              MR. WIERS:   Mr. Cento.

6         A.    I mean, sorry, Mr. Cento.   Theoretically we

7    could do anything, but this is how we feel that we're

8    best providing a service to our consumers with our

9    number one objective as helping them understand

10   what's being reported about them, which is the whole

11   point of the consumer disclosure.

12        Q.    Now, on a credit report, though, of the

13   credit reports that I've seen that were prepared

14   about Mr. Shaw and that contain this trade line, why

15   didn't you put "closed" in the payment grid there?

16             MR. WIERS:  Objection, foundation.

17        A.    Well, that's a credit reporting question.

18   And so why those grids are configured in the manner

19   they are, that would be for another witness.

20        Q.    Any other reasons that you know of why you

21   looked -- why the disclosures don't output the 9 in a

22   payment, in a payment grid to the disclosure field?

23             MR. WIERS:  Objection, form.  What do

24   you mean by "disclosure field"?

25             MR. CENTO:  Yeah, that was a bad

Page 85

1    STATE OF TEXAS

2    COUNTY OF DALLAS

3

4                    REPORTER'S CERTIFICATE

5              ORAL DEPOSITION OF KIM HUGHES

6                     March 17, 2015

7

8         I, the undersigned Certified Shorthand Reporter

9    in and for the State of Texas, certify that the facts

10   stated in the foregoing pages are true and correct.

11        I further certify that I am neither attorney or

12   counsel for, related to, nor employed by any parties

13   to the action in which this testimony is taken and,

14   further, that I am not a relative or employee of any

15   counsel employed by the parties hereto or financially

16   interested in the action.

17        SUBSCRIBED AND SWORN TO under my hand and seal

18   of office on this the 26th day of March, 2015.

19

20

21

22

23             Cheryl Duncan, CSR

               Texas CSR 3371

24             Expiration:  12/31/16

25

                                              Page 103

# EXHIBIT 42

# LODGED UNDER SEAL

# EXHIBIT 43

 **B3-5.3-01, DU Credit Report Analysis (12/30/2009)**

### Introduction

This topic describes how DU analyzes credit report data and requirements lenders must follow in response to the credit-related Findings messages. This topic includes:

- Inquiries
- Omitted Accounts
- Possible Non-applicant Debts
- Authorized User Tradelines
- Disputed Credit Report Tradelines
- Undisclosed Debts
- Contradictory, Derogatory, or Erroneous Information
- Duplicate Public Records
- Judgments, Garnishments, and Liens
- Mortgage Delinquencies
- Past-Due, Collections, and Charge-Off Accounts
- Prior Bankruptcy, Foreclosure, and Deed-in-Lieu of Foreclosure

### Inquiries

The lender should examine inquiries to determine whether they represent potential sources of undisclosed credit. If new debt was obtained, the lender may need to correct the loan application and resubmit it.

### Omitted Accounts

Supporting documentation is required when a credit report liability with a balance greater than zero is omitted from the loan application.

### Possible Non-applicant Debts

The DU Underwriting Findings report will list any debts that are identified as "possible non-applicant debts" on the credit report. If the debts are on the loan application, DU will include them in the back ratio and will include them in the credit profile analysis. If the debts do not belong to the borrower, the lender may provide supporting documentation, remove the debts from the loan application, and resubmit the loan.

### Authorized User Tradelines

DU takes credit report tradelines designated as authorized user tradelines into consideration as part of the DU credit risk assessment. However the lender must review credit report tradelines in which the applicant has been designated as an authorized user in order to ensure the tradelines are an accurate reflection of the borrower's credit history. If the lender believes the authorized user tradelines are not an accurate reflection of the borrower's credit history, the lender should evaluate the borrower's credit history without the benefit of these tradelines and use prudent underwriting judgment when making its final underwriting decision. In order to assist the lender in its review of authorized user tradelines, DU issues a message providing the name of the creditor and account number for each authorized user tradeline identified.

When ensuring tradelines are an accurate reflection of the borrower's credit history, as a general guide, if the borrower has several authorized user accounts but only has a few accounts of his/her own, the lender should establish:

- the relationship of the borrower to the owner of the account,
- if the borrower uses the account, and
- if the borrower makes the payments on the account.

If the authorized user tradeline belongs to another borrower on the mortgage loan, no additional investigation is needed. On the other hand, if the borrower has several tradelines in good standing and only a minor number of authorized user accounts, the lender could make the determination that:

- the authorized user accounts had minimal, if any, impact on the borrower's overall credit profile; and
- the information reported on the credit report is an accurate reflection of the borrower's credit history.

The lender is not required to review an authorized user tradelines that belongs to the borrower's spouse when the spouse is not on the mortgage transaction.

For manual underwriting consideration of authorized users of credit, see B3-5.3-07, Authorized Users of Credit(10/30/2009).

### Disputed Credit Report Tradelines

Lenders must confirm the accuracy of disputed tradelines reported on the borrower's credit report. If it is determined that the disputed tradeline information is accurate, lenders must ensure the disputed tradelines are considered in the credit risk assessment.

### Undisclosed Debts

An undisclosed debt is a debt that is on the credit report but not on the loan application.

DU compares the balances and payments of the debts on the credit report with the debts on the loan application. If material differences are found, the lender must confirm that all debts from the credit report are included on the loan application and provide documentation to support the use of payments and balances lower than those on the credit report. If the debt affects the total expense ratio by more than the allowable tolerances, the lender must add the debt to the loan application and resubmit the loan. Otherwise, the lender is expected to provide documentation that supports the omission from the loan application.

### Contradictory, Derogatory, or Erroneous Information

Lenders are obligated to take action when contradictory, derogatory, or erroneous information would justify additional investigation or would provide grounds for a decision that is different from the recommendation DU delivers. For example, if the credit report reflects a previous foreclosure but the information was not accurately mapped to DU, the lender must consider this when making its final underwriting decision.

### Duplicate Public Records

Items that typically appear in the Public Records section of the credit report (judgments, bankruptcies, foreclosures, and tax liens) are often duplicated because the credit agencies may not attempt to merge items of this severe nature. As a result, these items may also appear in more than one verification message in the Underwriting Findings report. If it is clear from the credit report data that the items are duplicates (identical account numbers, date filed, and dollar amounts), the lender can disregard the duplicates and document the item once. However, if it is unclear from the credit report whether any of the items are duplicated, the lender should treat each item individually and obtain the required documentation for each item, as indicated in the verification messages.

### Judgments, Garnishments, and Liens



Open judgments, garnishments, and all outstanding liens that are in the Public Records section of the credit report will be identified in the Underwriting Findings report, and must be paid off at or prior to closing.

Documentation of the satisfaction of these liabilities, along with verification of funds sufficient to satisfy these obligations, must also be maintained in the permanent loan file.

> **Note:** Fannie Mae guidelines regarding the payoff of tax liens and the supporting documentation apply to loan casefiles underwritten through DU as well as manually underwritten loans.

## Mortgage Delinquencies

DU applies the following guidelines to the processing of loans with mortgage delinquencies:

- If any borrower's credit report contains a mortgage tradeline that is 60 or more days past due when the account was last reported by the creditor and the account was reported within the 12 months prior to the credit report date, the loan casefile will receive a Refer with Caution/IV recommendation and will be ineligible for delivery to Fannie Mae.

- If an account is reported on the credit report as a non-mortgage tradeline, and yet the account is listed on the loan application as a mortgage, DU will analyze the credit history of the tradeline as a mortgage.

  For example, if the credit report identifies an account as a revolving account, and the account is listed as a HELOC on the loan application, DU will evaluate the credit history of the account as a mortgage. Any late payments in the credit report will be treated by DU as delinquent mortgage payments.

- If there is a mortgage that is disclosed on the loan application but not reported on the credit report, DU will issue a message requiring the lender to confirm that the account is not two or more payments past due as of the date of the application and that it has not been past due by two or more payments in the last 12 months. If the lender determines that the borrower does have a mortgage that is past due by two or more payments or has been past due by two or more payments in the last 12 months, then the loan casefile is not eligible for delivery to Fannie Mae.

- Borrowers may not bring past-due mortgage accounts current prior to closing in order to circumvent Fannie Mae's policy regarding past-due mortgages. However, the lender may apply some discretion with regard to the application of this policy if it determines and documents that the past-due account status was not the fault of the borrower—for example, if the servicer misapplied or lost the borrower's payment.

- Loan casefiles will receive an Ineligible recommendation due to excessive prior mortgage delinquency if the borrower has a mortgage tradeline on his or her credit report that has one or more 60-, 90-, 120-, or 150-day delinquency reported within the 12 months prior to the credit report date.

The above policies will apply to all mortgage tradelines, including first liens, second liens, home improvement loans, HELOCs, and mobile home loans.

### Past-Due, Collections, and Charge-Off Accounts

Accounts that are reported as past due (not reported as collection accounts) must be brought current.

- For one-unit, owner-occupied properties, borrowers are not required to pay off outstanding collections or charge-offs—regardless of the amount—provided the collection will not threaten Fannie Mae's first-lien position.

  > **Note:** If the lender marks the collection account Paid By Close in the online loan application, DU will issue a message in the Findings report stating that the collection must be paid.

- For two- to four-unit owner-occupied and second home properties, collections and charge-offs totaling more than $5,000 must be paid in full prior to or at closing.

- For investment properties, individual accounts equal to or greater than $250 and accounts that total more than $1,000 must be paid in full prior to or at closing.

### Prior Bankruptcy, Foreclosure, and Deed-in-Lieu of Foreclosure

DU applies the following guidelines to prior bankruptcies:

- If a Chapter 13 bankruptcy was discharged within the last 24 months, dismissed within the last 48 months, or filed but neither discharged nor dismissed within the last 48 months, the loan casefile will receive a Refer with Caution/IV recommendation and will be ineligible for delivery to Fannie Mae.

- If a non-Chapter 13 bankruptcy was filed, discharged, or dismissed within the last 48 months, the loan casefile will receive a Refer with Caution/IV recommendation and will be ineligible for delivery to Fannie Mae.

- DU will ignore tradeline accounts that are reported with a bankruptcy status code or manner of payment/MOP code of "7" if there is at least one bankruptcy reported in a public record. In this scenario, DU assumes the date filed and the date discharged in the public record are more accurate than the dates in the tradeline; i.e., specific filed and discharged dates do not exist in the tradeline.

- If the bankruptcy is not reported in a public record, but a tradeline is reported with a bankruptcy status code, the lender will need to verify the actual filed and discharged dates to determine that the bankruptcy meets the DU bankruptcy policy.

- DU is not able to determine if multiple filings have occurred due to the manner in which bankruptcies are reported to the credit report. DU will issue a message when it appears that there may have been multiple bankruptcy filings. This message will list each of the bankruptcies seen on the credit report, and will instruct lenders to ensure the loan casefile meets the criteria for underwriting loan casefiles with multiple bankruptcies.

For additional requirements on bankruptcies, see B3-5.3-08, Derogatory Credit Information (04/01/2009)

DU applies the following guidelines to prior foreclosures:

- Mortgage accounts, including first liens, second liens, home improvement loans, HELOCs, and mobile home loans, will be identified as a foreclosure if there is a current status or manner of payment/MOP code of "8" (foreclosure) or "9" (collection or charge-off).

- If a foreclosure was reported within the 5-year period prior to the credit report date, the loan casefile will receive a Refer with Caution/IV and will be ineligible for delivery to Fannie Mae.

- If the filed date and the satisfied date of the foreclosure are both unknown, but it appears that the foreclosure occurred within the 5-year period prior to the credit report date, the lender must confirm that the foreclosure did not occur within the most recent 5-year period.

- If a foreclosure was reported more than five years before the credit report date, the existence of the foreclosure is acceptable provided the loan complies with the additional requirements that apply after five years and up to seven years following the completion date, as stated in B3-5.3-08, Derogatory Credit Information (04/01/2009).

- Foreclosure laws vary by state and the time it takes to complete the process may vary by state. DU assumes that the date the foreclosure was reported in the tradeline is the date of the foreclosure sale or liquidation. The lender must confirm that all foreclosures are satisfied.

DU applies the following guidelines to prior deeds-in-lieu of foreclosure:

- DU will determine if a mortgage tradeline is a deed-in-lieu of foreclosure by using specific Remark Codes that are present in the credit report data and associated to the tradeline.

- If a deed-in-lieu of foreclosure was reported within the 4-year period prior to the credit report date, the loan casefile will receive a Refer with Caution/IV and will be ineligible for delivery to Fannie Mae.

- If a deed-in-lieu of foreclosure was reported more than four years before the credit report date, the existence of the deed-in-lieu foreclosure is acceptable provided the loan complies with the additional requirements that apply after four years and up to seven years following the completion date, as stated in B3-5.3-08, Derogatory Credit Information (04/01/2009).

### Related Announcements

The table below provides references to the Announcements and Release Notes that have been released that are related to this topic.

| Announcements and Release Notes | Issue Date |
|---|---|
| Announcement 09-32 | October 30, 2009 |
| DU Version 8.0 | September 22, 2009 |
| DU Version 7.1 | October 31, 2008 |

# EXHIBIT 44

# LODGED UNDER SEAL

**EXHIBIT  45**

Fannie Mae Single Family / 2010 Selling Guide / Part B, Origination Through Closing / Subpart B3, Underwriting Borrowers / Chapter B3-5, Credit Assessment / Section B3-5.3, Traditional Credit History / B3-5.3-09, DU Credit Report Analysis (09/20/2010)

 **B3-5.3-09, DU Credit Report Analysis (09/20/2010)**

## Introduction

This topic describes how DU analyzes credit report data and requirements lenders must follow in response to the credit-related Findings messages. This topic includes:

- Inquiries
- Omitted Accounts
- Possible Non-applicant Debts
- Authorized User Tradelines
- Disputed Credit Report Tradelines
- DU Debt Comparison
- Contradictory, Derogatory, or Erroneous Information
- Duplicate Public Records
- Judgments, Garnishments, and Liens
- Mortgage Delinquencies
- Past-Due, Collections, and Charge-Off Accounts
- Prior Bankruptcy, Foreclosure, Deed-in-Lieu of Foreclosure, and Preforeclosure Sales
- Preforeclosure Sales or Short Sales

## Inquiries

The lender should examine inquiries to determine whether they represent potential sources of undisclosed credit. If new debt was obtained, the lender may need to correct the loan application and resubmit it.

## Omitted Accounts

Supporting documentation is required when a credit report liability with a balance greater than zero is omitted from the loan application.

## Possible Non-applicant Debts

The DU Underwriting Findings report will list any debts that are identified as "possible non-applicant debts" on the credit report. If the debts are on the loan application, DU will include them in the back ratio and will include them in the credit profile analysis. If the debts do not belong to the borrower, the lender may provide supporting documentation, remove the debts from the loan application, and resubmit the loan.

## Authorized User Tradelines

DU takes credit report tradelines designated as authorized user tradelines into consideration as part of the DU credit risk assessment. However the lender must review credit report tradelines in which the applicant has been designated as an authorized user in order to ensure the tradelines are an accurate reflection of the borrower's credit history. If the lender believes the authorized user tradelines are not an accurate reflection of the

Δ π EXHIBIT 10
Deponent Shiman
Date 4/2/14  Rptr nm
WWW.DEPOBOOK.COM

borrower's credit history, the lender should evaluate the borrower's credit history without the benefit of these tradelines and use prudent underwriting judgment when making its final underwriting decision. In order to assist the lender in its review of authorized user tradelines, DU issues a message providing the name of the creditor and account number for each authorized user tradeline identified.

When ensuring tradelines are an accurate reflection of the borrower's credit history, as a general guide, if the borrower has several authorized user accounts but only has a few accounts of his/her own, the lender should establish:

- the relationship of the borrower to the owner of the account,
- if the borrower uses the account, and
- if the borrower makes the payments on the account.

If the authorized user tradeline belongs to another borrower on the mortgage loan, no additional investigation is needed. On the other hand, if the borrower has several tradelines in good standing and only a minor number of authorized user accounts, the lender could make the determination that:

- the authorized user accounts had minimal, if any, impact on the borrower's overall credit profile; and
- the information reported on the credit report is an accurate reflection of the borrower's credit history.

The lender is not required to review an authorized user tradelines that belongs to the borrower's spouse when the spouse is not on the mortgage transaction.

For manual underwriting consideration of authorized users of credit, see B3-5.3-06, Authorized Users of Credit(10/30/2009).

## Disputed Credit Report Tradelines

Lenders must confirm the accuracy of disputed tradelines reported on the borrower's credit report. If it is determined that the disputed tradeline information is accurate, lenders must ensure the disputed tradelines are considered in the credit risk assessment.

## DU Debt Comparison

DU compares the balances and payments of the debts on the credit report with the debts on the loan application. If material differences are found, the lender must confirm that all debts from the credit report are included on the loan application and provide documentation to support the use of payments and balances lower than those on the credit report. If the debt affects the total expense ratio by more than the allowable tolerances, the lender must add the debt to the loan application and resubmit the loan. Otherwise, the lender is expected to provide documentation that supports the omission from the loan application. See B3-6-02, Debt-to-Income Ratios (09/20/2010)and B3-2-10, Accuracy of DU Data, DU Tolerances, and Errors in the Credit Report (09/20/2010)for additional information.)

## Contradictory, Derogatory, or Erroneous Information

Lenders are obligated to take action when contradictory, derogatory, or erroneous information would justify additional investigation or would provide grounds for a decision that is different from the recommendation DU delivers. For example, if the credit report reflects a previous foreclosure but the information was not accurately mapped to DU, the lender must consider this when making its final underwriting decision.

## Duplicate Public Records

Items that typically appear in the Public Records section of the credit report (judgments, bankruptcies, foreclosures, and tax liens) are often duplicated because the credit agencies may not attempt to merge items of this severe nature. As a result, these items may also appear in more than one verification message in the Underwriting Findings report. If it is clear from the credit report data that the items are duplicates (identical account numbers, date filed, and dollar amounts), the lender can disregard the duplicates and document the item once. However, if it is unclear from the credit report whether any of the items are duplicated, the lender should treat each item individually and obtain the required documentation for each item, as indicated in the verification messages.

## Judgments, Garnishments, and Liens

Open judgments, garnishments, and all outstanding liens that are in the Public Records section of the credit report will be identified in the Underwriting Findings report, and must be paid off at or prior to closing.

Documentation of the satisfaction of these liabilities, along with verification of funds sufficient to satisfy these obligations, must also be maintained in the permanent loan file.

> **Note**: Fannie Mae guidelines regarding the payoff of tax liens and the supporting documentation apply to loan casefiles underwritten through DU as well as manually underwritten loans.

## Mortgage Delinquencies

DU applies the following guidelines to the processing of loans with mortgage delinquencies:

- If any borrower's credit report contains a mortgage tradeline that is 60 or more days past due when the account was last reported by the creditor and the account was reported within the 12 months prior to the credit report date, the loan casefile will receive a Refer with Caution/IV recommendation and will be ineligible for delivery to Fannie Mae.

- If an account is reported on the credit report as a non-mortgage tradeline, and yet the account is listed on the loan application as a mortgage, DU will analyze the credit history of the tradeline as a mortgage.

  For example, if the credit report identifies an account as a revolving account, and the account is listed as a HELOC on the loan application, DU will evaluate the credit history of the account as a mortgage. Any late payments in the credit report will be treated by DU as delinquent mortgage payments.

- If there is a mortgage that is disclosed on the loan application but not reported on the credit report, DU will issue a message requiring the lender to confirm that the account is not two or more payments past due as of the date of the application and that it has not been past due by two or more payments in the last 12 months. If the lender determines that the borrower does have a mortgage that is past due by two or more payments or has been past due by two or more payments in the last 12 months, then the loan casefile is not eligible for delivery to Fannie Mae.

- Borrowers may not bring past-due mortgage accounts current prior to closing in order to circumvent Fannie Mae's policy regarding past-due mortgages. However, the lender may apply some discretion with regard to the application of this policy if it determines and documents that the past-due account status was not the fault of the borrower—for example, if the servicer misapplied or lost the borrower's payment.

- Loan casefiles will receive an Ineligible recommendation due to excessive prior mortgage delinquency if the borrower has a mortgage tradeline on his or her credit report that has one or more 60-, 90-, 120-, or 150-day delinquency reported within the 12 months prior to the credit report date.

The above policies will apply to all mortgage tradelines, including first liens, second liens, home improvement loans, HELOCs, and mobile home loans.

## Past-Due, Collections, and Charge-Off Accounts

Accounts that are reported as past due (not reported as collection accounts) must be brought current.

- For one-unit, owner-occupied properties, borrowers are not required to pay off outstanding collections or charge-offs—regardless of the amount—provided the collection will not threaten Fannie Mae's first-lien position.

  **Note**: If the lender marks the collection account Paid By Close in the online loan application, DU will issue a message in the Findings report stating that the collection must be paid.

- For two- to four-unit owner-occupied and second home properties, collections and charge-offs totaling more than $5,000 must be paid in full prior to or at closing.
- For investment properties, individual accounts equal to or greater than $250 and accounts that total more than $1,000 must be paid in full prior to or at closing.

## Prior Bankruptcy, Foreclosure, Deed-in-Lieu of Foreclosure, and Preforeclosure Sales

DU applies the following guidelines to prior bankruptcies:

- If a Chapter 13 bankruptcy was discharged within the last 24 months, dismissed within the last 48 months, or filed but neither discharged nor dismissed within the last 48 months, the loan casefile will receive a Refer with Caution/IV recommendation and will be ineligible for delivery to Fannie Mae.
- If a non-Chapter 13 bankruptcy was filed, discharged, or dismissed within the last 48 months, the loan casefile will receive a Refer with Caution/IV recommendation and will be ineligible for delivery to Fannie Mae.
- DU will ignore tradeline accounts that are reported with a bankruptcy status code or manner of payment/MOP code of "7" if there is at least one bankruptcy reported in a public record. In this scenario, DU assumes the date filed and the date discharged in the public record are more accurate than the dates in the tradeline; i.e., specific filed and discharged dates do not exist in the tradeline.
- If the bankruptcy is not reported in a public record, but a tradeline is reported with a bankruptcy status code, the lender will need to verify the actual filed and discharged dates to determine that the bankruptcy meets the DU bankruptcy policy.
- DU is not able to determine if multiple filings have occurred due to the manner in which bankruptcies are reported to the credit report. DU will issue a message when it appears that there may have been multiple bankruptcy filings. This message will list each of the bankruptcies seen on the credit report, and will instruct lenders to ensure the loan casefile meets the criteria for underwriting loan casefiles with multiple bankruptcies.

DU applies the following guidelines to prior foreclosures:

- Mortgage accounts, including first liens, second liens, home improvement loans, HELOCs, and mobile home loans, will be identified as a foreclosure if there is a current status or manner of payment/MOP code of "8" (foreclosure) or "9" (collection or charge-off).
- If a foreclosure was reported within the seven-year period prior to the credit report date, the loan casefile will receive a Refer with Caution/IV and will be ineligible for delivery to Fannie Mae.
- If the filed date and the satisfied date of the foreclosure are both unknown, but it appears that the foreclosure occurred within the seven-year period prior to the credit report date, the lender must confirm that the foreclosure did not occur within the most recent seven-year period.
- Foreclosure laws vary by state and the time it takes to complete the process may vary by state. DU assumes that the date the foreclosure was reported in the tradeline is the date of the foreclosure sale or liquidation. The lender must confirm that all foreclosures are satisfied.

DU applies the following guidelines to prior deeds-in-lieu of foreclosure:

- DU will determine if a mortgage tradeline is a deed-in-lieu of foreclosure by using specific Remark Codes that are present in the credit report data and associated to the tradeline.
- If a deed-in-lieu of foreclosure was reported within the two-year period prior to the credit report date, the loan casefile will receive a Refer with Caution/IV and will be ineligible for delivery to Fannie Mae.
- If a deed-in-lieu of foreclosure was reported more than two years before the credit report date, the existence of the deed-of-lieu foreclosure is acceptable provided the loan complies with the LTV ratio requirements that apply after two years and up to seven years following the completion date, as stated in B3-5.3-07, Significant Derogatory Credit Events — Waiting Periods and Re-establishing Credit (06/30/2010).

## Preforeclosure Sales or Short Sales

DU is not able to identify preforeclosure or short sales in the credit report data. Lenders must manually apply the preforeclosure sale requirements to DU loan casefiles, regardless of the underwriting recommendation received from DU.

DU will issue a message on loan casefiles where the borrower's credit report indicates an account may have been released to a preforeclosure sale. The recommendation on the loan casefile will not be changed when this information appears on the credit report, though as stated above, the lender must ensure the loan complies with all other requirements specific to preforeclosure sales as specified in B3-5.3-07, Significant Derogatory Credit Events — Waiting Periods and Re-establishing Credit (06/30/2010).

**Note:** B3-5.3-07, Significant Derogatory Credit Events — Waiting Periods and Re-establishing Credit (06/30/2010), also contains additional requirements pertaining to underwriting borrowers with a preforeclosure sale, short sale, or extenuating circumstances. DU is not able to identify preforeclosure or short sales in the credit report data, or whether the borrower's derogatory credit history was the result of extenuating circumstances. Loan casefiles that receive a Refer with Caution/IV recommendation due to a bankruptcy or foreclosure action that was caused by extenuating circumstances may be manually underwritten if the lender has the appropriate documentation that these events occurred, the applicable minimum time period has elapsed, and the loan meets all

requirements of this *Selling Guide* that pertain to manually underwritten loans.

## Related Announcements

The table below provides references to the Announcements and Release Notes that have been released that are related to this topic.

| Announcements and Release Notes | Issue Date |
|---|---|
| Announcement SEL-2010–13 | September 20, 2010 |
| DU Version 8.2 | September 20, 2010 |
| Announcement SEL-2010–11 | August 13, 2010 |
| Announcement SEL-2010–08 | June 23, 2010 |
| Announcement SEL-2010–06 | April 30, 2010 |
| Announcement SEL-2010–05 | April 14, 2010 |
| Announcement SEL-2010–02 | March 2, 2010 |
| Announcement 09-32 | October 30, 2009 |
| DU Version 8.0 | September 22, 2009 |
| DU Version 7.1 | October 31, 2008 |

**EXHIBIT 46**

| | |
|---|---|
| **From:** | Price, Randall <gaurpp@fannie mae.com> |
| **Sent:** | Thursday, May 31, 2012 2:37 PM |
| **To:** | 'Eiden, Ken' <keiden@corelogic.com> |
| **Subject:** | RE: DU and Short Sales |

Ken,
I spoke to Experian about this a couple of weeks ago. I believe they report Short Sales with a MOB = 9.
Below is information I provided regarding that.
Let me know if this is helpful or I need to dig up additional information. I believe Experian determined that they needed to work with the ACB reporting format to include a code for Short Sales. (Note: I'm not sure I have the right acronym there).

Thanks,
Randy

**B3-5.3-09, DU Credit Report Analysis**

...

**Prior Bankruptcy, Foreclosure, Deed-in-Lieu of Foreclosure, and Preforeclosure Sales**

...

DU applies the following guidelines to prior foreclosures:

- Mortgage accounts, including first liens, second liens, home improvement loans, HELOCs, and mobile home loans, will be identified as a foreclosure if there is a current status or manner of payment/MOP code of "8" (foreclosure) or "9" (collection or charge-off); or if there is a foreclosure-related Remarks Code present in the credit report data and associated to the tradeline.
- If a foreclosure was reported within the seven-year period prior to the credit report date, the loan casefile will receive a Refer with Caution/IV and will be ineligible for delivery to Fannie Mae.
- If the filed date and the satisfied date of the foreclosure are both unknown, but it appears that the foreclosure occurred within the seven-year period prior to the credit report date, the lender must confirm that the foreclosure did not occur within the most recent seven-year period.
- Foreclosure laws vary by state and the time it takes to complete the process may vary by state. DU assumes that the date the foreclosure was reported in the tradeline is the date of the foreclosure sale or liquidation. The lender must confirm that all foreclosures are satisfied.

DU applies the following guidelines to prior deeds-in-lieu of foreclosure:

- DU will determine if a mortgage tradeline is a deed-in-lieu of foreclosure by using specific Remarks Codes that are present in the credit report data and associated to the tradeline.
- If a deed-in-lieu of foreclosure was reported within the two-year period prior to the credit report date, the loan casefile will receive a Refer with Caution/IV and will be ineligible for delivery to Fannie Mae.
- If a deed-in-lieu of foreclosure was reported more than two years before the credit report date, the existence of the deed-of-lieu foreclosure is acceptable provided the loan complies with the LTV ratio requirements that apply after two years and up to seven years following the completion date, as stated in B3-5.3-07, Significant Derogatory Credit Events — Waiting Periods and Re-establishing Credit (12/20/2011).

**Preforeclosure Sales or Short Sales**

DU is not able to identify preforeclosure or short sales in the credit report data. Lenders must manually apply the preforeclosure sale requirements to DU loan casefiles, regardless of the underwriting recommendation received from DU.

Δ π EXHIBIT 16
Deponent Shuman
Date 4/2/14   Rptr NM
WWW.DEPOBOOK.COM

FM-SHAW-00000168

DU will issue a message on loan casefiles where the borrower's credit report indicates an account may have been released to a preforeclosure sale. The recommendation on the loan casefile will not be changed when this information appears on the credit report, though as stated above, the lender must ensure the loan complies with all other requirements specific to preforeclosure sales as specified in B3-5.3-07, Significant Derogatory Credit Events — Waiting Periods and Re-establishing Credit (12/20/2011).

**Note:** B3-5.3-07, Significant Derogatory Credit Events — Waiting Periods and Re-establishing Credit (12/20/2011), also contains additional requirements pertaining to underwriting borrowers with a preforeclosure sale, short sale, or extenuating circumstances. DU is not able to identify preforeclosure or short sales in the credit report data, or whether the borrower's derogatory credit history was the result of extenuating circumstances. Loan casefiles that receive a Refer with Caution/IV recommendation due to a bankruptcy or foreclosure action that was caused by extenuating circumstances may be manually underwritten if the lender has the appropriate documentation that these events occurred, the applicable minimum time period has elapsed, and the loan meets all requirements of this *Selling Guide* that pertain to manually underwritten loans.

Randy Price
Product Dev. Manager, Financial Services
703-833-0548

**From:** Eiden, Ken [mailto:keiden@corelogic.com]
**Sent:** Thursday, May 31, 2012 1:08 PM
**To:** Price, Randall
**Subject:** DU and Short Sales

Hey Randy

We've come across a discrepancy with how the bureaus are reporting short sales within credit tradelines. I've reviewed the integration specification guide as well as subsequent updates and see no reference to short sales. Can you tell me what DU is expecting with these types of transactions? Specifically, would you be looking at bureau comments, MOP codes, payment pattern, account status, etc?

Thanks,

Ken

FM-SHAW-00000169

# EXHIBIT 47

| From: | Alcorn, Brian A <brian_a_alcorn@fanniemae.com> |
|---|---|
| Sent: | Monday, July 15, 2013 4:40 AM |
| To: | Alcorn, Brian A <brian_a_alcorn@fanniemae.com>; Bohley, David <david_bohley@fanniemae.com>; McGovern, Kristin <kristin_mcgovern@fanniemae.com> |
| Subject: | CFPB/CDIA Bullets |

Kristin:

How does this sound?

- In a May 7, 2013 letter to CFPB and FTC, Senator Bill Nelson (FL) requested the Agencies investigate why some short sales are being reported to consumer credit repositories as foreclosures;  the Senator also requested that CFBP or FTC *"penalize responsible parties in the mortgage- and credit-reporting industries if they don't fix the problem within 90 days;"*

- Senator Nelson had been informed/urged by local mortgage brokers in his district that they were unable to help consumers obtain new mortgages two years after a short sale due to a reporting "glitch" that was hampering automated underwriting;

- Following the CFPB's discussions with various parties (credit bureaus, CDIA, FHFA, Fannie Mae, etc), CFPB asked Fannie Mae to review whether DU (Desktop Underwriter) could be changed to accept a "MOP Code" (current manner of payment code on a tradeline) of 9 to indicate a short sale;  changing DU's treatment of a "MOP 9" was one of three potential solutions CFPB was considering to respond to the problem raised by Senator Nelson;

- Fannie Mae will change DU to accept a "MOP Code" of 9 plus short sale remarks codes as an acceptable indicator of a prior short sale for an "Approve" recommendation;  currently presence of a "MOP Code" of 9 in a credit tradeline will cause DU to issue a an "Ineligible" recommendation;  Fannie Mae will likely implement in a November release of DU;

- All parties understand an industry-wide change to how short sales are reported in credit data is needed and any changes to DU just by Fannie Mae are a temporary fix to a larger industry challenge.

Brian Alcorn
Fannie Mae, Government and Industry Relations (GIR)

For FAA-Related Communications:
This e-mail and its attachments are proprietary, confidential, pre-decisional, not for publication, and contain Nonpublic Information under a Financial Agency Agreement with the U.S. Department of Treasury. If received in error, contact the sender and delete this e-mail and its attachments. Confidential treatment required.

For Fannie Mae Communications:
This e-mail and its attachments are confidential and solely for the intended addressee(s). Do not share or use them without Fannie Mae's approval. If received in error, delete them and contact the sender.

All E-Mails:
Please note that Social Security #'s are not needed for our staff to research your constituent's inquiry.  Please do not include this information in correspondence to us.



FM-SHAW-00003574

**EXHIBIT 48**



# Selling Guide

Fannie Mae Single Family



Δ π EXHIBIT 23

Deponent: Shifman

Date 4/2/14   Rptr: MO

WWW.DEPOBOOK.COM

October 22, 2013

## Selling Guide: Fannie Mae Single Family

Published October 22, 2013

## ☑ B3-5.3-07, Significant Derogatory Credit Events — Waiting Periods and Re-establishing Credit (05/28/2013)

**Introduction**

This topic contains information on the waiting periods for significant derogatory credit events, including:

- General Information

- Identification of Significant Derogatory Credit Events in the Credit Report

- Bankruptcy (Chapter 7 or Chapter 11)

- Bankruptcy (Chapter 13)

- Multiple Bankruptcy Filings

- Foreclosure

- Deed-in-Lieu of Foreclosure and Preforeclosure Sale

- Summary — All Waiting Period Requirements

- Requirements for Re-establishing Credit

**General Information**

The presence of significant derogatory credit events dramatically increases the likelihood of a future default and represents a significantly higher level of default risk. Examples of significant derogatory credit events include bankruptcies, foreclosures, deeds-in-lieu of foreclosure, preforeclosure sales, and short sales.

> **Note:** The terms "preforeclosure sale" and "short sale" are used interchangeably in this Guide and have the same meaning (see Deed-in-Lieu of Foreclosure and Preforeclosure Sale below).

The lender must determine the cause and significance of the derogatory information, verify that sufficient time has elapsed since the date of the last derogatory information, and confirm that the borrower has re-established an acceptable credit history. The lender must make the final decision about the acceptability of a borrower's credit history when significant derogatory credit information exists.

This topic describes the amount of time that must elapse (the "waiting period") after a significant derogatory credit event before the borrower is eligible for a new loan salable to Fannie Mae. The waiting period commences on the completion, discharge, or dismissal date (as applicable) of the derogatory credit event and ends on the disbursement date of the new loan for manually underwritten loans, or the credit report date for DU loan casefiles. See B3-5.3-09, DU Credit Report Analysis.

> **Note:** The requirements in this topic are not applicable to Refi Plus mortgage loans, but are applicable for DU Refi Plus loans (see B5-5.2-02, DU Refi Plus and Refi Plus Underwriting Considerations).

Also see B3-5.3-08, Extenuating Circumstances for Derogatory Credit, for additional information.

### Identification of Significant Derogatory Credit Events in the Credit Report

Lenders must review the credit report and Section VIII, Declarations, of the loan application to identify instances of significant derogatory credit events. Lenders must review the public records section of the credit report and all tradelines, including mortgage accounts (first liens, second liens, home improvement loans, HELOCs, and mobile home loans), to identify previous foreclosures, deeds-in-lieu or preforeclosure sales, and bankruptcies. Lenders must carefully review the current status of each tradeline, manner of payment codes, and remarks (descriptive text or codes such as "Foreclosure," "Forfeit deed in lieu of foreclosure," "Settled for less than full balance") to identify these types of significant derogatory credit events.

Significant derogatory credit events may not be accurately reported or consistently reported in the same manner by all creditors or credit reporting agencies. If not clearly identified in the credit report, the lender must obtain copies of appropriate documentation. The documentation must establish the completion date of a previous foreclosure, deed-in-lieu or preforeclosure sale; confirm the bankruptcy discharge or dismissal date; and identify debts that were not satisfied by the bankruptcy. Debts that were not satisfied by a bankruptcy must be paid off or have an acceptable, established repayment schedule.

### Bankruptcy (Chapter 7 or Chapter 11)

A four-year waiting period is required, measured from the discharge or dismissal date of the bankruptcy action.

*Exceptions for Extenuating Circumstances*

A two-year waiting period is permitted if extenuating circumstances can be documented, and is measured from the discharge or dismissal date of the bankruptcy action.

### Bankruptcy (Chapter 13)

A distinction is made between Chapter 13 bankruptcies that were discharged and those that were dismissed. The waiting period required for Chapter 13 bankruptcy actions is measured as follows:

- two years from the discharge date, or

- four years from the dismissal date.

The shorter waiting period based on the discharge date recognizes that borrowers have already met a portion of the waiting period within the time needed for the successful completion of a Chapter 13 plan and subsequent discharge.

A borrower who was unable to complete the Chapter 13 plan and received a dismissal will be held to a four-year waiting period.

*Exceptions for Extenuating Circumstances*

A two-year waiting period is permitted after a Chapter 13 dismissal, if extenuating circumstances can be documented. There are no exceptions permitted to the two-year waiting period after a Chapter 13 discharge.

### Multiple Bankruptcy Filings

For a borrower with more than one bankruptcy filing within the past seven years, a five-year waiting period is required, measured from the most recent dismissal or discharge date.

> **Note:** The presence of multiple bankruptcies in the borrower's credit history is evidence of significant derogatory credit and increases the likelihood of future default. Two or more borrowers with individual bankruptcies are not cumulative, and do not constitute multiple bankruptcies. For example, if the borrower has one bankruptcy and the co-borrower has one bankruptcy this is not considered a multiple bankruptcy.

*Exceptions for Extenuating Circumstances*

A three-year waiting period is permitted if extenuating circumstances can be documented, and is measured from the most recent bankruptcy discharge or dismissal date. The most recent bankruptcy filing must have been the result of extenuating circumstances.

Part B, Origination Through Closing
Subpart 3, Underwriting Borrowers
Chapter 5, Credit Assessment, Traditional Credit History

October 22, 2013

**Foreclosure**

A seven-year waiting period is required, and is measured from the completion date of the foreclosure action as reported on the credit report or other foreclosure documents provided by the borrower.

*Exceptions for Extenuating Circumstances*

A three-year waiting period is permitted if extenuating circumstances can be documented, and is measured from the completion date of the foreclosure action. Additional requirements apply between three and seven years, which include:

- Maximum LTV, CLTV, or HCLTV ratios of the lesser of 90% or the maximum LTV, CLTV, or HCLTV ratios for the transaction per the *Eligibility Matrix*.

- The purchase of a principal residence is permitted.

- Limited cash-out refinances are permitted for all occupancy types pursuant to the eligibility requirements in effect at that time.

  **Note:** The purchase of second homes or investment properties and cash-out refinances (any occupancy type) are not permitted until a seven-year waiting period has elapsed.

**Deed-in-Lieu of Foreclosure and Preforeclosure Sale**

These transaction types are completed as alternatives to foreclosure. A deed-in-lieu of foreclosure is a transaction in which the deed to the real property is transferred back to the servicer. A preforeclosure sale or short sale is the sale of a property in lieu of a foreclosure resulting in a payoff of less than the total amount owed, which was pre-approved by the servicer.

The following waiting period requirements apply.

| Waiting Period | Additional Requirements |
| --- | --- |
| Two years | 80% maximum LTV ratios[a] |
| Four years | 90% maximum LTV ratios[a] |
| Seven years | LTV ratios per the *Eligibility Matrix* |

[a]References to LTV ratios include LTV, CLTV, and HCLTV ratios. The maximum LTV ratios permitted are the lesser of the LTV ratios in this table or the maximum LTV ratios for the transaction per the *Eligibility Matrix*.

Part B, Origination Through Closing                                    October 22, 2013
Subpart 3, Underwriting Borrowers
Chapter 5, Credit Assessment, Traditional Credit History

*Exceptions for Extenuating Circumstances*

A two-year waiting period is permitted if extenuating circumstances can be documented, with maximum LTV, CLTV, or HCLTV ratios of the lesser of 90% or the maximum LTV, CLTV, or HCLTV ratios for the transaction per the *Eligibility Matrix*.

> **Note:** Deeds-in-lieu and preforeclosure sales may not be accurately or consistently reported in the same manner by all creditors or credit reporting agencies. See Identification of Significant Derogatory Credit Events in the Credit Report above for additional information.

**Summary — All Waiting Period Requirements**

The following table summarizes the waiting period requirements for all significant derogatory credit events.

| Derogatory Event | Waiting Period Requirements | Waiting Period with Extenuating Circumstances |
|---|---|---|
| Bankruptcy — Chapter 7 or 11 | 4 years | 2 years |
| Bankruptcy — Chapter 13 | • 2 years from discharge date<br>• 4 years from dismissal date | • 2 years from discharge date<br>• 2 years from dismissal date |
| Multiple Bankruptcy Filings | 5 years if more than one filing within the past 7 years | 3 years from the most recent discharge or dismissal date |
| Foreclosure | 7 years | 3 years<br><br>Additional requirements after 3 years up to 7 years:<br><br>• 90% maximum LTV ratios[a]<br><br>• Purchase, principal residence<br><br>• Limited cash-out refinance, all occupancy types |
| Deed-in-Lieu of Foreclosure or Preforeclosure Sale | • 2 years — 80% maximum LTV ratios[a] | 2 years — 90% maximum LTV ratios[a] |

Part B, Origination Through Closing
Subpart 3, Underwriting Borrowers
Chapter 5, Credit Assessment, Traditional Credit History

October 22, 2013

| | |
|---|---|
| | • 4 years — 90% maximum LTV ratios[a]<br><br>• 7 years — LTV ratios per the *Eligibility Matrix* |

[a]References to LTV ratios include LTV, CLTV, and HCLTV ratios. The maximum LTV ratios permitted are the lesser of the LTV ratios in this table or the maximum LTV ratios for the transaction per the *Eligibility Matrix*.

## Requirements for Re-establishing Credit

After a bankruptcy, foreclosure, deed-in-lieu of foreclosure, or preforeclosure sale, the borrower's credit will be considered re-established if all of the following are met:

• The waiting period and the related additional requirements are met.

• The loan receives a recommendation from DU that is acceptable for delivery to Fannie Mae or, if manually underwritten, meets the minimum credit score requirements based on the parameters of the loan and the established eligibility requirements.

• The borrower has traditional credit as outlined in Section B3-5.3, Traditional Credit History. Nontraditional credit or "thin files" are not acceptable.

## Related Announcements

The table below provides references to the Announcements that have been issued that are related to this topic.

| Announcements | Issue Date |
|---|---|
| Announcement SEL-2013–04 | May 28, 2013 |
| Announcement SEL-2012–04 | May 15, 2012 |
| Announcement SEL-2011–13 | December 20, 2011 |
| Announcement SEL-2011–12 | November 15, 2011 |
| Announcement SEL-2011–04 | May 24.2011 |
| Announcement SEL-2010–09 | June 30, 2010 |
| Announcement SEL-2010–08 | June 23, 2010 |
| Announcement SEL–2010–06 | April 30, 2010 |
| Announcement SEL–2010–05 | April 14, 2010 |

Part B, Origination Through Closing
Subpart 3, Underwriting Borrowers
Chapter 5, Credit Assessment, Traditional Credit History

October 22, 2013

# B3-5.3-08, Extenuating Circumstances for Derogatory Credit (04/01/2009)

## Introduction

This topic provides information on extenuating circumstances for derogatory credit information.

## Extenuating Circumstances

Extenuating circumstances are nonrecurring events that are beyond the borrower's control that result in a sudden, significant, and prolonged reduction in income or a catastrophic increase in financial obligations.

If a borrower claims that derogatory information is the result of extenuating circumstances, the lender must substantiate the borrower's claim. Examples of documentation that can be used to support extenuating circumstances include documents that confirm the event (such as a copy of a divorce decree, medical reports or bills, notice of job layoff, job severance papers, etc.) and documents that illustrate factors that contributed to the borrower's inability to resolve the problems that resulted from the event (such as a copy of insurance papers or claim settlements, property listing agreements, lease agreements, tax returns (covering the periods prior to, during, and after a loss of employment), etc.).

The lender must obtain a letter from the borrower explaining the relevance of the documentation. The letter must support the claims of extenuating circumstances, confirm the nature of the event that led to the bankruptcy or foreclosure-related action, and illustrate the borrower had no reasonable options other than to default on their financial obligations.

#  B3-5.3-09, DU Credit Report Analysis (09/24/2013)

## Introduction

This topic describes how DU analyzes credit report data and requirements lenders must follow in response to the credit-related Findings messages. This topic includes:

- Inquiries
- Omitted Accounts
- Possible Non-applicant Debts
- Authorized User Tradelines
- Disputed Credit Report Tradelines
- DU Debt Comparison
- Contradictory, Derogatory, or Erroneous Information
- Duplicate Public Records
- Judgments, Garnishments, and Liens
- Mortgage Delinquencies
- Past-Due, Collections, and Charge-Off Accounts
- Prior Bankruptcy, Foreclosure, Deed-in-Lieu of Foreclosure, and Preforeclosure Sales
- Bankruptcy
- Foreclosure
- Deed-in-Lieu of Foreclosure
- Preforeclosure Sales or Short Sales

## Inquiries

The lender should examine inquiries to determine whether they represent potential sources of undisclosed credit. If new debt was obtained, the lender may need to correct the loan application and resubmit it.

Part B, Origination Through Closing
Subpart 3, Underwriting Borrowers
Chapter 5, Credit Assessment, Traditional Credit History

October 22, 2013

**Omitted Accounts**

Supporting documentation is required when a credit report liability with a balance greater than zero is omitted from the loan application.

**Possible Non-applicant Debts**

The DU Underwriting Findings report will list any debts that are identified as "possible non-applicant debts" on the credit report. The possible non-applicant accounts will be included in the credit risk assessment and, if the debts are on the loan application, DU will include them in the DTI ratio. If the debts do not belong to the borrower, the lender may provide supporting documentation, remove the debts from the loan application, and resubmit the loan casefile to DU in order for the DTI ratio to be updated to exclude the non-applicant debts. See B3-2-09, Accuracy of DU Data, DU Tolerances, and Errors in the Credit Report, for additional information about non-applicant debts.

**Authorized User Tradelines**

DU takes credit report tradelines designated as authorized user tradelines into consideration as part of the DU credit risk assessment. However the lender must review credit report tradelines in which the applicant has been designated as an authorized user in order to ensure the tradelines are an accurate reflection of the borrower's credit history. If the lender believes the authorized user tradelines are not an accurate reflection of the borrower's credit history, the lender should evaluate the borrower's credit history without the benefit of these tradelines and use prudent underwriting judgment when making its final underwriting decision. In order to assist the lender in its review of authorized user tradelines, DU issues a message providing the name of the creditor and account number for each authorized user tradeline identified.

When ensuring tradelines are an accurate reflection of the borrower's credit history, as a general guide, if the borrower has several authorized user accounts but only has a few accounts of his/her own, the lender should establish:

- the relationship of the borrower to the owner of the account,

- if the borrower uses the account, and

- if the borrower makes the payments on the account.

If the authorized user tradeline belongs to another borrower on the mortgage loan, no additional investigation is needed. On the other hand, if the borrower has several tradelines in good standing and only a minor number of authorized user accounts, the lender could make the determination that:

October 22, 2013

- the authorized user accounts had minimal, if any, impact on the borrower's overall credit profile; and

- the information reported on the credit report is an accurate reflection of the borrower's credit history.

The lender is not required to review an authorized user tradelines that belongs to the borrower's spouse when the spouse is not on the mortgage transaction.

For manual underwriting consideration of authorized users of credit, see B3-5.3-06, Authorized Users of Credit.

## Disputed Credit Report Tradelines

When DU issues a message stating that DU identified a disputed tradeline and that tradeline was not included in the credit risk assessment, the lender must confirm the accuracy of disputed tradelines reported on the borrower's credit report. If it is determined that the disputed tradeline information is accurate, lenders must ensure the disputed tradelines are considered in the credit risk assessment by either obtaining a new credit report with the tradeline no longer reported as disputed and resubmitting the loan casefile to DU, or manually underwriting the loan.

If DU does not issue the disputed tradeline message, the lender is not required to

- further investigate the disputed tradeline on the credit report,

- obtain an updated credit report (with the undisputed tradeline), or

- manually underwrite the loan.

However, the lender is required to ensure that the payment for the tradeline, if any, is included in the total expense ratio if the account does belong to the borrower.

## DU Debt Comparison

DU compares the balances and payments of the debts on the credit report with the debts on the loan application. If material differences are found, the lender must confirm that all debts from the credit report are included on the loan application and provide documentation to support the use of payments and balances lower than those on the credit report. If the debt affects the total expense ratio by more than the allowable tolerances, the lender must add the debt to the loan application and resubmit the loan. Otherwise, the lender is expected to provide documentation that supports the omission from the loan application. See B3-6-02, Debt-to-Income Ratios, and B3-2-09, Accuracy of DU Data, DU Tolerances, and Errors in the Credit Report, for additional information.)

**Contradictory, Derogatory, or Erroneous Information**

Lenders are obligated to take action when contradictory, derogatory, or erroneous information would justify additional investigation or would provide grounds for a decision that is different from the recommendation DU delivers. For example, if the credit report reflects a previous foreclosure but the information was not accurately mapped to DU, the lender must consider this when making its final underwriting decision.

**Duplicate Public Records**

Items that typically appear in the Public Records section of the credit report (judgments, bankruptcies, foreclosures, and tax liens) are often duplicated because the credit agencies may not attempt to merge items of this severe nature. As a result, these items may also appear in more than one verification message in the Underwriting Findings report. If it is clear from the credit report data that the items are duplicates (identical account numbers, date filed, and dollar amounts), the lender can disregard the duplicates and document the item once. However, if it is unclear from the credit report whether any of the items are duplicated, the lender should treat each item individually and obtain the required documentation for each item, as indicated in the verification messages.

**Judgments, Garnishments, and Liens**

Open judgments, garnishments, and all outstanding liens that are in the Public Records section of the credit report will be identified in the Underwriting Findings report, and must be paid off at or prior to closing.

Documentation of the satisfaction of these liabilities, along with verification of funds sufficient to satisfy these obligations, must also be maintained in the permanent loan file.

> **Note:** Fannie Mae guidelines regarding the payoff of tax liens and the supporting documentation apply to loan casefiles underwritten through DU as well as manually underwritten loans.

**Mortgage Delinquencies**

DU applies the following guidelines to the processing of loans with mortgage delinquencies:

- If any borrower's credit report contains a mortgage tradeline that is 60 or more days past due when the account was last reported by the creditor and the account was reported within the 12 months prior to the credit report date, the loan casefile will receive a Refer with Caution recommendation and will be ineligible for delivery to Fannie Mae.

- If an account is reported on the credit report as a non-mortgage tradeline, and yet the account is listed on the loan application as a mortgage, DU will analyze the credit history of the tradeline as a mortgage.

  For example, if the credit report identifies an account as a revolving account, and the account is listed as a HELOC on the loan application, DU will evaluate the credit history of the account as a mortgage. Any late payments in the credit report will be treated by DU as delinquent mortgage payments.

- If there is a mortgage that is disclosed on the loan application but not reported on the credit report, DU will issue a message requiring the lender to confirm that the account is not two or more payments past due as of the date of the application and that it has not been past due by two or more payments in the last 12 months. If the lender determines that the borrower does have a mortgage that is past due by two or more payments or has been past due by two or more payments in the last 12 months, then the loan casefile is not eligible for delivery to Fannie Mae.

- Borrowers may not bring past-due mortgage accounts current prior to closing in order to circumvent Fannie Mae's policy regarding past-due mortgages. However, the lender may apply some discretion with regard to the application of this policy if it determines and documents that the past-due account status was not the fault of the borrower—for example, if the servicer misapplied or lost the borrower's payment.

- Loan casefiles will receive an Ineligible recommendation due to excessive prior mortgage delinquency if the borrower has a mortgage tradeline on his or her credit report that has one or more 60-, 90-, 120-, or 150-day delinquency reported within the 12 months prior to the credit report date.

The above policies will apply to all mortgage tradelines, including first liens, second liens, home improvement loans, HELOCs, and mobile home loans.

---

**Past-Due, Collections, and Charge-Off Accounts**

Accounts that are reported as past due (not reported as collection accounts) must be brought current.

- For one-unit, principal residence properties, borrowers are not required to pay off outstanding collections or charge-offs—regardless of the amount.

  **Note:** If the lender marks the collection account Paid By Close in the online loan application, DU will issue a message in the Findings report stating that the collection must be paid.

Part B, Origination Through Closing
Subpart 3, Underwriting Borrowers
Chapter 5, Credit Assessment, Traditional Credit History

October 22, 2013

- For two- to four-unit owner-occupied and second home properties, collections and charge-offs totaling more than $5,000 must be paid in full prior to or at closing.

- For investment properties, individual accounts equal to or greater than $250 and accounts that total more than $1,000 must be paid in full prior to or at closing.

**Prior Bankruptcy, Foreclosure, Deed-in-Lieu of Foreclosure, and Preforeclosure Sales**

When the credit report is used to identify a significant derogatory event, DU uses the credit report date to measure whether or not the applicable waiting period has been met after a significant derogatory event. If DU determines that the waiting period has not been met based on the credit report used on the initial submission to DU, the lender may obtain an updated credit report and resubmit the loan casefile to DU after the required time has elapsed. When Fannie Mae data is used to identify a significant derogatory event, DU measures whether or not the applicable waiting period has been met after a significant derogatory event using the submission date. See B3-5.3-07, Significant Derogatory Credit Events — Waiting Periods and Re-establishing Credit, for additional information about identification of these types of accounts.

**Bankruptcy**

DU uses the credit report data to identify bankruptcy information. DU applies the following guidelines to prior bankruptcies:

- If a Chapter 13 bankruptcy was discharged within the last two years, dismissed within the last four years, or filed but neither discharged nor dismissed within the last four years, the loan casefile will receive a Refer with Caution recommendation and will be ineligible for delivery to Fannie Mae.

- If a non-Chapter 13 bankruptcy was filed, discharged, or dismissed within the last four years, the loan casefile will receive a Refer with Caution recommendation and will be ineligible for delivery to Fannie Mae.

- DU will not take bankruptcy information in the public record section of the credit report into account if the bankruptcy is dated more than seven years prior to the credit report date.

- DU will not take tradeline accounts that are reported with a bankruptcy status code or manner of payment (MOP) code of "7" into account if there is at least one bankruptcy reported in a public record within seven years of the credit report date. In this scenario, DU assumes the date filed and the date discharged in the public record are more accurate than the dates in the tradeline; i.e., specific filed and discharged dates do not exist in the tradeline.

Part B, Origination Through Closing
Subpart 3, Underwriting Borrowers
Chapter 5, Credit Assessment, Traditional Credit History

October 22, 2013

- DU will use tradeline accounts that are reported with a bankruptcy status code or MOP code of "7" if there is not a bankruptcy reported in a public record within seven years of the credit report date. In this scenario, the lender will need to verify the actual filed and discharged dates to determine that the bankruptcy meets the DU bankruptcy policy.

- DU is not able to determine if multiple filings have occurred due to the manner in which bankruptcies are reported to the credit report. DU will issue a message when it appears that there may have been multiple bankruptcy filings. This message will list each of the bankruptcies seen on the credit report, and will instruct lenders to ensure the loan casefile meets the criteria for underwriting loan casefiles with multiple bankruptcies.

---

**Foreclosure**

DU applies the following guidelines to prior foreclosures:

*Using Credit Report Data*

- Mortgage accounts, including first liens, second liens, home improvement loans, HELOCs, and mobile home loans, will be identified as a foreclosure if there is an MOP code of "8," a maximum delinquency MOP of "8," an MOP in the MOP history grid of "8," or a Remarks Code that indicates a foreclosure is present in the credit report data and associated to the tradeline.

- Mortgage accounts, including first liens, second liens, home improvement loans, HELOCs, and mobile home loans, will also be identified as a foreclosure if there is a current MOP code of "9" (collection or charge-off) and there are no deed-in-lieu of foreclosure (DIL) or preforeclosure sale (PFS) Remarks Codes associated to the tradeline.

- If a foreclosure was reported within the seven-year period prior to the credit report date, the loan casefile will receive a Refer with Caution recommendation and will be ineligible for delivery to Fannie Mae.

- If the filed date and the satisfied date of the foreclosure are both unknown, but it appears that the foreclosure occurred within the seven-year period prior to the credit report date, the lender must confirm that the foreclosure did not occur within the most recent seven-year period.

- Foreclosure laws vary by state and the time it takes to complete the process may vary by state. DU assumes that the date the foreclosure was reported in the tradeline is the date of the foreclosure sale or liquidation. The lender must confirm that all foreclosures are satisfied.

*Underwriting when Conflicting or Inaccurate Foreclosure Information on a DIL or PFS Tradeline*

Part B, Origination Through Closing
Subpart 3, Underwriting Borrowers
Chapter 5, Credit Assessment, Traditional Credit History

October 22, 2013

- When DU identifies a foreclosure on a credit report tradeline that appears to be one that was subject to a DIL or PFS, the lender may instruct DU to disregard the foreclosure information on the credit report by entering "Confirmed CR DIL" or "Confirmed CR PFS" in the Explanation field for question c. in the Declarations section of the online loan application and resubmitting the loan casefile to DU. When DU sees this indication, the foreclosure information on the credit report tradeline that also has a DIL or PFS Remarks Code will not be used.

- If the lender enters "Confirmed CR DIL" or "Confirmed CR PFS," it must then document that the account was subject to a DIL or PFS, that the event was completed two or more years from the credit report date, and the loan casefile complies with all other requirements specific to a DIL or PFS, as stated in B3-5.3-07, Significant Derogatory Credit Events — Waiting Periods and Re-establishing Credit.

*Using Fannie Mae Data*

- DU uses information Fannie Mae has on loans that have been liquidated due to a foreclosure. If the Fannie Mae data shows a foreclosure occurred in the seven years prior to the submission date, the loan casefile will receive a Refer with Caution recommendation.

- When the Fannie Mae data includes information associated with a foreclosure that the lender confirms is inaccurate, the lender may instruct DU to disregard the information by entering "Confirmed FM FC Incorrect" in the Explanation field for question c. in the Declarations section of the online loan application and resubmitting the loan casefile to DU. When DU sees this indication, the information associated with the event will not be used. The lender must then document why the Fannie Mae data should be disregarded.

**Deed-in-Lieu of Foreclosure**

DU applies the following guidelines to prior DILs:

*Using Credit Report Data*

- DU will determine if a mortgage tradeline is a DIL by using specific Remarks Codes that are present in the credit report data and associated to the tradeline.

- When DU identifies a DIL, the lender must confirm the accuracy of the information. The lender must also document that the event was completed two or more years from the credit report date and the loan casefile must comply with all other requirements specific to a DIL, as stated in B3-5.3-07, Significant Derogatory Credit Events — Waiting Periods and Re-establishing Credit.

*Using Fannie Mae Data*

October 22, 2013

- DU uses information Fannie Mae has on loans that have been liquidated due to a DIL. If the Fannie Mae data shows a DIL occurred in the two years prior to the submission date, the loan casefile will receive a Refer with Caution recommendation.

- When the Fannie Mae data includes information associated with the DIL that the lender confirms is inaccurate, the lender may instruct DU to disregard the information by entering "Confirmed FM DIL Incorrect" in the Explanation field for question c. in the Declarations section of the online loan application and resubmitting the loan casefile to DU. When DU sees this indication, the information associated with the event will not be used. The lender must then document why the Fannie Mae data should be disregarded.

### Preforeclosure Sales or Short Sales

*Using Credit Report Data*

- DU will determine if a mortgage tradeline is a PFS by using specific Remarks Codes that are present in the credit report data and associated to the tradeline.

- When DU identifies a PFS, the lender must confirm the accuracy of the information. The lender must also document that the event was completed two or more years from the credit report date and the loan casefile must comply with all other requirements specific to a PFS, as stated in B3-5.3-07, Significant Derogatory Credit Events — Waiting Periods and Re-establishing Credit.

*Using Fannie Mae Data*

- DU uses information Fannie Mae has on loans that have been liquidated due to a PFS. If the Fannie Mae data shows a PFS occurred in the two years prior to the submission date, the loan casefile will receive a Refer with Caution recommendation.

- When the Fannie Mae data includes information associated with the PFS that the lender confirms is inaccurate, the lender may instruct DU to disregard the information by entering "Confirmed FM PFS Incorrect" in the Explanation field for question c. in the Declarations section of the online loan application and resubmitting the loan casefile to DU. When DU sees this indication, the information associated with the event will not be used. The lender must then document why the Fannie Mae data should be disregarded.

> **Note:** Topic B3-5.3-07, Significant Derogatory Credit Events – Waiting Periods and Re-establishing Credit, also contains additional requirements pertaining to underwriting borrowers with extenuating circumstances. DU is not able to identify whether the borrower's derogatory credit history was the result of extenuating circumstances. Loan

October 22, 2013

casefiles that receive a Refer with Caution recommendation due to a bankruptcy or foreclosure action that was caused by extenuating circumstances may be manually underwritten if the lender has the appropriate documentation that these events occurred, the applicable minimum time period has elapsed, and the loan meets all requirements of this *Selling Guide* that pertain to manually underwritten loans.

**Related Announcements**

The table below provides references to the Announcements and Release Notes that have been issued that are related to this topic.

| Announcements and Release Notes | Issue Date |
|---|---|
| Announcement SEL-2013–07 | September 24, 2013 |
| Announcement SEL-2013–04 | May 28, 2013 |
| Announcement SEL-2012-13 | November 13, 2012 |
| Announcement SEL-2012–07 | August 21, 2012 |
| DU Version 9.0 | July 24, 2012 |
| Announcement SEL-2012–04 | May 15, 2012 |
| Announcement SEL-2011–11 | October 25, 2011 |
| Announcement SEL-2011–04 | May 24, 2011 |
| Announcement SEL-2011–01 | January 27, 2011 |
| Announcement SEL-2010–13 | September 20, 2010 |
| DU Version 8.2 | September 20, 2010 |
| Announcement SEL-2010–11 | August 13, 2010 |
| Announcement SEL-2010–08 | June 23, 2010 |
| Announcement SEL-2010–06 | April 30, 2010 |
| Announcement SEL-2010–05 | April 14, 2010 |
| Announcement SEL-2010–02 | March 2, 2010 |
| Announcement 09-32 | October 30, 2009 |
| DU Version 8.0 | September 22, 2009 |
| DU Version 7.1 | October 31, 2008 |

# EXHIBIT 49



# Selling Guide

Fannie Mae Single Family



November 10, 2014

# Selling Guide: Fannie Mae Single Family

Published November 10, 2014

Part B, Origination Through Closing
Subpart 3, Underwriting Borrowers
Chapter 5, Credit Assessment, Traditional Credit History

November 10, 2014

- the borrower can provide written documentation (e.g., canceled checks, payment receipts, etc.) that he or she has been the actual and sole payer of the monthly payment on the account for at least 12 months preceding the date of the application.

If written documentation of the borrower's monthly payments on the authorized user tradeline is provided, then the payment history — particularly any late payments that are indicated — must be considered in the credit analysis and the monthly payment obligation must be included in the debt-to-income ratio.

An authorized user tradeline must be considered if the owner of the tradeline is the borrower's spouse and the spouse is not a borrower in the mortgage transaction.

These requirements do not apply to loan casefiles underwritten through DU. For DU requirements, see B3-5.3-09, DU Credit Report Analysis.

**Related Announcements**

The table below provides references to the Announcements that have been issued that are related to this topic.

| Announcements | Issue Date |
|---|---|
| Announcement 09–32 | October 30, 2009 |
| Announcement 08–01 | January 31, 2008 |

Part B, Origination Through Closing
Subpart 3, Underwriting Borrowers
Chapter 5, Credit Assessment, Traditional Credit History

November 10, 2014

## B3-5.3-07, Significant Derogatory Credit Events — Waiting Periods and Re-establishing Credit (07/29/2014)

### Introduction

This topic contains information on the waiting periods for significant derogatory credit events, including:

- General Information

- Identification of Significant Derogatory Credit Events in the Credit Report

- Bankruptcy (Chapter 7 or Chapter 11)

- Bankruptcy (Chapter 13)

- Multiple Bankruptcy Filings

- Foreclosure

- Foreclosure and Bankruptcy on the Same Mortgage

- Deed-in-Lieu of Foreclosure, Preforeclosure Sale, and Charge-Off of a Mortgage Account

- Summary — All Waiting Period Requirements

- Requirements for Re-establishing Credit

### General Information

The presence of significant derogatory credit events dramatically increases the likelihood of a future default and represents a significantly higher level of default risk. Examples of significant derogatory credit events include bankruptcies, foreclosures, deeds-in-lieu of foreclosure, preforeclosure sales, short sales, and charge-offs of mortgage accounts.

> Note: The terms "preforeclosure sale" and "short sale" are used interchangeably in this Guide and have the same meaning (see Deed-in-Lieu of Foreclosure, Preforeclosure Sale, and Charge-Off of a Mortgage Account below).

The lender must determine the cause and significance of the derogatory information, verify that sufficient time has elapsed since the date of the last derogatory information, and confirm that

Part B, Origination Through Closing
Subpart 3, Underwriting Borrowers
Chapter 5, Credit Assessment, Traditional Credit History

November 10, 2014

the borrower has re-established an acceptable credit history. The lender must make the final decision about the acceptability of a borrower's credit history when significant derogatory credit information exists.

This topic describes the amount of time that must elapse (the "waiting period") after a significant derogatory credit event before the borrower is eligible for a new loan salable to Fannie Mae. The waiting period commences on the completion, discharge, or dismissal date (as applicable) of the derogatory credit event and ends on the disbursement date of the new loan for manually underwritten loans. See B3-5.3-09, DU Credit Report Analysis, for additional information pertaining to DU loan casefiles, including how the waiting period is determined. Also see B3-5.3-08, Extenuating Circumstances for Derogatory Credit, for additional information.

> **Note:** The requirements pertaining to significant derogatory credit are not applicable to DU Refi Plus or Refi Plus mortgage loans. (See B5-5.2-02, DU Refi Plus and Refi Plus Underwriting Considerations.)

### Identification of Significant Derogatory Credit Events in the Credit Report

Lenders must review the credit report and Section VIII, Declarations, of the loan application to identify instances of significant derogatory credit events. Lenders must review the public records section of the credit report and all tradelines, including mortgage accounts (first liens, second liens, home improvement loans, HELOCs, and manufactured home loans), to identify previous foreclosures, deeds-in-lieu, preforeclosure sales, charge-offs of mortgage accounts, and bankruptcies. Lenders must carefully review the current status of each tradeline, manner of payment codes, and remarks to identify these types of significant derogatory credit events. Remarks Codes are descriptive text or codes that appear on a tradeline, such as "Foreclosure," "Forfeit deed-in-lieu of foreclosure," and "Settled for less than full balance."

Significant derogatory credit events may not be accurately reported or consistently reported in the same manner by all creditors or credit reporting agencies. If not clearly identified in the credit report, the lender must obtain copies of appropriate documentation. The documentation must establish the completion date of a previous foreclosure, deed-in-lieu or preforeclosure sale, or date of the charge-off of a mortgage account; confirm the bankruptcy discharge or dismissal date; and identify debts that were not satisfied by the bankruptcy. Debts that were not satisfied by a bankruptcy must be paid off or have an acceptable, established repayment schedule.

### Bankruptcy (Chapter 7 or Chapter 11)

A four-year waiting period is required, measured from the discharge or dismissal date of the bankruptcy action.

Part B, Origination Through Closing
Subpart 3, Underwriting Borrowers
Chapter 5, Credit Assessment, Traditional Credit History

November 10, 2014

*Exceptions for Extenuating Circumstances*

A two-year waiting period is permitted if extenuating circumstances can be documented, and is measured from the discharge or dismissal date of the bankruptcy action.

## Bankruptcy (Chapter 13)

A distinction is made between Chapter 13 bankruptcies that were discharged and those that were dismissed. The waiting period required for Chapter 13 bankruptcy actions is measured as follows:

- two years from the discharge date, or

- four years from the dismissal date.

The shorter waiting period based on the discharge date recognizes that borrowers have already met a portion of the waiting period within the time needed for the successful completion of a Chapter 13 plan and subsequent discharge. A borrower who was unable to complete the Chapter 13 plan and received a dismissal will be held to a four-year waiting period.

*Exceptions for Extenuating Circumstances*

A two-year waiting period is permitted after a Chapter 13 dismissal, if extenuating circumstances can be documented. There are no exceptions permitted to the two-year waiting period after a Chapter 13 discharge.

## Multiple Bankruptcy Filings

For a borrower with more than one bankruptcy filing within the past seven years, a five-year waiting period is required, measured from the most recent dismissal or discharge date.

> **Note:** The presence of multiple bankruptcies in the borrower's credit history is evidence of significant derogatory credit and increases the likelihood of future default. Two or more borrowers with individual bankruptcies are not cumulative, and do not constitute multiple bankruptcies. For example, if the borrower has one bankruptcy and the co-borrower has one bankruptcy this is not considered a multiple bankruptcy.

*Exceptions for Extenuating Circumstances*

A three-year waiting period is permitted if extenuating circumstances can be documented, and is measured from the most recent bankruptcy discharge or dismissal date. The most recent bankruptcy filing must have been the result of extenuating circumstances.

Part B, Origination Through Closing
Subpart 3, Underwriting Borrowers
Chapter 5, Credit Assessment, Traditional Credit History

November 10, 2014

### Foreclosure

A seven-year waiting period is required, and is measured from the completion date of the foreclosure action as reported on the credit report or other foreclosure documents provided by the borrower.

*Exceptions for Extenuating Circumstances*

A three-year waiting period is permitted if extenuating circumstances can be documented, and is measured from the completion date of the foreclosure action. Additional requirements apply between three and seven years, which include:

- Maximum LTV, CLTV, or HCLTV ratios of the lesser of 90% or the maximum LTV, CLTV, or HCLTV ratios for the transaction per the *Eligibility Matrix*.

- The purchase of a principal residence is permitted.

- Limited cash-out refinances are permitted for all occupancy types pursuant to the eligibility requirements in effect at that time.

   **Note:** The purchase of second homes or investment properties and cash-out refinances (any occupancy type) are not permitted until a seven-year waiting period has elapsed.

### Foreclosure and Bankruptcy on the Same Mortgage

If a mortgage debt was discharged through a bankruptcy, the bankruptcy waiting periods may be applied if the lender obtains the appropriate documentation to verify that the mortgage obligation was discharged in the bankruptcy. Otherwise, the greater of the applicable bankruptcy or foreclosure waiting periods must be applied.

### Deed-in-Lieu of Foreclosure, Preforeclosure Sale, and Charge-Off of a Mortgage Account

These transaction types are completed as alternatives to foreclosure.

- A deed-in-lieu of foreclosure is a transaction in which the deed to the real property is transferred back to the servicer. These are typically identified on the credit report through Remarks Codes such as "Forfeit deed-in-lieu of foreclosure."

- A preforeclosure sale or short sale is the sale of a property in lieu of a foreclosure resulting in a payoff of less than the total amount owed, which was pre-approved by the servicer. These are

Part B, Origination Through Closing
Subpart 3, Underwriting Borrowers
Chapter 5, Credit Assessment, Traditional Credit History

November 10, 2014

typically identified on the credit report through Remarks Codes such as "Settled for less than full balance."

- A charge-off of a mortgage account occurs when a creditor has determined that there is little (or no) likelihood that the mortgage debt will be collected. A charge-off is typically reported after an account reaches a certain delinquency status, and is identified on the credit report with a manner of payment (MOP) code of "9."

A four-year waiting period is required from the completion date of the deed-in-lieu of foreclosure, preforeclosure sale, or charge-off as reported on the credit report or other documents provided by the borrower.

*Exceptions for Extenuating Circumstances*

A two-year waiting period is permitted if extenuating circumstances can be documented.

> **Note:** Deeds-in-lieu and preforeclosure sales may not be accurately or consistently reported in the same manner by all creditors or credit reporting agencies. See Identification of Significant Derogatory Credit Events in the Credit Report above for additional information.

**Summary — All Waiting Period Requirements**

The following table summarizes the waiting period requirements for all significant derogatory credit events.

| Derogatory Event | Waiting Period Requirements | Waiting Period with Extenuating Circumstances |
|---|---|---|
| Bankruptcy — Chapter 7 or 11 | 4 years | 2 years |
| Bankruptcy — Chapter 13 | • 2 years from discharge date<br>• 4 years from dismissal date | • 2 years from discharge date<br>• 2 years from dismissal date |
| Multiple Bankruptcy Filings | 5 years if more than one filing within the past 7 years | 3 years from the most recent discharge or dismissal date |
| Foreclosure[a] | 7 years | 3 years<br><br>Additional requirements after 3 years up to 7 years: |

Case 3:13-cv-01295-JLS-BLM   Document 115-7   Filed 07/21/15   Page 137 of 151

Part B, Origination Through Closing
Subpart 3, Underwriting Borrowers
Chapter 5, Credit Assessment, Traditional Credit History

November 10, 2014

| | | • 90% maximum LTV ratios[b] |
|---|---|---|
| | | • Purchase, principal residence |
| | | • Limited cash-out refinance, all occupancy types |
| Deed-in-Lieu of Foreclosure, Preforeclosure Sale, or Charge-Off of Mortgage Account | 4 years | 2 years |

[a]When both a bankruptcy and foreclosure are disclosed on the loan application, or when both appear on the credit report, the lender may apply the bankruptcy waiting period if the lender obtains the appropriate documentation to verify that the mortgage loan in question was discharged in the bankruptcy. Otherwise, the greater of the applicable bankruptcy or foreclosure waiting period must be applied.

[b]References to LTV ratios include LTV, CLTV, and HCLTV ratios. The maximum LTV ratios permitted are the lesser of the LTV ratios in this table or the maximum LTV ratios for the transaction per the *Eligibility Matrix*.

**Requirements for Re-establishing Credit**

After a bankruptcy, foreclosure, deed-in-lieu of foreclosure, preforeclosure sale, or charge-off of a mortgage account, the borrower's credit will be considered re-established if all of the following are met:

• The waiting period and the related additional requirements are met.

• The loan receives a recommendation from DU that is acceptable for delivery to Fannie Mae or, if manually underwritten, meets the minimum credit score requirements based on the parameters of the loan and the established eligibility requirements.

• The borrower has traditional credit as outlined in Section B3–5.3, Traditional Credit History. Nontraditional credit or "thin files" are not acceptable.

Part B, Origination Through Closing
Subpart 3, Underwriting Borrowers
Chapter 5, Credit Assessment, Traditional Credit History

November 10, 2014

**Related Announcements**

The table below provides references to the Announcements that have been issued that are related to this topic.

| Announcements | Issue Date |
|---|---|
| Announcement SEL–2014–10 | July 29, 2014 |
| Announcement SEL–2013–04 | May 28, 2013 |
| Announcement SEL–2012–04 | May 15, 2012 |
| Announcement SEL–2011–13 | December 20, 2011 |
| Announcement SEL–2011–12 | November 15, 2011 |
| Announcement SEL–2011–04 | May 24.2011 |
| Announcement SEL–2010–09 | June 30, 2010 |
| Announcement SEL–2010–08 | June 23, 2010 |
| Announcement SEL–2010–06 | April 30, 2010 |
| Announcement SEL–2010–05 | April 14, 2010 |

# B3-5.3-08, Extenuating Circumstances for Derogatory Credit (04/01/2009)

**Introduction**

This topic provides information on extenuating circumstances for derogatory credit information.

**Extenuating Circumstances**

Extenuating circumstances are nonrecurring events that are beyond the borrower's control that result in a sudden, significant, and prolonged reduction in income or a catastrophic increase in financial obligations.

If a borrower claims that derogatory information is the result of extenuating circumstances, the lender must substantiate the borrower's claim. Examples of documentation that can be used to

Part B, Origination Through Closing
Subpart 3, Underwriting Borrowers
Chapter 5, Credit Assessment, Traditional Credit History

November 10, 2014

support extenuating circumstances include documents that confirm the event (such as a copy of a divorce decree, medical reports or bills, notice of job layoff, job severance papers, etc.) and documents that illustrate factors that contributed to the borrower's inability to resolve the problems that resulted from the event (such as a copy of insurance papers or claim settlements, property listing agreements, lease agreements, tax returns (covering the periods prior to, during, and after a loss of employment), etc.).

The lender must obtain a letter from the borrower explaining the relevance of the documentation. The letter must support the claims of extenuating circumstances, confirm the nature of the event that led to the bankruptcy or foreclosure-related action, and illustrate the borrower had no reasonable options other than to default on their financial obligations.

Part B, Origination Through Closing
Subpart 3, Underwriting Borrowers
Chapter 5, Credit Assessment, Traditional Credit History

November 10, 2014

# B3-5.3-09, DU Credit Report Analysis (07/29/2014)

## Introduction

This topic describes how DU analyzes credit report data and requirements lenders must follow in response to the credit-related Findings messages. This topic includes:

- Inquiries

- Omitted Accounts

- Possible Non-applicant Debts

- Authorized User Tradelines

- Disputed Credit Report Tradelines

- DU Debt Comparison

- Contradictory, Derogatory, or Erroneous Information

- Duplicate Public Records

- Judgments, Garnishments, and Liens

- Mortgage Delinquencies

- Past-Due, Collection, and Charge-Off of Non-Mortgage Accounts

- Prior Bankruptcy, Foreclosure, Deed-in-Lieu of Foreclosure, Preforeclosure Sales, and Charge-Off of Mortgage Accounts

- Bankruptcy

- Foreclosure

- Deed-in-Lieu of Foreclosure

- Preforeclosure Sales or Short Sales

- Charge-Off of Mortgage Accounts

**Inquiries**

The lender should examine inquiries to determine whether they represent potential sources of undisclosed credit. If new debt was obtained, the lender may need to correct the loan application and resubmit it.

**Omitted Accounts**

Supporting documentation is required when a credit report liability with a balance greater than zero is omitted from the loan application.

**Possible Non-applicant Debts**

The DU Underwriting Findings report will list any debts that are identified as "possible non-applicant debts" on the credit report. The possible non-applicant accounts will be included in the credit risk assessment and, if the debts are on the loan application, DU will include them in the DTI ratio. If the debts do not belong to the borrower, the lender may provide supporting documentation, remove the debts from the loan application, and resubmit the loan casefile to DU in order for the DTI ratio to be updated to exclude the non-applicant debts. See B3-2-09, Accuracy of DU Data, DU Tolerances, and Errors in the Credit Report, for additional information about non-applicant debts.

**Authorized User Tradelines**

DU takes credit report tradelines designated as authorized user tradelines into consideration as part of the DU credit risk assessment. However the lender must review credit report tradelines in which the applicant has been designated as an authorized user in order to ensure the tradelines are an accurate reflection of the borrower's credit history. If the lender believes the authorized user tradelines are not an accurate reflection of the borrower's credit history, the lender should evaluate the borrower's credit history without the benefit of these tradelines and use prudent underwriting judgment when making its final underwriting decision. In order to assist the lender in its review of authorized user tradelines, DU issues a message providing the name of the creditor and account number for each authorized user tradeline identified.

When ensuring tradelines are an accurate reflection of the borrower's credit history, as a general guide, if the borrower has several authorized user accounts but only has a few accounts of his/her own, the lender should establish:

• the relationship of the borrower to the owner of the account,

• if the borrower uses the account, and

- if the borrower makes the payments on the account.

If the authorized user tradeline belongs to another borrower on the mortgage loan, no additional investigation is needed. On the other hand, if the borrower has several tradelines in good standing and only a minor number of authorized user accounts, the lender could make the determination that:

- the authorized user accounts had minimal, if any, impact on the borrower's overall credit profile; and

- the information reported on the credit report is an accurate reflection of the borrower's credit history.

The lender is not required to review an authorized user tradelines that belongs to the borrower's spouse when the spouse is not on the mortgage transaction.

For manual underwriting consideration of authorized users of credit, see B3-5.3-06, Authorized Users of Credit.

**Disputed Credit Report Tradelines**

When DU issues a message stating that DU identified a disputed tradeline and that tradeline was not included in the credit risk assessment, the lender must confirm the accuracy of disputed tradelines reported on the borrower's credit report. If it is determined that the disputed tradeline information is accurate, lenders must ensure the disputed tradelines are considered in the credit risk assessment by either obtaining a new credit report with the tradeline no longer reported as disputed and resubmitting the loan casefile to DU, or manually underwriting the loan.

If DU does not issue the disputed tradeline message, the lender is not required to

- further investigate the disputed tradeline on the credit report,

- obtain an updated credit report (with the undisputed tradeline), or

- manually underwrite the loan.

However, the lender is required to ensure that the payment for the tradeline, if any, is included in the total expense ratio if the account does belong to the borrower.

**DU Debt Comparison**

DU compares the balances and payments of the debts on the credit report with the debts on the loan application. If material differences are found, the lender must confirm that all debts from

the credit report are included on the loan application and provide documentation to support the use of payments and balances lower than those on the credit report. If the debt affects the total expense ratio by more than the allowable tolerances, the lender must add the debt to the loan application and resubmit the loan. Otherwise, the lender is expected to provide documentation that supports the omission from the loan application. See B3-6-02, Debt-to-Income Ratios, and B3-2-09, Accuracy of DU Data, DU Tolerances, and Errors in the Credit Report, for additional information.)

### Contradictory, Derogatory, or Erroneous Information

Lenders are obligated to take action when contradictory, derogatory, or erroneous information would justify additional investigation or would provide grounds for a decision that is different from the recommendation DU delivers. For example, if the credit report reflects a previous foreclosure but the information was not accurately mapped to DU, the lender must consider this when making its final underwriting decision.

### Duplicate Public Records

Items that typically appear in the Public Records section of the credit report (judgments, bankruptcies, foreclosures, and tax liens) are often duplicated because the credit agencies may not attempt to merge items of this severe nature. As a result, these items may also appear in more than one verification message in the Underwriting Findings report. If it is clear from the credit report data that the items are duplicates (identical account numbers, date filed, and dollar amounts), the lender can disregard the duplicates and document the item once. However, if it is unclear from the credit report whether any of the items are duplicated, the lender should treat each item individually and obtain the required documentation for each item, as indicated in the verification messages.

### Judgments, Garnishments, and Liens

Open judgments, garnishments, and all outstanding liens that are in the Public Records section of the credit report will be identified in the Underwriting Findings report, and must be paid off at or prior to closing. Documentation of the satisfaction of these liabilities, along with verification of funds sufficient to satisfy these obligations, must also be maintained in the permanent loan file.

> Note: Fannie Mae guidelines regarding the payoff of tax liens and the supporting documentation apply to loan casefiles underwritten through DU as well as manually underwritten loans.

Part B, Origination Through Closing
Subpart 3, Underwriting Borrowers
Chapter 5, Credit Assessment, Traditional Credit History

November 10, 2014

**Mortgage Delinquencies**

DU applies the following guidelines to the processing of loans with mortgage delinquencies:

- If any borrower's credit report contains a mortgage tradeline that is 60 or more days past due when the account was last reported by the creditor and the account was reported within the 12 months prior to the credit report date, the loan casefile will receive a Refer with Caution recommendation and will be ineligible for delivery to Fannie Mae.

- If an account is reported on the credit report as a non-mortgage tradeline, and yet the account is listed on the loan application as a mortgage, DU will analyze the credit history of the tradeline as a mortgage.

  For example, if the credit report identifies an account as a revolving account, and the account is listed as a HELOC on the loan application, DU will evaluate the credit history of the account as a mortgage. Any late payments in the credit report will be treated by DU as delinquent mortgage payments.

- If there is a mortgage that is disclosed on the loan application but not reported on the credit report, DU will issue a message requiring the lender to confirm that the account is not two or more payments past due as of the date of the application and that it has not been past due by two or more payments in the last 12 months. If the lender determines that the borrower does have a mortgage that is past due by two or more payments or has been past due by two or more payments in the last 12 months, then the loan casefile is not eligible for delivery to Fannie Mae.

- Borrowers may not bring past-due mortgage accounts current prior to closing in order to circumvent Fannie Mae's policy regarding past-due mortgages. However, the lender may apply some discretion with regard to the application of this policy if it determines and documents that the past-due account status was not the fault of the borrower—for example, if the servicer misapplied or lost the borrower's payment.

- Loan casefiles will receive an Ineligible recommendation due to excessive prior mortgage delinquency if the borrower has a mortgage tradeline on his or her credit report that has one or more 60-, 90-, 120-, or 150-day delinquency reported within the 12 months prior to the credit report date.

The above policies will apply to all mortgage tradelines, including first liens, second liens, home improvement loans, HELOCs, and mobile home loans.

**Past-Due, Collection, and Charge-Off of Non-Mortgage Accounts**

Accounts that are reported as past due (not reported as collection accounts) must be brought current.

- For one-unit, principal residence properties, borrowers are not required to pay off outstanding collections or non-mortgage charge-offs—regardless of the amount.

  **Note:** If the lender marks the collection account Paid By Close in the online loan application, DU will issue a message in the DU Underwriting Findings report stating that the collection must be paid.

- For two- to four-unit owner-occupied and second home properties, collections and non-mortgage charge-offs totaling more than $5,000 must be paid in full prior to or at closing.

- For investment properties, individual collection and non-mortgage charge-off accounts equal to or greater than $250 and accounts that total more than $1,000 must be paid in full prior to or at closing.

**Prior Bankruptcy, Foreclosure, Deed-in-Lieu of Foreclosure, Preforeclosure Sales, and Charge-Off of Mortgage Accounts**

The credit report is used to identify significant derogatory credit events. DU uses the credit report date to measure whether or not the applicable waiting period has been met after a significant derogatory event. If DU determines that the waiting period has not been met based on the credit report used on the initial submission to DU, the lender may obtain an updated credit report and resubmit the loan casefile to DU after the required time has elapsed. See B3-5.3-07, Significant Derogatory Credit Events — Waiting Periods and Re-establishing Credit, for additional information about these types of accounts.

  **Note:** DU is not able to identify whether the borrower's derogatory credit event(s) was the result of extenuating circumstances. See below for information on how to treat extenuating circumstances; see B3-5.3-07, Significant Derogatory Credit Events — Waiting Periods and Re-establishing Credit, for additional requirements; and see B3-5.3-08, Extenuating Circumstances for Derogatory Credit, for additional information.

**Bankruptcy**

DU applies the following guidelines to prior bankruptcies:

Part B, Origination Through Closing
Subpart 3, Underwriting Borrowers
Chapter 5, Credit Assessment, Traditional Credit History

November 10, 2014

- If a Chapter 13 bankruptcy was discharged within the last two years, dismissed within the last four years, or filed but neither discharged nor dismissed within the last four years, the loan casefile will receive a Refer with Caution recommendation and will be ineligible for delivery to Fannie Mae.

- If a non-Chapter 13 bankruptcy was filed, discharged, or dismissed within the last four years, the loan casefile will receive a Refer with Caution recommendation and will be ineligible for delivery to Fannie Mae.

- DU will not take bankruptcy information in the public record section of the credit report into account if the bankruptcy is dated more than seven years prior to the credit report date.

- DU will not take tradeline accounts that are reported with a bankruptcy status code or manner of payment (MOP) code of "7" into account if there is at least one bankruptcy reported in a public record within seven years of the credit report date. In this scenario, DU assumes the date filed and the date discharged in the public record are more accurate than the dates in the tradeline; i.e., specific filed and discharged dates do not exist in the tradeline.

- DU will use tradeline accounts that are reported with a bankruptcy status code or MOP code of "7" if there is not a bankruptcy reported in a public record within seven years of the credit report date. In this scenario, the lender will need to verify the actual filed and discharged dates to determine that the bankruptcy meets the DU bankruptcy policy.

- DU is not able to determine if multiple filings have occurred due to the manner in which bankruptcies are reported to the credit report. DU will issue a message when it appears that there may have been multiple bankruptcy filings. This message will list each of the bankruptcies seen on the credit report, and will instruct lenders to ensure the loan casefile meets the criteria for underwriting loan casefiles with multiple bankruptcies.

*Underwriting when Extenuating Circumstances Exist*

- Loan casefiles that receive a Refer with Caution recommendation due to a bankruptcy action that was caused by extenuating circumstances may be manually underwritten if the lender has the appropriate documentation that the event occurred, the applicable minimum time period has elapsed, and the loan meets all requirements of this *Selling Guide* that pertain to manually underwritten loans.

---

**Foreclosure**

DU applies the following guidelines to prior foreclosures:

- Mortgage accounts, including first liens, second liens, home improvement loans, HELOCs, and manufactured home loans, will be identified as a foreclosure if there is an MOP code of

Part B, Origination Through Closing
Subpart 3, Underwriting Borrowers
Chapter 5, Credit Assessment, Traditional Credit History

November 10, 2014

"8," or a Remarks Code that indicates a foreclosure is present in the credit report data and associated to the tradeline.

• If a foreclosure was reported within the seven-year period prior to the credit report date, the loan casefile will receive a Refer with Caution recommendation and will be ineligible for delivery to Fannie Mae.

• If the filed date and the satisfied date of the foreclosure are both unknown, but it appears that the foreclosure occurred within the seven-year period prior to the credit report date, the lender must confirm that the foreclosure did not occur within the most recent seven-year period.

• Foreclosure laws vary by state and the time it takes to complete the process may vary by state. DU assumes that the date the foreclosure was reported in the tradeline is the date of the foreclosure sale or liquidation. The lender must confirm that all foreclosures are satisfied.

*Underwriting when Inaccurate Foreclosure Information Exists*

• When DU identifies a foreclosure on a credit report tradeline and the foreclosure information on that tradeline is inaccurate, the lender may instruct DU to disregard the foreclosure information on the credit report in the eligibility assessment. This is done by entering "Confirmed CR FC Incorrect" in the Explanation field for question c. in the Declarations section of the online loan application and resubmitting the loan casefile to DU. When the loan casefile is resubmitted to DU, the foreclosure information on the credit report tradeline will not be used in the eligibility assessment.

• If the lender enters "Confirmed CR FC Incorrect," the lender must then document the foreclosure was completed seven or more years from the disbursement date of the new loan, or that the account was not subject to foreclosure and the loan complies with all other applicable requirements.

*Underwriting when Extenuating Circumstances Exist*

• When DU identifies a foreclosure on a credit report tradeline and that foreclosure was due to extenuating circumstances, the lender may instruct DU to disregard the foreclosure information on the credit report in the eligibility assessment. This is done by entering "Confirmed CR FC EC" in the Explanation field for question c. in the Declarations section of the online loan application and resubmitting the loan casefile to DU. When the loan casefile is resubmitted to DU, the foreclosure information on the credit report tradeline will not be used in the eligibility assessment.

• If the lender enters "Confirmed CR FC EC," the lender must then document that the foreclosure was due to extenuating circumstances, the foreclosure was completed three or

Part B, Origination Through Closing
Subpart 3, Underwriting Borrowers
Chapter 5, Credit Assessment, Traditional Credit History

November 10, 2014

more years from the disbursement date of the new loan, and the loan complies with all other requirements specific to a foreclosure due to extenuating circumstances.

*Underwriting when Conflicting or Inaccurate Foreclosure Information on a DIL or PFS Tradeline Exists*

• When DU identifies a foreclosure on a credit report tradeline that appears to be one that was subject to a DIL or PFS, the lender may instruct DU to disregard the foreclosure information on the credit report in the eligibility assessment. This is done by entering "Confirmed CR DIL" or "Confirmed CR PFS" in the Explanation field for question c. in the Declarations section of the online loan application and resubmitting the loan casefile to DU. When the loan casefile is resubmitted to DU, the foreclosure information on the credit report tradeline that also has a DIL or PFS Remarks Code will not be used in the eligibility assessment.

• If the lender enters "Confirmed CR DIL" or "Confirmed CR PFS," the lender must then document that the account was subject to a DIL or PFS and the event was completed four or more years from the disbursement date of the new loan.

**Deed-in-Lieu of Foreclosure**

DU applies the following guidelines to prior DILs:

• DU will determine if a mortgage tradeline is a DIL by using specific Remarks Codes that are present in the credit report data and associated to the tradeline.

• When DU identifies a DIL, the lender must confirm the accuracy of the information. The lender must also document that the event was completed four or more years from the disbursement date of the new loan, or two or more years from the disbursement date of the new loan when the lender confirms that the mortgage loan meets the applicable timeframes and eligibility requirements for a deed-in-lieu of foreclosure due to extenuating circumstances.

**Preforeclosure Sales or Short Sales**

• DU will determine if a mortgage tradeline is a PFS by using specific Remarks Codes that are present in the credit report data and associated to the tradeline.

• When DU identifies a PFS, the lender must confirm the accuracy of the information. The lender must also document that the event was completed four or more years from the disbursement date of the new loan, or two or more years from the disbursement date of the

Part B, Origination Through Closing
Subpart 3, Underwriting Borrowers
Chapter 5, Credit Assessment, Traditional Credit History

November 10, 2014

new loan when the lender confirms that the mortgage loan meets the applicable timeframes and eligibility requirements for a preforeclosure sale due to extenuating circumstances.

**Charge-Off of Mortgage Accounts**

- Mortgage accounts, including first liens, second liens, home improvements loans, HELOCs, and manufactured home loans, will be identified as a charge-off if there is an MOP code of "9" (collection or charge-off) and there is no information indicating the account may also be subject to a foreclosure (MOP code "8" or foreclosure Remarks Code), a bankruptcy (MOP code "7"), a deed-in-lieu of foreclosure (DIL Remarks Code), or a preforeclosure sale (PFS Remarks Code).

- When DU identifies a charge-off on a mortgage tradeline, the lender must confirm the accuracy of the information. The lender must also document that the event was completed four or more years from the disbursement date of the new loan, or two or more years from the disbursement date of the new loan when the lender confirms that the mortgage loan meets the applicable timeframes and eligibility requirements for a charge-off due to extenuating circumstances.

November 10, 2014

**Related Announcements**

The table below provides references to the Announcements and Release Notes that have been issued that are related to this topic.

| Announcements and Release Notes | Issue Date |
|---|---|
| Announcement SEL-2014–10 | July 29, 2014 |
| DU Version 9.1 | June 17, 2014 |
| Announcement SEL-2014–03 | April 15, 2014 |
| Announcement SEL-2013–07 | September 24, 2013 |
| Announcement SEL-2013–04 | May 28, 2013 |
| Announcement SEL-2012-13 | November 13, 2012 |
| Announcement SEL-2012–07 | August 21, 2012 |
| DU Version 9.0 | July 24, 2012 |
| Announcement SEL-2012–04 | May 15, 2012 |
| Announcement SEL-2011–11 | October 25, 2011 |
| Announcement SEL-2011–04 | May 24, 2011 |
| Announcement SEL-2011–01 | January 27, 2011 |
| Announcement SEL-2010–13 | September 20, 2010 |
| DU Version 8.2 | September 20, 2010 |
| Announcement SEL-2010–11 | August 13, 2010 |
| Announcement SEL-2010–08 | June 23, 2010 |
| Announcement SEL-2010–06 | April 30, 2010 |
| Announcement SEL-2010–05 | April 14, 2010 |
| Announcement SEL-2010–02 | March 2, 2010 |
| Announcement 09-32 | October 30, 2009 |
| DU Version 8.0 | September 22, 2009 |
| DU Version 7.1 | October 31, 2008 |

# EXHIBIT 50

# LODGED UNDER SEAL