# EXHIBIT 51



# Selling Guide

Fannie Mae Single Family



EXHIBIT

Danko 2

12/12/14

May 28, 2013

# Selling Guide: Fannie Mae Single Family

Published May 28, 2013

Part B, Origination Through Closing
Subpart 3, Underwriting Borrowers
Chapter 5, Credit Assessment, Traditional Credit History

May 28, 2013

## B3-5.3-07, Significant Derogatory Credit Events — Waiting Periods and Re-establishing Credit (05/28/2013)

Click to see prior version of topic

**Introduction**

This topic contains information on the waiting periods for significant derogatory credit events, including:

- General Information

- Identification of Significant Derogatory Credit Events in the Credit Report

- Bankruptcy (Chapter 7 or Chapter 11)

- Bankruptcy (Chapter 13)

- Multiple Bankruptcy Filings

- Foreclosure

- Deed-in-Lieu of Foreclosure and Preforeclosure Sale

- **Summary** — All Waiting Period Requirements

- Requirements for Re-establishing Credit

---

### General Information

The presence of significant derogatory credit events dramatically increases the likelihood of a future default and represents a significantly higher level of default risk. Examples of significant derogatory credit events include bankruptcies, foreclosures, deeds-in-lieu of foreclosure, preforeclosure sales, and short sales.

> **Note:** The terms "preforeclosure sale" and "short sale" are used interchangeably in this Guide and have the same meaning (see Deed-in-Lieu of Foreclosure and Preforeclosure Sale below).

The lender must determine the cause and significance of the derogatory information, verify that sufficient time has elapsed since the date of the last derogatory information, and confirm that the borrower has re-established an acceptable credit history. The lender must make the final decision about the acceptability of a borrower's credit history when significant derogatory credit information exists.

This topic describes the amount of time that must elapse (the "waiting period") after a significant derogatory credit event before the borrower is eligible for a new loan salable to Fannie Mae. The waiting period commences on the completion, discharge, or dismissal date (as applicable) of the derogatory credit event and ends on the disbursement date of the new loan for manually underwritten loans, or the credit report date for DU loan casefiles. See B3-5.3-09, DU Credit Report Analysis.

> **Note:** The requirements in this topic are not applicable to Refi Plus mortgage loans, but are applicable for DU Refi Plus loans (see B5-5.2-02, DU Refi Plus and Refi Plus Underwriting Considerations).

Also see B3-5.3-08, Extenuating Circumstances for Derogatory Credit, for additional information

## Identification of Significant Derogatory Credit Events in the Credit Report

Lenders must review the credit report and Section VIII, Declarations, of the loan application to identify instances of significant derogatory credit events. Lenders must review the public records section of the credit report and all tradelines, including mortgage accounts (first liens, second liens, home improvement loans, HELOCs, and mobile home loans), to identify previous foreclosures, deeds-in-lieu or preforeclosure sales, and bankruptcies. Lenders must carefully review the current status of each tradeline, manner of payment codes, and remarks (descriptive text or codes such as "Foreclosure," "Forfeit deed in lieu of foreclosure," "Settled for less than full balance") to identify these types of significant derogatory credit events.

Significant derogatory credit events may not be accurately reported or consistently reported in the same manner by all creditors or credit reporting agencies. If not clearly identified in the credit report, the lender must obtain copies of appropriate documentation. The documentation must establish the completion date of a previous foreclosure, deed-in-lieu or preforeclosure sale; confirm the bankruptcy discharge or dismissal date; and identify debts that were not satisfied by the bankruptcy. Debts that were not satisfied by a bankruptcy must be paid off or have an acceptable, established repayment schedule.

## Bankruptcy (Chapter 7 or Chapter 11)

A four-year waiting period is required, measured from the discharge or dismissal date of the bankruptcy action.

*Exceptions for Extenuating Circumstances*

Part B, Origination Through Closing
Subpart 3, Underwriting Borrowers
Chapter 5, Credit Assessment, Traditional Credit History

May 28, 2013

A two-year waiting period is permitted if extenuating circumstances can be documented, and is measured from the discharge or dismissal date of the bankruptcy action.

---

## Bankruptcy (Chapter 13)

A distinction is made between Chapter 13 bankruptcies that were discharged and those that were dismissed. The waiting period required for Chapter 13 bankruptcy actions is measured as follows:

- two years from the discharge date, or

- four years from the dismissal date.

The shorter waiting period based on the discharge date recognizes that borrowers have already met a portion of the waiting period within the time needed for the successful completion of a Chapter 13 plan and subsequent discharge.

A borrower who was unable to complete the Chapter 13 plan and received a dismissal will be held to a four-year waiting period.

*Exceptions for Extenuating Circumstances*

A two-year waiting period is permitted after a Chapter 13 dismissal, if extenuating circumstances can be documented. There are no exceptions permitted to the two-year waiting period after a Chapter 13 discharge.

---

## Multiple Bankruptcy Filings

For a borrower with more than one bankruptcy filing within the past seven years, a five-year waiting period is required, measured from the most recent dismissal or discharge date.

> **Note:** The presence of multiple bankruptcies in the borrower's credit history is evidence of significant derogatory credit and increases the likelihood of future default. Two or more borrowers with individual bankruptcies are not cumulative, and do not constitute multiple bankruptcies. For example, if the borrower has one bankruptcy and the co-borrower has one bankruptcy this is not considered a multiple bankruptcy.

*Exceptions for Extenuating Circumstances*

A three-year waiting period is permitted if extenuating circumstances can be documented, and is measured from the most recent bankruptcy discharge or dismissal date. The most recent bankruptcy filing must have been the result of extenuating circumstances.

Part B, Origination Through Closing
Subpart 3, Underwriting Borrowers
Chapter 5, Credit Assessment, Traditional Credit History

May 28, 2013

## Foreclosure

A seven-year waiting period is required, and is measured from the completion date of the foreclosure action as reported on the credit report or other foreclosure documents provided by the borrower.

### Exceptions for Extenuating Circumstances

A three-year waiting period is permitted if extenuating circumstances can be documented, and is measured from the completion date of the foreclosure action. Additional requirements apply between three and seven years, which include:

- Maximum LTV, CLTV, or HCLTV ratios of the lesser of 90% or the maximum LTV, CLTV, or HCLTV ratios for the transaction per the *Eligibility Matrix.*

- The purchase of a principal residence is permitted.

- Limited cash-out refinances are permitted for all occupancy types pursuant to the eligibility requirements in effect at that time.

   **Note:** The purchase of second homes or investment properties and cash-out refinances (any occupancy type) are not permitted until a seven-year waiting period has elapsed.

## Deed-in-Lieu of Foreclosure and Preforeclosure Sale

These transaction types are completed as alternatives to foreclosure. A deed-in-lieu of foreclosure is a transaction in which the deed to the real property is transferred back to the servicer. A preforeclosure sale or short sale is the sale of a property in lieu of a foreclosure resulting in a payoff of less than the total amount owed, which was pre-approved by the servicer.

The following waiting period requirements apply.

| Waiting Period | Additional Requirements |
|---|---|
| Two years | 80% maximum LTV ratios[a] |
| Four years | 90% maximum LTV ratios[a] |
| Seven years | LTV ratios per the *Eligibility Matrix* |

[a]References to LTV ratios include LTV, CLTV, and HCLTV ratios. The maximum LTV ratios permitted are the lesser of the LTV ratios in this table or the maximum LTV ratios for the transaction per the *Eligibility Matrix.*

Part B, Origination Through Closing                                      May 28, 2013
Subpart 3, Underwriting Borrowers
Chapter 5, Credit Assessment, Traditional Credit History

*Exceptions for Extenuating Circumstances*

A two-year waiting period is permitted if extenuating circumstances can be documented, with maximum LTV, CLTV, or HCLTV ratios of the lesser of 90% or the maximum LTV, CLTV, or HCLTV ratios for the transaction per the *Eligibility Matrix.*

> **Note:** Deeds-in-lieu and preforeclosure sales may not be accurately or consistently reported in the same manner by all creditors or credit reporting agencies. See Identification of Significant Derogatory Credit Events in the Credit Report above for additional information.

## Summary — All Waiting Period Requirements

The following table summarizes the waiting period requirements for all significant derogatory credit events.

| Derogatory Event | Waiting Period Requirements | Waiting Period with Extenuating Circumstances |
|---|---|---|
| Bankruptcy — Chapter 7 or 11 | 4 years | 2 years |
| Bankruptcy — Chapter 13 | • 2 years from discharge date<br>• 4 years from dismissal date | • 2 years from discharge date<br>• 2 years from dismissal date |
| Multiple Bankruptcy Filings | 5 years if more than one filing within the past 7 years | 3 years from the most recent discharge or dismissal date |
| Foreclosure | 7 years | 3 years<br><br>Additional requirements after 3 years up to 7 years:<br><br>• 90% maximum LTV ratios[a]<br>• Purchase, principal residence<br>• Limited cash-out refinance, all occupancy types |
| Deed-in-Lieu of Foreclosure or Preforeclosure Sale | • 2 years — 80% maximum LTV ratios[a] | 2 years — 90% maximum LTV ratios[a] |

May 28, 2013

| | | |
|---|---|---|
| | • 4 years — 90% maximum LTV ratios[a] <br><br> • 7 years — LTV ratios per the *Eligibility Matrix* | |

[a]References to LTV ratios include LTV, CLTV, and HCLTV ratios. The maximum LTV ratios permitted are the lesser of the LTV ratios in this table or the maximum LTV ratios for the transaction per the *Eligibility Matrix*.

## Requirements for Re-establishing Credit

After a bankruptcy, foreclosure, deed-in-lieu of foreclosure, or preforeclosure sale, the borrower's credit will be considered re-established if all of the following are met:

- The waiting period and the related additional requirements are met.

- The loan receives a recommendation from DU that is acceptable for delivery to Fannie Mae or, if manually underwritten, meets the minimum credit score requirements based on the parameters of the loan and the established eligibility requirements.

- The borrower has traditional credit as outlined in Section B3-5.3, Traditional Credit History. Nontraditional credit or "thin files" are not acceptable.

## Related Announcements

The table below provides references to the Announcements that have been issued that are related to this topic.

| Announcements | Issue Date |
|---|---|
| Announcement SEL-2013-04 | May 28, 2013 |
| Announcement SEL-2012-04 | May 15, 2012 |
| Announcement SEL-2011-13 | December 20, 2011 |
| Announcement SEL-2011-12 | November 15, 2011 |
| Announcement SEL-2011-04 | May 24.2011 |
| Announcement SEL-2010-09 | June 30, 2010 |
| Announcement SEL-2010-08 | June 23, 2010 |
| Announcement SEL-2010-06 | April 30, 2010 |
| Announcement SEL-2010-05 | April 14, 2010 |

Part B, Origination Through Closing
Subpart 3, Underwriting Borrowers
Chapter 5, Credit Assessment, Traditional Credit History

May 28, 2013

# ☑ B3-5.3-08, Extenuating Circumstances for Derogatory Credit (04/01/2009)

## Introduction

This topic provides information on extenuating circumstances for derogatory credit information.

## Extenuating Circumstances

Extenuating circumstances are nonrecurring events that are beyond the borrower's control that result in a sudden, significant, and prolonged reduction in income or a catastrophic increase in financial obligations.

If a borrower claims that derogatory information is the result of extenuating circumstances, the lender must substantiate the borrower's claim. Examples of documentation that can be used to support extenuating circumstances include documents that confirm the event (such as a copy of a divorce decree, medical reports or bills, notice of job layoff, job severance papers, etc.) and documents that illustrate factors that contributed to the borrower's inability to resolve the problems that resulted from the event (such as a copy of insurance papers or claim settlements, property listing agreements, lease agreements, tax returns (covering the periods prior to, during, and after a loss of employment), etc.).

The lender must obtain a letter from the borrower explaining the relevance of the documentation. The letter must support the claims of extenuating circumstances, confirm the nature of the event that led to the bankruptcy or foreclosure-related action, and illustrate the borrower had no reasonable options other than to default on their financial obligations.

Part B, Origination Through Closing                                   May 28, 2013
Subpart 3, Underwriting Borrowers
Chapter 5, Credit Assessment, Traditional Credit History



# B3-5.3-09, DU Credit Report Analysis (05/28/2013)

Click to see prior version of topic

## Introduction

This topic describes how DU analyzes credit report data and requirements lenders must follow in response to the credit-related Findings messages. This topic includes:

- Inquiries

- Omitted Accounts

- Possible Non-applicant Debts

- Authorized User Tradelines

- Disputed Credit Report Tradelines

- DU Debt Comparison

- Contradictory, Derogatory, or Erroneous Information

- Duplicate Public Records

- Judgments, Garnishments, and Liens

- Mortgage Delinquencies

- Past-Due, Collections, and Charge-Off Accounts

- Prior Bankruptcy, Foreclosure, Deed-in-Lieu of Foreclosure, and Preforeclosure Sales

- Preforeclosure Sales or Short Sales

## Inquiries

The lender should examine inquiries to determine whether they represent potential sources of undisclosed credit. If new debt was obtained, the lender may need to correct the loan application and resubmit it.

## Omitted Accounts

Supporting documentation is required when a credit report liability with a balance greater than zero is omitted from the loan application.

**Possible Non-applicant Debts**

The DU Underwriting Findings report will list any debts that are identified as "possible non-applicant debts" on the credit report. The possible non-applicant accounts will be included in the credit risk assessment and, if the debts are on the loan application, DU will include them in the DTI ratio. If the debts do not belong to the borrower, the lender may provide supporting documentation, remove the debts from the loan application, and resubmit the loan casefile to DU in order for the DTI ratio to be updated to exclude the non-applicant debts. See B3-2-09, Accuracy of DU Data, DU Tolerances, and Errors in the Credit Report, for additional information about non-applicant debts.

**Authorized User Tradelines**

DU takes credit report tradelines designated as authorized user tradelines into consideration as part of the DU credit risk assessment. However the lender must review credit report tradelines in which the applicant has been designated as an authorized user in order to ensure the tradelines are an accurate reflection of the borrower's credit history. If the lender believes the authorized user tradelines are not an accurate reflection of the borrower's credit history, the lender should evaluate the borrower's credit history without the benefit of these tradelines and use prudent underwriting judgment when making its final underwriting decision. In order to assist the lender in its review of authorized user tradelines, DU issues a message providing the name of the creditor and account number for each authorized user tradeline identified.

When ensuring tradelines are an accurate reflection of the borrower's credit history, as a general guide, if the borrower has several authorized user accounts but only has a few accounts of his/her own, the lender should establish:

- the relationship of the borrower to the owner of the account,

- if the borrower uses the account, and

- if the borrower makes the payments on the account.

If the authorized user tradeline belongs to another borrower on the mortgage loan, no additional investigation is needed. On the other hand, if the borrower has several tradelines in good standing and only a minor number of authorized user accounts, the lender could make the determination that:

- the authorized user accounts had minimal, if any, impact on the borrower's overall credit profile; and

Part B, Origination Through Closing
Subpart 3, Underwriting Borrowers
Chapter 5, Credit Assessment, Traditional Credit History

May 28, 2013

- the information reported on the credit report is an accurate reflection of the borrower's credit history.

The lender is not required to review an authorized user tradelines that belongs to the borrower's spouse when the spouse is not on the mortgage transaction.

For manual underwriting consideration of authorized users of credit, see B3-5.3-06, Authorized Users of Credit.

**Disputed Credit Report Tradelines**

When DU issues a message stating that DU identified a disputed tradeline and that tradeline was not included in the credit risk assessment, the lender must confirm the accuracy of disputed tradelines reported on the borrower's credit report. If it is determined that the disputed tradeline information is accurate, lenders must ensure the disputed tradelines are considered in the credit risk assessment by either obtaining a new credit report with the tradeline no longer reported as disputed and resubmitting the loan casefile to DU, or manually underwriting the loan.

If DU does not issue the disputed tradeline message, the lender is not required to

- further investigate the disputed tradeline on the credit report,

- obtain an updated credit report (with the undisputed tradeline) , or

- manually underwrite the loan.

However, the lender is required to ensure that the payment for the tradeline, if any, is included in the total expense ratio if the account does belong to the borrower.

**DU Debt Comparison**

DU compares the balances and payments of the debts on the credit report with the debts on the loan application. If material differences are found, the lender must confirm that all debts from the credit report are included on the loan application and provide documentation to support the use of payments and balances lower than those on the credit report. If the debt affects the total expense ratio by more than the allowable tolerances, the lender must add the debt to the loan application and resubmit the loan. Otherwise, the lender is expected to provide documentation that supports the omission from the loan application. See B3-6-02, Debt-to-Income Ratios, and B3-2-09, Accuracy of DU Data, DU Tolerances, and Errors in the Credit Report, for additional information.)

Part B, Origination Through Closing
Subpart 3, Underwriting Borrowers
Chapter 5, Credit Assessment, Traditional Credit History

May 28, 2013

## Contradictory, Derogatory, or Erroneous Information

Lenders are obligated to take action when contradictory, derogatory, or erroneous information would justify additional investigation or would provide grounds for a decision that is different from the recommendation DU delivers. For example, if the credit report reflects a previous foreclosure but the information was not accurately mapped to DU, the lender must consider this when making its final underwriting decision.

## Duplicate Public Records

Items that typically appear in the Public Records section of the credit report (judgments, bankruptcies, foreclosures, and tax liens) are often duplicated because the credit agencies may not attempt to merge items of this severe nature. As a result, these items may also appear in more than one verification message in the Underwriting Findings report. If it is clear from the credit report data that the items are duplicates (identical account numbers, date filed, and dollar amounts), the lender can disregard the duplicates and document the item once. However, if it is unclear from the credit report whether any of the items are duplicated, the lender should treat each item individually and obtain the required documentation for each item, as indicated in the verification messages.

## Judgments, Garnishments, and Liens

Open judgments, garnishments, and all outstanding liens that are in the Public Records section of the credit report will be identified in the Underwriting Findings report, and must be paid off at or prior to closing.

Documentation of the satisfaction of these liabilities, along with verification of funds sufficient to satisfy these obligations, must also be maintained in the permanent loan file.

> **Note:** Fannie Mae guidelines regarding the payoff of tax liens and the supporting documentation apply to loan casefiles underwritten through DU as well as manually underwritten loans.

## Mortgage Delinquencies

DU applies the following guidelines to the processing of loans with mortgage delinquencies:

- If any borrower's credit report contains a mortgage tradeline that is 60 or more days past due when the account was last reported by the creditor and the account was reported within the 12

Part B, Origination Through Closing
Subpart 3, Underwriting Borrowers
Chapter 5, Credit Assessment, Traditional Credit History

May 28, 2013

months prior to the credit report date, the loan casefile will receive a Refer with Caution or Refer with Caution/IV recommendation and will be ineligible for delivery to Fannie Mae.

- If an account is reported on the credit report as a non-mortgage tradeline, and yet the account is listed on the loan application as a mortgage, DU will analyze the credit history of the tradeline as a mortgage.

  For example, if the credit report identifies an account as a revolving account, and the account is listed as a HELOC on the loan application, DU will evaluate the credit history of the account as a mortgage. Any late payments in the credit report will be treated by DU as delinquent mortgage payments.

- If there is a mortgage that is disclosed on the loan application but not reported on the credit report, DU will issue a message requiring the lender to confirm that the account is not two or more payments past due as of the date of the application and that it has not been past due by two or more payments in the last 12 months. If the lender determines that the borrower does have a mortgage that is past due by two or more payments or has been past due by two or more payments in the last 12 months, then the loan casefile is not eligible for delivery to Fannie Mae.

- Borrowers may not bring past-due mortgage accounts current prior to closing in order to circumvent Fannie Mae's policy regarding past-due mortgages. However, the lender may apply some discretion with regard to the application of this policy if it determines and documents that the past-due account status was not the fault of the borrower—for example, if the servicer misapplied or lost the borrower's payment.

- Loan casefiles will receive an Ineligible recommendation due to excessive prior mortgage delinquency if the borrower has a mortgage tradeline on his or her credit report that has one or more 60-, 90-, 120-, or 150-day delinquency reported within the 12 months prior to the credit report date.

The above policies will apply to all mortgage tradelines, including first liens, second liens, home improvement loans, HELOCs, and mobile home loans.

---

**Past-Due, Collections, and Charge-Off Accounts**

Accounts that are reported as past due (not reported as collection accounts) must be brought current.

- For one-unit, principal residence properties, borrowers are not required to pay off outstanding collections or charge-offs—regardless of the amount.

Part B, Origination Through Closing
Subpart 3, Underwriting Borrowers
Chapter 5, Credit Assessment, Traditional Credit History

May 28, 2013

> **Note:** If the lender marks the collection account Paid By Close in the online loan application, DU will issue a message in the Findings report stating that the collection must be paid.

- For two- to four-unit owner-occupied and second home properties, collections and charge-offs totaling more than $5,000 must be paid in full prior to or at closing.

- For investment properties, individual accounts equal to or greater than $250 and accounts that total more than $1,000 must be paid in full prior to or at closing.

### Prior Bankruptcy, Foreclosure, Deed-in-Lieu of Foreclosure, and Preforeclosure Sales

DU measures whether or not the applicable waiting period has been met after a significant derogatory event using the credit report date. If DU determines that the waiting period has not been met based on the credit report used on the initial submission to DU, the lender may obtain an updated credit report and resubmit the loan casefile to DU after the required time has elapsed. See B3-5.3-07, Significant Derogatory Credit Events — Waiting Periods and Re-establishing Credit, for additional information about identification of these types of accounts.

DU applies the following guidelines to prior bankruptcies:

- If a Chapter 13 bankruptcy was discharged within the last two years, dismissed within the last four years, or filed but neither discharged nor dismissed within the last four years, the loan casefile will receive a Refer with Caution or Refer with Caution/IV recommendation and will be ineligible for delivery to Fannie Mae.

- If a non-Chapter 13 bankruptcy was filed, discharged, or dismissed within the last four years, the loan casefile will receive a Refer with Caution or Refer with Caution/IV recommendation and will be ineligible for delivery to Fannie Mae.

- DU will not take bankruptcy information in the public record section of the credit report into account if the bankruptcy is dated more than seven years prior to the credit report date.

- DU will not take tradeline accounts that are reported with a bankruptcy status code or manner of payment/MOP code of "7" into account if there is at least one bankruptcy reported in a public record within seven years of the credit report date. In this scenario, DU assumes the date filed and the date discharged in the public record are more accurate than the dates in the tradeline; i.e., specific filed and discharged dates do not exist in the tradeline.

- DU will use tradeline accounts that are reported with a bankruptcy status code or manner of payment/MOP code of "7" if there is not a bankruptcy reported in a public record within seven

May 28, 2013

years of the credit report date. In this scenario, the lender will need to verify the actual filed and discharged dates to determine that the bankruptcy meets the DU bankruptcy policy.

- DU is not able to determine if multiple filings have occurred due to the manner in which bankruptcies are reported to the credit report. DU will issue a message when it appears that there may have been multiple bankruptcy filings. This message will list each of the bankruptcies seen on the credit report, and will instruct lenders to ensure the loan casefile meets the criteria for underwriting loan casefiles with multiple bankruptcies.

DU applies the following guidelines to prior foreclosures:

- Mortgage accounts, including first liens, second liens, home improvement loans, HELOCs, and mobile home loans, will be identified as a foreclosure if there is a current status or manner of payment/MOP code of "8" (foreclosure) or "9" (collection or charge-off); or if there is a foreclosure-related Remarks Code present in the credit report data and associated to the tradeline.

- If a foreclosure was reported within the seven-year period prior to the credit report date, the loan casefile will receive a Refer with Caution or Refer with Caution/IV and will be ineligible for delivery to Fannie Mae.

- If the filed date and the satisfied date of the foreclosure are both unknown, but it appears that the foreclosure occurred within the seven-year period prior to the credit report date, the lender must confirm that the foreclosure did not occur within the most recent seven-year period.

- Foreclosure laws vary by state and the time it takes to complete the process may vary by state. DU assumes that the date the foreclosure was reported in the tradeline is the date of the foreclosure sale or liquidation. The lender must confirm that all foreclosures are satisfied.

DU applies the following guidelines to prior deeds-in-lieu of foreclosure:

- DU will determine if a mortgage tradeline is a deed-in-lieu of foreclosure by using specific Remarks Codes that are present in the credit report data and associated to the tradeline.

- If a deed-in-lieu of foreclosure was reported within the two-year period prior to the credit report date, the loan casefile will receive a Refer with Caution or Refer with Caution/IV and will be ineligible for delivery to Fannie Mae.

- If a deed-in-lieu of foreclosure was reported more than two years before the credit report date, the existence of the deed-of-lieu foreclosure is acceptable provided the loan complies with the LTV ratio requirements that apply after two years and up to seven years following the completion date, as stated in B3-5.3-07, Significant Derogatory Credit Events — Waiting Periods and Re-establishing Credit.

**Preforeclosure Sales or Short Sales**

DU is not able to identify preforeclosure or short sales in the credit report data. Lenders must manually apply the preforeclosure sale requirements to DU loan casefiles, regardless of the underwriting recommendation received from DU.

DU will issue a message on loan casefiles where the borrower's credit report indicates an account may have been released to a preforeclosure sale. The recommendation on the loan casefile will not be changed when this information appears on the credit report, though as stated above, the lender must ensure the loan complies with all other requirements specific to preforeclosure sales as specified in B3-5.3-07, Significant Derogatory Credit Events — Waiting Periods and Re-establishing Credit.

> **Note:** Topic B3-5.3-07, Significant Derogatory Credit Events — Waiting Periods and Re-establishing Credit, also contains additional requirements pertaining to underwriting borrowers with a preforeclosure sale, short sale, or extenuating circumstances. DU is not able to identify preforeclosure or short sales in the credit report data, or whether the borrower's derogatory credit history was the result of extenuating circumstances. Loan casefiles that receive a Refer with Caution or Refer with Caution/IV recommendation due to a bankruptcy or foreclosure action that was caused by extenuating circumstances may be manually underwritten if the lender has the appropriate documentation that these events occurred, the applicable minimum time period has elapsed, and the loan meets all requirements of this *Selling Guide* that pertain to manually underwritten loans.

May 28, 2013

**Related Announcements**

The table below provides references to the Announcements and Release Notes that have been issued that are related to this topic.

| Announcements and Release Notes | Issue Date |
|---|---|
| Announcement SEL-2013–04 | May 28, 2013 |
| Announcement SEL-2012-13 | November 13, 2012 |
| Announcement SEL-2012–07 | August 21, 2012 |
| DU Version 9.0 | July 24, 2012 |
| Announcement SEL-2012–04 | May 15, 2012 |
| Announcement SEL-2011–11 | October 25, 2011 |
| Announcement SEL-2011–04 | May 24, 2011 |
| Announcement SEL-2011–01 | January 27, 2011 |
| Announcement SEL-2010–13 | September 20, 2010 |
| DU Version 8.2 | September 20, 2010 |
| Announcement SEL-2010–11 | August 13, 2010 |
| Announcement SEL-2010–08 | June 23, 2010 |
| Announcement SEL-2010–06 | April 30, 2010 |
| Announcement SEL-2010–05 | April 14, 2010 |
| Announcement SEL-2010–02 | March 2, 2010 |
| Announcement 09-32 | October 30, 2009 |
| DU Version 8.0 | September 22, 2009 |
| DU Version 7.1 | October 31, 2008 |

Part B, Origination Through Closing
Subpart 3, Underwriting Borrowers
Chapter 5, Credit Assessment, Nontraditional Credit History

May 28, 2013

# Section B3-5.4, Nontraditional Credit History

## B3-5.4-01, Nontraditional Mortgage Credit Reports (08/21/2012)

### Introduction

This topic contains information on nontraditional mortgage credit reports, including:

- Overview

- Unacceptable Uses

- Requirements for Consumer Reporting Agencies

- Borrowers with Disabilities

- Non-U.S. Citizen Borrowers

### Overview

If a borrower does not have the types of credit that would appear on traditional credit reports, or if the borrower does not have a sufficient number of credit references to develop a traditional credit report, the lender may use a nontraditional mortgage credit report.

The lender should inform the borrower that a nontraditional mortgage credit report may be developed if information obtained through the standard credit report is not sufficient for the lender to make an underwriting decision. The lender must use its own judgment in determining whether the references on the standard credit report are sufficient for making underwriting decisions without ordering a nontraditional mortgage credit report. Nontraditional mortgage credit reports must be evaluated under the same standards as those used to assess traditional credit history.

> **Note:** For certain loan transactions, one or more borrower(s) are required to have traditional credit as evidenced by a credit score. See B3-5.1-01, General Requirements for Credit Scores.

# EXHIBIT 52



# Selling Guide

Fannie Mae Single Family



EXHIBIT

Danko 3

12|12|14

October 22, 2013

# Selling Guide: Fannie Mae Single Family

Published October 22, 2013

Part B, Origination Through Closing
Subpart 3, Underwriting Borrowers
Chapter 5, Credit Assessment, Traditional Credit History

October 22, 2013

## B3-5.3-07, Significant Derogatory Credit Events — Waiting Periods and Re-establishing Credit (05/28/2013)

### Introduction

This topic contains information on the waiting periods for significant derogatory credit events, including:

- General Information

- Identification of Significant Derogatory Credit Events in the Credit Report

- Bankruptcy (Chapter 7 or Chapter 11)

- Bankruptcy (Chapter 13)

- Multiple Bankruptcy Filings

- Foreclosure

- Deed-in-Lieu of Foreclosure and Preforeclosure Sale

- Summary — All Waiting Period Requirements

- Requirements for Re-establishing Credit

### General Information

The presence of significant derogatory credit events dramatically increases the likelihood of a future default and represents a significantly higher level of default risk. Examples of significant derogatory credit events include bankruptcies, foreclosures, deeds-in-lieu of foreclosure, preforeclosure sales, and short sales.

> **Note:** The terms "preforeclosure sale" and "short sale" are used interchangeably in this Guide and have the same meaning (see Deed-in-Lieu of Foreclosure and Preforeclosure Sale below).

The lender must determine the cause and significance of the derogatory information, verify that sufficient time has elapsed since the date of the last derogatory information, and confirm that the borrower has re-established an acceptable credit history. The lender must make the final decision about the acceptability of a borrower's credit history when significant derogatory credit information exists.

This topic describes the amount of time that must elapse (the "waiting period") after a significant derogatory credit event before the borrower is eligible for a new loan salable to Fannie Mae. The waiting period commences on the completion, discharge, or dismissal date (as applicable) of the derogatory credit event and ends on the disbursement date of the new loan for manually underwritten loans, or the credit report date for DU loan casefiles. See B3-5.3-09, DU Credit Report Analysis.

> **Note:** The requirements in this topic are not applicable to Refi Plus mortgage loans, but are applicable for DU Refi Plus loans (see B5-5.2-02, DU Refi Plus and Refi Plus Underwriting Considerations).

Also see B3-5.3-08, Extenuating Circumstances for Derogatory Credit, for additional information.

## Identification of Significant Derogatory Credit Events in the Credit Report

Lenders must review the credit report and Section VIII, Declarations, of the loan application to identify instances of significant derogatory credit events. Lenders must review the public records section of the credit report and all tradelines, including mortgage accounts (first liens, second liens, home improvement loans, HELOCs, and mobile home loans), to identify previous foreclosures, deeds-in-lieu or preforeclosure sales, and bankruptcies. Lenders must carefully review the current status of each tradeline, manner of payment codes, and remarks (descriptive text or codes such as "Foreclosure," "Forfeit deed in lieu of foreclosure," "Settled for less than full balance") to identify these types of significant derogatory credit events.

Significant derogatory credit events may not be accurately reported or consistently reported in the same manner by all creditors or credit reporting agencies. If not clearly identified in the credit report, the lender must obtain copies of appropriate documentation. The documentation must establish the completion date of a previous foreclosure, deed-in-lieu or preforeclosure sale; confirm the bankruptcy discharge or dismissal date; and identify debts that were not satisfied by the bankruptcy. Debts that were not satisfied by a bankruptcy must be paid off or have an acceptable, established repayment schedule.

## Bankruptcy (Chapter 7 or Chapter 11)

A four-year waiting period is required, measured from the discharge or dismissal date of the bankruptcy action.

*Exceptions for Extenuating Circumstances*

Part B, Origination Through Closing
Subpart 3, Underwriting Borrowers
Chapter 5, Credit Assessment, Traditional Credit History

October 22, 2013

A two-year waiting period is permitted if extenuating circumstances can be documented, and is measured from the discharge or dismissal date of the bankruptcy action.

---

## Bankruptcy (Chapter 13)

A distinction is made between Chapter 13 bankruptcies that were discharged and those that were dismissed. The waiting period required for Chapter 13 bankruptcy actions is measured as follows:

- two years from the discharge date, or

- four years from the dismissal date.

The shorter waiting period based on the discharge date recognizes that borrowers have already met a portion of the waiting period within the time needed for the successful completion of a Chapter 13 plan and subsequent discharge.

A borrower who was unable to complete the Chapter 13 plan and received a dismissal will be held to a four-year waiting period.

*Exceptions for Extenuating Circumstances*

A two-year waiting period is permitted after a Chapter 13 dismissal, if extenuating circumstances can be documented. There are no exceptions permitted to the two-year waiting period after a Chapter 13 discharge.

---

## Multiple Bankruptcy Filings

For a borrower with more than one bankruptcy filing within the past seven years, a five-year waiting period is required, measured from the most recent dismissal or discharge date.

> **Note:** The presence of multiple bankruptcies in the borrower's credit history is evidence of significant derogatory credit and increases the likelihood of future default. Two or more borrowers with individual bankruptcies are not cumulative, and do not constitute multiple bankruptcies. For example, if the borrower has one bankruptcy and the co-borrower has one bankruptcy this is not considered a multiple bankruptcy.

*Exceptions for Extenuating Circumstances*

A three-year waiting period is permitted if extenuating circumstances can be documented, and is measured from the most recent bankruptcy discharge or dismissal date. The most recent bankruptcy filing must have been the result of extenuating circumstances.

Part B, Origination Through Closing
Subpart 3, Underwriting Borrowers
Chapter 5, Credit Assessment, Traditional Credit History

October 22, 2013

## Foreclosure

A seven-year waiting period is required, and is measured from the completion date of the foreclosure action as reported on the credit report or other foreclosure documents provided by the borrower.

*Exceptions for Extenuating Circumstances*

A three-year waiting period is permitted if extenuating circumstances can be documented, and is measured from the completion date of the foreclosure action. Additional requirements apply between three and seven years, which include:

- Maximum LTV, CLTV, or HCLTV ratios of the lesser of 90% or the maximum LTV, CLTV, or HCLTV ratios for the transaction per the *Eligibility Matrix*.

- The purchase of a principal residence is permitted.

- Limited cash-out refinances are permitted for all occupancy types pursuant to the eligibility requirements in effect at that time.

   **Note:** The purchase of second homes or investment properties and cash-out refinances (any occupancy type) are not permitted until a seven-year waiting period has elapsed.

## Deed-in-Lieu of Foreclosure and Preforeclosure Sale

These transaction types are completed as alternatives to foreclosure. A deed-in-lieu of foreclosure is a transaction in which the deed to the real property is transferred back to the servicer. A preforeclosure sale or short sale is the sale of a property in lieu of a foreclosure resulting in a payoff of less than the total amount owed, which was pre-approved by the servicer.

The following waiting period requirements apply.

| Waiting Period | Additional Requirements |
|---|---|
| Two years | 80% maximum LTV ratios[a] |
| Four years | 90% maximum LTV ratios[a] |
| Seven years | LTV ratios per the *Eligibility Matrix* |

[a]References to LTV ratios include LTV, CLTV, and HCLTV ratios. The maximum LTV ratios permitted are the lesser of the LTV ratios in this table or the maximum LTV ratios for the transaction per the *Eligibility Matrix*.

Part B, Origination Through Closing
Subpart 3, Underwriting Borrowers
Chapter 5, Credit Assessment, Traditional Credit History

October 22, 2013

*Exceptions for Extenuating Circumstances*

A two-year waiting period is permitted if extenuating circumstances can be documented, with maximum LTV, CLTV, or HCLTV ratios of the lesser of 90% or the maximum LTV, CLTV, or HCLTV ratios for the transaction per the *Eligibility Matrix*.

> **Note:** Deeds-in-lieu and preforeclosure sales may not be accurately or consistently reported in the same manner by all creditors or credit reporting agencies. See Identification of Significant Derogatory Credit Events in the Credit Report above for additional information.

**Summary — All Waiting Period Requirements**

The following table summarizes the waiting period requirements for all significant derogatory credit events.

| Derogatory Event | Waiting Period Requirements | Waiting Period with Extenuating Circumstances |
|---|---|---|
| Bankruptcy — Chapter 7 or 11 | 4 years | 2 years |
| Bankruptcy — Chapter 13 | • 2 years from discharge date<br>• 4 years from dismissal date | • 2 years from discharge date<br>• 2 years from dismissal date |
| Multiple Bankruptcy Filings | 5 years if more than one filing within the past 7 years | 3 years from the most recent discharge or dismissal date |
| Foreclosure | 7 years | 3 years<br><br>Additional requirements after 3 years up to 7 years:<br><br>• 90% maximum LTV ratios[a]<br><br>• Purchase, principal residence<br><br>• Limited cash-out refinance, all occupancy types |
| Deed-in-Lieu of Foreclosure or Preforeclosure Sale | • 2 years — 80% maximum LTV ratios[a] | 2 years — 90% maximum LTV ratios[a] |

Part B, Origination Through Closing
Subpart 3, Underwriting Borrowers
Chapter 5, Credit Assessment, Traditional Credit History

October 22, 2013

| | • 4 years — 90% maximum LTV ratios[a] <br><br> • 7 years — LTV ratios per the *Eligibility Matrix* | |

[a]References to LTV ratios include LTV, CLTV, and HCLTV ratios. The maximum LTV ratios permitted are the lesser of the LTV ratios in this table or the maximum LTV ratios for the transaction per the *Eligibility Matrix*.

## Requirements for Re-establishing Credit

After a bankruptcy, foreclosure, deed-in-lieu of foreclosure, or preforeclosure sale, the borrower's credit will be considered re-established if all of the following are met:

• The waiting period and the related additional requirements are met.

• The loan receives a recommendation from DU that is acceptable for delivery to Fannie Mae or, if manually underwritten, meets the minimum credit score requirements based on the parameters of the loan and the established eligibility requirements.

• The borrower has traditional credit as outlined in Section B3-5.3, Traditional Credit History. Nontraditional credit or "thin files" are not acceptable.

## Related Announcements

The table below provides references to the Announcements that have been issued that are related to this topic.

| Announcements | Issue Date |
|---|---|
| Announcement SEL-2013–04 | May 28, 2013 |
| Announcement SEL-2012–04 | May 15, 2012 |
| Announcement SEL-2011–13 | December 20, 2011 |
| Announcement SEL-2011–12 | November 15, 2011 |
| Announcement SEL-2011–04 | May 24.2011 |
| Announcement SEL-2010–09 | June 30, 2010 |
| Announcement SEL-2010–08 | June 23, 2010 |
| Announcement SEL–2010–06 | April 30, 2010 |
| Announcement SEL–2010–05 | April 14, 2010 |

Part B, Origination Through Closing
Subpart 3, Underwriting Borrowers
Chapter 5, Credit Assessment, Traditional Credit History

October 22, 2013

## B3-5.3-08, Extenuating Circumstances for Derogatory Credit (04/01/2009)

**Introduction**

This topic provides information on extenuating circumstances for derogatory credit information.

**Extenuating Circumstances**

Extenuating circumstances are nonrecurring events that are beyond the borrower's control that result in a sudden, significant, and prolonged reduction in income or a catastrophic increase in financial obligations.

If a borrower claims that derogatory information is the result of extenuating circumstances, the lender must substantiate the borrower's claim. Examples of documentation that can be used to support extenuating circumstances include documents that confirm the event (such as a copy of a divorce decree, medical reports or bills, notice of job layoff, job severance papers, etc.) and documents that illustrate factors that contributed to the borrower's inability to resolve the problems that resulted from the event (such as a copy of insurance papers or claim settlements, property listing agreements, lease agreements, tax returns (covering the periods prior to, during, and after a loss of employment), etc.).

The lender must obtain a letter from the borrower explaining the relevance of the documentation. The letter must support the claims of extenuating circumstances, confirm the nature of the event that led to the bankruptcy or foreclosure-related action, and illustrate the borrower had no reasonable options other than to default on their financial obligations.

Part B, Origination Through Closing
Subpart 3, Underwriting Borrowers
Chapter 5, Credit Assessment, Traditional Credit History

October 22, 2013

#  B3-5.3-09, DU Credit Report Analysis (09/24/2013)

## Introduction

This topic describes how DU analyzes credit report data and requirements lenders must follow in response to the credit-related Findings messages. This topic includes:

- Inquiries

- Omitted Accounts

- Possible Non-applicant Debts

- Authorized User Tradelines

- Disputed Credit Report Tradelines

- DU Debt Comparison

- Contradictory, Derogatory, or Erroneous Information

- Duplicate Public Records

- Judgments, Garnishments, and Liens

- Mortgage Delinquencies

- Past-Due, Collections, and Charge-Off Accounts

- Prior Bankruptcy, Foreclosure, Deed-in-Lieu of Foreclosure, and Preforeclosure Sales

- Bankruptcy

- Foreclosure

- Deed-in-Lieu of Foreclosure

- Preforeclosure Sales or Short Sales

## Inquiries

The lender should examine inquiries to determine whether they represent potential sources of undisclosed credit. If new debt was obtained, the lender may need to correct the loan application and resubmit it.

Part B, Origination Through Closing
Subpart 3, Underwriting Borrowers
Chapter 5, Credit Assessment, Traditional Credit History

October 22, 2013

**Omitted Accounts**

Supporting documentation is required when a credit report liability with a balance greater than zero is omitted from the loan application.

**Possible Non-applicant Debts**

The DU Underwriting Findings report will list any debts that are identified as "possible non-applicant debts" on the credit report. The possible non-applicant accounts will be included in the credit risk assessment and, if the debts are on the loan application, DU will include them in the DTI ratio. If the debts do not belong to the borrower, the lender may provide supporting documentation, remove the debts from the loan application, and resubmit the loan casefile to DU in order for the DTI ratio to be updated to exclude the non-applicant debts. See B3-2-09, Accuracy of DU Data, DU Tolerances, and Errors in the Credit Report, for additional information about non-applicant debts.

**Authorized User Tradelines**

DU takes credit report tradelines designated as authorized user tradelines into consideration as part of the DU credit risk assessment. However the lender must review credit report tradelines in which the applicant has been designated as an authorized user in order to ensure the tradelines are an accurate reflection of the borrower's credit history. If the lender believes the authorized user tradelines are not an accurate reflection of the borrower's credit history, the lender should evaluate the borrower's credit history without the benefit of these tradelines and use prudent underwriting judgment when making its final underwriting decision. In order to assist the lender in its review of authorized user tradelines, DU issues a message providing the name of the creditor and account number for each authorized user tradeline identified.

When ensuring tradelines are an accurate reflection of the borrower's credit history, as a general guide, if the borrower has several authorized user accounts but only has a few accounts of his/her own, the lender should establish:

- the relationship of the borrower to the owner of the account,

- if the borrower uses the account, and

- if the borrower makes the payments on the account.

If the authorized user tradeline belongs to another borrower on the mortgage loan, no additional investigation is needed. On the other hand, if the borrower has several tradelines in good standing and only a minor number of authorized user accounts, the lender could make the determination that:

Part B, Origination Through Closing
Subpart 3, Underwriting Borrowers
Chapter 5, Credit Assessment, Traditional Credit History

October 22, 2013

- the authorized user accounts had minimal, if any, impact on the borrower's overall credit profile; and

- the information reported on the credit report is an accurate reflection of the borrower's credit history.

The lender is not required to review an authorized user tradelines that belongs to the borrower's spouse when the spouse is not on the mortgage transaction.

For manual underwriting consideration of authorized users of credit, see B3-5.3-06, Authorized Users of Credit.

**Disputed Credit Report Tradelines**

When DU issues a message stating that DU identified a disputed tradeline and that tradeline was not included in the credit risk assessment, the lender must confirm the accuracy of disputed tradelines reported on the borrower's credit report. If it is determined that the disputed tradeline information is accurate, lenders must ensure the disputed tradelines are considered in the credit risk assessment by either obtaining a new credit report with the tradeline no longer reported as disputed and resubmitting the loan casefile to DU, or manually underwriting the loan.

If DU does not issue the disputed tradeline message, the lender is not required to

- further investigate the disputed tradeline on the credit report,

- obtain an updated credit report (with the undisputed tradeline), or

- manually underwrite the loan.

However, the lender is required to ensure that the payment for the tradeline, if any, is included in the total expense ratio if the account does belong to the borrower.

**DU Debt Comparison**

DU compares the balances and payments of the debts on the credit report with the debts on the loan application. If material differences are found, the lender must confirm that all debts from the credit report are included on the loan application and provide documentation to support the use of payments and balances lower than those on the credit report. If the debt affects the total expense ratio by more than the allowable tolerances, the lender must add the debt to the loan application and resubmit the loan. Otherwise, the lender is expected to provide documentation that supports the omission from the loan application. See B3-6-02, Debt-to-Income Ratios, and B3-2-09, Accuracy of DU Data, DU Tolerances, and Errors in the Credit Report, for additional information.)

October 22, 2013

### Contradictory, Derogatory, or Erroneous Information

Lenders are obligated to take action when contradictory, derogatory, or erroneous information would justify additional investigation or would provide grounds for a decision that is different from the recommendation DU delivers. For example, if the credit report reflects a previous foreclosure but the information was not accurately mapped to DU, the lender must consider this when making its final underwriting decision.

### Duplicate Public Records

Items that typically appear in the Public Records section of the credit report (judgments, bankruptcies, foreclosures, and tax liens) are often duplicated because the credit agencies may not attempt to merge items of this severe nature. As a result, these items may also appear in more than one verification message in the Underwriting Findings report. If it is clear from the credit report data that the items are duplicates (identical account numbers, date filed, and dollar amounts), the lender can disregard the duplicates and document the item once. However, if it is unclear from the credit report whether any of the items are duplicated, the lender should treat each item individually and obtain the required documentation for each item, as indicated in the verification messages.

### Judgments, Garnishments, and Liens

Open judgments, garnishments, and all outstanding liens that are in the Public Records section of the credit report will be identified in the Underwriting Findings report, and must be paid off at or prior to closing.

Documentation of the satisfaction of these liabilities, along with verification of funds sufficient to satisfy these obligations, must also be maintained in the permanent loan file.

> **Note:** Fannie Mae guidelines regarding the payoff of tax liens and the supporting documentation apply to loan casefiles underwritten through DU as well as manually underwritten loans.

### Mortgage Delinquencies

DU applies the following guidelines to the processing of loans with mortgage delinquencies:

- If any borrower's credit report contains a mortgage tradeline that is 60 or more days past due when the account was last reported by the creditor and the account was reported within the 12 months prior to the credit report date, the loan casefile will receive a Refer with Caution recommendation and will be ineligible for delivery to Fannie Mae.

- If an account is reported on the credit report as a non-mortgage tradeline, and yet the account is listed on the loan application as a mortgage, DU will analyze the credit history of the tradeline as a mortgage.

  For example, if the credit report identifies an account as a revolving account, and the account is listed as a HELOC on the loan application, DU will evaluate the credit history of the account as a mortgage. Any late payments in the credit report will be treated by DU as delinquent mortgage payments.

- If there is a mortgage that is disclosed on the loan application but not reported on the credit report, DU will issue a message requiring the lender to confirm that the account is not two or more payments past due as of the date of the application and that it has not been past due by two or more payments in the last 12 months. If the lender determines that the borrower does have a mortgage that is past due by two or more payments or has been past due by two or more payments in the last 12 months, then the loan casefile is not eligible for delivery to Fannie Mae.

- Borrowers may not bring past-due mortgage accounts current prior to closing in order to circumvent Fannie Mae's policy regarding past-due mortgages. However, the lender may apply some discretion with regard to the application of this policy if it determines and documents that the past-due account status was not the fault of the borrower—for example, if the servicer misapplied or lost the borrower's payment.

- Loan casefiles will receive an Ineligible recommendation due to excessive prior mortgage delinquency if the borrower has a mortgage tradeline on his or her credit report that has one or more 60-, 90-, 120-, or 150-day delinquency reported within the 12 months prior to the credit report date.

The above policies will apply to all mortgage tradelines, including first liens, second liens, home improvement loans, HELOCs, and mobile home loans.

---

**Past-Due, Collections, and Charge-Off Accounts**

Accounts that are reported as past due (not reported as collection accounts) must be brought current.

- For one-unit, principal residence properties, borrowers are not required to pay off outstanding collections or charge-offs—regardless of the amount.

  **Note:** If the lender marks the collection account Paid By Close in the online loan application, DU will issue a message in the Findings report stating that the collection must be paid.

October 22, 2013

- For two- to four-unit owner-occupied and second home properties, collections and charge-offs totaling more than $5,000 must be paid in full prior to or at closing.

- For investment properties, individual accounts equal to or greater than $250 and accounts that total more than $1,000 must be paid in full prior to or at closing.

### Prior Bankruptcy, Foreclosure, Deed-in-Lieu of Foreclosure, and Preforeclosure Sales

When the credit report is used to identify a significant derogatory event, DU uses the credit report date to measure whether or not the applicable waiting period has been met after a significant derogatory event. If DU determines that the waiting period has not been met based on the credit report used on the initial submission to DU, the lender may obtain an updated credit report and resubmit the loan casefile to DU after the required time has elapsed. When Fannie Mae data is used to identify a significant derogatory event, DU measures whether or not the applicable waiting period has been met after a significant derogatory event using the submission date. See B3-5.3-07, Significant Derogatory Credit Events — Waiting Periods and Re-establishing Credit, for additional information about identification of these types of accounts.

### Bankruptcy

DU uses the credit report data to identify bankruptcy information. DU applies the following guidelines to prior bankruptcies:

- If a Chapter 13 bankruptcy was discharged within the last two years, dismissed within the last four years, or filed but neither discharged nor dismissed within the last four years, the loan casefile will receive a Refer with Caution recommendation and will be ineligible for delivery to Fannie Mae.

- If a non-Chapter 13 bankruptcy was filed, discharged, or dismissed within the last four years, the loan casefile will receive a Refer with Caution recommendation and will be ineligible for delivery to Fannie Mae.

- DU will not take bankruptcy information in the public record section of the credit report into account if the bankruptcy is dated more than seven years prior to the credit report date.

- DU will not take tradeline accounts that are reported with a bankruptcy status code or manner of payment (MOP) code of "7" into account if there is at least one bankruptcy reported in a public record within seven years of the credit report date. In this scenario, DU assumes the date filed and the date discharged in the public record are more accurate than the dates in the tradeline; i.e., specific filed and discharged dates do not exist in the tradeline.

Part B, Origination Through Closing
Subpart 3, Underwriting Borrowers
Chapter 5, Credit Assessment, Traditional Credit History

October 22, 2013

- DU will use tradeline accounts that are reported with a bankruptcy status code or MOP code of "7" if there is not a bankruptcy reported in a public record within seven years of the credit report date. In this scenario, the lender will need to verify the actual filed and discharged dates to determine that the bankruptcy meets the DU bankruptcy policy.

- DU is not able to determine if multiple filings have occurred due to the manner in which bankruptcies are reported to the credit report. DU will issue a message when it appears that there may have been multiple bankruptcy filings. This message will list each of the bankruptcies seen on the credit report, and will instruct lenders to ensure the loan casefile meets the criteria for underwriting loan casefiles with multiple bankruptcies.

## Foreclosure

DU applies the following guidelines to prior foreclosures:

### Using Credit Report Data

- Mortgage accounts, including first liens, second liens, home improvement loans, HELOCs, and mobile home loans, will be identified as a foreclosure if there is an MOP code of "8," a maximum delinquency MOP of "8," an MOP in the MOP history grid of "8," or a Remarks Code that indicates a foreclosure is present in the credit report data and associated to the tradeline.

- Mortgage accounts, including first liens, second liens, home improvement loans, HELOCs, and mobile home loans, will also be identified as a foreclosure if there is a current MOP code of "9" (collection or charge-off) and there are no deed-in-lieu of foreclosure (DIL) or preforeclosure sale (PFS) Remarks Codes associated to the tradeline.

- If a foreclosure was reported within the seven-year period prior to the credit report date, the loan casefile will receive a Refer with Caution recommendation and will be ineligible for delivery to Fannie Mae.

- If the filed date and the satisfied date of the foreclosure are both unknown, but it appears that the foreclosure occurred within the seven-year period prior to the credit report date, the lender must confirm that the foreclosure did not occur within the most recent seven-year period.

- Foreclosure laws vary by state and the time it takes to complete the process may vary by state. DU assumes that the date the foreclosure was reported in the tradeline is the date of the foreclosure sale or liquidation. The lender must confirm that all foreclosures are satisfied.

### Underwriting when Conflicting or Inaccurate Foreclosure Information on a DIL or PFS Tradeline

Part B, Origination Through Closing
Subpart 3, Underwriting Borrowers
Chapter 5, Credit Assessment, Traditional Credit History

October 22, 2013

- When DU identifies a foreclosure on a credit report tradeline that appears to be one that was subject to a DIL or PFS, the lender may instruct DU to disregard the foreclosure information on the credit report by entering "Confirmed CR DIL" or "Confirmed CR PFS" in the Explanation field for question c. in the Declarations section of the online loan application and resubmitting the loan casefile to DU. When DU sees this indication, the foreclosure information on the credit report tradeline that also has a DIL or PFS Remarks Code will not be used.

- If the lender enters "Confirmed CR DIL" or "Confirmed CR PFS," it must then document that the account was subject to a DIL or PFS, that the event was completed two or more years from the credit report date, and the loan casefile complies with all other requirements specific to a DIL or PFS, as stated in B3-5.3-07, Significant Derogatory Credit Events — Waiting Periods and Re-establishing Credit.

*Using Fannie Mae Data*

- DU uses information Fannie Mae has on loans that have been liquidated due to a foreclosure. If the Fannie Mae data shows a foreclosure occurred in the seven years prior to the submission date, the loan casefile will receive a Refer with Caution recommendation.

- When the Fannie Mae data includes information associated with a foreclosure that the lender confirms is inaccurate, the lender may instruct DU to disregard the information by entering "Confirmed FM FC Incorrect" in the Explanation field for question c. in the Declarations section of the online loan application and resubmitting the loan casefile to DU. When DU sees this indication, the information associated with the event will not be used. The lender must then document why the Fannie Mae data should be disregarded.

**Deed-in-Lieu of Foreclosure**

DU applies the following guidelines to prior DILs:

*Using Credit Report Data*

- DU will determine if a mortgage tradeline is a DIL by using specific Remarks Codes that are present in the credit report data and associated to the tradeline.

- When DU identifies a DIL, the lender must confirm the accuracy of the information. The lender must also document that the event was completed two or more years from the credit report date and the loan casefile must comply with all other requirements specific to a DIL, as stated in B3-5.3-07, Significant Derogatory Credit Events — Waiting Periods and Re-establishing Credit.

*Using Fannie Mae Data*

Part B, Origination Through Closing                         October 22, 2013
Subpart 3, Underwriting Borrowers
Chapter 5, Credit Assessment, Traditional Credit History

- DU uses information Fannie Mae has on loans that have been liquidated due to a DIL. If the Fannie Mae data shows a DIL occurred in the two years prior to the submission date, the loan casefile will receive a Refer with Caution recommendation.

- When the Fannie Mae data includes information associated with the DIL that the lender confirms is inaccurate, the lender may instruct DU to disregard the information by entering "Confirmed FM DIL Incorrect" in the Explanation field for question c. in the Declarations section of the online loan application and resubmitting the loan casefile to DU. When DU sees this indication, the information associated with the event will not be used. The lender must then document why the Fannie Mae data should be disregarded.

## Preforeclosure Sales or Short Sales

### Using Credit Report Data

- DU will determine if a mortgage tradeline is a PFS by using specific Remarks Codes that are present in the credit report data and associated to the tradeline.

- When DU identifies a PFS, the lender must confirm the accuracy of the information. The lender must also document that the event was completed two or more years from the credit report date and the loan casefile must comply with all other requirements specific to a PFS, as stated in B3-5.3-07, Significant Derogatory Credit Events — Waiting Periods and Re-establishing Credit.

### Using Fannie Mae Data

- DU uses information Fannie Mae has on loans that have been liquidated due to a PFS. If the Fannie Mae data shows a PFS occurred in the two years prior to the submission date, the loan casefile will receive a Refer with Caution recommendation.

- When the Fannie Mae data includes information associated with the PFS that the lender confirms is inaccurate, the lender may instruct DU to disregard the information by entering "Confirmed FM PFS Incorrect" in the Explanation field for question c. in the Declarations section of the online loan application and resubmitting the loan casefile to DU. When DU sees this indication, the information associated with the event will not be used. The lender must then document why the Fannie Mae data should be disregarded.

**Note:** Topic B3-5.3-07, Significant Derogatory Credit Events – Waiting Periods and Re-establishing Credit, also contains additional requirements pertaining to underwriting borrowers with extenuating circumstances. DU is not able to identify whether the borrower's derogatory credit history was the result of extenuating circumstances. Loan

Part B, Origination Through Closing
Subpart 3, Underwriting Borrowers
Chapter 5, Credit Assessment, Traditional Credit History

October 22, 2013

casefiles that receive a Refer with Caution recommendation due to a bankruptcy or foreclosure action that was caused by extenuating circumstances may be manually underwritten if the lender has the appropriate documentation that these events occurred, the applicable minimum time period has elapsed, and the loan meets all requirements of this *Selling Guide* that pertain to manually underwritten loans.

**Related Announcements**

The table below provides references to the Announcements and Release Notes that have been issued that are related to this topic.

| Announcements and Release Notes | Issue Date |
|---|---|
| Announcement SEL-2013–07 | September 24, 2013 |
| Announcement SEL-2013–04 | May 28, 2013 |
| Announcement SEL-2012-13 | November 13, 2012 |
| Announcement SEL-2012–07 | August 21, 2012 |
| DU Version 9.0 | July 24, 2012 |
| Announcement SEL-2012–04 | May 15, 2012 |
| Announcement SEL-2011–11 | October 25, 2011 |
| Announcement SEL-2011–04 | May 24, 2011 |
| Announcement SEL-2011–01 | January 27, 2011 |
| Announcement SEL-2010–13 | September 20, 2010 |
| DU Version 8.2 | September 20, 2010 |
| Announcement SEL-2010–11 | August 13, 2010 |
| Announcement SEL-2010–08 | June 23, 2010 |
| Announcement SEL-2010–06 | April 30, 2010 |
| Announcement SEL-2010–05 | April 14, 2010 |
| Announcement SEL-2010–02 | March 2, 2010 |
| Announcement 09-32 | October 30, 2009 |
| DU Version 8.0 | September 22, 2009 |
| DU Version 7.1 | October 31, 2008 |

# EXHIBIT 53

| From: | Arce, Laura <Laura.Arce@fhfa.gov> |
|-------|-----------------------------------|
| Sent: | Wednesday, May 29, 2013 9:36 AM |
| To: | Armstrong, Melinda <melinda_armstrong@fanniemae.com> |
| Cc: | ODonald, Lisa <lisa_odonald@fanniemae.com>; Danko, Cyndi <cyndi_danko@fanniemae.com> |
| Subject: | RE: converstaion with CFPB |

Here's what I got from Brian last night. Let me know if you have time to chat today so we can best frame the conversation. While FN has identified an issue, I don't want them leaving you holding the bag for all credit reporting problems. Let me know when you have time today, even for just 15 minutes.

It has been reported that borrowers that went through a pre-foreclosure/short sale in the past are being turned down for new mortgages after the appropriate waiting period has been met. We have been approached by Senator Nelson from FL to investigate and resolve this issue within 90 days so we have been diligently researching and attempting to narrow down on the reason.

I would like to accomplish the following during the call:
1. Get FNMA's perspective on this issue.
2. What credit report format does DU currently use?  (MISMO, FN, InFiles ?)
3. For Derogatory purposes, does the trade-line evaluation look back into the payment pattern, only the last place holder, only the MOP, remarks codes etc? (this would be to identify a PF sale)
4. In reference to the March 2013 Announcement, would like to understand how a credit report presents a short sale trade-line to DU and what information is missing or unclear that is precenting DU from correctly being able to differentiate between a PF and a foreclosure?
5. Is FNMA currently attempting to address this within DU?
6. In theory, if a resolution is in the works, what is the typical timeframe for an update of this scope to be implemented?

There is a reference case file that was used to start this process and this is the borrower that was the basis of the news story down in Tampa. The file referenced below was Approved for FHA and VA within DU but received an Ineligible for a conventional loan with the reason being a foreclosure in the credit history.

Case File ID:  1112613995

I am not sure if the DU team would have time to look up this file and walk through it over the phone.

If you have any questions or need more information before the call, please let me know.


Laura Arce
202-649-3131

...........................................................................................................................

**From:** Armstrong, Melinda [mailto:melinda_armstrong@fanniemae.com]
**Sent:** Tuesday, May 28, 2013 2:46 PM
**To:** Arce, Laura
**Cc:** ODonald, Lisa; Danko, Cyndi
**Subject:** RE: converstaion with CFPB

I got your voicemail letting me know that the Corey from CFPB does believe that this is a DU issue (not a credit reporting or servicer reporting issue), and that they were planning on releasing something this week regarding that.

Has Corey seen this document regarding DUs identification of these events - https://www.fanniemae.com/content/tool/du-clarification-foreclosure-preforeclosure-sale.pdf?  Will Corey be on the call on Thursday with Brian?



EXHIBIT
Danko 4
12/12/14

FM-SHAW-00003356

Mindy Armstrong
Product Management, Automated Underwriting
Single Family Mortgage Business
(614) 392-2400
melinda_armstrong@fanniemae.com

This e-mail and its attachments are confidential and solely for the intended addressee(s). Do not share or use them without Fannie Mae's approval. If received in error, delete them and contact the sender.

---

**From:** Arce, Laura [mailto:Laura.Arce@fhfa.gov]
**Sent:** Tuesday, May 28, 2013 10:08 AM
**To:** Armstrong, Melinda
**Subject:** RE: converstaion with CFPB

Also, he thought 30 minutes might not be enough, but that's how long the FR call took so let's keep it at 30 and see how it goes.  If we go over a few minutes, maybe you can stay?  We can always schedule a follow-up.

Laura Arce
202-649-3131

---

**From:** Arce, Laura
**Sent:** Tuesday, May 28, 2013 10:07 AM
**To:** 'Armstrong, Melinda'
**Subject:** RE: converstaion with CFPB

Thanks again.  I told him you can describe the current state to him but that you're still analyzing what/if any changes may be made so you won't be able to address future state.  I suggested that his cases/questions may help inform your work and that it would be helpful to see them ahead of time.

Laura Arce
202-649-3131

---

**From:** Armstrong, Melinda [mailto:melinda_armstrong@fanniemae.com]
**Sent:** Tuesday, May 28, 2013 9:33 AM
**To:** Arce, Laura
**Subject:** RE: converstaion with CFPB

Good deal.  You can let him know we are still in the analysis phase and it is premature to discuss details on the call.

Will let folks know the invite is coming.

Mindy Armstrong
Product Management, Automated Underwriting
Single Family Mortgage Business
(614) 392-2400
melinda_armstrong@fanniemae.com

**This e-mail and its attachments are confidential and solely for the intended addressee(s). Do not share or use them without Fannie Mae's approval. If received in error, delete them and contact the sender.**

---

**From:** Arce, Laura [mailto:Laura.Arce@fhfa.gov]

**Sent:** Tuesday, May 28, 2013 9:30 AM
**To:** Armstrong, Melinda
**Subject:** RE: converstaion with CFPB

Let's go for Thursday the 30th at 2p; I agree 30 minutes should be sufficient. I've asked Brian to send specific questions/cases to us ahead of time. Is there anything you want me to say to him to frame the conversation (perhaps let him know that you can't discuss what changes you may/may not do this year)? I've not said anything to him yet about your concerns.

I'll send out the invite shortly.

Laura Arce
202-649-3131

**From:** Armstrong, Melinda [mailto:melinda_armstrong@fanniemae.com]
**Sent:** Tuesday, May 28, 2013 9:27 AM
**To:** Arce, Laura
**Subject:** RE: converstaion with CFPB

Unfortunately, no.

The only time I could find this week where Lisa and Cyndi are both open is Thursday (30th) from 2 - 3. I think we should only need 30 mins. Could that time work? Or should I look into next week.

Mindy Armstrong
Product Management, Automated Underwriting
Single Family Mortgage Business
(614) 392-2400
melinda_armstrong@fanniemae.com

**This e-mail and its attachments are confidential and solely for the intended addressee(s). Do not share or use them without Fannie Mae's approval. If received in error, delete them and contact the sender.**

**From:** Arce, Laura [mailto:Laura.Arce@fhfa.gov]
**Sent:** Tuesday, May 28, 2013 9:11 AM
**To:** Armstrong, Melinda
**Subject:** RE: converstaion with CFPB

One correction:

Tuesday (28th): 12:00 - 1:30 and 4:30 - 5:00 pm
Friday (31st): 9 – 10a; 1:30 – 2p

Laura Arce
202-649-3131

**From:** Arce, Laura
**Sent:** Tuesday, May 28, 2013 9:10 AM
**To:** 'Armstrong, Melinda'

**Subject:** RE: converstaion with CFPB

Do any of these times work for you and team?

Tuesday (28th): 12:00 - 1:00 and 4:30 - 5:00 pm
Friday (31st): 9 – 10a; 1:30 – 2p

Laura Arce
202-649-3131

---

**From:** Armstrong, Melinda [mailto:melinda_armstrong@fanniemae.com]
**Sent:** Friday, May 24, 2013 9:32 AM
**To:** Armstrong, Melinda; Arce, Laura
**Subject:** RE: converstaion with CFPB

Ok, we can have a quick call with the CFPB.  Call me on Tuesday and we can work on getting it scheduled.  I can see the availability for everyone here, but finding a time when everyone is free is always tricky.

Hope you had a great weekend.

Mindy Armstrong
Product Management, Automated Underwriting
Single Family Mortgage Business
(614) 392-2400
melinda_armstrong@fanniemae.com

**This e-mail and its attachments are confidential and solely for the intended addressee(s). Do not share or use them without Fannie Mae's approval. If received in error, delete them and contact the sender.**

---

**From:** Armstrong, Melinda
**Sent:** Thursday, May 23, 2013 6:27 PM
**To:** 'Arce, Laura'
**Subject:** RE: converstaion with CFPB

Definitely!  Sorry I didn't have anything today.  Have a great weekend!

Mindy Armstrong
Product Management, Automated Underwriting
Single Family Mortgage Business
(614) 392-2400
melinda_armstrong@fanniemae.com

**This e-mail and its attachments are confidential and solely for the intended addressee(s). Do not share or use them without Fannie Mae's approval. If received in error, delete them and contact the sender.**

---

**From:** Arce, Laura [mailto:Laura.Arce@fhfa.gov]
**Sent:** Thursday, May 23, 2013 5:30 PM
**To:** Armstrong, Melinda

FM-SHAW-00003359

**Subject:** RE: converstaion with CFPB

Hi Mindy:  I'm out tomorrow. Can you can get an answer by early Tuesday? I'm stalling as best I can but it's getting uncomfortable.

Laura Arce
202-649-3131

**From:** Armstrong, Melinda [mailto:melinda_armstrong@fanniemae.com]
**Sent:** Wednesday, May 22, 2013 2:34 PM
**To:** Arce, Laura
**Subject:** RE: converstaion with CFPB

Hi there,

Sorry I haven't picked up your message, I have been on calls all afternoon.

Let me check with the folks I talked to on Tuesday about this.  I'll get back to you shortly.

Thanks,

Mindy Armstrong
Product Management, Automated Underwriting
Single Family Mortgage Business
(614) 392-2400
melinda_armstrong@fanniemae.com

**This e-mail and its attachments are confidential and solely for the intended addressee(s). Do not share or use them without Fannie Mae's approval. If received in error, delete them and contact the sender.**

**From:** Arce, Laura [mailto:Laura.Arce@fhfa.gov]
**Sent:** Wednesday, May 22, 2013 2:28 PM
**To:** Armstrong, Melinda
**Subject:** converstaion with CFPB
**Importance:** High

Hi Mindy,

I left you a voicemail this afternoon asking if there is a compromise we can figure out on talking with CFPB regarding the DU issue.  I totally understand your position about disclosing potential future announcements.  They're under a lot of political pressure and trying to get a full picture of the issue; they've already talked with FR and would also like to talk with FN.

Is it possible to frame the conversation around the current state so he has an understanding of what's happening now. You can then just say that you recognize there's a potential issue and that you're considering solutions, but that you can't say more than that, but we'd let him know when there's an update?

Let me know; thanks!

**Laura V. Arce**
Office of Housing & Regulatory Policy

Federal Housing Finance Agency
202.649.3131

Confidentiality Notice: The information contained in this e-mail and any attachments may be confidential or privileged under applicable law, or otherwise may be protected from disclosure to anyone other than the intended recipient(s). Any use, distribution, or copying of this e-mail, including any of its contents or attachments by any person other than the intended recipient, or for any purpose other than its intended use, is strictly prohibited. If you believe you have received this e-mail in error: permanently delete the e-mail and any attachments, and do not save, copy, disclose, or rely on any part of the information contained in this e-mail or its attachments. Please call 202-649-3800 if you have questions.

FM-SHAW-00003361

# EXHIBIT 54

# LODGED UNDER SEAL

# EXHIBIT 55

| From: | Armstrong, Melinda <melinda_armstrong@fanniemae.com> |
|-------|------------------------------------------------------|
| Sent: | Monday, February 25, 2013 9:15 AM |
| To: | Myers, Elizabeth <elizabeth_myers@fanniemae.com>; Danko, Cyndi <cyndi_danko@fanniemae.com>; Lescott, Philson <philson_lescott@fanniemae.com> |
| Cc: | Price, Randall <randall_price@fanniemae.com> |
| Subject: | RE: question on the hitch in DU's giddy-up relating to short sale |

Also, we stated in the Guide how DU identifies foreclosures, and DU has been doing it this way for at least 12 years.

### B3-5.3-09, DU Credit Report Analysis
...

DU applies the following guidelines to prior foreclosures:

- Mortgage accounts, including first liens, second liens, home improvement loans, HELOCs, and mobile home loans, will be identified as a foreclosure if there is a current status or manner of payment/MOP code of "8" (foreclosure) or "9" (collection or charge-off); or if there is a foreclosure-related Remarks Code present in the credit report data and associated to the tradeline.
- If a foreclosure was reported within the seven-year period prior to the credit report date, the loan casefile will receive a Refer with Caution or Refer with Caution/IV and will be ineligible for delivery to Fannie Mae.
- If the filed date and the satisfied date of the foreclosure are both unknown, but it appears that the foreclosure occurred within the seven-year period prior to the credit report date, the lender must confirm that the foreclosure did not occur within the most recent seven-year period.
- Foreclosure laws vary by state and the time it takes to complete the process may vary by state. DU assumes that the date the foreclosure was reported in the tradeline is the date of the foreclosure sale or liquidation. The lender must confirm that all foreclosures are satisfied.

DU applies the following guidelines to prior deeds-in-lieu of foreclosure:

- DU will determine if a mortgage tradeline is a deed-in-lieu of foreclosure by using specific Remarks Codes that are present in the credit report data and associated to the tradeline.
- If a deed-in-lieu of foreclosure was reported within the two-year period prior to the credit report date, the loan casefile will receive a Refer with Caution or Refer with Caution/IV and will be ineligible for delivery to Fannie Mae.
- If a deed-in-lieu of foreclosure was reported more than two years before the credit report date, the existence of the deed-of-lieu foreclosure is acceptable provided the loan complies with the LTV ratio requirements that apply after two years and up to seven years following the completion date, as stated in B3-5.3-07, Significant Derogatory Credit Events — Waiting Periods and Re-establishing Credit (05/15/2012).

### Preforeclosure Sales or Short Sales

DU is not able to identify preforeclosure or short sales in the credit report data. Lenders must manually apply the preforeclosure sale requirements to DU loan casefiles, regardless of the underwriting recommendation received from DU.

DU will issue a message on loan casefiles where the borrower's credit report indicates an account may have been released to a preforeclosure sale. The recommendation on the loan casefile will not be changed when this information appears on the credit report, though as stated above, the lender must ensure the loan complies with all other requirements specific to preforeclosure sales as specified in B3-5.3-07, Significant Derogatory Credit Events — Waiting Periods and Re-establishing Credit (05/15/2012).

FM-SHAW-00003265

Mindy Armstrong
Product Management, Automated Underwriting
Single Family Mortgage Business
(614) 392-2400
melinda_armstrong@fanniemae.com

This e-mail and its attachments are confidential and solely for the intended addressee(s). Do not share or use them without Fannie Mae's approval. If received in error, delete them and contact the sender.

---

**From:** Myers, Elizabeth
**Sent:** Monday, February 25, 2013 9:01 AM
**To:** Danko, Cyndi; Lescott, Philson
**Cc:** Price, Randall; Armstrong, Melinda
**Subject:** RE: question on the hitch in DU's giddy-up relating to short sale

Agreed - and if there is a message we want to get out there, Rob is the best way to do it.  Let's have a conversation since this is likely to keep coming up. E

---

**From:** Danko, Cyndi
**Sent:** Monday, February 25, 2013 9:00 AM
**To:** Myers, Elizabeth; Lescott, Philson
**Cc:** Price, Randall; Armstrong, Melinda
**Subject:** RE: question on the hitch in DU's giddy-up relating to short sale

No, the May release is not a new KB and we are not making changes to the credit assessment. We are working with Stacey and team to see about changes for the Oct release.

Randy deals with the MOP code issues/FC reporting on a daily basis.  If the CRA sends a MOP code of 9 with an account type mortgage, DU will read it as a FC.  DU has a hard time identifying short sales as there are no MOP codes specifically assigned to short sales.

We may want to set up a quick call to work through talking points on this issue.

Copying Mindy and Randy on the email for more insight.

This e-mail and its attachments are confidential and solely for the intended addressee(s). Do not share or use them without Fannie Mae's approval. If received in error, contact the sender and delete them.

---

**From:** Myers, Elizabeth
**Sent:** Monday, February 25, 2013 8:44 AM
**To:** Lescott, Philson; Danko, Cyndi
**Subject:** FW: question on the hitch in DU's giddy-up relating to short sale

Philson and Cyndi -

See the question below.  Isnt this something that we are addressing in the May release? E

---

**From:** Whip, Jennifer R
**Sent:** Monday, February 25, 2013 8:37 AM
**To:** Myers, Elizabeth
**Subject:** FW: question on the hitch in DU's giddy-up relating to short sale

Elizabeth, can you help me respond to Rob (or do directly)? This might be a topic worth exploring for publication – timing feels about right...

**Jennifer R. Whip**
Vice President, Customer Engagement
Fannie Mae
215-575-1932 *(office)*
*267-253-8485 (cell)*
Jennifer_r_whip@fanniemae.com
This e-mail and its attachments are confidential and solely for the intended addressee(s). Do not share or use them without Fannie Mae's approval. If received in error, contact the sender and delete them.

**From:** Rob Chrisman [mailto:rchrisman@robchrisman.com]
**Sent:** Monday, February 25, 2013 7:56 AM
**To:** Whip, Jennifer R
**Subject:** FW: question on the hitch in DU's giddy-up relating to short sale

Jennifer – a bit behind on your e-mails, and will get to them today. Can I refer this person to someone?

**From:** Tom Ross [mailto:tom.ross@novahomeloans.com]
**Sent:** Friday, February 22, 2013 8:07 AM
**To:** rchrisman@robchrisman.com
**Subject:** question on the hitch in DU's giddy-up relating to short sale

Rob,

Appreciate all your news and insight. Your intel is always terrific and extremely helpful as we navigate these cloudy waters of our post meltdown mortgage market.

Quick question:

Do you have any high level intel on the issue of DU reading credit trade line statuses 5,8, and 9 (charge off) as foreclosure? This is a MASSIVE issue as people re-enter the market post short sale. They wait their 2 or 4 years, depending, and when ready to buy again they are faced with DU credit denials for foreclosures they never had for trade lines that don't even show as foreclosed. 99% of the market will not manually underwrite and override a DU credit denial so there are very limited options available to a growing mass of people attempting to re-enter. Many just waited the extra year to jump in FHA and are paying the MI price for it.

So: Credit reports accurately reflect as a charge off or a deep delinquency, short sale occurs, Fannie DU engine reads and indicates bwr as having had a foreclosure when one clearly, and on credit, did not exist.

Are there any remedies in the works? Does anyone care? Have you written about this before? It's an ever growing segment of the consuming public and a large issue at the ground level that will continue to increase in importance for immediate future.

Cheers,

Tom

Tom Ross
Senior Loan Officer
Office: 602.224.4840
Cell: 602.791.5861
Fax: 602.324.4960
tom.ross@novahomeloans.com
www.novahomeloans.com/Tom.Ross
NMLS: 179446

FM-SHAW-00003267



**CONFIDENTIALITY AND PRIVILEGE NOTICE** This e-mail from Nova Financial & Investment Corporation contains confidential information intended only for the addressee(s). Information in or attached to it may be privileged, confidential or protected by law. If you are not the addressee (or a person responsible for delivering this transmission to the addressee) you are strictly prohibited from reading, copying, disseminating or distributing it. If you have received this e-mail in error please notify the sender by replying to this message or calling 1-800-955-9125; then delete it and any attachments from your system, and destroy any print outs you may have made. Thank you.

FM-SHAW-00003268

# EXHIBIT 56

# LODGED UNDER SEAL

# EXHIBIT 57

| From: | Arce, Laura <Laura.Arce@fhfa.gov> |
|---|---|
| Sent: | Monday, June 3, 2013 6:01 PM |
| To: | McGovern, Kristin <kristin_mcgovern@fanniemae.com> |
| Subject: | CFPB follow-up |

Hi Kristin,

I just got off the phone with Brian and he has one follow-up question (in addition to the trends in contradictory data question Philson noted on our earlier call).

What would it do to FN credit model if you were to exclude MOP code "9" from the foreclosure bucket and count it as a short sale?

He asked if we could schedule a call on this either Thursday or Friday morning.

Let me know; thanks!

**Laura V. Arce**
Office of Housing & Regulatory Policy
Federal Housing Finance Agency
202.649.3131

Confidentiality Notice: The information contained in this e-mail and any attachments may be confidential or privileged under applicable law, or otherwise may be protected from disclosure to anyone other than the intended recipient(s). Any use, distribution, or copying of this e-mail, including any of its contents or attachments by any person other than the intended recipient, or for any purpose other than its intended use, is strictly prohibited. If you believe you have received this e-mail in error: permanently delete the e-mail and any attachments, and do not save, copy, disclose, or rely on any part of the information contained in this e-mail or its attachments. Please call 202-649-3800 if you have questions.

# EXHIBIT 58

Paul B. Mengedoth (018507)
**MENGEDOTH LAW PLLC**
20909 N. 90th Place, Suite 211
Scottsdale, AZ 85255
Tel: (480) 778-9100
Fax: (480) 778-9101
E-mail: paul@mengedothlaw.com

Sylvia A. Goldsmith, Esq. (*Pro Hac Vice Pending*)
Geoffrey B. McCarrell, Esq. (*Pro Hac Vice Pending*)
**LAW OFFICE OF SYLVIA A. GOLDSMITH**
Milano Law Office
2639 Wooster Road
Rocky River, OH 44116
Tel: (440) 934-3025
Fax: (440) 934-3026
E-mail:sgoldsmith@sgoldsmithlawoffice.com

Attorneys for Plaintiffs James and Katherine McCalmont

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| JAMES AND KATHERINE MCCALMONT, married individuals, <br><br> Plaintiffs, <br><br> v. <br><br> FEDERAL NATIONAL MORTGAGE ASSOCIATION and FEDERAL HOUSING FINANCE AGENCY AS CONSERVATOR OF THE FEDERAL NATIONAL MORTGAGE ASSOCIATION, <br><br> Defendants. | No. _____ <br><br> **COMPLAINT** <br><br> **JURY TRIAL REQUESTED** |

## I. PRELIMINARY STATEMENT

1.      Plaintiffs James and Katherine McCalmont, mortgage applicants subjected to the repeated violation of and intentional non-compliance with the Fair Credit Reporting Act, 15 U.S.C. §1681 *et seq.* (the "FCRA"), bring this action against Defendants Federal National Mortgage Association ("Fannie Mae") and Federal Housing Finance Agency ("FHFA") as the Conservator of the Federal National Mortgage Association.

2.      As a well-known colossus in the secondary mortgage loan market, Fannie Mae also silently plays a dominant role in home mortgage loan origination. While its involvement in the loan origination process is largely unknown to the public, Fannie Mae exerts a tremendous influence on each step of the application process. Through its automated underwriting system that it requires lenders to use throughout the country, Fannie Mae obtains, reviews and evaluates consumer credit information in advance of loan origination for its own underwriting purposes; charges lenders, brokers and consumers for this information through the generation and publication of consumer reports; and dictates to lenders and consumers the outcome of mortgage loan applications, including rates and terms. This process enables Fannie Mae to reap significant profits by carrying out a business model based on risk-based pricing and the collection of fees for each loan application run through its automated underwriting system.

3.      However, despite its manifold roles as a user of credit information, a consumer reporting agency and a reseller of credit information in a typical mortgage transaction, Fannie Mae has deliberately made itself unaccountable to consumers, and intentionally fails to comply with any of the requirements imposed on it by the FCRA.

4.      Fannie Mae's flagrant disregard for the law results from a presumed contention that, as a government sponsored enterprise, it is somehow exempt from the grave responsibilities imposed by the FCRA on every other company that assembles, uses, disseminates and/or sells consumer credit information.  As such, mortgage applicants like Plaintiffs are harmed because they are denied certain rights guaranteed by the FCRA, including the ability to discover what information may have impacted their loan eligibility, the right to request and/or dispute the information that was considered in connection with their applications, and the right to expect that their credit information was reported with maximum possible accuracy.

## II. PARTIES

5.      Plaintiffs Mr. and Mrs. McCalmont are married adult individuals who are residents of Scottsdale, Maricopa County, Arizona.

6.      Defendant Fannie Mae is a publicly held corporation that has a principal place of business located at 3900 Wisconsin Ave., NW Washington, DC 20016-2892, and which regularly conducts business throughout Arizona and in all fifty (50) states in the United States.

3

7.     Defendant Federal Housing Finance Agency ("FHFA") is an independent federal agency, created under the Housing and Economic Recovery Act of 2008, Pub.L. No. 110–289, 122 Stat. 2654 (codified at 12 U.S.C. § 4617 *et seq.*). On September 6, 2008, Fannie Mae was placed under the conservatorship of the FHFA.

8.     Fannie Mae is a "consumer reporting agency" as that term is defined by Section 1681a(f) of the FCRA.

### III.  JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over this matter pursuant to 15 U.S.C. § 1681p and 28 U.S.C. § 1337.

10.     Venue in this judicial district is proper because Mr. and Mrs. McCalmont reside in this judicial district and many of the facts relevant to this Complaint occurred in this judicial district.

### IV.  FACTUAL ALLEGATIONS

#### A.  Fannie Mae and Its Automated Desktop Underwriter System

11.     Fannie Mae is a shareholder-owned for-profit corporation that is publicly traded on the U.S. Stock Exchange.

12.     Fannie Mae is also a government-sponsored enterprise ("GSE") because it was chartered by Congress to provide a secondary market for home mortgages.  In exchange for its agreement to act as a mortgage loan purchaser in the secondary market, Fannie Mae's charter provides it with certain financial advantages and incentives.

4

13.     Due to federal banking regulations requiring most primary mortgage lenders to maintain minimum capital, after originating mortgage loans, many mortgage lenders in the United States sell their loans to Fannie Mae.

14.     Fannie Mae, together with its "little brother" Freddie Mac, purchase or guarantee more than half of all mortgages originated in the United States, depending upon market conditions and consumer trends.

15.     Fannie Mae purchases what are known as conventional conforming loans. These are loans that are not insured or guaranteed by the federal government, are less than $417,000, and have certain prescribed risk characteristics. Fannie Mae publishes its Selling Guide which outlines the specific requirements necessary for eligibility for Fannie Mae purchase.

16.     Fannie Mae buys these conventional conforming loans and either bundles them as securities and sells them to investors or holds the loans in its own portfolios.

17.     Unknown to the public, and due to its status as one of the two (2) dominant secondary market purchasers of mortgages, along with mortgage lenders' interest in assuring the sale of their loans, Fannie Mae has entered into contracts with numerous mortgage lenders throughout the United States which, in exchange for its advance commitment to buy mortgage loans from these lenders in the secondary market, allow it to dictate the underwriting terms and conditions of most of the conventional conforming loans that these lenders originate.

5

18.     For the mortgage lenders who have contracts with Fannie Mae and who sell mortgage loans to Fannie Mae in the secondary market, Fannie Mae requires that mortgage brokers and lenders submit residential mortgage applications through its Desktop Underwriter automated underwriting system ("DU") in order to get a quick approval or denial, the best lender/broker pricing, higher debt-to-income ratios, higher loan-to-value ratios, better loan programs not available outside DU, and risk-based pricing, before any commitment is made to the prospective borrowers.

19.     For these brokers and lenders, Fannie Mae leases or licenses its DU system for use by the lenders or mortgage loan brokers and charges these lenders or brokers a fee for each mortgage application run through the DU system.

20.     Fannie Mae's DU system is also used in connection with non-conforming loans that Fannie Mae is not permitted to purchase pursuant to its congressional charter. These other types of loans include, but are not limited to FHA, Jumbo, and sub-prime loans.

21.     Through the DU system, Fannie Mae obtains an applicant's three-file and/or "tri-merge" consumer report from either a reseller of credit information, or one or more of the three (3) major credit repositories, Equifax, Trans Union and Experian, which Fannie Mae sells to the lender or broker.

22.     Fannie Mae's DU system assembles reviews, assesses and evaluates all of the information it obtains from the lender and/or broker, and the consumer reporting agencies and/or resellers, including the consumer reports, and generates its own report,

known most frequently as the Desktop Underwriting Findings report ("DU Findings Report").

23.    The DU Findings Report is a detailed report documenting, among other things, the applicant's credit history, credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, mode of living, assets, income, debt-to-income ratio, and employment.  Further, the DU Findings Report contains findings, conclusions, comments and results reached by Fannie Mae concerning the applicant's credit and his or her "eligibility" for loan purchase by Fannie Mae, as well as Fannie Mae's recommendation as to whether the lender should grant or originate the loan, deny the loan or approve it subject to certain conditions being satisfied.  These DU Findings determinations are made for all types of loans submitted through DU, whether or not Fannie Mae purchases them in the secondary market.

24.    Upon information and belief, most mortgage brokers and lenders do not disclose all or part of an applicant's DU Findings Report to the consumers to whom they relate in the ordinary course of their submission of a mortgage loan application to Fannie Mae.

25.    If Fannie Mae determines that a consumer is ineligible for loan purchase, or may only be approved subject to a change in loan terms, a higher interest rate, the imposition of additional fees, charges, documentation or the satisfaction of certain underwriting conditions based on information contained in the consumer report it

obtains, it does not provide the consumer with any notice of the adverse action it has taken, in violation of the FCRA.

26.     Further, despite the fact that it compiles, issues, maintains and sells its DU Findings Reports to lenders and/or brokers on a nationwide basis, Fannie Mae does not provide consumers with disclosures of the files it maintains on them, the sources of the information it reports, summaries of their rights, does not maintain any toll-free telephone numbers available to consumers and does not investigate any consumer disputes, in further violation of the FCRA.

27.     Fannie Mae has been placed on notice that the Federal Trade Commission, the primary financial regulator first provided with the authority by Congress to interpret the provisions of the FCRA, long ago emphasized and characterized the FCRA was designed to cover a very broad range of "assembling" or "evaluating" activities and bring many entities within the ambit of the FCRA.  *See* FTC Staff Opinion Letter, William Haynes (June 9, 1998), 1998 WL 3423759.

**B.   Plaintiffs Negotiated a Short Sale of Their Home**

28.     Plaintiffs were the owners of a home with a loan that was subject to a first mortgage with Chase Bank, and a second mortgage with Wells Fargo Bank.

29.     Like millions of other Americans adversely impacted by the downturn of the economy, Plaintiffs found themselves struggling to pay their mortgages.

30.     In November 2008, Plaintiffs initiated a loan modification with Chase Bank in hopes of lessening the burden of their monthly mortgage payments.

8

31.     After several months of negotiations with Chase Bank, the loan modification was declined in March 2009.

32.     Immediately after the loan modification was declined, Plaintiffs retained an attorney to assist them in negotiating a short sale of the property.

33.     Plaintiffs were advised by Chase Bank that no short sale could be approved if their monthly mortgage payments were current.  Therefore, in March 2009, Plaintiffs stopped making their mortgage payments to both Chase Bank and to Wells Fargo Bank.

34.     On October 26, 2009, the short sale of Plaintiffs' home closed escrow.

35.     Pursuant to Fannie Mae's published Desktop Underwriter Guidelines ("DU Guidelines"), Plaintiffs would not be able to qualify for conventional financing for a minimum of two (2) years following this short sale.

### C. Plaintiffs Were Denied Mortgage Financing For The Shetland Trail Property

36.     In October 2011, having waited the mandatory two (2) years, Plaintiffs contacted a company called Pinnacle Lending to obtain pre-qualification for financing to buy another home.  Plaintiffs discovered that the close of escrow date on their short sale was entered incorrectly as January 2010, so any financing of a home purchase would have to wait until January 2012.

37.     Mindful of the length of time necessary to close on a new home loan, Plaintiffs discontinued their efforts to buy another home and then contacted Pinnacle

Lending again in November 2011 to obtain a pre-qualification letter in connection with a particular piece of property Plaintiffs' hoped to buy (the "Shetland Trail property").

38. The Shetland Trail property was being sold in a short sale by its current owner with approval of his current mortgage holder.

39. Pinnacle Lending told Plaintiffs that they would not be approved for financing because their own previous short sale was flagged as a "foreclosure" which, per DU Guidelines, would prevent Plaintiffs from obtaining financing for seven (7) years. Plaintiffs were confused since their previous home was never in foreclosure at any point.

40. Upon information and belief, and unknown to Plaintiff at the time, Pinnacle Lending obtained and relied upon a DU Finding Report it purchased from Defendant Fannie Mae on or before November of 2011 and which DU Finding Report falsely stated that Plaintiffs first and second mortgage loans were coded as a foreclosure instead of a short sale.

41. In hopes that Plaintiffs could still buy the Shetland Trail property, Pinnacle Lending contacted each of the credit bureaus for Plaintiffs to dispute the "foreclosure." Since none of Plaintiffs' credit reports contained any reference to foreclosure, these disputes were dismissed by the credit bureaus.

42. Plaintiffs were unable to secure financing for the Shetland Trail property based at least in part on the false information in a DU Findings Report, and their contract to purchase that home was terminated.

10

**D.  Plaintiffs Were Denied Mortgage Financing For The Timberlane Property**

43.    In January 2012, Plaintiffs found another piece of property (the "Timberlane Court property") that they wanted to purchase.

44.    Hopeful that the underlying "foreclosure" issue was related to the incorrect entry of their short sale in January 2010 (instead of October 2009), Plaintiffs contacted Amerifirst Financial to obtain a pre-qualification letter.

45.    Plaintiffs successfully obtained a pre-qualification letter from Amerifirst Financial on January 31, 2012.

46.    Plaintiffs were excited that they were able to pre-qualify for financing, and made an offer on the Timberlane Court property.  Plaintiffs offer was accepted and escrow was opened on or around February 3, 2012.  The loan was scheduled to close one month later.

47.    On March 1, 2013, Plaintiffs learned that their loan application was denied.

48.    Plaintiffs were shocked, embarrassed and devastated.

49.    Upon information and belief, and unknown to Plaintiffs at the time, Amerifirst obtained and relied upon a DU Finding Report it purchased from Defendant Fannie Mae and which DU Finding Report falsely stated that Plaintiffs first and second mortgage loans were coded as a foreclosure instead of a short sale.

11

50.     Plaintiffs were unable to secure financing for the Timberline Court property from Amerifirst based at least in part on the false information in a DU Findings Report Defendant Fannie Mae provided to Amerifirst.

51.     As a local real estate agent, Mrs. McCalmont was humiliated that her personal contract for real estate fell through in the eleventh hour.  She believed and feared that word of the cancellation of the Timberlane Court contract would damage her reputation as an agent.

52.     Both Plaintiffs were especially aggravated and disheartened by the fact that there was seemingly nothing they could do about the "foreclosure" notation that was preventing them from obtaining financing, and that, to date, they could find no evidence of it anywhere on their personal credit reports.

**E.  Plaintiffs Were Forced To Obtain A Personal Loan To Purchase A Home**

53.     Plaintiffs still wanted to purchase a home and felt they were left with few options to do so.

54.     While dealing with the financial, mental and emotional strains of their two (2) previous failed efforts to purchase a home, Plaintiffs learned that the Shetland Trail property they originally tried to purchase had come back on the market (as Plaintiffs' earlier attempt to purchase the property fell through, the owner of the Shetland Trail property fell into foreclosure and the bank was now selling the property).  Plaintiffs were determined not to let this property slip through their fingers again.

55. Knowing that the "foreclosure" notation would prevent approval at most lending institutions and determined not to suffer that embarrassment and disappointment again, Plaintiffs contacted a private bank, Republic Bank, to explore their financing options.

56. In order to purchase the Shetland Trail property, Plaintiffs were required to take out a personal, hard-money loan for the purchase price to be paid in cash. This interest-only loan has an adjustable APR of no less than 7% and must be repaid (or refinanced) within three (3) years. Additionally, Plaintiffs were required to put $140,000 cash into a Certificate of Deposit as collateral.

57. While Plaintiffs were relieved to be able to secure *any* financing to purchase the Shetland Trail property, this financing is significantly more expensive for Plaintiffs' than the terms of the previous loan on which they were prequalified.

58. Plaintiffs closed on the Shetland Trail property on April 2, 2012.

**F. Plaintiffs Were Denied Refinancing Of The Shetland Trail Property**

59. Over the next several months, Plaintiffs tried desperately to find answers to their problem of the "foreclosure" notation which was preventing them from obtaining traditional mortgage financing.

60. Plaintiffs were desperate for such answers so they could make sure to refinance the Shetland Trail property before the three-year period expired on their current adjustable, hard-money loan with Republic Bank.

13

61. Plaintiffs repeatedly came up empty. Contacts with various mortgage brokers/lenders, Plaintiffs' first and second mortgage holders on the short sale property, and the Big Three credit bureaus, Equifax, Experian and Trans Union, all continued to confirm that no one was reporting that Plaintiffs were ever in foreclosure on that property.

62. With the housing market finally starting to show signs of recovery and home loan interest rates beginning to rise, and with a deadline to refinance hanging over their heads, Plaintiffs contacted Homeowners Financial Group in hopes of refinancing the Shetland Trail property in February 2013.

63. Once again, a "foreclosure" notation prevented Plaintiffs from refinancing the Shetland Trail property.

64. Upon information and belief, and unknown to Plaintiffs at the time, Homeowners Financial obtained and relied upon a DU Finding Report it purchased from Defendant Fannie Mae and which DU Finding Report falsely stated that Plaintiffs first and second mortgage loans were coded as a foreclosure instead of a short sale.

65. Plaintiffs were unable to refinance the Timberline Court property with Homeowners Financial based at least in part on the false information in a DU Findings Report Defendant Fannie Mae provided to Homeowners Financial.

66. Plaintiffs' level of frustration and desperation with the entire ordeal continued to grow.

**G. Plaintiffs' Uncover The False Foreclosure Notation In DU Findings**

14

67.     As part of their latest efforts to get to the bottom of the false "foreclosure" notation, Plaintiffs received a copy of the DU Findings Report pertaining to them that Homeowners Financial Group obtained from Defendant Fannie Mae

68.     These DU Findings correctly noted a potential short sale in its *Risk/Eligibility* section:

6    The credit report has identified an account that may have been subject to a preforeclosure sale. The preforeclosure sale must have been completed two or more years from the credit report date, and the loan casefile must comply with all other requirements specific to preforeclosure sales as specified in the Fannie Mae Selling Guide.

| Borrower | Creditor | Account Number |
|---|---|---|
| JAMES A MCCALMONT | CHASE | |
| JAMES A MCCALMONT | WELSHMQTY | |
| JAMES A MCCALMONT | JPM CHASE | |

*See* DU Findings, dated March 12, 2013 (a copy of which is attached hereto as Exhibit 1), at Page 2 of 7.  These DU Findings further note that so long as the short sale was "completed two or more years from the credit report date" the loan could still be approved. *Id.*

69.     However, the DU Findings reported that the proposed loan was not eligible for delivery to Fannie Mae because of a foreclosure:

<sup>2</sup> Desktop Underwriter has identified a deed-in-lieu of foreclosure that was reported within the last two years, or a foreclosure that was reported within the last seven years. This loan is ineligible for delivery to Fannie Mae.

| Borrower | Creditor | FC Type | Account Number | Date Reported |
|----------|----------|---------|----------------|---------------|
| JAMES A MCCALMONT | CHASE | Foreclosure | | 03/12 |
| JAMES A MCCALMONT | WELSHMQTY | Foreclosure | | 02/13 |
| JAMES A MCCALMONT | JPM CHASE | Foreclosure | | 03/13 |

*See* Exhibit 1 at Page 1 of 7. This resulted in a "Refer with Caution" recommendation which amounts to a credit denial per Fannie Mae's *Selling Guide. Id.* at 5 of 7.

70. Homeowners Financial Group also shared with Plaintiffs the tri-merge credit report used in connection with Plaintiffs' credit application. See Advantage Plus Tri-merge Credit Report dated March 12, 2013 (a redacted copy of which is attached hereto as Exhibit 2).

71. This tri-merge report confirmed that despite Plaintiffs' short sale (and the delinquent mortgage payments immediately preceding same), Plaintiffs' credit scores remained in the 700s and would otherwise allow them to obtain traditional mortgage financing. *See* Exhibit 2 at 1 of 11.

72. The Advantage Plus tri-merge report further confirmed that none of Plaintiffs' creditors were reporting Plaintiffs as having been through a foreclosure. *See* generally, Exhibit 2.

16

73.     For the first time, Plaintiffs began to understand that their inability to obtain traditional mortgage financing was a result of Fannie Mae's reading (or misreading) of Plaintiffs' accurate credit report information.

**H. DU Wrongly Flags Any Serious Mortgage Delinquency As A Foreclosure**

74.     Plaintiffs are just two of potentially millions of consumers who have been unable to obtain mortgage financing because a previous short sale has wrongly been flagged by Fannie Mae as a foreclosure.

75.     On March 13, 2013, Fannie Mae released a "Desktop Underwriter Clarification" in response to mounting "requests for clarification on how Desktop Underwriter (DU) identifies a foreclosure and a pre-foreclosure sale[.]" *See* Desktop Underwriter Clarification (a copy of which is attached hereto as Exhibit 3).

76.     In this regard, Fannie Mae described DU's identification of a pre-foreclosure or short sale as follows:

**Preforeclosure Sale Identification**

**Preforeclosure Sale Identification**

A preforeclosure sale or short sale is the sale of a property in lieu of a foreclosure resulting in a payoff of less than the total amount owed, which was pre-approved. At this time, there are no codes provided in the credit report data received by DU that specifically identify a preforeclosure sale.

With DU Version 8.2 in December 2010, DU began issuing a message based on the presence of Remarks Codes E0047 (Settlement accepted on this account), T0140 (Settled for less than full balance), or R0107 (Account legally paid in full for less than the full balance) on a mortgage or HELOC account. However, because those codes can be used on any account for any reason, DU is not able to use those codes to identify a preforeclosure sale with 100% accuracy, so it is not able to fully automate the preforeclosure sale waiting period or eligibility requirements.

When DU issues the preforeclosure sale message the lender must confirm that the preforeclosure sale had been completed two or more years from the credit report date, and must confirm that the loan casefile complies with all other requirements specific to preforeclosure sales as specified in the Fannie Mae *Selling Guide*.

*See* Exhibit 3 at 1 of 3.

77.     Per the DU Findings Report used to deny Plaintiffs their refinancing application, Plaintiffs' previous short-sale was specifically identified by DU. *See* Exhibit 1 at Page 2 of 7.

78.     So long as the pre-foreclosure or short-sale was completed more than two (2) years before the current application, that prospective loan is still eligible for purchase by Fannie Mae and DU will not refer, i.e., deny, the application. *See Selling Guide*, Part B, Subpart 3, Chapter 5 (a copy of the relevant excerpt of the 2011 and 2013 versions is attached hereto as Exhibit 4) at 434 and 465 respectively.

79.     In describing DU's identification of a foreclosure, Fannie Mae represents as follows:

**Foreclosure Identification**

When reviewing the credit report data received, DU reviews the manner of payment (MOP) codes and Remarks Codes associated with each tradeline, and the Public Record information to determine if a foreclosure has occurred.

Mortgage accounts, including first liens, second liens, home improvement loans, HELOCs, and mobile home loans, will be identified as subject to a foreclosure if there is a current status code or MOP code of "8" (foreclosure) or "9" (collection or charge-off); or if there is a foreclosure-related Remarks Code present in the credit report data and associated to the tradeline. If a foreclosure was reported within the seven-year period prior to the report date associated with the tradeline, the loan casefile will receive a Refer with Caution recommendation and will be ineligible for delivery to Fannie Mae as a DU loan.

See Exhibit 3 at 1 of 3.

80.     Per this "Desktop Underwriter Clarification," Fannie Mae admits that accounts reported by the original creditor merely as "collection or charge-off" – accounts admittedly not in foreclosure – will be identified by the DU system as having been in foreclosure.

18

81.     Any prospective loan that DU identifies as having a foreclosure in the previous seven (7) years will automatically be ineligible for purchase by Fannie Mae. *See* Exhibit 4 at 464.

82.     So even though DU correctly identified Plaintiffs' previous short sale, acknowledging that so long as that short sale was more than two (2) years ago, DU also manufactured a non-existent foreclosure for Plaintiffs and referred, i.e., denied, their application accordingly.

83.     This incorrect identification by DU prevented Plaintiffs from obtaining any conventional financing or refinancing for a home.

**I.  Fannie Mae Acknowledges Deficiency in DU Computer Software.**

84.     Upon information and belief, the McCalmonts are only two of hundreds of thousands (if not greater numbers) of individual consumers who have had a short sale misidentified by DU as a foreclosure, thereby preventing them from obtaining conventional financing.

85.     In May 2013, the *Consumer Protection Subcommittee* of the *U.S. Senate Committee on Commerce, Science & Transportation* held a hearing on Capitol Hill to address a variety of problems plaguing the consumer reporting industry.

86.     During this hearing, Senator Bill Nelson, D-Fla, raised serious concerns about the significant and growing numbers of his constituents that had been denied conventional financing due to DU wrongly identifying a foreclosure in addition to or instead of a short sale.

19

87.    After months of prodding from Senator Nelson, the federal *Consumer Financial Protection Bureau*, the *National Consumer Reporting Association* and the *National Association of Realtors*, Fannie Mae announced a change to its automated DU system to "fix" the problem:

> ***Underwriting when Conflicting or Inaccurate Foreclosure Information Provided on DIL or PFS Tradeline***
> Fannie Mae has been made aware that there are often inconsistencies in the credit data when DIL and PFS events occur, and in an effort to assist borrowers in obtaining a new loan in an appropriate timeframe, DU will be updated to disregard the foreclosure information on the credit report when instructed to do so by the lender on the online loan application.
>
> When DU identifies a foreclosure on a credit report tradeline that appears to be one that was subject to a DIL or PFS, the lender may instruct DU to disregard the foreclosure information on the credit report by entering "Confirmed CR DIL" or "Confirmed CR PFS" in the Explanation field for question c. in the Declarations section of the online loan application and resubmitting the loan casefile to DU. When DU sees this indication, the foreclosure information on the credit report tradeline that also has a DIL or PFS Remarks Code will not be used.

*See* Desktop Originator/Desktop Underwriter Release Notes DU Version 9.1 (a copy of relevant excerpts of which is attached hereto as Exhibit 5) at 6.

88.    While these changes are expected to take effect the week of November 16, 2013, *see* Exhibit 5 at 1, and hopefully will allow consumers to rightfully obtain conventional financing from that point going forward, the McCalmonts have already suffered substantial economic and non-economic harm.

## V. CLAIMS
## FAIR CREDIT REPORT ACT VIOLATIONS

89.    Plaintiff hereby incorporates by reference all well-pleaded allegations contained in the preceding paragraphs as if fully rewritten herein.

90.    Section 1681o of the FCRA provides for civil liability against any CRA that is negligent in failing to comply with any requirement imposed under the Act

20

91.     Section 1681n of the FCRA imposes civil liability on any CRA "who willfully fails to comply with any requirement" of the Act. *See* 15 U.S.C. § 1681n(a).

### 1. Failure To Adopt And/Or Follow Reasonable Procedures

92.     The FCRA mandates that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." *See* 15 U.S.C. § 1681e(b).

93.     The DU Findings Report generated by Fannie Mae's DU system is a consumer report as defined by Section 1681a(d) of the FCRA.

94.     On numerous occasions in the past two (2) years, Fannie Mae has prepared a consumer report concerning Plaintiffs, and disseminated such report to one or more third party(s), that failed to assure "maximum possible accuracy" of information pertaining to Plaintiffs.

95.     Fannie Mae willfully and/or negligently failed to follow reasonable procedures to assure maximum possible accuracy of the consumer reports it prepared and/or published concerning Plaintiffs, in violation of 15 U.S.C. § 1681e(b).

96.     To the contrary, Fannie Mae has affirmatively adopted and follows an unreasonable foreclosure identification procedure that, by its plain terms, knowingly misidentifies non-foreclosures as foreclosures.

97.     As a direct and proximate result of Fannie Mae's willful and/or negligent refusal to follow reasonable procedures as mandated by the FCRA, Plaintiffs have

suffered loss and damage including, but not limited to: financial loss, loss of credit opportunity, a justifiable fear to request credit, expenditure of time and resources, mental anguish, humiliation, and embarrassment, entitling them to an award of actual damages in amounts to be proved at trial, plus attorneys' fees together with the costs of this action pursuant to 15 U.S.C. § 1681o.

98.     Fannie Mae's refusal to follow reasonable procedures as mandated by the FCRA reveals a conscious disregard of the rights of Plaintiffs. The injuries suffered by Plaintiffs are attended by circumstances of fraud, malice, retaliation, and willful and wanton misconduct, calling for statutory damages, an assessment of punitive damages, plus attorneys' fees and costs pursuant 15 U.S.C. § 1681n.

99.     WHEREFORE, Plaintiffs, James and Katherine McCalmont, pray for judgment in their favor and against Defendant Fannie Mae and Defendant FHFA as Conservator of Fannie Mae for the following relief:

A.     An award of actual damages in such amounts as determined by the jury;

B.     Statutory damages pursuant to 15 U.S.C. § 1681n;

C.     An assessment of punitive damages against Defendant pursuant to 15 U.S.C. § 1681n;

D.     Costs and reasonable attorneys' fees pursuant to 15 U.S.C. § 1681n and 15 U.S.C. § 1681o; and

E.     Such other and further relief as may be just and proper.

22

## VI. JURY DEMAND

100. Plaintiffs hereby demand a trial by jury on all their claims.

DATED: October 16, 2013.                    Respectfully Submitted,


/s/ Paul B. Mengedoth
Paul B. Mengedoth, Esq.
MENGEDOTH LAW PLLC
20909 N. 90th Place., Ste. 211
Scottsdale AZ 85255

Sylvia A. Goldsmith, Esq. (*Pro Hac Pending*)
Geoffrey B. McCarrell, Esq. (*Pro Hac Pending*)
Law Office Of Sylvia A. Goldsmith
Milano Law Building
2639 Wooster Road
Rocky River, OH 44116

Attorneys for Plaintiffs

23

# EXHIBIT 59

WO             IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| JAMES and KATHLEEN McCALMONT, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| FEDERAL NATIONAL MORTGAGE | ) | |
| ASSOCIATION, et al., | ) | |
| | ) | No. 2:13-cv-2107-HRH |
| Defendants. | ) | |
| | ) | |

O R D E R

Motions to Dismiss

Defendants move[1] to dismiss plaintiffs' complaint.  Plaintiffs oppose the Federal National Mortgage Association's motion to dismiss[2] but do not oppose the Federal Housing Finance Agency's motion to dismiss, although they request that the dismissal be with conditions.[3]  Oral argument was requested and has been heard on the Federal National Mortgage Association's motion to dismiss.

---

[1]Docket Nos. 14 & 23.

[2]Docket No. 25.

[3]Docket No. 26.

-1-

<u>Background</u>

Plaintiffs are James and Katherine McCalmont.  Defendants are the Federal National Mortgage Association (Fannie Mae) and the Federal Housing Finance Agency (FHFA), as the conservator of Fannie Mae.[4]

Fannie Mae is a government-sponsored enterprise which was created, in part, "to establish secondary market facilities for residential mortgages[.]" 12 U.S.C. § 1716.  Fannie Mae operates exclusively in the secondary mortgage market and does not originate loans.  "[M]any mortgage lenders in the United States sell their loans to Fannie Mae."[5]  "Fannie Mae purchases what are known as conventional conforming loans.  These are loans that are not insured or guaranteed by the federal government, are less than $417,000, and have certain prescribed risks characteristics."[6] "Fannie Mae buys these conventional conforming loans and either bundles them as securities and sells them to investors or holds the loans in its own portfolios."[7]  Fannie Mae only buys loans that meet its eligibility criteria which are outlined in its Selling Guide.[8]

---

[4]Complaint at 2, ¶ 1, Docket No. 1.

[5]<u>Id.</u> at 5, ¶ 13.

[6]<u>Id.</u> at ¶ 15.

[7]<u>Id.</u> at ¶ 16.

[8]<u>Id.</u> at ¶ 15.

Fannie Mae "leases or licenses" the Desktop Underwriter (DU) automated underwriting system to lenders and mortgage loan brokers,[9] which Fannie Mae contends allows lenders to determine if a prospective loan will be eligible for sale to Fannie Mae. As explained by counsel at oral argument, the lender obtains an applicant's tri-merge consumer report from the three major credit reporting agencies, Equifax, Trans Union and Experian.  This information, along with other information provided by the applicant, is entered into the DU system by the lender.  The "DU system [then] assembles[,] reviews, assesses and evaluates all of the information it obtains from the lender and/or broker, and the consumer reporting agencies and/or resellers, including the consumer reports,[10] and generates its own report, known most frequently as the Desktop Underwriting Findings report...."[11]  "The DU Findings Report is a detailed report documenting, among other things, the applicant's credit history, credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, mode of living, assets, income, debt-

---

[9]Id. at 6, ¶¶ 18-19.

[10]Lenders which license the DU system are required to "maintain a separate agreement with any 'consumer reporting agency' ... from which it orders 'consumer reports'[.]" Desktop Underwriter Schedule at 4, ¶ 11, Exhibit 1, Federal National Mortgage Association's Motion to Dismiss, Docket No. 14.

[11]Complaint at 6-7, ¶ 22, Docket No. 1.

to-income ratio, and employment."[12]  The DU Findings Report also indicates whether the applicant would be eligible to have his loan purchased by Fannie Mae and includes "Fannie Mae's recommendation as to whether the lender should grant or originate the loan, deny the loan or approve it subject to certain conditions being satisfied."[13]  If the recommendation is "refer with caution",[14] the "loan casefile ... may be manually underwritten in accordance with the Fannie Mae Selling Guide."[15]

In October 2009, plaintiffs short sold their home.[16]  Plaintiffs allege that "[p]ursuant to Fannie Mae's published Desktop Underwriter Guidelines..., [they] would not be able to qualify for conventional financing for a minimum of two (2) years following this short sale."[17]

Approximately two years after the short sale, in November 2011, plaintiffs attempted to obtain a mortgage from Pinnacle Lending but were "told ... that they would not be approved for financing because their own previous short sale was flagged as a

---

[12]Id. at 7, ¶ 23.

[13]Id.

[14]A "refer with caution" may mean the applicant has a foreclosure or short-sale in his history, which, at the time in question, the DU System coded the same.

[15]DU Underwriting Findings at 1, Exhibit 1, Complaint, Docket No. 1.

[16]Complaint at 9, ¶ 34, Docket No. 1.

[17]Id. at ¶ 35.

'foreclosure' which, per DU Guidelines, would prevent [p]laintiffs from obtaining financing for seven (7) years."[18]  Plaintiffs allege that "Pinnacle Lending obtained and relied upon a DU Finding Report it purchased from Defendant Fannie Mae ... which ... falsely stated that [p]laintiffs['] ... mortgage loans were coded as a foreclosure instead of a short sale."[19] Plaintiffs allege, however, that they were not aware at the time that the DU Finding Report falsely coded their short sale as a foreclosure.[20]

In January 2012, plaintiffs again tried to obtain a mortgage.  This time, they contacted Amerifirst Financial to attempt to obtain a pre-qualification letter.[21]  Plaintiffs obtained a pre-qualification letter on January 31, 2012, but on March 1, 2012, after having had their offer on a home accepted, plaintiffs were told that their loan was denied.[22] Plaintiffs allege, that again, unknown to them, "Amerifirst [had] obtained and relied upon a DU Findings Report it purchased from Defendant Fannie Mae ... which ... falsely stated that [p]laintiffs' ... mortgage loans were coded as a foreclosure instead of a short sale."[23]

---

[18]Id. at 10, ¶ 39.

[19]Id. at ¶ 40.  Plaintiffs' tri-merge report reflected a short-sale, not a foreclosure. Exhibit 2, Complaint, Docket No. 1.

[20]Complaint at 10, ¶ 39, Docket No. 1.

[21]Id. at 11, ¶ 44.

[22]Id. at ¶¶ 45-47.

[23]Id. at ¶ 49.

Plaintiffs, "[k]nowing that the 'foreclosure' notation would prevent approval at most lending institutions[,]" next contacted a private bank, Republic Bank, to explore their financing options.[24]  Plaintiffs were able to obtain financing through Republic Bank, but "this financing is significantly more expensive ... than the terms of the previous loan on which they were prequalified."[25]

In February 2013, plaintiffs "contacted Homeowners Financial Group in hopes of refinancing...."[26]  Plaintiffs allege that a false "foreclosure" notation in a DU Findings Report that "Homeowners Financial obtained and relied upon" prevented them from obtaining refinancing.[27] But, plaintiffs allege that they obtained a copy of the DU Findings Report from Homeowners Financial and discovered for the first time that "the proposed loan was not eligible for delivery to Fannie Mae because of a foreclosure[.]"[28]  The recommendation in plaintiffs' DU Findings Report was "refer with caution", which means that the "loan casefile is ineligible for delivery as a DU loan...."[29] Plaintiffs allege that "even though DU correctly identified [their] previous short sale acknowledging that so long as

---

[24]Id. at 13, ¶¶ 55.

[25]Id. at ¶ 57.

[26]Id. at 14, ¶ 62.

[27]Id. at ¶¶ 63-65.

[28]Id. at 15, ¶ 69.

[29]DU Underwriting Findings at 1, Exhibit 1, Complaint, Docket No. 1.

that short sale was more than two (2) years ago, DU also manufactured a non-existent foreclosure for [them] and referred, i.e., denied, their application[s] accordingly."[30]

On October 16, 2013, plaintiffs commenced this action in which they allege that Fannie Mae violated the Fair Credit Reporting Act (FCRA) by failing to adopt and follow "'reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom [a credit] report relates.'"[31]

Pursuant to Rule 12(b)(6), Federal Rules of Civil Procedure, defendants now move to dismiss plaintiffs' complaint.

## Discussion

"Rule 12(b)(6) authorizes courts to dismiss a complaint for 'failure to state a claim upon which relief can be granted.'" In re Rigel Pharmaceuticals, Inc. Securities Litig., 697 F.3d 869, 875 (9th Cir. 2012) (quoting Fed. R. Civ. P. 12(b)(6)).  "To avoid dismissal, the complaint must provide 'more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.'" Id. (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  "[A] plaintiff must 'allege sufficient factual matter ... to state a claim to relief that is plausible on its face.'" OSU Student Alliance v. Ray, 699 F.3d 1053, 1061 (9th Cir. 2012) (quoting Pinnacle Armor, Inc. v. United States, 648 F.3d 708, 721 (9th Cir. 2011)).

---

[30]Complaint at 19, ¶ 82, Docket No. 1.

[31]Id. at 21, ¶ 92 (quoting 15 U.S.C. § 1681e(b)).

"In evaluating a Rule 12(b)(6) motion, the court accepts the complaint's well-pleaded factual allegations as true and draws all reasonable inferences in the light most favorable to the plaintiff."  Adams v. U.S. Forest Srvc., 671 F.3d 1138, 1142-43 (9th Cir. 2012).

Fannie Mae's motion to dismiss

"'Congress enacted the FCRA in 1970 to promote efficiency in the Nation's banking system and to protect consumer privacy.'"  Pintos v. Pacific Creditors Ass'n, 605 F.3d 665, 674 (9th Cir. 2010) (quoting TRW Inc. v. Andrews, 534 U.S. 19, 23 (2001)).  "The legislative history of the FCRA reveals that it was crafted to protect consumers from the transmission of inaccurate information about them and to establish credit reporting practices that utilize accurate, relevant, and current information in a confidential and responsible manner."  Guimond v. Trans Union Credit Information Co., 45 F.3d 1329, 1333 (9th Cir. 1995) (internal citations omitted).  Section 1681e(b) of the FCRA provides:

> Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates.

15 U.S.C. § 1681e(b).  "In order to make out a prima facie violation under § 1681e(b), a consumer must present evidence tending to show that a [consumer] reporting agency prepared a report containing inaccurate information."  Guimond, 45 F.3d at 1333.

Fannie Mae argues that plaintiffs have failed to state a plausible claim under § 1681e(b) because it is not a consumer reporting agency.

-8-

> The term "consumer reporting agency" means any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports.

15 U.S.C. § 1681a(f).

> Thus, an entity can be deemed a consumer reporting agency if four factors are satisfied: (1) it acts in exchange for compensation of the kind described; (2) it "regularly" "assembles" or "evaluates" information on consumers; (3) its purpose in doing so is to furnish consumer reports; and (4) it utilizes interstate commerce in the preparation or furnishing of a consumer report.

Lewis v. Ohio Professional Electronic Network LLC, 190 F. Supp. 2d 1049, 1056 (S.D. Ohio 2002) (quoting 15 U.S.C. § 1681a(f)).

The parties' arguments focus on the second factor, whether Fannie Mae regularly assembles or evaluates information on consumers.  Plaintiffs argue that they have alleged facts sufficient to show that it is plausible that Fannie Mae regularly assembles and evaluates consumer information.  Plaintiffs contend that this is exactly what they have alleged the DU system does, that they have alleged that the DU system assembles and evaluates consumer information in order to provide a preliminary assessment of whether

a loan would meet Fannie Mae's eligibility requirements for purchase.[32]  In short, plaintiffs are arguing that because Fannie Mae's DU system assembles and evaluates consumer information, Fannie Mae is assembling and evaluating consumer information.  Plaintiffs cite to <u>Zabriskie v. Federal National Mortgage Association</u>, Case No. 13-02260-PHX-SRB, slip. op, (D. Ariz. April 17, 2014), in support of their argument.  There, on a motion to dismiss a complaint that is factually similar to plaintiffs' complaint, the court held that "Fannie Mae acts as a 'consumer reporting agency' as the term is defined in the [FRCA] when it licenses its Desktop Underwriter Software."  <u>Id.</u> at 7-8.  This holding was based, in part, on the court's finding that Fannie Mae's "software 'assembles' and 'evaluates' consumer credit information by compiling (i. e., assembling) an individual's credit scores and other information relevant to making lending decisions (such as whether the individual has gone through foreclosure)."  <u>Id.</u> at 7.

        This court respectfully disagrees with the result reached by the court in <u>Zabriskie</u>. It is lenders which obtain an applicant's credit reports from credit reporting agencies and it is the lenders which input information about the applicant into the DU system, which then analyzes the information.  It is <u>not</u> Fannie Mae that is assembling and evaluating the applicant's information.  Rather, it is the software that Fannie Mae has licensed or leased to the lender which is assembles or analyzes the applicant's information.  Fannie Mae

---

        [32]Complaint at 6-7, ¶ 22, Docket No. 1.

merely provides access to the DU system to assist the lenders with purchase eligibility guidance.  The FTC has taken the position that "[a] seller of software to a company that uses the software product to process credit report information is not a CRA because it is not 'assembling or evaluating' any information."[33]  Because Fannie Mae is not actively involved in the compilation of the consumer information, it is not regularly assembling and evaluating consumer information and thus it cannot be a "consumer reporting agency."[34] See Thomas v. Cendant Mortg., Case No. Civ.A. 03–167, 2004 WL 2600772, at *4 (E.D. Pa. Nov. 15, 2004) (holding that Freddie Mac and Fannie Mae were not "consumer reporting agencies" because "[t]heir automated underwriting tools review information assembled by a lender from the credit application, credit report, and other consumer reports and provide the lender with a preliminary assessment of whether the loan would meet the eligibility criteria for purchase by Freddie Mac or Fannie Mae"); Barnes v. DiTech.Com, Case No. 03-CV-6471, 2005 WL 913090, at *4-5 (E.D. Pa. April 19, 2005) (noting that, in connection

---

[33]40 Years of Experience with the Fair Credit Reporting Act:  An FTC Staff Report With Summary of Interpretations at 29, (July 2011); see also, October 27, 1997 Informal Opinion Letter:  Cast (opining that a software provider of a program that merged information from different sources into a final credit report would not be a "consumer reporting agency" because the software provider is not assembling the information.  "The software ... could be said to assemble and evaluate the information, but the software provider no longer has any connection at all to the information.").

[34]Because Fannie Mae does not regularly assemble or evaluate consumer information, the court need not consider whether Fannie Mae meets the other three factors necessary to make it a consumer reporting agency.

with a DU Findings Report, "Fannie Mae did not collect and evaluate [Barnes'] credit information, nor did it direct or recommend whether [DiTech] should approve [Barnes'] loan application. In fact, Fannie Mae did not engage in any affirmative action on [Barnes'] application for credit.").

Fannie Mae also argues that it is not a "consumer reporting agency" because it is acting as a limited agent for the lenders that use the DU system. However, as plaintiffs are quick to point out, there are no allegations in their complaint that would suggest that Fannie Mae is a joint user. Rather, plaintiffs have alleged that Fannie Mae functions independently of its subscribing lenders and that it is licensing or leasing its DU system to lenders for a fee. But, as discussed above, because Fannie Mae is not regularly assembling and evaluating consumer information, it is not a consumer reporting agency.

### FHFA's motion to dismiss

Defendant FHFA moves to dismiss plaintiff's claims against it because plaintiffs have not alleged how the fact of FHFA's conservatorship of Fannie Mae makes it liable under the FCRA. Plaintiffs do not oppose FHFA's dismissal but request that this dismissal be with the condition that FHFA cannot later move to intervene or otherwise participate in this litigation. As FHFA is quick to point out however, such an order would be, in effect, an injunction against FHFA from taking action in this lawsuit, if FHFA at some later point, determined such action was necessary. Such an injunction is not permissible under federal

-12-

law.  See 12 U.S.C. § 4617(f) ("Except as provided in this section or at the request of the Director, no court may take any action to restrain or affect the exercise of powers or functions of the Agency as a conservator or a receiver."); see also, Zabriskie, Case No. 13-cv-2260-PHX-SRB, slip op. at 8-9.

Conclusion

Based on the foregoing, defendants' motions to dismiss[35] are granted.  The clerk of court shall enter judgment dismissing plaintiffs' complaint with prejudice.

DATED at Anchorage, Alaska, this 21st day of July, 2014.

/s/ H. Russel Holland
United States District Judge

---

[35]Docket Nos. 14 & 23.

# EXHIBIT 60

# U.S. District Court
## DISTRICT OF ARIZONA (Phoenix Division)
## CIVIL DOCKET FOR CASE #: 2:13-cv-02107-HRH

McCalmont et al v. Federal National Mortgage Association et al

Assigned to: Judge H Russel Holland

Case in other court: Ninth Circuit, 14-16990

Cause: 15:1681 Fair Credit Reporting Act

Date Filed: 10/16/2013
Date Terminated: 07/21/2014
Jury Demand: Plaintiff
Nature of Suit: 480 Other Statutes: Consumer Credit
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**James McCalmont**
*a married man*

    represented by    **Geoffrey B McCarrell**
Goldsmith & Associates LLC
20545 Center Ridge Rd., Ste. 120
Rocky River, OH 44116
440-934-3025
Fax: 440-934-3026
Email: gmccarrell@sgoldsmithlawoffice.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Paul B Mengedoth**
Mengedoth Law PLLC
20909 N 90th St., Ste. 211
Scottsdale, AZ 85255
480-778-9100
Fax: 480-778-9101
Email: paul@mengedothlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sylvia Antalis Goldsmith**
Goldsmith & Associates LLC
20545 Center Ridge Rd., Ste. 120
Rocky River, OH 44116
440-934-3025
Fax: 440-934-3026
Email: goldsmith@goldsmithlawyers.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Katherine McCalmont**

    represented by    **Geoffrey B McCarrell**

*a married woman*

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Paul B Mengedoth**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sylvia Antalis Goldsmith**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*


V.

**Defendant**

**Federal National Mortgage Association**    represented by    **Erica Julie Stutman**
Snell & Wilmer LLP - Phoenix, AZ
1 Arizona Center
400 E Van Buren
Phoenix, AZ 85004-2202
602-382-6000
Email: estutman@swlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Gregory James Marshall**
Snell & Wilmer LLP - Phoenix, AZ
1 Arizona Center
400 E Van Buren
Phoenix, AZ 85004-2202
602-382-6000
Fax: 602-382-6070
Email: gmarshall@swlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael B Miller**
Morrison & Foerster LLP - New York, NY
250 W 55th St., 24th Fl.
New York, NY 10019-9601
212-468-8000
Fax: 212-468-7900
Email: mbmiller@mofo.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Federal Housing Finance Agency**    represented by    **Dinita L James**

*conservator for*
Federal National Mortgage Association

Gonzalez Saggio & Harlan LLP -
Phoenix, AZ
2999 N 44th St., Ste. 130
Phoenix, AZ 85018
602-840-3301
Fax: 602-297-6688
Email: dinita_james@gshllp.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/16/2013 | 1 | COMPLAINT. Filing fee received: $400.00, receipt number PHX 0970-9724016 filed by James McCalmont, Katherine McCalmont. (submitted by Paul Mengedoth) (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Civil Cover Sheet)(REK) (Entered: 10/16/2013) |
| 10/16/2013 | 2 | SUMMONS Submitted by James McCalmont, Katherine McCalmont. (submitted by Paul Mengedoth) (Attachments: # 1 Summons)(REK) (Entered: 10/16/2013) |
| 10/16/2013 | 3 | Filing fee paid, receipt number PHX 0970-9724016. This case has been assigned to the Honorable H. Russel Holland. All future pleadings or documents should bear the correct case number: CV-13-02107-PHX-HRH. Notice of Availability of Magistrate Judge to Exercise Jurisdiction form attached. (REK) (Entered: 10/16/2013) |
| 10/16/2013 | 4 | Summons Issued as to Federal Housing Finance Agency, Federal National Mortgage Association. (Attachments: # 1 Summons)(REK). *** IMPORTANT: When printing the summons, select "Document and stamps" or "Document and comments" for the seal to appear on the document. (Entered: 10/16/2013) |
| 10/16/2013 | 5 | NOTICE TO FILER OF DEFICIENCY re 1 Complaint, filed by Katherine McCalmont, James McCalmont. Description of deficiency: Document not in compliance with Local Rule 7.1(c): Document should be in PDF format and text searchable. (REK) (Entered: 10/16/2013) |
| 10/21/2013 | 6 | MOTION for Admission Pro Hac Vice as to attorney Sylvia A Goldsmith on behalf of plaintiffs James McCalmont, and Katherine McCalmont. (BAS) (Entered: 10/22/2013) |
| 10/21/2013 | 7 | MOTION for Admission Pro Hac Vice as to attorney Geoffrey B McCarrell on behalf of plaintiffs James McCalmont, and Katherine McCalmont. (BAS) (Entered: 10/22/2013) |
| 10/22/2013 | | PRO HAC VICE FEE PAID. $ 100, receipt number PHX139116 as to Sylvia A Goldsmith, Geoffrey B McCarrell. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (BAS) (Entered: 10/22/2013) |
| 10/22/2013 | 8 | ORDER pursuant to General Order 09-08 granting 6 Motion for Admission Pro Hac Vice; granting 7 Motion for Admission Pro Hac Vice. Per the Court's Administrative Policies and Procedures Manual, applicant has five (5) days in which to register as a user of the Electronic Filing System. Registration to be |

| | | |
|---|---|---|
| | | accomplished via the court's website at www.azd.uscourts.gov. (BAS)(This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (Entered: 10/22/2013) |
| 11/21/2013 | 9 | SERVICE EXECUTED filed by James McCalmont, Katherine McCalmont: Rule 4 Waiver of Service of Summons. Waiver sent on 10/28/2013 to Federal National Mortgage Association . (Mengedoth, Paul) (Entered: 11/21/2013) |
| 12/16/2013 | 10 | MOTION for Extension of Time to File Answer re 1 Complaint, *(Unopposed)* by Federal National Mortgage Association. (Attachments: # 1 Text of Proposed Order) (Marshall, Gregory) (Entered: 12/16/2013) |
| 12/19/2013 | 11 | ORDER granting 10 Unopposed Motion for Extension of Time to Answer. Federal National Mortgage Association answer due 1/13/2014. Signed by Judge H Russel Holland on 12/18/13. (LAD) (Entered: 12/19/2013) |
| 01/08/2014 | 12 | SUMMONS Submitted by James McCalmont, Katherine McCalmont. (Goldsmith, Sylvia) (Entered: 01/08/2014) |
| 01/09/2014 | 13 | Summons Issued as to Federal Housing Finance Agency. (REK). *** IMPORTANT: When printing the summons, select "Document and stamps" or "Document and comments" for the seal to appear on the document. (Entered: 01/09/2014) |
| 01/13/2014 | 14 | MOTION to Dismiss Case by Federal National Mortgage Association. (Attachments: # 1 Exhibit 1)(Stutman, Erica) (Entered: 01/13/2014) |
| 01/20/2014 | 15 | NOTICE OF ATTORNEY'S CHANGE OF ADDRESS/FIRM NAME by Geoffrey B McCarrell. (McCarrell, Geoffrey) (Entered: 01/20/2014) |
| 01/27/2014 | 16 | SERVICE EXECUTED filed by James McCalmont, Katherine McCalmont: Proof of Service re Summons upon Federal Housing Finance Agency on 1/23/2014. (Goldsmith, Sylvia) (Entered: 01/27/2014) |
| 01/27/2014 | 17 | Corporate Disclosure Statement by Federal National Mortgage Association. (Stutman, Erica) (Entered: 01/27/2014) |
| 01/27/2014 | 18 | MOTION to Stay *Dispositive Motion Briefing Or, in the Alternative, Stipulation for Extension of Time to Respond* by James McCalmont, Katherine McCalmont. (Attachments: # 1 Text of Proposed Order)(McCarrell, Geoffrey) (Entered: 01/27/2014) |
| 02/05/2014 | 19 | RESPONSE to Motion re: 18 MOTION to Stay *Dispositive Motion Briefing Or, in the Alternative, Stipulation for Extension of Time to Respond* filed by Federal National Mortgage Association. (Marshall, Gregory) (Entered: 02/05/2014) |
| 02/18/2014 | 20 | ORDER that Plaintiff's 18 Motion to Stay is granted. Unless all parties agree otherwise, plaintiffs' response to FNMA's Motion to Dismiss shall be due 14 days following the filing of FHFA's response to plaintiffs' complaint. Signed by Judge H Russel Holland on 2/18/2014.(LFIG) (Entered: 02/18/2014) |
| 02/28/2014 | 21 | NOTICE OF ATTORNEY APPEARANCE: Dinita L. James appearing for Federal Housing Finance Agency. . (James, Dinita) (Entered: 02/28/2014) |
| 03/17/2014 | 22 | ORDER FROM CHAMBERS: Defendant Federal Housing Finance Agency (FHFA) will please file its response to plaitfns' complaint on or before March 28, |

| | | 2014. (LFIG) (Entered: 03/17/2014) |
|---|---|---|
| 03/28/2014 | 23 | MOTION to Dismiss Case *and Memorandum of Points and Authorities* by Federal Housing Finance Agency. (James, Dinita) (Entered: 03/28/2014) |
| 04/01/2014 | 24 | ORDER that under the terms of the Court's 20 Order, plaintiffs' response to FNMA's 14 MOTION to Dismiss is due April 11, 2014. Signed by Judge H Russel Holland on 4/1/2014. (LFIG) (Entered: 04/01/2014) |
| 04/11/2014 | 25 | RESPONSE in Opposition re: 14 MOTION to Dismiss Case *of Fannie Mae* filed by James McCalmont, Katherine McCalmont. (Attachments: # 1 Exhibit) (Goldsmith, Sylvia) (Entered: 04/11/2014) |
| 04/11/2014 | 26 | RESPONSE to Motion re: 23 MOTION to Dismiss Case *and Memorandum of Points and Authorities of FHFA* filed by James McCalmont, Katherine McCalmont. (Goldsmith, Sylvia) (Entered: 04/11/2014) |
| 04/18/2014 | 27 | REPLY to Response to Motion re: 23 MOTION to Dismiss Case *and Memorandum of Points and Authorities* filed by Federal Housing Finance Agency. (James, Dinita) (Entered: 04/18/2014) |
| 04/18/2014 | 28 | MOTION for Leave to File Supplemental Argument and Authority to Plaitniff's Memorandum in Opposition to Fannie Mae's Motion to Dismiss by James McCalmont, Katherine McCalmont. (Attachments: # 1 Text of Proposed Order) (Mengedoth, Paul) (Entered: 04/18/2014) |
| 04/21/2014 | 29 | ORDER that Plaintiff's 28 Motion for Leave to File Supplemental Argument and Authority to Plaintiffs' Memorandum in Opposition to Fannie Mae's Motion to Dismiss is hereby GRANTED. Signed by Judge H Russel Holland on 4/21/2014. (See Order for details.)(LFIG) (Entered: 04/21/2014) |
| 04/21/2014 | 30 | REPLY to Response to Motion re: 14 MOTION to Dismiss Case filed by Federal National Mortgage Association. (Stutman, Erica) (Entered: 04/21/2014) |
| 04/22/2014 | 31 | MOTION for Leave to File Supplement to its Reply Supporting its Motion to Dismiss by Federal National Mortgage Association. (Attachments: # 1 Text of Proposed Order)(Stutman, Erica) (Entered: 04/22/2014) |
| 04/22/2014 | 32 | *MOTION for Oral Argument on 14 Motion to Dismiss by Defendant Federal National Mortgage Association. (Stutman, Erica) *Modified to add motion type on 4/25/2014 (LSP). (Entered: 04/22/2014) |
| 04/23/2014 | 33 | ORDER FROM CHAMBERS that the 31 Motion for Leave to Supplement is granted and Federal National Mortgage Association's Reply is supplemented with the arguments asserted in the motion. (LFIG) (Entered: 04/23/2014) |
| 06/13/2014 | 34 | ORDER FROM CHAMBERS: Telephonic Oral Argument will be heard on Thursday, July 10, 2014 at 2:30PM (1:30PM Alaska Daylight Time) before Judge H Russel Holland as to the pending 14 , 23 MOTIONS to Dismiss. Counsel who will be participating in the hearing should each call approximately three to five minutes prior to the scheduled start time for the hearing. (LFIG) (Entered: 06/13/2014) |
| 06/27/2014 | 35 | MOTION for Admission Pro Hac Vice as to attorney Michael B Miller on behalf of Federal National Mortgage Association. (BAS) (Entered: 06/30/2014) |

| 06/30/2014 | | PRO HAC VICE FEE PAID. $ 35, receipt number PHX147632 as to Michael B Miller. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (BAS) (Entered: 06/30/2014) |
|---|---|---|
| 06/30/2014 | 36 | ORDER pursuant to General Order 09-08 granting 35 Motion for Admission Pro Hac Vice. Per the Court's Administrative Policies and Procedures Manual, applicant has five (5) days in which to register as a user of the Electronic Filing System. Registration to be accomplished via the court's website at www.azd.uscourts.gov. Counsel is advised that they are limited to two (2) additional e-mail addresses in their District of Arizona User Account. (BAS) (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (Entered: 06/30/2014) |
| 07/10/2014 | 37 | MINUTE ENTRY for proceedings held before Judge H Russel Holland: Motion hearing held on 7/10/14; taking under advisement 14 Motion to Dismiss; taking under advisement 23 Motion to Dismiss, written order to issue. (Court Reporter Nancy Lealaisalanoa.) Hearing held 1:29 PM to 2:00 PM.(LAD) (Entered: 07/10/2014) |
| 07/21/2014 | 38 | ORDER that Defendants' 14 , 23 Motions to Dismiss are granted. The Clerk of Court shall enter judgment dismissing Plaintiffs' complaint with prejudice. Signed by Judge H Russel Holland on 7/21/2014.(LFIG) (Entered: 07/21/2014) |
| 07/21/2014 | 39 | CLERK'S JUDGMENT - IT IS ORDERED AND ADJUDGED that pursuant to the Court's Order filed July 21, 2014, judgment of dismissal is entered. Plaintiffs to take nothing, and the complaint and action are hereby dismissed with prejudice. (LFIG) (Entered: 07/21/2014) |
| 08/13/2014 | 40 | TRANSCRIPT REQUEST 12 (b) (6) Oral Argument by James McCalmont for proceedings held on 07-10-2014, Judge H Russel Holland hearing judge(s). (Goldsmith, Sylvia) (Entered: 08/13/2014) |
| 08/14/2014 | 41 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Telephonic Motion Hearing Proceedings held on 7/10/2014, before Judge Holland. Transcriber Candy Potter. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber by filing a Transcript Order Form on the docket before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 9/4/2014. Redacted Transcript Deadline set for 9/15/2014. Release of Transcript Restriction set for 11/12/2014. (VPB) (Entered: 08/14/2014) |
| 08/18/2014 | 42 | *MOTION to Set Aside Judgment Pursuant to Rule 59(e) with Memorandum of Points and Authorities by James McCalmont, Katherine McCalmont. (Attachments: # 1 Exhibit Proffer, # 2 Text of Proposed Order)(Goldsmith, Sylvia) *Document not in compliance with L.R.Civ 7.1(c); attorney notified on 8/19/2014 (LFIG). (Entered: 08/18/2014) |
| 08/20/2014 | 43 | TRANSCRIPT REQUEST by Federal National Mortgage Association for proceedings held on July 10, 2014, Judge H Russel Holland hearing judge(s). (Marshall, Gregory) (Entered: 08/20/2014) |
| 09/05/2014 | 44 | RESPONSE in Opposition re: 42 MOTION to Set Aside Judgment Pursuant to |

| | | |
|---|---|---|
| | | *Rule 59(e) with Memorandum of Points and Authorities* filed by Federal National Mortgage Association. (Stutman, Erica) (Entered: 09/05/2014) |
| 09/24/2014 | 45 | ORDER that 42 Plaintiffs' motion to amend or alter judgment is denied. Signed by Judge H Russel Holland on 9/24/2014.(KMG) (Entered: 09/24/2014) |
| 10/14/2014 | 46 | NOTICE OF APPEAL to 9th Circuit Court of Appeals re: 45 Order on Motion to Set Aside Judgment by James McCalmont, Katherine McCalmont. Filing fee received: $ 505.00, receipt number 0970-10963204. (Goldsmith, Sylvia) (Entered: 10/14/2014) |
| 10/16/2014 | 47 | USCA Case Number re: 46 Notice of Appeal. Ninth Circuit Case Number 14-16990. (Copies issued by Ninth Circuit) (LFIG) (Entered: 10/16/2014) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 07/17/2015 16:00:16 | | | |
| **PACER Login:** | jd9208:4256163:4023096 | **Client Code:** | 026123-058837 |
| **Description:** | Docket Report | **Search Criteria:** | 2:13-cv-02107-HRH |
| **Billable Pages:** | 5 | **Cost:** | 0.50 |

# EXHIBIT 61

1   Paul B. Mengedoth (018507)
2   **MENGEDOTH LAW PLLC**
    20909 N. 90th Place, Suite 211
3   Scottsdale, AZ 85255
    Tel: (480) 778-9100
4   Fax: (480) 778-9101
5   E-mail:  paul@mengedothlaw.com

6   Sylvia A. Goldsmith, Esq. (*Pro Hac Vice Pending*)
7   Geoff B. McCarrell, Esq. (*Pro Hac Vice Pending*)
8   **LAW OFFICE OF SYLVIA A. GOLDSMITH**
    Park West Building
9   20545 Center Ridge Road, Suite 120
    Rocky River, OH 44116
10  Tel: (440) 934-3025
11  Fax: (440) 934-3026
    E-mail:  sgoldsmith@sgoldsmithlawoffice.com
12
13  *Attorneys for Plaintiffs Richard and Kristin Zabriskie*

14

15              **UNITED STATES DISTRICT COURT**

16                   **DISTRICT OF ARIZONA**

17

18  RICHARD and KRISTIN ZABRISKIE,    )    **No. _____**
19  married individuals,               )
                                       )
20              Plaintiffs,            )
21                                     )          **COMPLAINT**
    v.                                 )
22                                     )
23  FEDERAL NATIONAL MORTGAGE          )    **JURY TRIAL REQUESTED**
    ASSOCIATION and FEDERAL            )
24  HOUSING FINANCE AGENCY as the      )
    Conservator of FEDERAL NATIONAL    )
25  MORTGAGE ASSOCIATION,              )
                                       )
26                                     )
            Defendants.                )
27  _____   )

28

# I.  PRELIMINARY STATEMENT

1.      Plaintiffs Richard and Kristin Zabriskie, mortgage applicants subjected to the repeated violation of and intentional non-compliance with the Fair Credit Reporting Act, 15 U.S.C. §1681 *et seq*. (the "FCRA"), bring this action against Defendants Federal National Mortgage Association ("Fannie Mae") and Federal Housing Finance Agency ("FHFA"), as the Conservator of Fannie Mae.

2.      As a well-known colossus in the secondary mortgage loan market, Fannie Mae also silently plays a dominant role in home mortgage loan origination.  While its involvement in the loan origination process is largely unknown to the public, Fannie Mae exerts a tremendous influence on each step of the application process.  Through its automated underwriting system that it requires lenders to use throughout the country, Fannie Mae obtains, reviews and evaluates consumer credit information in advance of loan origination for its own underwriting purposes; charges lenders, brokers and consumers for this information through the generation and publication of consumer reports; and dictates to lenders and consumers the outcome of mortgage loan applications, including rates and terms.  This process enables Fannie Mae to reap significant profits by carrying out a business model based on risk-based pricing and the collection of fees for each loan application run through its automated underwriting system.

3.      However, despite its role as a consumer reporting agency and/or a reseller of credit information in a typical mortgage transaction, Fannie Mae has

2

deliberately made itself unaccountable to consumers, and intentionally fails to comply with any of the requirements imposed on it by the FCRA.

4.      Fannie Mae's flagrant disregard for the law results from a presumed contention that, as a government-sponsored enterprise, it is somehow exempt from the grave responsibilities imposed by the FCRA on every other company that assembles, disseminates and/or sells consumer credit information.  As such, mortgage applicants like Plaintiffs are harmed because they are denied certain rights guaranteed by the FCRA, including the ability to discover what information may have impacted their loan eligibility, the right to request and/or dispute the information that was considered in connection with their applications, and the right to expect that their credit information was reported with maximum possible accuracy.

## II.  PARTIES

5.      Plaintiffs, Mr. and Mrs. Zabriskie, are married adult individuals who are residents of Gilbert, Maricopa County, Arizona.

6.      Defendant Fannie Mae is a publicly held corporation with a principal place of business located at 3900 Wisconsin Ave., NW Washington, DC 20016-2892, and which regularly conducts business throughout Arizona and in all fifty (50) states in the United States.

7.      Defendant Federal Housing Finance Agency ("FHFA") is an independent federal agency, created under the Housing and Economic Recovery Act of 2008, Pub. L.

3

No. 110–289, 122 Stat. 2654 (codified at 12 U.S.C. § 4617 *et seq.*).  On September 6, 2008, Fannie Mae was placed under the conservatorship of the FHFA.

8.     Fannie Mae is a "consumer reporting agency" as that term is defined by Section 1681*a*(f) of the FCRA.

### III.  JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over this matter pursuant to 15 U.S.C. § 1681*p* and 28 U.S.C. § 1337.

10.     Venue in this judicial district is proper because Mr. and Mrs. Zabriskie reside in this judicial district and many of the facts relevant to this Complaint occurred in this judicial district.

### IV.  FACTUAL ALLEGATIONS

#### A.  Fannie Mae and Its Automated Desktop Underwriter System

11.     Fannie Mae is a shareholder-owned for-profit corporation that is publicly traded on the U.S. Stock Exchange.

12.     Fannie Mae is also a government-sponsored enterprise ("GSE") because it was chartered by Congress to provide a secondary market for home mortgages.  In exchange for its agreement to act as a mortgage loan purchaser in the secondary market, Fannie Mae's charter provides it with certain financial advantages and incentives.

13.     Due to federal banking regulations requiring most primary mortgage lenders to maintain minimum capital, many mortgage lenders in the United States sell their loans to Fannie Mae after they originate the loan.

14.     Fannie Mae, together with its "little brother" Freddie Mac, purchase or guarantee more than 75% of all mortgages originated in the United States, depending upon market conditions and consumer trends.

15.     Fannie Mae purchases what are known as "conventional conforming" loans.  These are loans that are not insured or guaranteed by the federal government, are less than $417,000.00, and have certain prescribed risk characteristics.  Fannie Mae publishes its *Selling Guide* which outlines the specific requirements necessary for eligibility for Fannie Mae purchase.

16.     Fannie Mae buys these conventional conforming loans and either bundles them as securities and sells them to investors, or holds the loans in its own portfolios.

17.     Unknown to the public, and due to its status as one of the two (2) dominant secondary market purchasers of mortgages, along with mortgage lenders' interest in assuring the sale of their loans, Fannie Mae has entered into contracts with numerous mortgage lenders throughout the United States which, in exchange for its advance commitment to buy mortgage loans from these lenders in the secondary market, allow it to dictate the underwriting terms and conditions of most of the conventional conforming loans that these lenders originate.

18.     For the mortgage lenders who have contracts with Fannie Mae and who sell mortgage loans to Fannie Mae in the secondary market, Fannie Mae requires that mortgage brokers and lenders submit residential mortgage applications through its Desktop Underwriter automated underwriting system ("DU") in order to get a quick

5

approval or denial, the best lender/broker pricing, higher debt-to-income ratios, higher loan-to-value ratios, better loan programs not available outside DU, and risk-based pricing, before any commitment is made to the prospective borrowers.

19.     For these brokers and lenders, Fannie Mae leases or licenses its DU system for use by the lenders or mortgage loan brokers and charges these lenders or brokers a fee for each mortgage application run through the DU system.

20.     Fannie Mae's DU system is also used in connection with non-conforming loans that Fannie Mae is not permitted to purchase pursuant to its congressional charter. These other types of loans include, but are not limited to: FHA, Jumbo, and sub-prime loans.

21.     Through the DU system, Fannie Mae obtains an applicant's three-file and/or "tri-merge" consumer report from either a reseller of credit information, or one or more of the three (3) major credit repositories, Equifax, Trans Union and Experian, which Fannie Mae sells to the lender or broker.

22.     Fannie Mae's DU system assembles reviews, assesses and evaluates all of the information it obtains from the lender and/or broker, and the consumer reporting agencies and/or resellers, including the consumer reports, and generates its own report, known most frequently as the *Desktop Underwriting Findings* ("DU Findings").

23.     The DU Findings is a detailed report documenting, among other things, the applicant's credit history, credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, mode of living, assets, income,

debt-to-income ratio, and employment. Further, the DU Findings contains findings, conclusions, comments and results reached by Fannie Mae concerning the applicant's credit and his or her "eligibility" for loan purchase by Fannie Mae, as well as Fannie Mae's recommendation as to whether the lender should grant or originate the loan, deny the loan or approve it subject to certain conditions being satisfied. These DU Findings determinations are made for all types of loans submitted through DU, whether or not Fannie Mae ultimately purchases them in the secondary market.

24.     Upon information and belief, most mortgage brokers and lenders do not disclose all or part of an applicant's DU Findings to the consumers to whom they relate, during the ordinary course of their submission of a mortgage loan application to Fannie Mae.

25.     If Fannie Mae determines that a consumer is ineligible for loan purchase, or may only be approved subject to a change in loan terms, a higher interest rate, the imposition of additional fees, charges, documentation or the satisfaction of certain underwriting conditions based on information contained in the consumer report it obtains, it does not provide the consumer with any notice of the adverse action it has taken, in violation of the FCRA.

26.     Further, despite the fact that it compiles, maintains, issues and sells its DU Findings to lenders and/or brokers on a nationwide basis, Fannie Mae does not provide consumers with disclosures of the files it maintains on them, the sources of the information it reports, summaries of their rights, does not maintain any toll-free

telephone numbers available to consumers and does not investigate any consumer disputes, in further violation of the FCRA.

27.     Fannie Mae has been placed on notice by the Federal Trade Commission, the primary financial regulator first provided with the authority by Congress to interpret the provisions of the FCRA, which long ago emphasized that the FCRA is intended to cover a very broad range of "assembling" or "evaluating" activities that bring many entities within the ambit of the FCRA. *See 40 Years of Experience With the Fair Credit Reporting Act – An FTC Staff Report With Summary of Interpretations* (July 2011) at pp. 28-32 (specifically citing to FTC Staff Opinion Letter, William Haynes (June 9, 1998), 1998 WL 3423759; *In the Matter of First American Real Estate Solutions, LLC ("Credco")*, FTC File No. 952 3267 (Oct. 28, 1998)).

**B.  Plaintiffs Negotiate a Short Sale of Their Virginia Home**

28.     Plaintiffs were the owners of a home in northern Virginia with a loan that was subject to a first mortgage with CitiMortgage, and two (2) Home Equity Lines of Credit with PNC Bank.

29.     In late 2006, Plaintiffs decided to move from Virginia to the Gilbert, Arizona area because Mr. Zabriskie had recently completed a Master's Degree program at Johns Hopkins University, the Zabriskies had recently seen the birth of their third son and could rely on the support of extended family living near Gilbert to help care for the children; and the average cost of living is much less in Arizona, and thus Mrs. Zabriskie could potentially make the transition to a full-time, stay-at-home mother of three (3).

30.     In February 2007, Plaintiffs placed their Virginia home on the market.

31.     Upon receiving a job offer, Mrs. Zabriskie and the kids moved to Arizona so that she could start work, find suitable daycare for the kids, and purchase a home for the family.   Mr. Zabriskie remained in Virginia and continued working and seeing through the sale of the home until he was able to find full-time employment in Arizona.

32.     In June 2007, Plaintiffs purchased their current home in Gilbert.

33.     However, due to economic conditions beyond their control, Plaintiffs were unable to sell their Virginia home as quickly as they had expected, and as a result, Plaintiffs were stuck paying two large monthly mortgage payments for almost a year.

34.     With the unexpectedly low offers that were coming in for the home, Plaintiffs' real estate agent advised them that they would need to slip into default on their mortgage payments for lenders to even consider such offers.

35.     Plaintiffs take great pride in maintaining an excellent credit history, and were current on all of their mortgage payments up to this point, and in fact, had never been late on any payments to any of their creditors before.

36.     As such, Plaintiffs reluctantly allowed their mortgages to slip into delinquency so that they could negotiate a short sale of the home with their lenders.

37.     In April 2008, the short sale of Plaintiffs' Virginia home closed escrow.

38.     Plaintiffs were able to pay off their first lien mortgage in full upon the short sale of their home.   *See* Letter from CitiMortgage to the Zabriskies, dated April 17, 2008 (a copy of which is attached hereto as Exhibit 1).

9

39.     Plaintiffs' other mortgage accounts were also paid off and closed as a result of the short sale, and subsequently reported to the credit reporting agencies as "paid settlement." *See* Letters from PNC Bank to Kristin A. Zabriskie, dated May 29, 2008 and June 25, 2008, respectively (copies of which are attached collectively hereto as Exhibit 2).

40.     Pursuant to Fannie Mae's published Desktop Underwriter Guidelines ("DU Guidelines"), Plaintiffs would not be able to qualify for conventional financing for a minimum of two (2) years following this short sale.

### C.   Plaintiffs Are Denied Mortgage Financing By NationsChoice

41.     In May 2012, having waited the mandatory two (2) years, Plaintiffs contacted NationsChoice Mortgage ("NationsChoice") to obtain pre-qualification for refinancing on their current home mortgage loan.

42.     Despite being prequalified in June, NationsChoice told Plaintiffs that they could not approve the financing because their short sale was flagged as a "foreclosure" which, per DU Guidelines, would prevent Plaintiffs from obtaining conventional financing for seven (7) years.  Plaintiffs were confused since their previous home was never in foreclosure at any point.

43.     Plaintiffs became understandably embarrassed, frustrated and angered, especially when NationsChoice representatives treated Plaintiffs as if they were deadbeats because of the apparent foreclosure on their credit record, and as if they were dumb for seemingly not knowing about it.

10

44.     Plaintiffs corresponded on a daily basis with several representatives from NationsChoice in an effort to clear up the discrepancy and have the loan approved.

45.     In doing so, Plaintiffs contacted both CitiMortgage and PNC to ensure that their previous short sale was being reported accurately to the national credit reporting agencies.

46.     Plaintiffs received response letters from both CitiMortgage and PNC in mid-July 2012 confirming that the mortgage accounts at issue were never reported or identified to the national credit reporting agencies as having been subject to foreclosure, but rather were always reported correspondingly as "paid in full" or "settled in full."

47.     Ultimately, Plaintiffs were shown the door by NationsChoice without being able to secure the financing they were prequalified to receive.

48.     Plaintiffs also lost their application and appraisal fees with the denial.

49.     Although extremely disappointed and dumbfounded with NationsChoice's unforeseen decision, Plaintiffs were nonetheless determined to set the record straight quickly as they stood to decrease their mortgage payment by approximately $500.00 per month through the refinance.

**D.    Plaintiffs' Uncover The False Foreclosure Notation In DU Findings**

50.     Plaintiffs received and reviewed a copy of the DU Findings pertaining to them that NationsChoice had obtained from Fannie Mae, and had relied upon in denying Plaintiffs' application.

51. These DU Findings correctly noted a potential short sale in its *Risk/Eligibility* section:

7 The credit report has identified an account that may have been subject to a preforeclosure sale. The preforeclosure sale must have been completed two or more years from the credit report date, and the loan casefile must comply with all other requirements specific to preforeclosure sales as specified in the Fannie Mae Selling Guide.

| Borrower | Creditor | Account Number |
|---|---|---|
| RICHARD C ZABRISKIE | PNC BANK | |
| RICHARD C ZABRISKIE | PNC BANK | |

52. *See* DU Findings Report, dated July 3, 2012 (redacted excerpts attached hereto as Exhibit 3) at page 2 of 7. These DU Findings further note that so long as the short sale was "completed two or more years from the credit report date" the loan could still be approved. *Id.*

53. However, the DU Findings reported that the proposed loan was not eligible for delivery to Fannie Mae because of a foreclosure:

3 Desktop Underwriter has identified a deed-in-lieu of foreclosure that was reported within the last two years, or a foreclosure that was reported within the last seven years. This loan is ineligible for delivery to Fannie Mae.

| Borrower | Creditor | FC Type | Account Number | Date Reported |
|---|---|---|---|---|
| RICHARD C ZABRISKIE | PNC BANK | Foreclosure | | 07/08 |
| RICHARD C ZABRISKIE | PNC BANK | Foreclosure | | 07/08 |

*See* Exhibit 3 at page 1 of 7. This resulted in a "Refer with Caution" recommendation which amounts to a credit denial per Fannie Mae's *Selling Guide*.

54. NationsChoice also shared with Plaintiffs excerpts from a tri-merge credit report accessed in connection with Plaintiffs' credit application which confirmed that,

12

despite Plaintiffs' short sale (and the delinquent mortgage payments immediately preceding same), Plaintiffs' credit scores remained in the 700s, which would otherwise allow them to obtain conventional mortgage financing.

55.     The tri-merge credit report further confirmed that none of Plaintiffs' creditors were reporting Plaintiffs as having been through a foreclosure.

56.     Plaintiffs now began to understand that their inability to obtain conventional mortgage financing was a result of Fannie Mae's reading (or misreading) of Plaintiffs' accurate credit report information.

### E.   Plaintiffs Are Denied Mortgage Financing By Amerisave

57.     Mrs. Zabriskie, who has worked in the area of loan origination her entire eighteen (18) year career, and who knows what criteria generally meets loan approval, took it upon herself to research into the issue to try and find a quick solution.

58.     Mrs. Zabriskie contacted numerous lenders and brokers who could provide no advice.

59.     Eventually, on or around July 19, 2012, Mrs. Zabriskie was assured by a representative of Amerisave Mortgage Corporation ("Amerisave") that he knew of the specific problem that Plaintiffs were going through and that his company could help with the approval of the financing through a "manual underwriting" process.

60.     Relying on these representations, Plaintiffs applied and were prequalified for conventional mortgage loan refinancing with Amerisave.

61.     However, after obtaining and relying upon a DU Findings report it purchased from Defendant Fannie Mae, which again falsely stated that Plaintiffs' previous mortgage accounts were coded as subject to a foreclosure, Amerisave indicated to Plaintiffs that their application process had hit a snag.

62.     Over the course of the next few months, Plaintiffs worked tirelessly with Amerisave to ultimately gain approval for the loan despite the negative DU Findings report from Fannie Mae.   As part of this process, Plaintiffs paid extra money for Amerisave to attempt a "Rapid Recheck" with one or more credit reporting agency.  *See* Email from Amerisave representative to Mrs. Zabriskie, dated October 5, 2012 (a copy of which is attached hereto as Exhibit 4).

63.     On or around October 5, 2012, despite all of the additional efforts made and documentation clearly evidencing the short sale in the hands of Amerisave, Plaintiffs received a final determination that their loan application with Amerisave had in fact been denied.  *See Statement of Credit Denial, Termination or Change*, dated October 5, 2012 (a copy of which is attached hereto as Exhibit 5).

64.     Amerisave also shared with Plaintiffs excerpts from a tri-merge credit report accessed in connection with Plaintiffs' credit application which confirmed that, despite Plaintiffs' short sale (and the delinquent mortgage payments immediately preceding same), Plaintiffs' credit scores remained in the 700s, which would otherwise allow them to obtain conventional mortgage financing.  *See* Exhibit 5 at page 2 of 2.

14

65.     The tri-merge credit report further confirmed that none of Plaintiffs' creditors were reporting Plaintiffs as having been through a foreclosure.

66.     Thus, Plaintiffs were ultimately unable to secure financing with Amerisave, based at least in part on the false information in the DU Findings report.

67.     Plaintiffs were shocked, embarrassed and devastated.

68.     Amerisave representatives were also discouraged by the result, but told Plaintiffs that it was Fannie Mae who was the ultimate decision-maker.

69.      As with NationsChoice previously, Plaintiffs were out the money spent on application and appraisal fees with the denial.

70.     Plaintiffs were especially aggravated and disheartened by the fact that there was seemingly nothing they nor their prospective lenders could do about the "foreclosure" notation that was preventing them from obtaining financing, and that, to date, they could find no evidence of it anywhere on their personal credit reports.

71.     This determination was especially upsetting and maddening for Mrs. Zabriskie, who believed she had found a solution to the problem after expending significant time and energy researching the issue over the previous several months.

**F.     Plaintiffs Are Approved For Refinancing At A Higher Interest Rate**

72.     Completely at a loss for how to proceed after the most recent denial, the search for a solution became an increasing obsession for Mrs. Zabriskie.  She continued researching endlessly, joining in on internet blogs and forums, and calling the credit bureaus and Fannie Mae directly to get to the bottom of the false foreclosure notation.

15

73.     While customer service representatives of Equifax, Experian and Trans Union blamed Fannie Mae, Fannie Mae did not return Mrs. Zabriskie's calls.

74.     In November 2012, the Zabriskies paid upfront fees of nearly $1,200.00 to an attorney who purported to have a fix to the problem from a credit reporting standpoint. This attempt to solve the problem also failed, and Plaintiffs again spent substantial money without any results to show for it.

75.     As her research continued, Mrs. Zabriskie spoke with a representative of PrimeLending who suggested that the Zabriskies again apply for the financing, but to have the application run through different credit reporting resellers until approved.

76.     In August 2013, over a year after initiating the refinance process, Plaintiffs were finally approved for conventional mortgage financing.

77.     If not for the gumption and perseverance of Mrs. Zabriskie in finding a solution to the problem, the Zabriskies would probably still be without the mortgage financing they rightfully deserve.

78.     However, whereas Amerisave had pre-approved them in July 2012 at an interest rate of **3.5%**, Plaintiffs were now stuck with a rate of **4.375%**.

### G.  DU Wrongly Flags Any Serious Mortgage Delinquency As A Foreclosure

79.     Upon information and belief, the Zabriskies are only two (2) of hundreds of thousands (if not greater numbers) of homeowners who have had a short sale

misidentified by DU as a foreclosure, thereby preventing them from obtaining conventional financing or refinancing.

80.    On March 13, 2013, Fannie Mae released a "Desktop Underwriter Clarification" in response to mounting "requests for clarification on how Desktop Underwriter identifies a foreclosure and a pre-foreclosure sale[.]"    *See* Desktop Underwriter Clarification (a copy of which is attached hereto as Exhibit 6).

81.    In this regard, Fannie Mae described DU's identification of a pre-foreclosure or short sale as follows:

**Preforeclosure Sale Identification**

**Preforeclosure Sale Identification**

A preforeclosure sale or short sale is the sale of a property in lieu of a foreclosure resulting in a payoff of less than the total amount owed, which was pre-approved.  At this time, there are no codes provided in the credit report data received by DU that specifically identify a preforeclosure sale.

With DU Version 8.2 in December 2010, DU began issuing a message based on the presence of Remarks Codes E0047 (Settlement accepted on this account), T0140 (Settled for less than full balance), or R0107 (Account legally paid in full for less than the full balance) on a mortgage or HELOC account.  However, because those codes can be used on any account for any reason, DU is not able to use those codes to identify a preforeclosure sale with 100% accuracy, so it is not able to fully automate the preforeclosure sale waiting period or eligibility requirements.

When DU issues the preforeclosure sale message the lender must confirm that the preforeclosure sale had been completed two or more years from the credit report date, and must confirm that the loan casefile complies with all other requirements specific to preforeclosure sales as specified in the Fannie Mae *Selling Guide*.

*See* Exhibit 6 at 1 of 3.

82.    Per the DU Findings used to deny Plaintiffs their refinance applications, Plaintiffs' previous short sale was specifically identified by DU.  *See* Exhibit 3 at page 2 of 7.

83.    So long as the pre-foreclosure or short sale was completed more than two (2) years before the current application, that prospective loan is still eligible for purchase by Fannie Mae, and DU will not refer, *i.e.*, deny, the application.  *See Selling*

*Guide*, Part B, Subpart 3, Chapter 5 (relevant excerpts of the 2011 and 2013 versions of which are attached collectively hereto as Exhibit 7) at 434 and 465, respectively.

84.     In describing DU's identification of a foreclosure, Fannie Mae represents as follows:

**Foreclosure Identification**

When reviewing the credit report data received, DU reviews the manner of payment (MOP) codes and Remarks Codes associated with each tradeline, and the Public Record information to determine if a foreclosure has occurred.

Mortgage accounts, including first liens, second liens, home improvement loans, HELOCs, and mobile home loans, will be identified as subject to a foreclosure if there is a current status code or MOP code of "8" (foreclosure) or "9" (collection or charge-off); or if there is a foreclosure-related Remarks Code present in the credit report data and associated to the tradeline. If a foreclosure was reported within the seven-year period prior to the report date associated with the tradeline, the loan casefile will receive a Refer with Caution recommendation and will be ineligible for delivery to Fannie Mae as a DU loan.

*See* Exhibit 6 at 1 of 3.

85.     Per this "Desktop Underwriter Clarification," Fannie Mae admits that accounts reported by the original creditor merely as "collection or charge-off" – accounts admittedly not in foreclosure – will be identified by the DU system as having been in foreclosure.

86.     Any prospective loan that DU identifies as having a foreclosure in the previous seven (7) years will automatically be ineligible for purchase by Fannie Mae. *See* Exhibit 7 at 464.

87.     Thus, even though DU correctly identified Plaintiffs' previous short sale, acknowledging that so long as that short sale was more than two (2) years ago, DU also manufactured a non-existent foreclosure for Plaintiffs and referred, *i.e.*, denied, their application accordingly.

88.     This incorrect identification by DU prevented Plaintiffs from obtaining the refinancing for their current home.

### H.  Fannie Mae Acknowledges Deficiency in DU Computer Software

89.     In May 2013, the *Consumer Protection Subcommittee* of the *U.S. Senate Committee on Commerce, Science & Transportation* held a hearing on Capitol Hill to address a variety of problems plaguing the consumer reporting industry.

90.     During this hearing, Senator Bill Nelson, D-Fla., raised serious concerns about the significant and growing numbers of his constituents that had been denied conventional financing due to DU wrongly identifying a foreclosure, in addition to, or instead of, a short sale.

91.     After months of prodding from Senator Nelson, the *Consumer Financial Protection Bureau*, the *National Consumer Reporting Association* and the *National Association of Realtors,* Fannie Mae announced a change to its automated DU system to "fix" the problem:

***Underwriting when Conflicting or Inaccurate Foreclosure Information Provided on DIL or PFS Tradeline***
Fannie Mae has been made aware that there are often inconsistencies in the credit data when DIL and PFS events occur, and in an effort to assist borrowers in obtaining a new loan in an appropriate timeframe, DU will be updated to disregard the foreclosure information on the credit report when instructed to do so by the lender on the online loan application.

When DU identifies a foreclosure on a credit report tradeline that appears to be one that was subject to a DIL or PFS, the lender may instruct DU to disregard the foreclosure information on the credit report by entering "Confirmed CR DIL" or "Confirmed CR PFS" in the Explanation field for question c. in the Declarations section of the online loan application and resubmitting the loan casefile to DU.  When DU sees this indication, the foreclosure information on the credit report tradeline that also has a DIL or PFS Remarks Code will not be used.

*See* Desktop Originator/Desktop Underwriter Release Notes DU Version 9.1 (relevant excerpts of which are attached collectively hereto as Exhibit 8) at 6.

19

92.     While these changes are expected to take effect the week of November 16, 2013, *see* Exhibit 8 at 1, and hopefully will allow consumers to rightfully obtain conventional financing without any hitches going forward, the Zabriskies have already suffered substantial economic and non-economic harm.

## V.  CAUSES OF ACTION

### FAIR CREDIT REPORTING ACT VIOLATIONS

93.     Plaintiff hereby incorporates by reference all well-pleaded allegations contained in the preceding paragraphs as if fully rewritten herein.

94.     Section 1681*o* of the FCRA provides for civil liability against any CRA that is negligent in failing to comply with any requirement imposed under the Act.

95.     Section 1681*n* of the FCRA imposes civil liability on any CRA "who willfully fails to comply with any requirement" of the Act.  *See* 15 U.S.C. § 1681*n*(a).

### Failure To Adopt And/Or Follow Reasonable Procedures

96.     The FCRA mandates that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."  *See* 15 U.S.C. § 1681*e*(b).

97.     The DU Findings Report generated by Fannie Mae's DU system is a consumer report as defined by Section 1681*a*(d) of the FCRA.

98.     On numerous occasions over the past two (2) years, Fannie Mae has prepared a consumer report concerning Plaintiffs, and disseminated such report to one

20

or more third party(s), that failed to assure "maximum possible accuracy" of information pertaining to Plaintiffs.

99.     Fannie Mae willfully and/or negligently failed to follow reasonable procedures to assure maximum possible accuracy of the consumer reports it prepared and/or published concerning Plaintiffs, in violation of 15 U.S.C. § 1681*e*(b).

100.     To the contrary, Fannie Mae has affirmatively adopted and follows an unreasonable foreclosure identification procedure that, on its plain terms, knowingly misidentifies non-foreclosures as foreclosures.

101.     As a direct and proximate result of Fannie Mae's willful and/or negligent refusal to follow reasonable procedures as mandated by the FCRA, Plaintiffs have suffered loss and damage including, but not limited to: financial loss, loss of credit opportunity, a justifiable fear to request credit, expenditure of significant time and resources, mental anguish, humiliation, and embarrassment, entitling them to an award of actual damages in amounts to be proved at trial, plus attorneys' fees together with the costs of this action pursuant to 15 U.S.C. § 1681*o*.

102.     Fannie Mae's refusal to follow reasonable procedures as mandated by the FCRA reveals a conscious disregard of the rights of Plaintiffs.  The injuries suffered by Plaintiffs are attended by circumstances of fraud, malice, retaliation, and willful and wanton misconduct, calling for statutory damages, an assessment of punitive damages, plus attorneys' fees and costs pursuant 15 U.S.C. § 1681*n*.

21

**WHEREFORE**, Plaintiffs, Richard and Kristin Zabriskie, pray for judgment in their favor and against Defendants Fannie Mae and FHFA, and for the following relief:

A.     An award of actual damages in such amounts as determined by the jury;

B.     Statutory damages pursuant to 15 U.S.C. § 1681*n*;

C.     An assessment of punitive damages against Defendant pursuant to 15 U.S.C. § 1681*n*;

D.     Costs and reasonable attorneys' fees pursuant to 15 U.S.C. § 1681*n* and 15 U.S.C. § 1681*o*; and

E.     Such other and further relief as may be just and proper.

## VI.  JURY DEMAND

103.   Plaintiffs hereby demand a trial by jury on all their claims.


DATED: November 4, 2013.                     Respectfully Submitted,


                                             */s/ Paul B. Mengedoth*
                                             Paul B. Mengedoth, Esq.
                                             **MENGEDOTH LAW PLLC**
                                             20909 N. 90th Place., Ste. 211
                                             Scottsdale, AZ 85255

                                             Sylvia A. Goldsmith, Esq. (*Pro Hac Pending*)
                                             Geoff B. McCarrell, Esq. (*Pro Hac Pending*)
                                             **LAW OFFICE OF SYLVIA A. GOLDSMITH**
                                             2639 Wooster Road
                                             Rocky River, OH 44116

                                             *Attorneys for Plaintiffs*

# EXHIBIT 62

# U.S. District Court
## DISTRICT OF ARIZONA (Phoenix Division)
## CIVIL DOCKET FOR CASE #: 2:13-cv-02260-SRB

Zabriskie et al v. Federal National Mortgage Association et al
Assigned to: Judge Susan R Bolton
Cause: 15:1681 Fair Credit Reporting Act

Date Filed: 11/05/2013
Jury Demand: Plaintiff
Nature of Suit: 480 Other Statutes:
Consumer Credit
Jurisdiction: Federal Question

**Plaintiff**

**Richard Zabriskie**
*a married individual*

represented by **Geoffrey B McCarrell**
Law Office of Sylvia A Goldsmith
20545 Center Ridge Rd., Ste. 120
Rocky River, OH 44116
440-934-3025
Fax: 440-934-3026
Email:
gmccarrell@sgoldsmithlawoffice.com
*TERMINATED: 03/06/2015*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Paul B Mengedoth**
Mengedoth Law PLLC
20909 N 90th St., Ste. 211
Scottsdale, AZ 85255
480-778-9100
Fax: 480-778-9101
Email: paul@mengedothlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sylvia Antalis Goldsmith**
Goldsmith & Associates LLC
20545 Center Ridge Rd., Ste. 120
Rocky River, OH 44116
440-934-3025
Fax: 440-934-3026
Email:
goldsmith@goldsmithlawyers.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Kristin Zabriskie**

represented by **Geoffrey B McCarrell**

*a married individual*

(See above for address)
*TERMINATED: 03/06/2015*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Paul B Mengedoth**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sylvia Antalis Goldsmith**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Federal National Mortgage Association**          represented by   **Erica Julie Stutman**
Snell & Wilmer LLP - Phoenix, AZ
1 Arizona Center
400 E Van Buren
Phoenix, AZ 85004-2202
602-382-6000
Email: estutman@swlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Gregory James Marshall**
Snell & Wilmer LLP - Phoenix, AZ
1 Arizona Center
400 E Van Buren
Phoenix, AZ 85004-2202
602-382-6000
Fax: 602-382-6070
Email: gmarshall@swlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joanna M Zdanys**
Morrison & Foerster LLP - New York,
NY
250 W 55th St., 24th Fl.
New York, NY 10019-9601
212-468-8000
Fax: 212-468-7900
Email: jzdanys@mofo.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael B Miller**
Morrison & Foerster LLP - New York,
NY
250 W 55th St., 24th Fl.
New York, NY 10019-9601
212-468-8000
Fax: 212-468-7900
Email: mbmiller@mofo.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Federal Housing Finance Agency**          represented by **Dinita L James**
*TERMINATED: 04/17/2014*                        Gonzalez Saggio & Harlan LLP -
*conservator for*                                              Phoenix, AZ
Federal National Mortgage Association          2999 N 44th St., Ste. 130
*TERMINATED: 04/17/2014*                        Phoenix, AZ 85018
                                                                  602-840-3301
                                                                  Fax: 602-297-6688
                                                                  Email: dinita_james@gshllp.com
                                                                  *LEAD ATTORNEY*
                                                                  *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/05/2013 | 1 | COMPLAINT. Filing fee received: $400.00, receipt number PHX 0970-9796549 filed by Kristin Zabriskie, Richard Zabriskie. (submitted by Paul Mengedoth) (Attachments: # 1 Civil Cover Sheet)(REK) (Entered: 11/05/2013) |
| 11/05/2013 | 2 | SUMMONS Submitted by Kristin Zabriskie, Richard Zabriskie. (submitted by Paul Mengedoth) (Attachments: # 1 Summons)(REK) (Entered: 11/05/2013) |
| 11/05/2013 | 3 | Filing fee paid, receipt number PHX 0970-9796549. This case has been assigned to the Honorable David K. Duncan. All future pleadings or documents should bear the correct case number: CV-13-02260-PHX-DKD. Magistrate Election form attached. (Attachments: # 1 Magistrate Consent Form)(REK) (Entered: 11/05/2013) |
| 11/05/2013 | 4 | Summons Issued as to Federal Housing Finance Agency, Federal National Mortgage Association. (Attachments: # 1 Summons)(REK). *** IMPORTANT: When printing the summons, select "Document and stamps" or "Document and comments" for the seal to appear on the document. (Entered: 11/05/2013) |
| 11/05/2013 | 5 | *Additional Attachments to Main Document re 1 Complaint by Plaintiffs Kristin Zabriskie, Richard Zabriskie. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8) (Mengedoth, Paul) *Modified to reflect document filed without case number on 11/6/2013 (ALS). (Entered: 11/05/2013) |
| 11/06/2013 | 6 | MOTION for Admission Pro Hac Vice as to attorney Geoffrey B. McCarrell by Kristin Zabriskie, Richard Zabriskie. (McCarrell, Geoffrey) (Entered: 11/06/2013) |

| | | |
|---|---|---|
| 11/06/2013 | 7 | MOTION for Admission Pro Hac Vice as to attorney Sylvia A. Goldsmith by Kristin Zabriskie, Richard Zabriskie. (Goldsmith, Sylvia) (Entered: 11/06/2013) |
| 11/15/2013 | 8 | Agreement to Magistrate Judge Jurisdiction. Party agrees to Magistrate Judge Jurisdiction. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (MAP) (Entered: 11/15/2013) |
| 11/18/2013 | | PRO HAC VICE FEE PAID. $ 100, receipt number PHX140126 as to Sylvia Antalis Goldsmith, Geoffrey B McCarrell. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (BAS) (Entered: 11/18/2013) |
| 11/18/2013 | 9 | ORDER pursuant to General Order 09-08 granting 6 Motion for Admission Pro Hac Vice; granting 7 Motion for Admission Pro Hac Vice. Per the Court's Administrative Policies and Procedures Manual, applicant has five (5) days in which to register as a user of the Electronic Filing System. Registration to be accomplished via the court's website at www.azd.uscourts.gov. (BAS)(This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (Entered: 11/18/2013) |
| 11/21/2013 | 10 | SERVICE EXECUTED filed by Kristin Zabriskie, Richard Zabriskie: Rule 4 Waiver of Service of Summons. Waiver sent on 11/20/2013 to Federal National Mortgage Association . (Mengedoth, Paul) (Entered: 11/21/2013) |
| 01/09/2014 | 11 | SUMMONS Submitted by Kristin Zabriskie, Richard Zabriskie. (Goldsmith, Sylvia) (Entered: 01/09/2014) |
| 01/10/2014 | 12 | Summons Reissued as to Federal Housing Finance Agency. (REK) (Entered: 01/10/2014) |
| 01/13/2014 | 13 | MOTION to Dismiss Case by Federal National Mortgage Association. (Attachments: # 1 Exhibit 1)(Stutman, Erica) (Entered: 01/13/2014) |
| 01/14/2014 | 14 | Party Elects Assignment of Case to District Judge Jurisdiction. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (MAP) (Entered: 01/15/2014) |
| 01/15/2014 | 15 | MINUTE ORDER: Pursuant to Local Rule 3.7(b), a request has been received for a random reassignment of this case to a District Judge. FURTHER ORDERED Case reassigned by random draw to Judge Susan R. Bolton. All further pleadings/papers should now list the following COMPLETE case number: CV-13-2260-PHX-SRB. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (MAP) (Entered: 01/15/2014) |
| 01/16/2014 | 16 | NOTICE TO PARTY OF DEFICIENCY RE CORPORATE DISCLOSURE STATEMENT: Pursuant to FRCiv 7.1 and LRCiv 7.1.1 the attached Corporate Disclosure Statement form must be filed by all nongovernmental corporate parties with their first appearance. A supplemental statement must be filed upon any change in the information. In addition, if not already filed, the Corporate Disclosure Statement should be filed within 14 days. Corporate Disclosure Statement Deadline set as to Federal National Mortgage Association. (MAW) (Entered: 01/16/2014) |
| 01/27/2014 | 17 | *NOTICE of Mailing and Receipt filed by Kristin Zabriskie, Richard Zabriskie: Proof of Service re Summons upon Federal Housing Finance Agency on 1/23/2014. (Goldsmith, Sylvia) *Modified from Service Executed on 1/28/2014; proof of |

| | | receipt not attached* (REW). (Entered: 01/27/2014) |
|---|---|---|
| 01/27/2014 | 18 | Corporate Disclosure Statement by Federal National Mortgage Association. (Stutman, Erica) (Entered: 01/27/2014) |
| 01/27/2014 | 19 | MOTION to Stay *Dispositive Motion Briefing Or, in the Alternative, Stipulation for Extension of Time to Respond* by Kristin Zabriskie, Richard Zabriskie. (Attachments: # 1 Text of Proposed Order)(McCarrell, Geoffrey) (Entered: 01/27/2014) |
| 02/05/2014 | 20 | RESPONSE to Motion re: 19 MOTION to Stay *Dispositive Motion Briefing Or, in the Alternative, Stipulation for Extension of Time to Respond* filed by Federal National Mortgage Association. (Marshall, Gregory) (Entered: 02/05/2014) |
| 02/19/2014 | 21 | *MOTION for Leave to File Reply Brief by Kristin Zabriskie, Richard Zabriskie. (Attachments: # 1 Text of Proposed Order)(Goldsmith, Sylvia) *Modified on 2/20/2014; document is not text searchable* (REW). (Entered: 02/19/2014) |
| 02/19/2014 | 22 | *FILED at 26 - LODGED Proposed Reply Brief re: 21 MOTION for Leave to File Reply Brief. Document to be filed by Clerk if Motion or Stipulation for Leave to File or Amend is granted. Filed by Kristin Zabriskie, Richard Zabriskie. (Goldsmith, Sylvia) *Modified to remove document number/link on 2/20/2014* (REW). (Entered: 02/19/2014) |
| 02/20/2014 | 23 | ORDER: On February 19, 2014, Plaintiffs filed a Motion for Leave to File Reply Brief One Day Late Due to New Information 21 . IT IS ORDERED that the Motion for Leave to File Reply Brief One Day Late Due to New Information will be denied within 3 days of the date of this order if counsel does not comply with the ECF Administrative Policies and Procedures Manual, Section II(G), specifically, subparagraph 1b. Signed by Judge Susan R Bolton on 2/20/14. (MAW) (Entered: 02/20/2014) |
| 02/20/2014 | 24 | ORDER: IT IS ORDERED denying Plaintiff's Motion to Stay Dispositive Motion Briefing 19 . IT IS ORDERED granting the Stipulation for Extension of Time to Respond. Plaintiffs' response to Federal National Mortgage Association's Motion to Dismiss shall be filed no later than 14 days from the date of this Order 19 . Signed by Judge Susan R Bolton on 2/20/14.(MAW) (Entered: 02/20/2014) |
| 02/21/2014 | 25 | ORDER granting 21 Plaintiffs leave to file a reply to Defendant Federal National Mortgage Association's Response to Plaintiff's Motion to Stay Dispositive Motion Briefing. Signed by Judge Susan R Bolton on 2/21/14.(MAW) (Entered: 02/21/2014) |
| 02/21/2014 | 26 | REPLY to Response to Motion re: 19 MOTION to Stay Dispositive Motion Briefing filed by Kristin Zabriskie, Richard Zabriskie. (REW) (Entered: 02/24/2014) |
| 02/28/2014 | 27 | NOTICE of Appearance by Dinita L James on behalf of Federal Housing Finance Agency. (James, Dinita) (Entered: 02/28/2014) |
| 03/06/2014 | 28 | RESPONSE in Opposition re: 13 MOTION to Dismiss Case filed by Kristin Zabriskie, Richard Zabriskie. (Goldsmith, Sylvia) (Entered: 03/06/2014) |
| 03/13/2014 | 29 | *MOTION for Extension of Time to File Response/Reply as to 13 MOTION to |

| | | |
|---|---|---|
| | | Disimss *(First Request)* by Federal National Mortgage Association. (Attachments: # 1 Text of Proposed Order)(Stutman, Erica) *Modified to correct document number/link on 3/14/2014* (REW). (Entered: 03/13/2014) |
| 03/13/2014 | 30 | ORDER granting 29 Motion for Extension of Time to File Reply and Defendant Federal National Mortgage Association shall have up to and including Friday, April 4, 2014, to reply in support of its Motion to Dismiss 13 . Signed by Judge Susan R Bolton on 3/13/14.(MAW) (Entered: 03/13/2014) |
| 03/28/2014 | 31 | *MOTION to Dismiss for Failure to State a Claim *and Memorandum of Points and Authorities* by Federal Housing Finance Agency. (James, Dinita) *Modified to correct Motion event on 3/31/2014* (REW). (Entered: 03/28/2014) |
| 04/04/2014 | 32 | REPLY to Response to Motion re: 13 MOTION to Dismiss Case filed by Federal National Mortgage Association. (Stutman, Erica) (Entered: 04/04/2014) |
| 04/11/2014 | 33 | RESPONSE to Motion re: 31 MOTION to Dismiss for Failure to State a Claim filed by Kristin Zabriskie, Richard Zabriskie. (Goldsmith, Sylvia) (Entered: 04/11/2014) |
| 04/17/2014 | 34 | ORDER, denying Federal National Mortgage Association's Motion to Dismiss 13 ; granting Defendant Federal Housing Finance Agency's Motion to Dismiss and Memorandum of Points and Authorities 31 . Signed by Judge Susan R Bolton on 4/17/14.(REW) (Entered: 04/17/2014) |
| 04/17/2014 | 35 | ORDER: Scheduling Conference set for 6/23/2014 at 10:45 AM before Judge Susan R Bolton [see attached Order for details]. Signed by Judge Susan R Bolton on 4/17/14. (MAW) (Entered: 04/17/2014) |
| 05/01/2014 | 36 | ANSWER to 1 Complaint by Federal National Mortgage Association.(Marshall, Gregory) (Entered: 05/01/2014) |
| 06/16/2014 | 37 | REPORT of Rule 26(f) Planning Meeting by Federal National Mortgage Association. (Stutman, Erica) (Entered: 06/16/2014) |
| 06/18/2014 | 38 | NOTICE of Service of Discovery filed by Federal National Mortgage Association. (Stutman, Erica) (Entered: 06/18/2014) |
| 06/19/2014 | 39 | NOTICE of Service of Discovery filed by Kristin Zabriskie, Richard Zabriskie. (Goldsmith, Sylvia) (Entered: 06/19/2014) |
| 06/23/2014 | 40 | MINUTE ENTRY for proceedings held before Judge Susan R Bolton: Scheduling Conference held on 6/23/2014. Deadlines discussed and entered. Scheduling Order to follow. A copy of the form of the Joint Proposed Pretrial Order is provided to counsel this date. APPEARANCES: Paul Mengedoth and Sylvia Goldsmith [telephonically] for Plaintiffs. Gregory Marshall and Erica Stutman for Defendant. (Court Reporter Liz Lemke) Hearing held 10:51 AM to 10:58 AM. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (MAW) (Entered: 06/23/2014) |
| 06/23/2014 | 41 | NOTICE re: Issuance of Subpoenas Duces Tecum by Federal National Mortgage Association . (Attachments: # 1 Exhibit A)(Stutman, Erica) (Entered: 06/23/2014) |

| 06/24/2014 | 42 | SCHEDULING ORDER: Discovery due by 3/27/2015. Dispositive motions due by 5/29/2015. Proposed Pretrial Order due by 10/26/2015. Final Pretrial Conference set for 11/2/2015 at 11:00 AM before Judge Susan R Bolton. Jury Trial set for 11/10/2015 at 09:00 AM before Judge Susan R Bolton [see attached Order for details]. Signed by Judge Susan R Bolton on 6/23/14. (MAW) (Entered: 06/24/2014) |
|---|---|---|
| 06/25/2014 | 43 | NOTICE re: Issuance of Subpoena Duces Tecum by Federal National Mortgage Association . (Attachments: # 1 Exhibit A)(Stutman, Erica) (Entered: 06/25/2014) |
| 07/09/2014 | 44 | NOTICE re: Issuance of Subpoena to Amerisave Mortgage Corporation by Federal National Mortgage Association . (Attachments: # 1 Exhibit A)(Stutman, Erica) (Entered: 07/09/2014) |
| 08/05/2014 | 45 | NOTICE of Service of Discovery filed by Federal National Mortgage Association. (Marshall, Gregory) (Entered: 08/05/2014) |
| 10/21/2014 | 46 | NOTICE of Service of Discovery filed by Federal National Mortgage Association. (Stutman, Erica) (Entered: 10/21/2014) |
| 10/30/2014 | 47 | NOTICE of Service of Discovery filed by Kristin Zabriskie, Richard Zabriskie. (Goldsmith, Sylvia) (Entered: 10/30/2014) |
| 10/31/2014 | 48 | NOTICE of Service of Discovery filed by Federal National Mortgage Association. (Stutman, Erica) (Entered: 10/31/2014) |
| 10/31/2014 | 49 | NOTICE of Service of Discovery filed by Kristin Zabriskie, Richard Zabriskie. (Goldsmith, Sylvia) (Entered: 10/31/2014) |
| 11/17/2014 | 50 | MOTION for Admission Pro Hac Vice as to attorney Michael B Miller on behalf of Federal National Mortgage Association. (BAS) (Entered: 11/18/2014) |
| 11/17/2014 | 51 | MOTION for Admission Pro Hac Vice as to attorney Joanna M Zdanys on behalf of Federal National Mortgage Association. (BAS) (Entered: 11/18/2014) |
| 11/18/2014 |  | PRO HAC VICE FEE PAID. $ 35, receipt number PHX152444 as to Michael B Miller. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (BAS) (Entered: 11/18/2014) |
| 11/18/2014 |  | PRO HAC VICE FEE PAID. $ 35, receipt number PHX152443 as to Joanna M Zdanys. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (BAS) (Entered: 11/18/2014) |
| 11/18/2014 | 52 | ORDER pursuant to General Order 09-08 granting 50 Motion for Admission Pro Hac Vice; granting 51 Motion for Admission Pro Hac Vice. Per the Court's Administrative Policies and Procedures Manual, applicant has five (5) days in which to register as a user of the Electronic Filing System. Registration to be accomplished via the court's website at www.azd.uscourts.gov. Counsel is advised that they are limited to two (2) additional e-mail addresses in their District of Arizona User Account. (BAS) (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (Entered: 11/18/2014) |
| 11/24/2014 | 53 | MOTION to Stay *Proceedings Pending Ninth Circuit Court of Appeals Ruling in McCalmont v. Federal National Mortgage Association* by Federal National Mortgage Association. (Attachments: # 1 Exhibit A, # 2 Text of Proposed Order) |

| | | (Marshall, Gregory) (Entered: 11/24/2014) |
|---|---|---|
| 11/26/2014 | 54 | NOTICE of Service of Discovery filed by Federal National Mortgage Association. (Stutman, Erica) (Entered: 11/26/2014) |
| 12/08/2014 | 55 | Joint MOTION to Amend/Correct 42 Scheduling Order by Federal National Mortgage Association. (Attachments: # 1 Text of Proposed Order Proposed Amended Scheduling Order)(Marshall, Gregory) (Entered: 12/08/2014) |
| 12/08/2014 | 56 | WITHDRAWAL OF DOCUMENT re: 53 MOTION to Stay *Proceedings Pending Ninth Circuit Court of Appeals Ruling in McCalmont v. Federal National Mortgage Association* by Defendant Federal National Mortgage Association. (Marshall, Gregory) (Entered: 12/08/2014) |
| 12/09/2014 | 57 | ORDER granting 55 Motion to to Amend Scheduling Order [see attached Order for details]. Signed by Judge Susan R Bolton on 12/9/14.(MAW) (Entered: 12/09/2014) |
| 12/29/2014 | 58 | NOTICE re: Federal National Mortgage Association's Notice of Issurance of Subpoenas Duces Tecum by Federal National Mortgage Association . (Stutman, Erica) (Entered: 12/29/2014) |
| 01/12/2015 | 59 | NOTICE re: Issuance of Subpoenas Duces Tecum by Federal National Mortgage Association . (Attachments: # 1 Exhibit A)(Stutman, Erica) (Entered: 01/12/2015) |
| 02/11/2015 | 60 | NOTICE of Service of Discovery filed by Federal National Mortgage Association. (Stutman, Erica) (Entered: 02/11/2015) |
| 02/11/2015 | 61 | NOTICE of Errata re: 60 Notice of Service of Discovery by Defendant Federal National Mortgage Association.. (Attachments: # 1 Exhibit A)(Stutman, Erica) (Entered: 02/11/2015) |
| 02/20/2015 | 62 | MOTION to Stay *of Proceedings* by Federal National Mortgage Association. (Attachments: # 1 Exhibit A)(Stutman, Erica) (Entered: 02/20/2015) |
| 03/06/2015 | 63 | *NOTICE of Attorney Withdrawal *Geoff B. McCarrell* filed by Sylvia Antalis Goldsmith. (Goldsmith, Sylvia) *Modified on 3/9/2015; document not in compliance with LRCiv 7.1(a)* (REW). (Entered: 03/06/2015) |
| 03/06/2015 | 64 | RESPONSE in Opposition re: 62 MOTION to Stay *of Proceedings* filed by Kristin Zabriskie, Richard Zabriskie. (Mengedoth, Paul) (Entered: 03/06/2015) |
| 03/13/2015 | 65 | REPLY to Response to Motion re: 62 MOTION to Stay *of Proceedings* filed by Federal National Mortgage Association. (Stutman, Erica) (Entered: 03/13/2015) |
| 03/30/2015 | 66 | STIPULATION *for Extension of Time for Federal National Mortgage Association to Disclose Expert Witnesses* by Federal National Mortgage Association. (Attachments: # 1 Text of Proposed Order)(Stutman, Erica) (Entered: 03/30/2015) |
| 03/30/2015 | 67 | ORDER denying 62 Federal National Mortgage Association's Motion for Stay of Proceedings Pending Ninth Circuit Court of Appeals Ruling in McCalmont v. Federal National Mortgage Association [see attached Order for details]. Signed by Judge Susan R Bolton on 3/30/15.(MAW) (Entered: 03/30/2015) |
| 03/30/2015 | 68 | ORDER pursuant to 66 Stipulation: IT IS HEREBY ORDERED that the deadline by which Fannie Mae must disclose its expert witnesses is extended from the |

| | | |
|---|---|---|
| | | current date of March 31, 2015, to the day seven days after the deposition of Plaintiffs' second expert witness. Signed by Judge Susan R Bolton on 3/30/15. (MAW) (Entered: 03/30/2015) |
| 04/08/2015 | 69 | NOTICE of Service of Discovery filed by Federal National Mortgage Association. (Stutman, Erica) (Entered: 04/08/2015) |
| 04/13/2015 | 70 | NOTICE of Service of Discovery filed by Kristin Zabriskie, Richard Zabriskie. (Goldsmith, Sylvia) (Entered: 04/13/2015) |
| 04/22/2015 | 71 | NOTICE of Service of Discovery filed by Federal National Mortgage Association. (Stutman, Erica) (Entered: 04/22/2015) |
| 04/28/2015 | 72 | NOTICE of Service of Discovery filed by Federal National Mortgage Association. (Stutman, Erica) (Entered: 04/28/2015) |
| 04/30/2015 | 73 | NOTICE re: Issuance of Subpoenas Duces Tecum by Federal National Mortgage Association . (Stutman, Erica) (Entered: 04/30/2015) |
| 05/06/2015 | 74 | NOTICE re: Issuance of Subpoenas Duces Tecum by Federal National Mortgage Association . (Stutman, Erica) (Entered: 05/06/2015) |
| 05/07/2015 | 75 | NOTICE of Service of Discovery filed by Federal National Mortgage Association. (Stutman, Erica) (Entered: 05/07/2015) |
| 05/12/2015 | 76 | MOTION for Protective Order by Kristin Zabriskie, Richard Zabriskie. (Attachments: # 1 Text of Proposed Order)(Goldsmith, Sylvia) (Entered: 05/12/2015) |
| 05/13/2015 | 77 | PROTECTIVE ORDER. Signed by Judge Susan R Bolton on 5/13/15. (MAW) (Entered: 05/13/2015) |
| 05/15/2015 | 78 | Joint MOTION to Amend/Correct 57 Order on Motion to Amend/Correct by Federal National Mortgage Association. (Attachments: # 1 Text of Proposed Order) (Miller, Michael) Modified on 5/18/2015 (REW). (Entered: 05/15/2015) |
| 05/18/2015 | 79 | ORDER granting 78 Motion to Amend Scheduling Order. The Discovery deadline is extended from the current date of May 26, 2015, to June 26, 2015; and the deadline to supplement is extended from the current date of April 28, 2015, to June 26, 2015. Signed by Judge Susan R Bolton on 5/18/15.(MAW) (Entered: 05/18/2015) |
| 05/21/2015 | 80 | NOTICE re: Issuance of Subpoena Duces Tecum by Federal National Mortgage Association . (Miller, Michael) (Entered: 05/21/2015) |
| 05/22/2015 | 81 | NOTICE re: Issuance of Subpoena Duces Tecum by Federal National Mortgage Association . (Stutman, Erica) (Entered: 05/22/2015) |
| 06/05/2015 | 82 | NOTICE of Service of Discovery filed by Federal National Mortgage Association. (Stutman, Erica) (Entered: 06/05/2015) |
| 06/07/2015 | 83 | Joint MOTION to Amend/Correct 79 Order on Motion to Amend/Correct ; *Joint Motion to Amend Scheduling Order* by Federal National Mortgage Association. (Miller, Michael) (Entered: 06/07/2015) |
| 06/08/2015 | 84 | ORDER: On June 7, 2015, Defendant filed a Joint Motion to Amend Scheduling Order 83 . IT IS ORDERED that the Joint Motion to Amend Scheduling Order will |

| | | |
|---|---|---|
| | | be denied within 3 days of the date of this order if counsel does not comply with the ECF Administrative Policies and Procedures Manual, Section II(G), specifically, subparagraph 1b. Signed by Judge Susan R Bolton on 6/8/15. (MAW) (Entered: 06/08/2015) |
| 06/08/2015 | 85 | NOTICE of Errata re: 84 Order, 83 Joint MOTION to Amend/Correct 79 Order on Motion to Amend/Correct *; Joint Motion to Amend Scheduling Order* by Plaintiffs Kristin Zabriskie, Richard Zabriskie.. (Attachments: # 1 Text of Proposed Order Exhibit A)(Mengedoth, Paul) (Entered: 06/08/2015) |
| 06/10/2015 | 86 | ORDER granting 83 Joint Motion to Amend Scheduling Order. Discovery due by 7/31/2015. Dispositive motions due by 9/28/2015. Proposed Pretrial Order due by 2/22/2016. Final Pretrial Conference re-set to 2/29/2016 at 10:00 AM. Jury Trial re-set to 3/8/2016 at 09:00 AM. IT IS FURTHER ORDERED that no further continuances will be granted [see attached Order for details]. Signed by Judge Susan R Bolton on 6/10/15.(MAW) (Entered: 06/10/2015) |
| 07/01/2015 | 87 | NOTICE of Service of Discovery filed by Kristin Zabriskie, Richard Zabriskie. (Goldsmith, Sylvia) (Entered: 07/01/2015) |
| 07/03/2015 | 88 | NOTICE of Service of Discovery filed by Kristin Zabriskie, Richard Zabriskie. (Goldsmith, Sylvia) (Entered: 07/03/2015) |
| 07/09/2015 | 89 | NOTICE of Service of Discovery filed by Federal National Mortgage Association. (Stutman, Erica) (Entered: 07/09/2015) |
| 07/10/2015 | 90 | **STRICKEN BY ORDER DOC. 91* MOTION for Discovery *Relief from Rule 30(d) Deposition Time Limitation* by Kristin Zabriskie, Richard Zabriskie. (Attachments: # 1 Text of Proposed Order, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit)(Goldsmith, Sylvia) Modified on 7/10/2015 (TCA). (Entered: 07/10/2015) |
| 07/10/2015 | 91 | ORDER striking 90 Motion for Relief from Rule 30(d) Deposition Time Limitations. Signed by Judge Susan R Bolton on 7/10/2015.(TCA) (Entered: 07/10/2015) |
| 07/15/2015 | 92 | NOTICE re: re Issuance of Subpoena with 30(b)(6) and Duces Tecum by Kristin Zabriskie, Richard Zabriskie . (Attachments: # 1 Subpoena)(Goldsmith, Sylvia) (Entered: 07/15/2015) |
| 07/15/2015 | 93 | NOTICE re: re Issuance of Subpoena Duces Tecum to Nations Choice Mortgage by Kristin Zabriskie, Richard Zabriskie . (Attachments: # 1 Subpoena)(Goldsmith, Sylvia) (Entered: 07/15/2015) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 07/17/2015 12:58:40 | | | |
| **PACER Login:** | jd9208:4256163:4023096 | **Client Code:** | 026123-058837 |
| **Description:** | Docket Report | **Search Criteria:** | 2:13-cv-02260-SRB |
| **Billable** | | | |

| Pages: | | 8 | | Cost: | | 0.80 | |

# EXHIBIT 63

```
 1            IN THE UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF CALIFORNIA
 2            CIVIL ACTION NO. 13CV1295 JLS BLM
 3
      JOHN T. SHAW; KENNETH COKE; and )
 4    RAYMOND RYDMAN, on behalf of     )
      themselves and all others       )
 5    similarly situated,             )
                                      )
 6                        Plaintiff,  )
                                      )
 7              -vs-                   )
                                      )
 8    EXPERIAN INFORMATION SOLUTIONS, )
      INC., WELLS FARGO BANK, NA and  )
 9    CITIMORTGAGE, INC.,            )
                                      )
10                        Defendants.  )
11
12
                DEPOSITION OF TIMOTHY LOBDELL
13
14
              The deposition upon oral examination of
15    TIMOTHY LOBDELL, a witness produced and sworn
      before me, Rhonda J. Hobbs, RPR, Notary Public, in
16    and for the County of Marion, State of Indiana,
      taken on behalf of the Plaintiff at the offices of
17    Cento Law, LLC, 334 North Senate Avenue,
      Indianapolis, Marion County, Indiana, on the 18th
18    day of March, 2015, commencing at the hour of 11:05
      a.m, pursuant to the Federal Rules of Civil
19    Procedure with written notice as to the time and
      place thereof.
20
21
22
23
24
25      Pages 1 - 67
```

Page 1

```
1    Q    I see.

2    A    But for as much noise as it was making, my

3         perception was the numbers were hundreds maybe.

4         Not thousands or ten thousands.

5    Q    Okay.  Do you know how many -- about how many

6         meetings you had with Fannie Mae on this issue?

7              MR. WIERS:  What do you mean by meeting?

8    A    If you define meeting as discussions, probably

9         30, 40.

10   Q    Okay.

11   A    If you want to talk like a bigger meeting with

12        technical folks from all sides, there were at

13        least a handful.

14   Q    Okay.  Let's talk about the -- let's break that

15        up and talk about the meetings with the

16        technical people, the handful of meetings.

17   A    Uh-huh.

18   Q    Was it always the same group or did it change?

19   A    There'd be different participants.

20   Q    Were there -- you were in it, obviously.  Do you

21        remember who was in those meetings for Fannie

22        Mae?

23   A    Could have been Stacey Shifman, Cindi Danko

24   Q    Price?

25   A    Randy Price -- there were a couple of other
```

Page 15

```
1      Fannie Mae folks that participated, but I can't
2      remember what their names are off the top of my
3      head.
4           But we brought in some people from Fannie
5      Mae's customer service because rumor had it that
6      Fannie Mae was telling some consumers that it
7      was just an Experian problem, when in fact it
8      wasn't, and that we were reporting something
9      wrong.
10          And we wanted to clarify and correct that,
11     and Fannie Mae came back and stated that, you
12     know, no, we're not telling them that it's an
13     Experian only problem and we're not telling them
14     you're reporting data incorrectly.
15   Q  What about on the Experian side, who
16     participated in those meetings?
17   A  So myself, Scott Wight, Steve Hester, Pat
18     Finneran, Debbie Cox, Kathy Herman.  I think
19     that's it.
20   Q  How many of those meetings with technical people
21     was Finneran in?  Was she in all of them or was
22     she in some of them?
23   A  A good number of them, yeah.
24   Q  Is that your phone?
25   A  Yeah.
```

Page 16

1  Q  And the 30 discussions, 30 or so discussions, I

2     take it some of these were by phone?

3  A  Yeah.

4  Q  Were any of them in person?

5  A  Yeah.

6  Q  Okay.   Any idea how many in person of the 30?

7  A  Six to eight.

8  Q  Were they here or in D.C.?

9  A  D.C.

10 Q  Same group on the Fannie Mae side that you were

11    meeting with in person?

12 A  Would have been Stacey and Cindi and Randy,

13    primarily.

14 Q  Okay.   And the same with the phone calls, was it

15    mainly them?

16 A  Yeah.

17 Q  Seemed to me from the e-mails that you talked to

18    Price more than you talked to anybody; is that

19    fair?

20 A  Price is the liaison at Experian.

21 Q  Right.   He's your counterpart over there?

22 A  Right.

23 Q  The meetings with the technical people, what was

24    being discussed?   What was the general subject

25    of these meetings?   Can you give me some detail

Page 17

1      about what you remember about those meetings?

2   A  The discussion was around 8s and 9s and exactly

3      what that meant.  The conceptualization of

4      getting that data -- at the time this was going

5      on, Fannie Mae did not get any detailed

6      individual bureau data.  They got merged data

7      from merged pro hires, so MeridianLink,

8      CoreLogic, Informative Research, Equifax

9      Mortgage Services, so forth and so on.  So they

10     really didn't have access to the raw data.  They

11     had access to a translated file of combined TU,

12     Equifax and Experian data.

13  Q  Was that discussed as something that might be

14     contributing to the problems, the fact that

15     Fannie didn't get the individual files, they

16     only got the merged data?

17  A  I'd characterize that as you have to account for

18     the fact that they're not getting the raw data.

19  Q  Okay.

20  A  You can't say on File X, Y, Z -- you can see the

21     9 and you can see the comment code, right,

22     because we don't know what they're getting on

23     the merged file.

24  Q  And so were there any proposals about what to do

25     about that aspect of the problem?

Page 18

1   A   Involve the vendors, the tri-merge vendors.

2           THE REPORTER:   The what?

3           THE WITNESS:   Trimerge, T-R-I dash

4       M-E-R-G-E.

5   Q   Did that ever happen?

6   A   Yeah.   MeridianLink participated in at least one

7       of the calls, maybe two.

8   Q   Of these technical meetings?

9   A   Yeah.

10  Q   Okay.   Did representatives of Credco ever

11      participate?

12  A   No.

13  Q   Okay.   Did any other resellers participate

14      besides MeridianLink?

15  A   Not to my recollection, but they could have.   I

16      mean, Advantage or -- Advantage is MeridianLink,

17      so I think Advantage was on one call.

18      Informative Research might have joined the call.

19      I don't know.

20  Q   Okay.   Did you not involve the others because

21      you thought this was -- this problem was

22      particularly related to MeridianLink's system,

23      or why was MeridianLink involved in it?

24  A   So let me go backwards and -- I think I went

25      through this the last time we talked but I'll go

1        through it again.  So at some point, and I don't

2        know when, MeridianLink became a merged credit

3        provider that was approved for Fannie Mae's

4        system.

5    Q   Okay.

6    A   They were the last one added to my knowledge.

7        Those guys are very good.  They do a great job.

8        They programmed very -- they implemented Fannie

9        Mae's requirements explicitly.

10   Q   Okay.

11   A   And because of that, they carried through the

12       data as Fannie Mae's guidelines told them to,

13       okay.  They come out with a different

14       translation theoretically, at least, or alleged

15       than CoreLogic did.  The assumption was

16       CoreLogic was translating the 8 and a 9 to an

17       ungraded.

18   Q   In did you ever get to the bottom of why they

19       were doing that?  Were they doing that on

20       purpose because they wanted to avoid the

21       problem?

22   A   Not my client.  And it's really Fannie Mae's

23       responsibility to please their vendors.  It's

24       their specs.

25   Q   Right.

1    A    So we had a discussion with Fannie Mae -- so are

2         you concerned that this vendor programs

3         explicitly to your specifications and you know

4         others are coming up with a different result for

5         the same consumer -- you know, are you going to

6         audit them, and yes, they were going to audit

7         them but at some time in the future.  I'm like

8         okay.  Fine.

9    Q    Okay.  Did those technical meetings -- was there

10        disagreement in those meetings between Experian

11        or Fannie Mae, or what was kind of the tenor of

12        the meetings?  Were they cooperative?

13   A    For the most part, they were cooperative.

14   Q    Were they contentious at all?

15   A    No, I don't remember contention.  I think

16        there's -- Fannie Mae always accepted our

17        explanation for where they should look -- you

18        know, what the codes meant.  Never really pushed

19        back and said no, that's not right or we're not

20        viewing it that way.

21   Q    Then let me ask you this.  We know that, you

22        know, if you were having these meetings, I

23        assume around the time of these e-mails; right,

24        September 2011 -- we know that Fannie Mae didn't

25        change the way they read the data.  Do you know

1      why they didn't, after having these meetings and

2      having these things explained from Experian's

3      perspective, why didn't it change?

4   A  I have really no idea.  I can give you what I

5      think --

6   Q  Sure.

7   A  -- but I'm not the CEO of Fannie Mae.  I don't

8      make decisions for them.

9   Q  Right.

10  A  They're a bureaucratic government organization,

11     right.  There's a chain of command.  It could

12     very well be that they wanted to make the

13     decision they were making.  They just didn't

14     want to come outwardly and say hey, you had a

15     short sale.  It's the resolution of a

16     foreclosure.

17  Q  You explained to me before that the decision

18     they -- the way you said it is that Fannie Mae

19     couldn't tell whether it was a foreclosure that

20     resulted in a short sale or a foreclosure that

21     resulted in a full foreclosure or a deed in

22     lieu, that's what you told me the last time.

23  A  That was kind of the base problem.

24  Q  That was the base problem, right.  Did they ever

25     say to Experian anything along the lines of why

1          they wanted to read it the way they were reading

2          it?

3     A    No.

4     Q    Okay.   Did they ever say in any of those

5          meetings yes, we're going to start reading it

6          differently?

7     A    No.

8     Q    Was Experian trying to say to Fannie in these

9          meetings we want you to read it differently?

10    A    I don't know if it was ever stated that way.   We

11         might have shared with them that we would look

12         at these data elements to identify more

13         specifically, if it's, you know, meaningful to

14         you, but they're a lender.   We provide data to

15         lenders and lenders interpret however they want

16         to.

17    Q    I mean, at the end of the day, is it fair to say

18         that Fannie had just decided that it was going

19         to read the data this way for whatever risk

20         assessment reasons it had; right?   They wanted

21         to...

22    A    I can assume that.   I have no more insight into

23         Fannie Mae or Freddie Mac than anybody else

24         does.

25    Q    Except for -- except for your participation in

1        these meetings; right --

2    A   Right.

3    Q   -- in terms of what we discussed?

4    A   But why they do what they do, why they don't do

5        things that you might think that they should,

6        that's their prerogative.

7    Q   Did they ever -- was ever part of the

8        conversation anything about risk assessment and

9        Fannie's view about what it meant to have these

10       kinds of codes in a credit file?

11   A   Could you kind of redirect that?  I'm not...

12   Q   So Fannie Mae gets these credit files and these

13       loan applications and decides whether to approve

14       this loan or not?

15   A   Right.

16   Q   Whether they're going to buy it; okay?

17   A   Whether they're going to guarantee it for a

18       secondary market --

19   Q   Exactly.

20   A   -- participation.

21   Q   To do that, they are assessing the risk of

22       lending to this consumer; right?

23   A   Yes.

24   Q   That's -- that's their role?

25   A   Yes.

Page 24

```
 1   A   They do.

 2   Q   And Fannie's next?

 3   A   Yeah.

 4   Q   Any idea what those rates are?

 5   A   Not that I would want to quote.  They vary over

 6       time.

 7   Q   Are they consistently near the best?

 8   A   Yeah.  In the crisis, it was incredible.

 9   Q   What do you mean by that?

10   A   In the worst part of the crisis, I don't know,

11       they were double digits default rates.  Fannie

12       might have been 6 or 7 percent.  Freddie was

13       like 3, 3.5.

14   Q   Okay.  Do you remember points of disagreement

15       between Experian and Fannie in these meetings?

16   A   You know, it's interesting, in the sense that we

17       had discussions about what is the issue?  Let's

18       isolate the problem.  Let's make sure we both

19       understand what's available -- you know, it was

20       more of an information sharing, making sure that

21       they weren't missing something that we could

22       help them with, and we truly understood what

23       they were seeing on their side, because again,

24       it's a translated file that they use but --

25   Q   Were -- go ahead.
```

1    A    The only point of contention I could say is

2         there was some frustration on the Experian side,

3         in that we were willing to send our most expert

4         people out to spend the day with them -- let's

5         walk-through some files, and they never took us

6         up on the offer.

7    Q    Do you know why?

8    A    Not that I'm going to state.

9    Q    All right.  You'd be speculating?

10   A    Uberous, arrogance, whatever.

11   Q    Yeah?

12   A    Yeah.

13   Q    In other words, they -- you got the --

14   A    They do what they do better than anybody else

15        does.  It's just the identity of the

16        organization.  They are the big dog in the

17        mortgage industry.

18   Q    And they're good at it?

19             MR. WIERS:  Objection.

20   A    That's opinion, you know.

21   Q    In your opinion, are they good at it?

22   A    Freddie's better.

23   Q    Right.  But the two of them are better than

24        others?

25   A    Yes.  There's all kind of -- you know, even

Veritext Legal Solutions
866 299-5127

```
 1                    CERTIFICATE

                          OF

 2                      REPORTER

 3          The undersigned Certified Shorthand Reporter

 4   Deposition Officer does hereby certify:

 5

 6          That the forgoing Deposition was taken before me

 7   at the time and place therein set forth, at which time

 8   the Witness was duly sworn by me:

 9          That the testimony of the Witness and all

10   objections made at the time of the Deposition were

11   recorded stenographically by me and was thereafter

12   transcribed, said transcript being a true and correct

13   copy of the proceedings thereof.

14          In witness whereof, I have subscribed my name

15   this date: _____

16

17

18

19

20          _____

21                    Reporter

22

23

24

25

                                          Page 67
```

# EXHIBIT 64

# LODGED UNDER SEAL